# EXHIBIT G

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# Form 10-K

(Mark One)

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2019**

Or

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from                    to                    .

Commission file number: **000-26727**

# BioMarin Pharmaceutical Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | | **68-0397820** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | | (I.R.S. Employer Identification No.) |
| **770 Lindaro Street    San Rafael    California** | | **94901** |
| (Address of principal executive offices) | | (Zip Code) |

**(415) 506-6700**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $.001** | **BMRN** | **The Nasdaq Global Select Market** |

Securities registered under Section 12(g) of the Act:

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging Growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act.)   Yes ☐    No ☒

The aggregate market value of the voting and non-voting common stock held by non-affiliates of the registrant as of June 30, 2019 was $8.1 billion, based on the closing price reported for such date on the Nasdaq Global Select Market.

As of February 12, 2020, the registrant had 179,925,602 shares of common stock, par value $0.001, outstanding.

The documents incorporated by reference are as follows: portions of the Registrant's Proxy Statement for its 2020 annual meeting of stockholders are incorporated by reference into Part III.

1

**BIOMARIN PHARMACEUTICAL INC.**
**2019 FORM 10-K ANNUAL REPORT**
**TABLE OF CONTENTS**

**Part I**

| | | |
|---|---|---|
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 24 |
| Item 1B. | Unresolved Staff Comments | 49 |
| Item 2. | Properties | 50 |
| Item 3. | Legal Proceedings | 50 |
| Item 4. | Mine Safety Disclosures | 50 |

**Part II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 51 |
| Item 6. | Selected Consolidated Financial Data | 53 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 55 |
| Item 7A. | Quantitative and Qualitative Disclosure About Market Risk | 73 |
| Item 8. | Financial Statements and Supplementary Data | 74 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 74 |
| Item 9A. | Controls and Procedures | 74 |
| Item 9B. | Other Information | 75 |

**Part III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 76 |
| Item 11. | Executive Compensation | 76 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 76 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 76 |
| Item 14. | Principal Accounting Fees and Services | 76 |

**Part IV**

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 77 |
| Item 16. | Form 10-K Summary | 81 |
| | **SIGNATURES** | 82 |

Unless the context suggests otherwise, references in this Annual Report on Form 10-K to "BioMarin," the "Company," "we," "us," and "our" refer to BioMarin Pharmaceutical Inc. and, where appropriate, its wholly owned subsidiaries.

BioMarin®, Brineura®, Firdapse®, Kuvan®, Naglazyme®, Palynziq® and Vimizim® are our registered trademarks. Aldurazyme® is a registered trademark of BioMarin/Genzyme LLC. All other brand names and service marks, trademarks and other trade names appearing in this report are the property of their respective owners.

## Forward-Looking Statements

This Annual Report on Form 10-K contains "forward-looking statements" as defined under securities laws. Many of these statements can be identified by the use of terminology such as "believes," "expects," "intends," "anticipates," "plans," "may," "will," "could," "would," "projects," "continues," "estimates," "potential," "opportunity" or the negative versions of these terms and other similar expressions. You should not place undue reliance on these types of forward-looking statements, which speak only as of the date that they were made. These forward-looking statements are based on the beliefs and assumptions of our management based on information currently available to management and should be considered in connection with any written or oral forward-looking statements that we may issue in the future as well as other cautionary statements we have made and may make. Our actual results or experience could differ significantly from the forward-looking statements. Factors that could cause or contribute to these differences include those discussed in the section titled "Risk Factors" in Part II, Item 1A of this Annual Report on Form 10-K as well as information provided elsewhere in this Annual Report on Form 10-K. You should carefully consider that information before you make an investment decision. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties and assumptions, the forward-looking events and circumstances discussed in this Annual Report on Form 10-K may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

Except as required by law, we do not undertake any obligation to release publicly any revisions to these forward-looking statements after completion of the filing of this Annual Report on Form 10-K to reflect later events or circumstances or the occurrence of unanticipated events.

3

**Part I**

**Item 1. Business**

**Overview**

BioMarin Pharmaceutical Inc. (BioMarin, we, us or our) is a global biotechnology company that develops and commercializes innovative therapies for people with serious and life-threatening rare diseases and medical conditions. We select product candidates for diseases and conditions that represent a significant unmet medical need, have well-understood biology and provide an opportunity to be first-to-market or offer a significant benefit over existing products.

Our portfolio consists of several commercial products and multiple clinical and preclinical product candidates for the treatment of various diseases. We continue to invest in our clinical and preclinical product pipeline by committing significant resources to research and development programs and business development opportunities within our areas of scientific, manufacturing and technical expertise.

A summary of our major commercial products is provided below:

| Major Commercial Products | Indication | United States Orphan Drug Exclusivity Expiration [1] | United States Biologic Exclusivity Expiration [2] | European Union Orphan Drug Exclusivity Expiration [1] |
|---|---|---|---|---|
| Aldurazyme (laronidase) | MPS I [3] | Expired | Expired | Expired |
| Brineura (cerliponase alfa) | CLN2 [4] | 2024 | 2029 | 2027 |
| Kuvan (sapropterin dihydrochloride) | PKU [5] | Expired | Not Applicable | 2020 [6] |
| Naglazyme (galsulfase) | MPS VI [7] | Expired | Expired | Expired |
| Palynziq (pegvaliase-pqpz) | PKU [8] | 2025 | 2030 | 2029 |
| Vimizim (elosulfase alpha) | MPS IVA [9] | 2021 | 2026 | 2024 |

(1) See "Government Regulation—Orphan Drug Designation" in this Annual Report on Form 10-K for further discussion

(2) See "Government Regulation—Healthcare Reform" in this Annual Report on Form 10-K for further discussion

(3) For the treatment of Mucopolysaccharidosis I (MPS I)

(4) For the treatment of late infantile neuronal ceroid lipofuscinosis type 2 (CLN2)

(5) For the treatment of phenylketonuria (PKU)

(6) Kuvan, a small molecule therapy, has been granted orphan drug status in the European Union (EU), which together with pediatric exclusivity, confers 12 years of market exclusivity in the EU that expires in December 2020

(7) For the treatment of Mucopolysaccharidosis VI (MPS VI)

(8) For adult patients with PKU

(9) For the treatment of Mucopolysaccharidosis IV Type A (MPS IVA)

A summary of our ongoing major development programs, including key metrics, is provided below:

| Major Product Candidates in Development | Target Indication | U.S. Orphan Designation | EU Orphan Designation | Stage |
|---|---|---|---|---|
| Valoctocogene roxaparvovec | Severe Hemophilia A | Yes | Yes | Clinical Phase 3 |
| Vosoritide | Achondroplasia | Yes | Yes | Clinical Phase 3 |
| BMN 307 | PKU | Yes | Yes | Clinical Phase 1/2 [1] |

(1) We expect to start dosing patients in a Phase 1/2 study in the first quarter of 2020. See "Major Product Candidates—BMN 307" in this Annual Report on Form 10-K for further discussion.

See "Patents and Proprietary Rights" in this Annual Report on Form 10-K for additional information on our market protection.

4

Table of Contents

**Recent Developments**

*Regulatory Review of Valoctocogene Roxaparvovec for the Treatment of Severe Hemophilia A*

On February 20, 2020, we announced that the U.S. Food and Drug Administration (FDA) accepted for priority review our Biologics License Application (BLA) for valoctocogene roxaparvovec for the treatment of adults with severe hemophilia A. The Prescription Drug User Fee Act (PDUFA) target action date for the BLA has been set for August 21, 2020. On December 23, 2019, we announced that the European Medicines Agency (EMA) validated our Marketing Authorisation Application (MAA) for valoctocogene roxaparvovec, which has been in review under accelerated assessment since January 2020. The submissions are based on our Phase 3 interim analysis and the three-year Phase 1/2 data of patients treated with valoctocogene roxaparvovec. Both submissions represent the first time a gene therapy product for any type of hemophilia indication is under review for marketing authorization by health authorities. See "Major Product Candidates in Development — Valoctocogene Roxaparvovec" in this Annual Report on Form 10-K for more information regarding valoctocogene roxaparvovec.

*Gene Therapy Product Candidate BMN 307 for the Treatment of PKU*

BMN 307 is a gene therapy product candidate that is designed to normalize blood phenylalanine (Phe) concentration levels in patients with PKU. On January 13, 2020, we announced that both the FDA and Medicines and Healthcare Products Regulatory Agency (MHRA) in the United Kingdom (U.K.) granted Investigational New Drug (IND) status and approved our Clinical Trial Application (CTA), respectively, for BMN 307. We expect to start dosing patients in PHEARLESS, a Phase 1/2 study of BMN 307, in the first quarter of 2020 using product made at commercial scale from our gene therapy manufacturing facility.

*Product Candidate Vosoritide for the Treatment of Achondroplasia*

On November 14, 2019, we provided an update on our development of vosoritide for the treatment of children with achondroplasia, the most common form of disproportionate short stature in humans. We announced that children in a cohort of our open-label Phase 2 study of vosoritide over 54 months achieved a statistically significant cumulative additional mean height gain of 9.0 cm compared to children, matched for age and gender, in a natural history achondroplasia dataset. On December 16, 2019, we announced positive results from our completed global Phase 3 randomized, double-blind, placebo-controlled study of vosoritide in approximately 121 children with achondroplasia ages 5-14 for 52 weeks. The placebo-adjusted increased change from baseline in growth velocity after one year of treatment with vosoritide, the primary endpoint, was 1.6 cm/yr. Based on these results, we plan to meet with health authorities in the first half of 2020 to discuss plans for submitting marketing applications in 2020. See "Major Product Candidates in Development — Vosoritide" in this Annual Report on Form 10-K for more information regarding vosoritide.

*Gene Therapy Product Candidate BMN 331 for the Treatment of Hereditary Angioedema*

On November 14, 2019, we announced our third gene therapy product candidate, BMN 331, for hereditary angioedema. We expect to begin IND-enabling studies for BMN 331 in early to mid-2020.

**Summary of Commercial Products and Development Programs**

*Major Commercial Products*

Net Product Revenues related to our major commercial products consisted of the following (in millions):

| Major Commercial Products | Years Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Aldurazyme | $97.8 | $135.1 | $90.0 |
| Brineura | $72.0 | $39.9 | $8.6 |
| Kuvan | $463.4 | $433.6 | $407.5 |
| Naglazyme | $374.3 | $345.9 | $332.2 |
| Palynziq | $86.9 | $12.2 | — |
| Vimizim | $544.3 | $482.0 | $413.3 |

5

*Aldurazyme*

Aldurazyme is a highly purified protein that is designed to be identical to a naturally occurring form of the human enzyme alpha-L-iduronidase, a lysosomal enzyme normally required for the breakdown of glycosaminoglycans (GAGs). Aldurazyme is approved for marketing in the U.S., the EU and other international markets for patients with MPS I. MPS I is a progressive and debilitating life-threatening genetic disease, for which no other drug treatment currently exists, that is caused by the deficiency of alpha-L-iduronidase. Patients with MPS I typically become progressively worse and experience multiple severe and debilitating symptoms resulting from the build-up of carbohydrate residues in all tissues in the body. These symptoms include: inhibited growth, delayed and regressed mental development (in the severe form of the disease), enlarged liver and spleen, joint deformities and reduced range of motion, impaired cardiovascular function, upper airway obstruction, reduced pulmonary function, frequent ear and lung infections, impaired hearing and vision, sleep apnea, malaise and reduced endurance.

We developed Aldurazyme through collaboration with Genzyme Corporation (Genzyme), now a wholly owned subsidiary of Sanofi. Under our collaboration agreement with Genzyme, we are responsible for manufacturing Aldurazyme and supplying it to Genzyme. We receive payments ranging from 39.5% to 50% on worldwide net Aldurazyme sales by Genzyme depending on sales volume. Genzyme and we are members of BioMarin/Genzyme LLC, a 50/50 limited liability company (the BioMarin/Genzyme LLC) that: (1) holds the intellectual property relating to Aldurazyme and other collaboration products and licenses all such intellectual property on a royalty-free basis to us and Genzyme to allow us to exercise our rights and perform our obligations under the agreements related to the BioMarin/Genzyme LLC, and (2) engages in research and development activities that are mutually selected and funded by Genzyme and us.

*Brineura*

Brineura is a recombinant human tripeptidyl peptidase 1 (TPP1) and is approved for the treatment of patients with CLN2, a form of Batten disease, in the U.S., the EU and other international markets. CLN2 is an incurable, rapidly progressive disease that ends in patient death by 10-12 years of age. Patients are initially healthy but begin to decline at approximately the age of three. We estimate that up to 1,200 to 1,600 cases exist worldwide. On April 27, 2017, Brineura was approved in the U.S. to slow the progression of loss of ambulation in symptomatic pediatric patients three years of age and older with CLN2. Brineura is the first treatment approved to slow the progression of loss of ambulation in children with CLN2 disease.

On June 1, 2017, we announced that the EC granted marketing authorization for Brineura in the EU to treat children with CLN2. Brineura is the first treatment approved in the EU for the treatment of CLN2, and the marketing authorization for Brineura includes all 28 countries of the EU, Norway, Iceland and Liechtenstein. On April 21, 2017, the CHMP, the scientific committee of the EMA adopted a positive opinion for our MAA for Brineura following an accelerated review procedure, reserved for medicinal products expected to be a major public health interest. Brineura was one of the first therapies to go through this process.

Brineura is administered via intracerebroventricular (ICV) infusion and intended to be used in combination with a delivery device, such as an injector or other delivery system. Please see "Government Regulation – Combination Products" in this Annual Report on Form 10-K for additional information on combination products.

*Kuvan*

Kuvan is a proprietary synthetic oral form of 6R-BH4, a naturally occurring enzyme co-factor for phenylalanine hydroxylase (PAH), indicated for patients with PKU. Kuvan is the first drug for the treatment of PKU, which is an inherited metabolic disease that affects at least 50,000 diagnosed patients under the age of 40 in the developed world. We believe that approximately 30% to 50% of those with PKU could benefit from treatment with Kuvan. PKU is caused by a deficiency of activity of an enzyme, PAH, which is required for the metabolism of Phe. Phe is an essential amino acid found in all protein-containing foods. Without sufficient quantity or activity of PAH, Phe accumulates to abnormally high levels in the blood, resulting in a variety of serious neurological complications, including severe mental retardation and brain damage, mental illness, seizures and other cognitive problems. As a result of newborn screening efforts implemented in the 1960s and early 1970s, virtually all PKU patients under the age of 40 in developed countries have been diagnosed at birth. Currently, PKU can be managed by a Phe-restricted diet, which is supplemented by nutritional replacement products, like formulas and specially manufactured foods; however, it is difficult for most patients to adhere to the strict diet to the extent needed for achieving adequate control of blood Phe levels.

Kuvan tablets were granted marketing approval for the treatment of PKU in the U.S. in December 2007 and in the EU in December 2008. In December 2013, the FDA approved the use of Kuvan powder for oral solution that is provided in a dose sachet packet allowing faster dissolution of powder in solution compared to the current tablet form. We commenced the commercial launch of this new form of Kuvan in February 2014. We market Kuvan in the U.S., the EU and other international markets (excluding Japan). In certain international markets, Kuvan is also approved for, or is only approved for, the treatment of primary BH4 deficiency, a different disorder than PKU.

6

Two companies previously filed paragraph IV certifications and submitted abbreviated new drug applications (ANDAs) to produce sapropterin dihydrochloride tablets and powder and we subsequently entered into settlement agreements regarding Kuvan with both companies. We expect generic versions of Kuvan to first become available in the U.S. in the fourth quarter of 2020. Please see "Risk Factors" included in Part I, Item 1A of this Annual Report on Form 10-K for more information regarding the settlement agreements and for a discussion of the risks posed by generic versions of Kuvan. Please see "Government Regulation – The Hatch-Waxman Act" in this Annual Report on Form 10-K for additional information regarding ANDAs.

*Naglazyme*

Naglazyme is a recombinant form of N-acetylgalactosamine 4-sulfatase (arylsulfatase B) indicated for patients with MPS VI. MPS VI is a debilitating life-threatening genetic disease for which no other drug treatment currently exists and is caused by the deficiency of arylsulfatase B, an enzyme normally required for the breakdown of certain complex carbohydrates known as GAGs. Patients with MPS VI typically become progressively worse and experience multiple severe and debilitating symptoms resulting from the build-up of carbohydrate residues in tissues in the body. These symptoms include: inhibited growth, spinal cord compression, enlarged liver and spleen, joint deformities and reduced range of motion, skeletal deformities, impaired cardiovascular function, upper airway obstruction, reduced pulmonary function, frequent ear and lung infections, impaired hearing and vision, sleep apnea, malaise and reduced endurance.

Naglazyme is approved for marketing in the U.S., the EU and other international markets.

*Palynziq*

Palynziq is a PEGylated recombinant phenylalanine ammonia lyase enzyme, which is delivered through subcutaneous injection to reduce blood Phe concentrations. On May 24, 2018, the FDA approved the use of Palynziq in adult patients with PKU who have uncontrolled blood Phe concentrations greater than 600 micromol/L (10mg/dL) on existing management. Palynziq is our second approved treatment for PKU. Palynziq is only available in the U.S. through the Palynziq Risk Evaluation and Mitigation Strategy (REMS) program, which is required by the FDA to mitigate the risk of anaphylaxis while using the product. Notable requirements of our REMS program include the following:

- prescribers must be certified by enrolling in the REMS program and completing training;

- prescribers must prescribe auto-injectable epinephrine with Palynziq;

- pharmacies must be certified with the REMS program and must dispense Palynziq only to patients who are authorized to receive it;

- patients must enroll in the REMS program and be educated about the risk of anaphylaxis by a certified prescriber to ensure they understand the risks and benefits of treatment with Palynziq; and

- patients must have auto-injectable epinephrine available at all times while taking Palynziq.

Please see "Risk Factors" included in Part I, Item 1A of this Annual Report on Form 10-K for a discussion of the risks posed by the REMS program.

On May 6, 2019, we announced that the European Commission (EC) granted marketing authorization for Palynziq in the EU, at doses of up to 60 mg once daily, to reduce Phe concentrations in patients with PKU aged 16 and older who have inadequate blood Phe control (blood Phe levels greater than 600 micromol/L) despite prior management with available treatment options.

*Vimizim*

Vimizim is an enzyme replacement therapy for the treatment of MPS IVA, a lysosomal storage disorder. MPS IVA is a disease characterized by deficient activity of N-acetylgalactosamine-6-sulfatase (GALNS) causing excessive lysosomal storage of glycosaminoglycans such as keratan sulfate and chondroitin sulfate. This excessive storage causes a systemic skeletal dysplasia, short stature, and joint abnormalities, which limit mobility and endurance. Malformation of the chest impairs respiratory function, and looseness of joints in the neck cause spinal instability and potentially spinal cord compression. Other symptoms may include hearing loss, corneal clouding, and heart disease. Initial symptoms often become evident in the first five years of life. The disease substantially limits both the quality and length of life of those affected. We have identified over 2,000 patients worldwide suffering from MPS IVA and estimate that the total number of patients suffering from MPS IV A worldwide could be as many as 3,000.

Vimizim is approved for marketing in the U.S., the EU and other international markets.

***Major Product Candidates in Development***

*Valoctocogene Roxaparvovec*

Valoctocogene roxaparvovec is an adeno associated virus (AAV5) vector drug development candidate designed to restore factor VIII plasma concentrations in patients with severe hemophilia A. Hemophilia A, also called factor VIII deficiency or classic hemophilia, is a genetic disorder caused by missing or defective factor VIII, a clotting protein. According to the World Federation of Hemophilia rankings of severity of hemophilia A, the normal range of factor VIII activity levels is between 50% and 150%, expressed as a percentage of normal factor activity in blood, the mild hemophilia A range of factor VIII activity levels is between 5% and 40%, the moderate hemophilia A range of factor VIII activity levels is between 1% and 5%, and the severe hemophilia range of factor VIII activity levels is less than 1%. People living with hemophilia A are not able to form blood clots efficiently and are at risk for excessive bleeding from modest injuries, potentially endangering their lives. People with severe hemophilia often bleed spontaneously into their muscles or joints.

On February 20, 2020, we announced that the FDA accepted for priority review our BLA for valoctocogene roxaparvovec for the treatment of adults with severe hemophilia A. The PDUFA target action date for the BLA has been set for August 21, 2020. On December 23, 2019, we announced that the EMA validated our MAA for valoctocogene roxaparvovec, which has been in review under accelerated assessment since January 2020. The submissions are based on our Phase 3 interim analysis and the three-year Phase 1/2 data of patients treated with valoctocogene roxaparvovec, described below. Both submissions represent the first time a gene therapy product for any type of hemophilia indication is under review for marketing authorization by health authorities.

On May 28, 2019, we announced a three-year update to our previously reported results from the Phase 1/2 dose-escalation study for valoctocogene roxaparvovec in patients with severe hemophilia A, which demonstrated that bleed rate control with the 6e13 vg/kg dose was maintained for a third year with a median Annualized Bleed Rate (ABR) of 0 and mean ABR of 0.7 in that year. In addition, factor VIII levels in the 6e13 vg/kg dose appeared to be approaching a plateau in year three. Factor VIII levels measured with the chromogenic substrate (CS) assay at the end of year three were mean and median of 32.7 international units per deciliter (IU/dL) and 19.9 IU/dl, respectively, compared with mean and median of 36.4 IU/dL and 26.2 IU/dL, respectively, at the end of year two. In January 2020, the New England Journal of Medicine (NEJM) published results from the three-year update from the Phase 1/2 study.

The global Phase 3 study program with valoctocogene roxaparvovec includes two studies, one with the 6e13 vg/kg dose (GENEr8-1) and one with the 4e13 vg/kg dose (GENEr8-2). In July 2019, we announced the discontinuation of the GENEr8-2 study given the overwhelming preference by patients to be treated with the 6e13 vg/kg dose. The GENEr8-1 study is an open-label single-arm study to evaluate the efficacy and safety of valoctocogene roxaparvovec as well as evaluate superiority of the product candidate compared to standard of care. The primary endpoint is based on the factor VIII activity level achieved following treatment with valoctocogene roxaparvovec, and the secondary endpoint measures annualized factor VIII replacement therapy use rate and ABR. We announced on May 28, 2019 that data from a 20-patient cohort of the Phase 3 GENEr8-1 study achieved pre-specified clinical criteria for regulatory review in the U.S. and Europe. As of May 28, 2019, eight patients in the cohort achieved factor VIII levels of 40 or more IU/dL using the CS assay at 23 to 26 weeks, meeting the pre-specified criteria for factor VIII activity levels. As of the April 30, 2019 data cutoff, between weeks 23 to 26, seven of 16 study participants in the cohort reached or exceeded the pre-specified factor VIII levels of 40 IU/dL using the CS assay. Subsequent to the April 30, 2019 cutoff, one additional participant met that criteria, bringing the total to eight participants. For the 16 patients who had reached week 26 since administration of valoctocogene roxaparvovec by the April 30, 2019 cutoff, the estimated median ABR was zero and the estimated mean ABR was 1.5, representing a reduction of 85% from baseline levels where all patients were on standard of care. In addition, there was a 98% reduction in median annualized factor VIII usage and a 94% reduction in mean factor VIII usage annualized between weeks 5 and 26. Between weeks 23 and 26, the mean factor VIII level using the CS assay was 36 IU/dL and the median was 33 IU/dl. We have dosed 134 study participants in the full GENEr8-1 study and the 52-week results are anticipated in the first quarter of 2021.

In addition to the global Phase 3 GENEr8-1 study, we are also conducting a Phase 1/2 study with the 6E13kg/vg dose of valoctocogene roxaparvovec in approximately 10 participants with pre-existing AAV5 antibodies. In May 2018, we announced that we dosed the first patient in the Phase 1/2 study (BMN 270-203) evaluating our investigational gene therapy, valoctocogene roxaparvovec, in severe hemophilia A patients with pre-existing AAV5 antibodies. An additional and separate study to evaluate seroprevalence in people with severe hemophilia A is ongoing around the world.

Overall, valoctocogene roxaparvovec continues to have a favorable safety profile and has been generally well tolerated by participants across all doses in the Phase 1/2 and Phase 3 studies. No participants have developed inhibitors to factor VIII or withdrawn from a study, and all participants have remained off factor VIII prophylaxis. Corticosteroid use has been transient with no long-lasting clinical results, and no participants have developed thrombotic events. The most common adverse events associated with valoctocogene roxaparvovec across studies include transient infusion associated reactions and transient, asymptomatic, and mild to moderate raised levels of certain proteins and enzymes measured in liver function tests.

Valoctocogene roxaparvovec has Orphan Drug designation from the FDA and the EMA. Valoctocogene roxaparvovec has also been accepted for Priority Medicines (PRIME) scheme from the EMA. Additionally, the FDA has granted valoctocogene roxaparvovec Breakthrough Therapy designation.

8

*Vosoritide*

Vosoritide is an investigational, once daily injection analog of C-type Natriuretic Peptide (CNP) in development for the treatment of achondroplasia, the most common form of disproportionate short stature in humans. Vosoritide has been and is being tested only in children in the age range when their growth plates are still open, which is approximately 25% of people with achondroplasia. In June 2019, the NEJM published results from our Phase 2 open-label, dose-finding and extension study for vosoritide in children aged 5 to 14 years with achondroplasia receiving a continuous dose of 15 µg/kg/day. Annualized growth velocity increased from baseline in all cohorts during each 12-month interval by 1.10 to 2.34 cm/year through 42 months. In cohort 3, which received 15 µg/kg continuous dosing from baseline, the mean annualized growth velocity derived between 30 and 42 months was 5.51 cm/year, representing a 1.46 cm/year change from baseline. On November 14, 2019, we announced that children in cohort 3 over 54 months achieved a statistically significant cumulative additional mean height gain of 9.0 cm compared to children, matched for age and gender, in a natural history achondroplasia dataset. In the global Phase 2 study of children with achondroplasia ages 0-5, enrollment of the first cohort of 24-60 months is complete and the second and third cohorts (six- to 24 months and 0- to six-months, respectively) are actively enrolling.

On December 16, 2019, we announced positive results from our completed global Phase 3 randomized, double-blind, placebo-controlled study of vosoritide in approximately 121 children with achondroplasia ages 5-14 for 52 weeks. The placebo-adjusted increased change from baseline in growth velocity after one year of treatment with vosoritide, the primary endpoint, was 1.6 cm/yr. Based on these results, we plan to meet with health authorities in the first half of 2020 to discuss plans for submitting marketing applications in 2020.

Overall, vosoritide continues to have a favorable safety profile and has been generally well tolerated by participants across the Phase 2 and Phase 3 studies with no clinically significant blood pressure changes and a mild side effect profile.

Vosoritide has Orphan Drug designation from the FDA and the EMA.

Additionally, on November 14, 2019, we announced that vosoritide will be studied in broader genetic statural abnormalities, starting with dominantly inherited short stature (DISS), as part of a research collaboration with Children's National Hospital. We expect the trial with vosoritide for DISS to begin mid-2020.

*BMN 307*

BMN 307 is an AAV5 mediated gene therapy that is designed to normalize blood Phe concentration levels in patients with PKU. We tested a broad range of vector constructs and combinations to optimize the vector and increase potency, resulting in a 10-fold increase in potency for the selected vector. Treatment of mice in a validated PKU mouse model with BMN 307 showed a lifetime normalization of Phe and normalized neurotransmitter levels. On January 13, 2020, we announced that both the FDA and MHRA in the U.K. granted IND status and approved its CTA, respectively, for BMN 307. We expect to start dosing patients in PHEARLESS, a Phase 1/2 study of BMN 307, in the first quarter of 2020 using product made at commercial scale from our gene therapy manufacturing facility.

BMN 307 has Orphan Drug designation from the FDA and the EMA.

**Manufacturing**

We manufacture the active pharmaceutical ingredients (API) for Aldurazyme, Naglazyme, Palynziq, Vimizim and vosoritide in our production facilities located in Novato, California. We currently also manufacture the API for Brineura and Vimizim in our manufacturing facility in Shanbally, Cork, Ireland. These facilities have demonstrated compliance with current Good Manufacturing Practices (cGMPs) to the satisfaction of the FDA, the EC and health agencies in other countries for the commercial production of these products. Vialing and most packaging are performed by contract manufacturers. We believe that with our Novato, California facility and our Shanbally facility, we have ample manufacturing capacity to support anticipated commercial demand for Aldurazyme, Brineura, Naglazyme, Palynziq and Vimizim for at least the next five years.

Kuvan tablets and powder sachets and Palynziq are currently manufactured on a contract basis by third parties. In general, we expect to continue to contract with outside service providers for certain manufacturing services, including drug substance, API, final product vialing, tableting and sachet production and packaging operations for our products. All of our facilities and those of any third-party manufacturers will be subject to periodic inspections confirming compliance with applicable law and must pass inspection before we can manufacture our drugs for commercial sales. Third-party manufacturers' facilities are subject to periodic inspections to confirm compliance with applicable law and must be cGMP certified. We believe that our current agreements with third-party manufacturers and suppliers provide for ample operating capacity to support the anticipated clinical and commercial demand for these products. In certain instances, there is only one approved contract manufacturer for certain aspects of the manufacturing process. In such cases, we attempt to prevent disruption of supplies through supply agreements, maintaining safety stock and other appropriate strategies.

In July 2017, we commissioned our commercial-scale gene therapy manufacturing facility, located in Novato, California, where we conduct cGMP production of valoctocogene roxaparvovec and BMN 307 to support clinical development activities and anticipated commercial demand. This facility has the potential to manufacture 10,000 gene therapy doses annually, depending on dose and production mix of valoctocogene roxaparvovec and BMN 307. The facility's production process was developed in accordance with International Conference on Harmonisation Technical Requirements for Registration of Pharmaceuticals for Human Use facilitating worldwide registration with health authorities.

**Raw Materials**

Raw materials and supplies required for the production of our products and product candidates are available in some instances from one supplier and in other instances from multiple suppliers. In those cases where raw materials are only available through one supplier, such supplier may be either a sole source (the only recognized supply source available to us) or a single source (the only approved supply source for us among other sources). We have adopted policies to attempt, to the extent feasible, to minimize our raw material supply risks, including maintenance of greater levels of raw materials inventory and implementation of multiple raw materials sourcing strategies, especially for critical raw materials. Although to date we have not experienced any significant delays in obtaining any raw materials from our suppliers, we cannot provide assurance that we will not face shortages from one or more of them in the future.

**Sales and Marketing**

We have established a commercial organization, including a sales force, to support our product lines directly in the U.S., Europe, South America and certain other significant markets. For other selected markets, we have signed agreements with other companies to act as distributors of Brineura, Kuvan, Naglazyme and Vimizim. Most of these agreements generally grant the distributor the right to market the product in the territory and the obligation to secure all necessary regulatory approvals for commercial or named patient sales. Additional markets are being assessed at this time and additional agreements may be signed in the future.

Genzyme has the exclusive right to distribute, market and sell Aldurazyme globally and is required to purchase its requirements exclusively from us.

In the U.S., our products (other than Aldurazyme) are marketed through our commercial teams, including sales representatives and supporting staff members, who promote our products, directly to physicians in specialties appropriate for each product. Outside of the U.S., our sales representatives and supporting staff members market our products (other than Aldurazyme). We believe that with moderate changes in 2020, the size of our sales force will be appropriate to effectively reach our target customers in markets where our products are directly marketed. The launch of any future products, if approved, will likely require expansion of our commercial organization, including our sales force, in the U.S. and abroad.

We utilize third-party logistics companies to store and distribute our products. Moreover, we use third-party vendors, such as advertising agencies, market research firms and suppliers of marketing and other sales support-related services, to assist with our commercial activities.

**Customers**

Our Brineura, Kuvan, Naglazyme, and Vimizim customers include a limited number of specialty pharmacies and end-users, such as hospitals and foreign government agencies. We also sell Brineura, Kuvan, Naglazyme and Vimizim to our authorized distributors and to certain larger pharmaceutical wholesalers globally, which act as intermediaries between us and end-users and generally do not stock significant quantities of our products. However, in certain countries, such as those in Latin America, governments place large periodic orders for Naglazyme and Vimizim. The timing of these orders can be inconsistent and can create significant quarter to quarter variation in our revenue. Palynziq is currently distributed in the U.S. pursuant to the REMS program through a limited number of certified specialty pharmacies. During 2019, 43% of our net product revenues, excluding Aldurazyme, was generated by three customers. Genzyme is our sole customer for Aldurazyme and is responsible for marketing and selling Aldurazyme to third parties.

**Competition**

10

The biopharmaceutical industry is rapidly evolving and highly competitive. Within the industry, there are many public and private companies, including pharmaceutical companies and biotechnology companies that have or may soon initiate programs for the same indications that our products and product candidates are intended to treat. Furthermore, universities and non-profit research organizations may have research programs, both early-stage and clinical, in the same disease areas. Our competitors may have advantages over us due to greater financial or scientific resources, lower labor and other costs, or due to higher headcount and more robust organizational structures. Our competitors have considerable experience in drug manufacturing, preclinical and clinical research, regulatory affairs, marketing, sales, and distribution. They pursue broad patent portfolios and other intellectual property to protect the products they are developing. Their products may outcompete ours due to one or more factors, including faster progress through preclinical and clinical development, lower manufacturing costs, superior safety and efficacy, lower pricing, stronger patent protection, and better marketing, sales, and distribution capabilities. In this event, our products and product candidates, if approved, could fail to gain significant market share, and as a result, our business, financial condition and results of operations could be adversely affected.

Our products and product candidates have no direct approved competition currently on the market in the U.S. or the EU, however, other companies are in the development phase with new and generic products. Our products and product candidates have potential competition from products under development either using similar technology to our programs or different treatment strategies. The following is a summary of some of the primary possible future competitors for our products and product candidates, but the information below may not include all potential competition.

**Products**

*Aldurazyme, Naglazyme, and Vimizim*

In the mucopolysaccharidosis field, several companies are researching treatments using small molecules, gene therapy, and other novel technologies. Aldurazyme, for the treatment of MPS I, has potential competition from clinical stage product candidates from ArmaGen, Inc., JCR Pharmaceuticals Co., Ltd., Orchard Therapeutics Plc, RegenxBio Inc., and earlier stage product candidates, including a product candidate from Immusoft Corporation. Naglazyme, for the treatment of MPS VI, has potential competition from a clinical stage product candidate from Inventiva S.A. and other potential candidates in earlier stages. Vimizim, for the treatment of MPS IVA, has potential competition from a preclinical stage product candidate from Esteve Pharmaceuticals, S.A. and other potential candidates in earlier stages.

*Brineura*

Brineura, for the treatment of CLN2, has potential competition from preclinical product candidates from RegenxBio Inc. and Spark Therapeutics, Inc.

*Kuvan and Palynziq*

There are currently no other approved drugs on the market in the U.S. or the EU for the treatment of PKU. However, two companies previously filed paragraph IV certifications and submitted ANDAs to produce sapropterin dihydrochloride tablets and powder. We entered into settlement agreements regarding Kuvan with both companies, which will allow these companies to market generic versions of sapropterin dihydrochloride. We expect generic versions of Kuvan to first become available in the U.S. in the fourth quarter of 2020. Please see "Risk Factors" included in Part I, Item 1A of this Annual Report on Form 10-K for more information regarding the settlement agreements and for a discussion of the risks posed by generic versions of Kuvan in the U.S. and abroad. Please see "Government Regulation – The Hatch-Waxman Act" in this Annual Report on Form 10-K for additional information regarding ANDAs. Kuvan and Palynziq also have potential competition from clinical stage product candidates from Censa Pharmaceuticals, Inc., Homology Medicines, Inc., Nestle Health Science, S.A., Rubius Therapeutics, Inc., Synlogic, Inc. and earlier stage product candidates, including product candidates from Generation Bio Co., LogicBio Therapeutics, Inc., Moderna Therapeutics, Inc. and Sangamo Therapeutics, Inc. BMN 307 is our preclinical gene therapy program for PKU, and other companies are also developing gene therapy product candidates for PKU, as described in "Competition—Product Candidates—BMN 307" in this Annual Report on Form 10-K.

**Product Candidates**

*Valoctocogene roxaparvovec*

Valoctocogene roxaparvovec, a gene therapy product candidate for severe hemophilia A, could have competition from marketed recombinant factor VIII replacement therapies, a novel bispecific antibody marketed by Roche Holding Ltd, and clinical stage programs, including gene therapy product candidates under development by Bayer AG, Pfizer, Inc., Roche Holding Ltd, Sangamo Therapeutics, Inc., Takeda Pharmaceutical Company Ltd. and preclinical product candidates from other companies, including Freeline Therapeutics Ltd. and Uniqure N.V. In addition, Novo Nordisk A/S, Pfizer, Inc. and Sanofi S.A. are developing

11

novel non-factor replacement product candidates in the clinic for the treatment of hemophilia A.

*Vosoritide*

Vosoritide, for the treatment of achondroplasia, could have competition from clinical stage products under development by Ascendis Pharma A/S and Pfizer, Inc., and preclinical product candidates from other companies, including QED Therapeutics, Inc.

*BMN 307*

BMN 307, a gene therapy product candidate for the treatment of PKU, has potential competition from clinical stage product candidates from Censa Pharmaceuticals, Inc., Homology Medicines, Inc., Nestle Health Science, S.A., Rubius Therapeutics, Inc., Synlogic, Inc. and earlier stage product candidates, including product candidates from Generation Bio Co., LogicBio Therapeutics, Inc., Moderna Therapeutics, Inc. and Sangamo Therapeutics, Inc.

**Patents and Proprietary Rights**

Our success depends on an intellectual property portfolio that supports our future revenue streams and also erects barriers to our competitors. We are maintaining and building our patent portfolio through: filing new patent applications; prosecuting existing applications; and licensing and acquiring new patents and patent applications. Furthermore we seek to protect our ownership of know-how, trade secrets and trademarks through an active program of legal mechanisms including registrations, assignments, confidentiality agreements, material transfer agreements, research collaborations and licenses.

As of January 23, 2020, the number of our worldwide issued patents now stands at 1,680, including 134 patents issued by the U.S. Patent and Trademark Office (the USPTO). Furthermore, our portfolio of pending patent applications totals 463 applications, including 71 pending U.S. applications.

With respect to Aldurazyme, we have rights to 31 issued patents, including four U.S. patents. These patents cover our ultra-pure alpha-L-iduronidase composition of Aldurazyme, methods of treating deficiencies of alpha-L-iduronidase by administering pharmaceutical compositions comprising such ultra-pure alpha-L-iduronidase, a method of purifying such ultra-pure alpha-L-iduronidase and the use of compositions of ultra-pure biologically active fragments of alpha-L-iduronidase. The last-to-expire Aldurazyme patent will expire in November 2020.

With respect to Brineura, we own or have licensed a number of patents and pending patent applications that relate generally to CLN2/TPP1 protein, use of CLN2/TPP1 protein and methods of treating late infantile neuronal ceroid lipofuscinosis, pharmaceutical compositions and liquid formulations of TPP1 formulations and intrathecal administration of TPP1. We have 7 issued patents, including five issued U.S. patents and eight foreign patents, and 20 pending applications including two U.S. and 18 foreign applications. These patents will expire between 2021 and 2036.

With respect to Palynziq, we own or have licensed a number of patents and pending patent applications that relate generally to pegylated and variant forms of *Anabaena variabilis* phenylalanine ammonia lyase (AvPAL), use of pegylated and variant forms of AvPAL in treating diseases caused all or in part by a deficiency in PAH, including PKU, methods of production and purification, and methods of detecting pegylated AvPAL and AvPAL-specific antibodies. We have 159 issued patents, including six issued U.S. patents and 153 foreign patents, and 17 pending applications including four U.S. and 13 foreign applications. These patents will expire between 2026 and 2031.

With respect to Kuvan, we own, co-own or have licensed a number of patents and pending patent applications that relate generally to formulations and forms of our drug substance, methods of use for various indications under development and dosing regimens. We have rights to 118 issued patents including 17 issued U.S. patents with claims to a stable tablet and oral solution formulation of 6R-BH4, methods of treating PKU using a once daily dosing regimen, methods of administration of Kuvan with food, crystalline forms of 6R-BH4, and methods of producing 6R-BH4. These patents will expire between 2024 and 2032 (dry blend formulation in the U.S.). We have granted licenses to certain of these patents to two companies, as further described in "Major Commercial Products—Kuvan" in this Annual Report on Form 10-K .

With respect to Naglazyme, we have 54 issued patents, including three U.S. patents. Claims cover our ultrapure *N* -acetylgalactosamine-4-sulfatase compositions of Naglazyme, methods of treating deficiencies of *N* -acetylgalactosamine-4-sulfatase, including MPS VI, methods of producing and purifying such ultrapure *N* -acetylgalactosamine-4-sulfatase compositions and methods of detecting. These patents will expire between 2021 and 2028.

With respect to Vimizim, we own or have licensed a number of patents and pending patent applications that relate generally to compositions of matter, methods of use and methods of production. We have rights to 202 issued patents including 13 issued U.S. patents with claims to compositions of purified recombinant N-acetylgalactosamine-6-sulfate sulfatase (Vimizim) methods of treating Morquio Syndrome and sulfatase-modifying factor I (SUMF1) polypeptides and nucleic acids used in the manufacture of Vimizim. Issued U.S. patents cover purified recombinant Vimizim compositions (set to expire in 2029) and methods of treating Morquio Syndrome (set to expire in 2029). We also have issued U.S. and European patents that cover methods of production (set to expire in 2024) and formulations (set to expire in 2031).

With respect to our clinical product candidates, we believe we have the necessary intellectual property rights to allowing us to undertake the development of these candidates. Certain of our product candidates are in therapeutic areas that have been the subject of many years of extensive research and development by academic organizations and third parties who may control patents or other intellectual property that they might assert against us, should one or more of our product candidates in these therapeutic areas succeed in obtaining regulatory approval and thereafter be commercialized. We continually evaluate the intellectual property rights of others in these areas in order to determine whether a claim of infringement may be made by others against us. Should we determine that a third party has intellectual property rights that could impact our ability to freely market a compound we consider a number of factors in determining how best to prepare for the commercialization of any such product candidate. In making this determination we consider, among other things, the stage of development of our product candidate and whether we and our outside counsel believe the intellectual property rights of others are valid, whether we infringe the intellectual property rights of others, whether a license is available upon commercially reasonable terms, whether we will seek to challenge the intellectual property rights of others, and the likelihood of and liability resulting from an adverse outcome should we be found to infringe the intellectual property rights of others.

## Government Regulation

Regulation by governmental authorities in the U.S. and other countries is a significant factor in the development, manufacture, commercialization, pricing and reimbursement of our products. Our industry is subject to significant federal, state, local and foreign regulation. Our present and future business has been, and will continue to be, subject to a variety of laws in the U.S. and other jurisdictions. In the U.S., failure to comply with applicable U.S. requirements may subject a company to a variety of administrative or judicial sanctions, such as FDA refusal to approve pending new drug applications (NDAs) or BLAs, warning or untitled letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, civil penalties, and criminal prosecution.

Our products require approval from the FDA, the EMA and corresponding agencies in other countries before they can be marketed.

### *Approval Process in the U.S. and EU*

Pharmaceutical product development in the U.S. and the EU typically involves preclinical laboratory and animal tests, the submission to the applicable regulatory agency of an application (e.g., an IND or a CTA), which must become effective before clinical testing may commence, and adequate and well-controlled human clinical trials to establish the safety and effectiveness of the drug for each indication for which marketing approval is sought. Currently, European clinical trial authorization applications must be submitted to the competent authority in each EU Member State in which the trial will be conducted. Under the new European Regulation on Clinical Trials, which is expected to take effect in 2020, there will be a centralized application procedure where one national authority takes the lead in reviewing the application and the other national authorities have only a limited involvement. Satisfaction of FDA and European pre-market approval requirements typically takes many years and the actual time required may vary substantially based upon the type, complexity and novelty of the product or disease.

Preclinical tests include laboratory evaluation, as well as animal studies, to assess the characteristics and potential pharmacology, pharmacokinetics and toxicity of the product. The conduct of the preclinical tests must comply with FDA and/or EMA regulations and requirements, including good laboratory practices. The results of preclinical testing, along with other information, including information about product chemistry, manufacturing and controls and a proposed clinical trial protocol are submitted to the applicable regulatory agency as part of an IND or CTA. Long-term preclinical tests, such as animal tests of reproductive toxicity and carcinogenicity, may continue after the IND or CTA is submitted. Until the CTA or IND is approved, or becomes effective following a waiting period, we may not start the clinical trial in the relevant jurisdiction.

Clinical trials involve the administration of the investigational new drug to healthy volunteers or patients under the supervision of a qualified investigator. Clinical trials must be conducted in compliance with applicable regulations, good clinical practices (GCP), as well as under protocols detailing the objectives of the trial and the parameters to be used in monitoring safety and the effectiveness criteria to be evaluated. Each protocol involving testing on patients and subsequent protocol amendments must be submitted to the FDA as part of the IND and to the relevant regulatory agency in the EU as part of a new CTA.

13

The regulatory agencies may order the temporary halt or permanent discontinuation of a clinical trial at any time or impose other sanctions if they believe that the clinical trial is not being conducted in accordance with applicable requirements or presents an unacceptable risk to the clinical trial patients. The study protocol and informed consent information for patients in clinical trials must also be submitted to an institutional review board (IRB) or ethics committee, for approval. An IRB/ethics committee may also require the clinical trial at the site to be halted, either temporarily or permanently, for failure to comply with the IRB/ethics committee's requirements, or may impose other conditions.

Clinical trials to support NDAs, BLAs or MAAs for marketing approval are typically conducted in three sequential phases, but the phases may overlap or be combined. In Phase 1, the initial introduction of the drug into healthy human subjects or patients, the drug is tested to assess metabolism, pharmacokinetics, pharmacological actions, side effects associated with increasing doses and, if possible, early evidence on effectiveness. Phase 2 usually involves trials in a limited patient population, to determine the effectiveness of the drug for a particular indication or indications, dosage tolerance and optimum dosage, and to identify common adverse effects and safety risks. If a compound demonstrates evidence of effectiveness and an acceptable safety profile in Phase 2 evaluations, Phase 3 trials are undertaken to obtain the additional information about clinical efficacy and safety in a larger number of patients, typically at geographically dispersed clinical trial sites. After completion of the required clinical testing, an application is prepared and submitted to the regulatory agency. Approval of the application by the applicable regulatory agency is required before marketing of the product may begin. In Europe, an MAA is prepared and, for all orphan designated products, is submitted to the EMA under the centralized application procedure. EC approval of the MAA under the centralized application procedure results in a single marketing authorization that is valid across the European Economic Area (i.e., the EU as well as Iceland, Liechtenstein and Norway). The NDA, BLA or MAA must include the results of all preclinical, clinical and other testing, a compilation of data relating to the product's pharmacology, chemistry, manufacture and controls and proposed labeling, among other things. In the U.S., each NDA or BLA is subject to a significant user fee at the time of submission, unless a waiver is granted by the FDA.

The FDA and the EMA initially review the applications for a threshold determination that it is sufficiently complete to permit substantive review, typically within 30-60 days. The regulatory agency may request additional information rather than accepting an application for filing or validation. Once the submission is accepted, the applicable agency begins an in-depth review. For the FDA, the review period for standard review applications is typically an additional ten months and, for priority review of drugs, that is, drugs that the FDA determines address a significant unmet need and represent a significant improvement over existing therapy, the review period is typically an additional six months in duration. The review process may be extended by the FDA for three additional months to consider new information submitted during the review or clarification regarding information already provided in the submission. The FDA may also refer applications for novel products or products that present difficult questions of safety or efficacy to an advisory committee, typically a panel that includes clinicians and other experts, for review, evaluation and a recommendation as to whether the application should be approved. The FDA is not bound by the recommendation of an advisory committee, but it generally follows such recommendations. After the FDA evaluates the information provided in the NDA/BLA, it issues an approval letter, or a complete response letter. A complete response letter outlines the deficiencies in the submission and may require substantial additional testing or information in order for the FDA to reconsider the application. If and when those deficiencies have been addressed and the NDA/BLA has been resubmitted, the FDA will re-initiate review. If it is satisfied that the deficiencies have been addressed, the FDA will issue an approval letter.

Under the centralized procedure in the EU, the maximum timeframe for the evaluation of an MAA by the EMA is 210 days. This excludes so-called clock stops, during which additional written or oral information is to be provided by the applicant in response to questions asked by the CHMP. At the end of the review period, the CHMP provides an opinion to the EC. If the opinion is favorable, the EC may then adopt a decision to grant marketing authorization. In the event of a negative opinion, the company may request a re-examination of the application within 15 days of receipt of the negative opinion. The company then has 60 days to provide the CHMP with detailed grounds for requesting the re-examination. Within 60 days of providing this information, the CHMP shall re-examine its opinion. The EC follows the recommendation of the CHMP in almost all cases. In exceptional cases, the CHMP might perform an accelerated review of an MAA in no more than 150 days. This is usually when the product is of major interest from the point of view of public health and, in particular, from the viewpoint of therapeutic innovation.

During the review period, the FDA and/or the EMA will typically inspect one or more clinical sites and/or the sponsor to assure compliance with GCP regulations and will inspect the facility or the facilities at which the drug is manufactured to ensure compliance with cGMPs regulations. Neither the FDA nor the EMA will approve the product unless compliance is satisfactory and the application contains data that provide substantial evidence that the drug is safe and effective in the indication studied.

A marketing approval authorizes commercial marketing of the drug with specific prescribing information for specific indications. As a condition of NDA or BLA approval, the FDA may require a risk mitigation and evaluation strategy, to help ensure that the benefits of the drug outweigh the potential risks. Risk mitigation and evaluation strategies can include medication guides, communication plans for healthcare professionals, and elements to assure safe use, such as special training or certification for prescribing or dispensing, dispensing only under certain circumstances, special monitoring and the use of patient registries. Moreover, product approval may require substantial post-approval testing and surveillance to monitor the drug's safety or efficacy. Once granted, product approvals may be withdrawn if compliance with regulatory standards is not maintained or problems are identified following initial marketing.

14

*Combination Products*

A combination product is a product comprising (i) two or more regulated components, i.e., drug/device, biologic/device, drug/biologic, or drug/device/biologic, that are physically, chemically, or otherwise combined or mixed and produced as a single entity; (ii) two or more separate products packaged together in a single package or as a unit and comprising drug and device products, device and biological products, or biological and drug products; (iii) a drug, device, or biological product packaged separately that according to its investigational plan or proposed labeling is intended for use only with an approved individually specified drug, device, or biological product where both are required to achieve the intended use, indication, or effect and where upon approval of the proposed product the labeling of the approved product would need to be changed, e.g., to reflect a change in intended use, dosage form, strength, route of administration, or significant change in dose; or (iv) any investigational drug, device, or biological product packaged separately that according to its proposed labeling is for use only with another individually specified investigational drug, device, or biological product where both are required to achieve the intended use, indication, or effect.

The FDA is divided into various branches, or Centers, by product type. Different Centers typically review drug, biologic, or device applications. In order to review an application for a combination product, the FDA must decide which Center should be responsible for the review. FDA regulations require that the FDA determine the combination product's primary mode of action, which is the single mode of a combination product that provides the most important therapeutic action of the combination product. The Center that regulates that portion of the product becomes the lead evaluator. When evaluating an application, a lead Center may consult other Centers but still retain complete reviewing authority, or it may collaborate with another Center, by which the Center assigns review of a specific section of the application to another Center, delegating its review authority for that section. Typically, the FDA requires a single marketing application submitted to the Center selected to be the lead evaluator, although the agency has the discretion to require separate applications to more than one Center. One reason to submit multiple evaluations is if the applicant wishes to receive some benefit that accrues only from approval under a particular type of application, like new drug product exclusivity. If multiple applications are submitted, each may be evaluated by a different lead Center.

*Disclosure of Clinical Trial Information*

Sponsors of clinical trials of FDA-regulated products, including drugs and biologics, are required to register and disclose certain clinical trial information. Information related to the product, patient population, phase of investigation, study sites and investigators, and other aspects of the clinical trial are then made public as part of the registration. Sponsors are also obligated to discuss the results of their clinical trials after completion. In certain circumstances, disclosure of the results of these trials can be delayed for up to two years after the date of completion of the trial. Competitors may use this publicly-available information to gain knowledge regarding the progress of development programs. Moreover, there is an increasing trend in the EU requiring public disclosure of development data, in particular clinical trial data. These data were traditionally regarded as confidential commercial information; however, under policies recently adopted in the EU, clinical study data submitted to the EMA in MAAs, including preclinical data, and patient level data, may be subject to public disclosure.

*The Hatch-Waxman Act*

Upon approval of a drug through an NDA, applicants are required to submit to the FDA each patent that covers the applicant's product or FDA approved method of using this product. Those patents are then published in the FDA's Orange Book. Drugs listed in the Orange Book can, in turn, be cited by potential competitors in support of approval of an ANDA. Generally, an ANDA provides for marketing of a drug product that has the same active ingredients in the same strength(s), route of administration, and dosage form as the listed drug and has been shown through bioequivalence testing to be therapeutically equivalent to the listed drug. ANDA applicants are not required to conduct or submit results of preclinical or clinical tests to prove the safety or effectiveness of their drug product, other than the requirement for bioequivalence testing. Drugs approved in this way are commonly referred to as "generic equivalents" to the listed drug, and can often be substituted by pharmacists under prescriptions written for the original listed drug.

The ANDA applicant is required to certify to the FDA concerning any patents listed for the approved product in the Orange Book. Specifically, the applicant must certify that: (i) the required patent information has not been filed; (ii) the listed patent has expired; (iii) the listed patent has not expired, but will expire on a particular date and approval is sought after patent expiration; or (iv) the listed patent is invalid or will not be infringed by the new product. A certification that the new product will not infringe the already approved product's listed patents or that such patents are invalid is called a paragraph IV certification. If the applicant does not challenge the listed patents, the ANDA application will not be approved until all the listed patents claiming the referenced product have expired. Alternatively, for a patent covering an approved method of use, an ANDA applicant may submit a statement to the FDA that the company is not seeking approval for the covered use.

If the ANDA applicant has submitted a paragraph IV certification to the FDA, the applicant must also send notice of the paragraph IV certification to the NDA and patent holders once the ANDA has been accepted for filing by the FDA. The NDA and patent holders may then initiate a patent infringement lawsuit in response to the notice of the paragraph IV certification. The filing of a patent infringement lawsuit within 45 days of the receipt of a paragraph IV certification automatically prevents the FDA from approving the ANDA until the earlier of 30 months, expiration of the patent, settlement of the lawsuit or a decision in the infringement case that is favorable to the ANDA applicant.

15

The ANDA application also will not be approved until any non-patent exclusivity, such as exclusivity for obtaining approval of a new chemical entity, listed in the Orange Book for the referenced product has expired. Federal law provides a period of five years following approval of a drug containing no previously approved active moiety, during which ANDAs for generic versions of those drugs cannot be submitted unless the submission contains a paragraph IV challenge to a listed patent, in which case the submission may be made four years following the original product approval. Federal law provides for a period of three years of exclusivity following approval of a listed drug that contains previously approved active ingredients but is approved in a new dosage form, route of administration or combination, or for a new condition of use, the approval of which was required to be supported by new clinical trials conducted by or for the sponsor, during which the FDA cannot grant effective approval of an ANDA based on that listed drug. Both of the five-year and three-year exclusivity periods, as well as any unexpired patents listed in the Orange Book for the listed drug, can be extended by six months if the FDA grants the NDA sponsor a period of pediatric exclusivity based on studies submitted by the sponsor in response to a written request.

### Exclusivity for Biologics

The Biologics Price Competition and Innovation Act of 2009 (BPCIA), which was enacted as part of the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 (as amended, the PPACA), created an abbreviated approval pathway for biological products that are demonstrated to be "biosimilar" or "interchangeable" with an FDA-licensed reference biological product. Biosimilarity sufficient to reference a prior FDA-licensed product requires that there be no differences in conditions of use, route of administration, dosage form, and strength, and no clinically meaningful differences between the biological product and the reference product in terms of safety, purity, and potency. Biosimilarity must be shown through analytical studies, animal studies, and at least one clinical study, absent a waiver from the Secretary of the U.S. Department of Health and Human Services. In order to meet the higher hurdle of interchangeability, a sponsor must demonstrate that the biosimilar product can be expected to produce the same clinical result as the reference product, and for a product that is administered more than once, that the risk of switching between the reference product and biosimilar product is not greater than the risk of maintaining the patient on the reference product. The first biosimilar product was approved under the BPCIA in 2015, though no interchangeable products have been approved to date. Complexities associated with the larger, and often more complex, structures of biological products, as well as the process by which such products are manufactured, pose significant hurdles to implementation that are still being evaluated by the FDA. A reference biologic is granted 12 years of exclusivity from the time of first licensure of the reference product and no application for a biosimilar can be submitted for four years from the date of licensure of the reference product. The first biologic product submitted under the abbreviated approval pathway that is determined to be interchangeable with the reference product has exclusivity against a finding of interchangeability for other biologics for the same condition of use for the lesser of (i) one year after first commercial marketing of the first interchangeable biosimilar, (ii) eighteen months after the first interchangeable biosimilar is approved if there is not patent challenge, (iii) eighteen months after resolution of a lawsuit over the patents of the reference biologic in favor of the first interchangeable biosimilar applicant, or (iv) 42 months after the first interchangeable biosimilar's application has been approved if a patent lawsuit is ongoing within the 42-month period.

### Orphan Drug Designation

Orphan drug designation is granted by the FDA and EMA to drugs intended to treat a rare disease or condition, which in the U.S. is defined as having a prevalence of less than 200,000 individuals in the U.S. In the EU, orphan drug designation is available if a sponsor can establish: that the medicine is intended for the diagnosis, prevention or treatment of (1) a life-threatening or chronically debilitating condition affecting no more than five in 10,000 people in the EU, which is equivalent to around 250,000 people or fewer, or (2) a life-threatening, seriously debilitating or serious and chronic condition in the EU and that without incentives it is unlikely that the marketing of the medicinal product in the EU would generate sufficient return to justify the necessary investment. For either of these criteria, the applicant must demonstrate that there exists no satisfactory method of diagnosis, prevention or treatment of the condition in question that has been authorized in the EU or, if such method exists, the medicinal product will be of significant benefit to those affected by that condition. Orphan drug designation must be requested before

16

submitting a marketing application.

Orphan drug designation does not shorten the regulatory review and approval process. However, if an orphan drug later receives approval for the indication for which it has designation, the relevant regulatory authority may not approve any other applications to market the same drug for the same indication, except in very limited circumstances, for seven years in the U.S. and ten years in the EU (extendable to twelve years for medicines that have complied with an agreed pediatric investigation plan pursuant to Regulation 1901/2006) and, in addition, a range of other benefits during the development and regulatory review process are available in the EU, including scientific assistance for study protocols, authorization through the centralized marketing authorization procedure covering all member countries and a reduction or elimination of registration and marketing authorization fees. Among the benefits of orphan drug designation in the U.S. are tax credits for certain research and a waiver of the NDA/BLA application user fee. Orphan drug exclusive marketing rights may be lost under certain conditions, such as if the request for designation was materially defective or if the manufacturer is unable to assure sufficient quantity of the drug. In the EU, marketing authorization may be granted to a similar medicinal product with the same orphan indication during the regulatory exclusivity period with the consent of the marketing authorization holder for the original orphan medicinal product or if the manufacturer of the original orphan medicinal product is unable to supply sufficient quantities. Marketing authorization may also be granted to a similar medicinal product with the same orphan indication if this medicinal product is safer, more effective or otherwise clinically superior to the original orphan medicinal product. The period of market exclusivity may, in addition, be reduced to six years if, at the end of the fifth year, it can be demonstrated on the basis of available evidence that the criteria for its designation as an orphan medicine are no longer satisfied, for example if the original orphan medicinal product has become sufficiently profitable not to justify maintenance of market exclusivity.

*Breakthrough Therapy Designation*

The FDA is also required to expedite the development and review of the application for approval of drugs that are intended to treat a serious or life-threatening disease or condition where preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints. Under the breakthrough therapy program, the sponsor of a new drug candidate may request that the FDA designate the drug candidate for a specific indication as a breakthrough therapy concurrent with, or after, the filing of the IND for the drug candidate. The FDA must determine if the drug candidate qualifies for breakthrough therapy designation within 60 days of receipt of the sponsor's request.

*PRIME Designation*

The EMA launched its PRIME regulatory initiative to enhance support for the development of therapies that target an unmet medical need. The initiative focuses on drugs that may offer a major therapeutic advantage over existing treatments, or benefit patients with no treatment options. These therapies are considered priority medicines within the EU. Through PRIME, the EMA offers early, proactive and enhanced support to drug developers to optimize the generation of robust data on a therapy's benefits and risks and enable accelerated assessment of drug applications.

*Pediatric Information*

Under the Pediatric Research Equity Act of 2007 (PREA), NDAs or BLAs or supplements to NDAs or BLAs must contain data to assess the safety and effectiveness of the drug for the claimed indication(s) in all relevant pediatric subpopulations and to support dosing and administration for each pediatric subpopulation for which the drug is safe and effective. The FDA may grant deferrals for submission of data or full or partial waivers. Unless otherwise required by statute or regulation, PREA does not apply to any drug for an indication for which orphan drug designation has been granted. The Best Pharmaceuticals for Children Act (BPCA) provides sponsors of NDAs with an additional six-month period of market exclusivity for all unexpired patent or non-patent exclusivity on all forms of the drug containing the active moiety if the sponsor submits results of pediatric studies specifically requested by the FDA under BPCA within required timeframes. The BPCIA provides sponsors of BLAs an additional six-month extension for all unexpired non-patent market exclusivity on all forms of the biological containing the active moiety pursuant to the BPCA if the conditions under the BPCA are met.

In the EU, companies developing a new medicinal product must agree to a Paediatric Investigation Plan (PIP) with the EMA and must conduct pediatric clinical trials in accordance with that PIP, unless a deferral or waiver applies, (e.g., because the relevant disease or condition occurs only in adults). The MAA for the product must include the results of pediatric clinical trials conducted in accordance with the PIP, unless a waiver applies, or a deferral has been granted, in which case the pediatric clinical trials must be completed at a later date. Products that are granted a marketing authorization on the basis of the pediatric clinical trials conducted in accordance with the PIP are eligible for a six month extension of the protection under a supplementary protection certificate (if any is in effect at the time of approval) or, in the case of orphan medicinal products, a two year extension of the orphan market exclusivity. This pediatric reward is subject to specific conditions and is not automatically available when data in compliance with the PIP are developed and submitted.

17

***Fast Track Designation and Accelerated Approval***

The FDA is required to facilitate the development and expedite the review of drugs that are intended for the treatment of a serious or life-threatening condition for which there is no effective treatment and that demonstrate the potential to address unmet medical needs for the condition. Under the FDA's fast track program, the sponsor of a new drug candidate may request that the FDA designate the drug candidate for a specific indication as a fast track drug concurrent with or after the filing of the IND for the drug candidate. The FDA must determine if the drug candidate qualifies for fast track designation within 60 days of receipt of the sponsor's request.

In addition to other benefits, such as the ability to use surrogate endpoints and have greater interactions with the FDA, the FDA may initiate review of sections of a fast track drug's NDA or BLA before the application is complete. This rolling review is available if the applicant provides and the FDA approves a schedule for the submission of the remaining information and the applicant pays applicable user fees. However, the FDA's time period goal for reviewing an application does not begin until the last section of the NDA or BLA is submitted. Additionally, the fast track designation may be withdrawn by the FDA if the FDA believes that the designation is no longer supported by data emerging in the clinical trial process.

Under the fast track program and the FDA's accelerated approval regulations, the FDA may approve a drug for a serious or life-threatening illness that provides meaningful therapeutic benefit to patients over existing treatments based upon a surrogate endpoint that is reasonably likely to predict clinical benefit, or on a clinical endpoint that can be measured earlier than irreversible morbidity or mortality, that is reasonably likely to predict an effect on irreversible morbidity or mortality or other clinical benefit, taking into account the severity, rarity, or prevalence of the condition and the availability or lack of alternative treatments. In clinical trials, a surrogate endpoint is a measurement of laboratory or clinical signs of a disease or condition that substitutes for a direct measurement of how a patient feels, functions, or survives. Surrogate endpoints can often be measured more easily or more rapidly than clinical endpoints. A drug candidate approved on this basis is subject to rigorous post-marketing compliance requirements, including the completion of a Phase 4 or post-approval clinical trial to confirm the effect on the clinical endpoint. Failure to conduct a required post-approval study or confirm a clinical benefit through a post-marketing study will allow the FDA to withdraw the drug from the market on an expedited basis. All promotional materials for drug candidates approved under accelerated regulations are subject to prior review by the FDA.

***Post-Approval Regulatory Requirements***

Following approval, the FDA and the EMA will impose certain post-approval requirements related to a product. For instance, the FDA closely regulates the post-approval marketing and promotion of approved products, including standards and regulations for direct-to-consumer advertising, off-label promotion, industry-sponsored scientific and educational activities and promotional activities involving the Internet. Moreover, if a company obtains original FDA approval for a product via the accelerated approval pathway, the company may be required to conduct a post-marketing confirmatory trial to verify and describe the clinical benefit in support of full approval. An unsuccessful post-marketing study or failure to complete such a study could result in the withdrawal of the FDA's marketing approval for a product.

Approved products may be marketed only for the approved indications and in accordance with the provisions of the approved labeling. Changes to some of the conditions established in an approved application, including changes in indications, labeling, or manufacturing processes or facilities, may require a submission to and approval by the FDA or the EMA, as applicable, before the change can be implemented. An NDA/BLA or MAA supplement for a new indication typically requires clinical data similar to that in the original application, and similar procedures and actions in reviewing NDA/ BLA or MAA supplements as in reviewing NDAs/BLAs and MAAs.

Adverse event reporting and submission of periodic reports is required following marketing approval. Either the FDA or EMA may also require post-marketing testing, known as Phase 4 testing, a risk evaluation and mitigation strategy, and surveillance to monitor the effects of an approved product or place conditions on an approval that could restrict the distribution or use of the product. In addition, quality control as well as the manufacture, packaging, and labeling procedures must continue to conform to cGMPs after approval. Drug and biological product manufacturers and certain of their subcontractors are subject to periodic unannounced inspections by the FDA or the EMA during which the agency inspects manufacturing facilities to assess compliance with cGMPs. Accordingly, manufacturers must continue to expend time, money and effort in the areas of production and quality control to maintain compliance with cGMPs. Regulatory authorities may withdraw product approvals or request product recalls if a company fails to comply with regulatory standards, if it encounters problems following initial marketing, or if previously unrecognized problems are subsequently discovered. In addition, prescription drug manufacturers in the U.S. must comply with applicable provisions of the Drug Supply Chain Security Act and provide and receive product tracing information, maintain appropriate licenses, ensure they only work with other properly licensed entities and have procedures in place to identify and properly handle suspect and illegitimate products.

18

Table of Contents

*Healthcare Reform*

The U.S. and some foreign jurisdictions are considering or have enacted a number of legislative and regulatory proposals to change the healthcare system in ways that could affect our ability to sell our products profitably. For example, in the U.S., the PPACA is a sweeping measure intended to improve quality of care, constrain healthcare spending, and expand healthcare coverage within the U.S., primarily through the imposition of health insurance mandates on employers and individuals and expansion of the Medicaid program.

The PPACA also imposed a fee on certain manufacturers and importers of branded prescription drugs (excluding orphan drugs under certain conditions). The annual fee is apportioned among the participating companies based on each company's sales of qualifying products to, or use by, certain U.S. government programs during the preceding year. Other provisions of the law have also affected us and have increased certain of our costs. For example, the Medicaid rebate rate was increased and the volume of rebated drugs has been expanded to include beneficiaries in Medicaid managed care organizations. Among other things, the PPACA also expanded the 340B drug discount program (excluding orphan drugs), including the creation of new penalties for non-compliance, and now includes a 70% discount on brand name drugs for Medicare Part D participants in the coverage gap, or "donut hole." The law also revised the definition of "average manufacturer price" for reporting purposes. In addition, drug manufacturers are required to collect and report annually information on payments or transfers of value to physicians and teaching hospitals, as well as investment interests held by physicians and their immediate family members during the preceding calendar year. Effective January 1, 2022, drug manufacturers will also be required to report on payments or transfers of value to physician assistants, nurse practitioners or clinical nurse specialists, certified registered nurse anesthetists, and certified nurse-midwives. The reported data are posted in searchable form on a public web site. Failure to submit required information may result in civil monetary penalties. It is still unclear the full impact that the PPACA will have on our business. There have been judicial and congressional challenges to certain aspects of the PPACA, and we expect that there will be additional challenges and amendments in the future, especially with the current Presidential administration.

Since January 2017, the U.S. President has signed two Executive Orders designed to delay the implementation of any certain provisions of the PPACA or otherwise circumvent some of the requirements for health insurance mandated by the PPACA. Concurrently, Congress has considered legislation that would repeal or repeal and replace all or part of the PPACA. While Congress has not passed legislation repealing the PPACA in its entirety, it has enacted laws that modify certain provisions of the PPACA such as removing penalties for not complying with the PPACA's individual mandate to carry health insurance, delaying the implementation of certain ACA-mandated fees, and increasing the point-of-sale discount that is owed by pharmaceutical manufacturers who participate in Medicare Part D. Additionally, on December 14, 2018, a Texas U.S. District Court Judge ruled that the PPACA is unconstitutional in its entirety because the individual mandate was repealed by Congress as part of the Tax Cuts and Jobs Act. While the Texas U.S. District Court Judge, as well as the U.S. Presidential administration and the Centers for Medicare and Medicaid Services (CMS), have stated that the ruling will have no immediate effect pending appeal of the decision, it is unclear how this decision, subsequent appeals, and other efforts to repeal and replace the PPACA will impact the PPACA.

Other legislative changes have been proposed and adopted since the PPACA was enacted. These changes included the Budget Control Act of 2011, which caused aggregate reductions to Medicare payments to providers of up to 2% per fiscal year effective April 1, 2013 which, following passage of the Bipartisan Budget Act of 2015, will stay in effect through 2029 unless additional congressional action is taken. Further, the American Taxpayer Relief Act of 2012, among other things, further reduced Medicare payments to several types of providers.

Additionally, there has been increasing legislative and enforcement interest in the U.S. with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. congressional inquiries and proposed and enacted state and federal legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, at the federal level, the U.S. Presidential administration's budget proposal for the fiscal year 2021 includes a $135.0 billion allowance to support legislative proposals seeking to reduce drug prices, increase competition, lower out-of-pocket drug costs for patients, and increase patient access to lower-cost generic and biosimilar drugs. Moreover, the U.S. Presidential administration previously released a "Blueprint" to lower drug prices and reduce out of pocket costs of drugs that contained proposals to increase manufacturer competition, increase the negotiating power of certain federal healthcare programs, incentivize manufacturers to lower the list price of their products and reduce the out of pocket costs of drug products paid by consumers. Although a number of these and other measures may require additional authorization to become effective, Congress and the U.S. Presidential administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, to encourage importation from other countries and bulk purchasing.

19

***Brexit and the Regulatory Framework in the U.K.***

In June 2016, a majority of the eligible members of the electorate in the U.K. voted to withdraw from the EU in a national referendum (Brexit). On March 29, 2017, the U.K.'s Prime Minister formally delivered the notice of withdrawal. After significant negotiation between the U.K. and the EU, the withdrawal of the U.K. from the EU took effect on January 31, 2020. There is now a transition period while the U.K. and EU negotiate additional arrangements, including their future trading terms. The U.K. has stated that it wants the transition period to expire, and the future trading terms to be agreed, by December 31, 2020.

Since the regulatory framework for pharmaceutical products in the U.K covering quality, safety and efficacy of pharmaceutical products, clinical trials, marketing authorization, commercial sales and distribution of pharmaceutical products is derived from EU directives and regulations, immediately following Brexit, it is expected that the U.K.'s regulatory regime will remain aligned with EU regulations. It remains to be seen how, if at all, Brexit will impact regulatory requirements for product candidates and products in the U.K. In the longer term, Brexit could materially impact the future regulatory regime which applies to products and the approval of product candidates in the U.K.

***Other U.S. Regulatory Requirements***

In addition to FDA restrictions on marketing of pharmaceutical products, several other types of state and federal laws have been applied to restrict certain business and marketing practices in the pharmaceutical industry in recent years. These laws include anti-kickback, false claims, patient data privacy and security, and transparency statutes and regulations.

The federal Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration to induce or in return for purchasing, leasing, ordering or arranging for the purchase, lease or order of any healthcare item or service reimbursable under Medicare, Medicaid or other federally financed healthcare programs. The PPACA amended the intent requirement of the federal Anti-Kickback and certain other criminal healthcare fraud statutes such that a person or entity no longer needs to have actual knowledge of these statutes or specific intent to violate them in order to commit a violation. This statute has been interpreted to apply to arrangements between pharmaceutical manufacturers on the one hand and prescribers, purchasers and formulary managers on the other. Although there are a number of statutory exceptions and regulatory safe harbors protecting certain common activities from prosecution or other regulatory sanctions, the exceptions and safe harbors are drawn narrowly, and practices that involve remuneration intended to induce prescribing, purchases or recommendations may be subject to scrutiny if they do not qualify for an exception or safe harbor.

Federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to have a false claim paid. The PPACA amended the statute so that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the false claims laws. Recently, several pharmaceutical and other healthcare companies have been prosecuted under these laws for allegedly inflating drug prices they report to pricing services, which in turn are used by the government to set Medicare and Medicaid reimbursement rates, and for allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product. In addition, certain marketing practices, including off-label promotion, may also violate false claims laws.

The federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, imposes criminal and civil liability for, among other things, executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters.

HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act and their implementing regulations, also imposes obligations, including mandatory contractual terms, on certain types of individuals and entities, with respect to safeguarding the privacy, security and transmission of individually identifiable health information.

The federal Physician Payments Sunshine Act requires certain manufacturers of drugs, devices, biologics and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program, with specific exceptions, to report annually to the CMS information related to payments or other transfers of value made to physicians and teaching hospitals, and applicable manufacturers and applicable group purchasing organizations to report annually to CMS ownership and investment interests held by the physicians and their immediate family members.

The majority of states also have statutes or regulations similar to the federal Anti-Kickback Statute and false claims laws, which apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payer. Sanctions under these federal and state laws may include civil monetary penalties, damages, monetary fines, disgorgement, exclusion of a company from federal healthcare programs, integrity oversight and reporting obligations, criminal fines, contractual damages, reputational harm, diminished profits and future earnings, curtailment of operations and imprisonment. Several states now require pharmaceutical companies to report expenses relating to the marketing and promotion of pharmaceutical products and to report gifts and payments to individual physicians in these states while other states prohibit various other marketing-related activities. Other states require submission or disclosure of certain pricing information. Still other states require the posting of information relating to clinical studies and their outcomes. In addition, states including California, Connecticut, Nevada and Massachusetts require pharmaceutical companies to implement compliance programs or marketing codes. Currently, several additional states are considering similar proposals. Compliance with these laws is difficult and time consuming, and companies that do not comply with these state laws face civil penalties.

### Approval Outside of the U.S./EU

For marketing outside the U.S. and the EU, we are subject to foreign regulatory requirements governing human clinical testing and marketing approval for our products. These requirements vary by jurisdiction, can differ from those in the U.S. and the EU and may require us to perform additional preclinical or clinical testing. The amount of time required to obtain necessary approvals may be longer or shorter than that required for FDA or EMA approval. In many countries outside of the U.S., approvals for pricing, coverage and reimbursement offered by third-party payers, including government payers and private insurance plans, are also required.

### Anti-Corruption Legislation

The U.S. Foreign Corrupt Practices Act (FCPA), to which we are subject, prohibits corporations and individuals from engaging in certain activities to obtain or retain business or to influence a person working in an official capacity. It is illegal to pay, offer to pay or authorize the payment of anything of value to any foreign government official, government staff member, political party or political candidate in an attempt to obtain or retain business or to otherwise influence a person working in an official capacity. Similar laws exist in other countries, such as the U.K., that restrict improper payments to public and private parties. Many countries have laws prohibiting these types of payments within the respective country. Historically, pharmaceutical companies have been the target of FCPA and other anti-corruption investigations and penalties.

### Pricing and Reimbursement

Because the course of treatment for patients using our products is expensive, sales of our products depend, in significant part, on the availability and extent of coverage and reimbursement offered by third-party payers, including government payers and private insurance plans. Governments may regulate access to, prices of or reimbursement levels for our products to control costs or to affect levels of use of our products, and private insurers may be influenced by government reimbursement methodologies.

Third-party payers carefully review and increasingly challenge the prices charged for drugs, examine their medical necessity, and review their cost effectiveness. Reimbursement rates from private companies vary depending on the third-party payer, the insurance plan and other factors. One payer's determination to provide coverage for a product does not assure that other payers will also provide coverage for the product. Moreover, the process for determining whether a third-party payer will provide coverage for a product may be separate from the process for setting the price of a product or for establishing the reimbursement rate that such a payer will pay for the product. Obtaining coverage and adequate reimbursement for our products may be particularly difficult because of the higher prices often associated with drugs administered under the supervision of a physician. A payer's decision to provide coverage for a product does not imply that an adequate reimbursement rate will be approved. Adequate third-party reimbursement may not be available to enable us to maintain high enough price levels to realize sufficient revenues from our investment in product development. In addition, emphasis on managed care in the U.S. has increased and we expect will continue to increase the pressure on pharmaceutical pricing. Coverage policies and third-party reimbursement rates may change at any time. Even if favorable coverage and reimbursement status is attained for one or more products for which we or our collaborators receive regulatory approval, less favorable coverage policies and reimbursement rates may be implemented in the future.

Outside of the U.S. our products are paid for by a variety of payers, with governments being the primary source of payment. Reimbursement in the EU and many other territories must be negotiated on a country-by-country basis and in many countries the product cannot be commercially launched until reimbursement is approved. In many countries the government closely regulates drug pricing and reimbursement and often has a significant discretion in determining whether a product will be reimbursed at all and, if it is, how much will be paid. Negotiating prices with governmental authorities can delay patient access to and commercialization of our products. Payers in many countries use a variety of cost-containment measures that can include referencing prices in other countries and using those reference prices to set their own price, mandatory price cuts and rebates. This international patchwork of price regulation has led to different prices across countries and some cross-border trade in our products from markets with lower prices. Even after a price is negotiated, countries frequently request or require adjustments to the price and other concessions over time.

21

***Government Programs for Marketed Drugs in the U.S***.

*Medicaid, the 340B Drug Pricing Program, and Medicare*

Federal law requires that a pharmaceutical manufacturer, as a condition of having its products receive federal reimbursement under Medicaid and Medicare Part B, must pay rebates to state Medicaid programs for all units of its covered outpatient drugs dispensed to Medicaid beneficiaries and paid for by a state Medicaid program under either a fee-for-service arrangement or through a managed care organization. This federal requirement is effectuated through a Medicaid drug rebate agreement between the manufacturer and the Secretary of Health and Human Services. CMS administers the Medicaid drug rebate agreements, which provide, among other things, that the drug manufacturer will pay rebates to each state Medicaid agency on a quarterly basis and report certain price information on a monthly and quarterly basis. The rebates are based on prices reported to CMS by manufacturers for their covered outpatient drugs. For non-innovator products, generally generic drugs marketed under ANDAs, the rebate amount is 13% of the average manufacturer price (AMP) for the quarter. The AMP is the weighted average of prices paid to the manufacturer (1) directly by retail community pharmacies and (2) by wholesalers for drugs distributed to retail community pharmacies. For innovator products (i.e., drugs that are marketed under NDAs or BLAs), the rebate amount is the greater of 23.1% of the AMP for the quarter or the difference between such AMP and the best price for that same quarter. The best price is essentially the lowest price available to non-governmental entities. Innovator products may also be subject to an additional rebate that is based on the amount, if any, by which the product's AMP for a given quarter exceeds the inflation-adjusted baseline AMP, which for most drugs is the AMP for the first full quarter after launch. Since 2017, non-innovator products are also subject to an additional rebate.

The terms of participation in the Medicaid drug rebate program impose an obligation to correct the prices reported in previous quarters, as may be necessary. Any such corrections could result in additional or lesser rebate liability, depending on the direction of the correction. In addition to retroactive rebates, if a manufacturer were found to have knowingly submitted false information to the government, federal law provides for civil monetary penalties for failing to provide required information, late submission of required information, and false information.

A manufacturer must also participate in a federal program known as the 340B drug pricing program in order for federal funds to be available to pay for the manufacturer's drugs under Medicaid and Medicare Part B. Under this program, the participating manufacturer agrees to charge certain safety net healthcare providers no more than an established discounted price for its covered outpatient drugs. The formula for determining the discounted price is defined by statute and is based on the AMP and the unit rebate amount as calculated under the Medicaid drug rebate program, discussed above. Manufacturers are required to report pricing information to the Health Resources and Services Administration (HRSA) on a quarterly basis. HRSA has also issued regulations relating to the calculation of the ceiling price as well as imposition of civil monetary penalties for each instance of knowingly and intentionally overcharging a 340B covered entity.

Federal law also requires that manufacturers report data on a quarterly basis to CMS regarding the pricing of drugs that are separately reimbursable under Medicare Part B. These are generally drugs, such as injectable products, that are administered "incident to" a physician service and are not generally self-administered. The pricing information submitted by manufacturers is the basis for reimbursement to physicians and suppliers for drugs covered under Medicare Part B. As with the Medicaid drug rebate program, federal law provides for civil monetary penalties for failing to provide required information, late submission of required information, and false information.

Medicare Part D provides prescription drug benefits for seniors and people with disabilities. Medicare Part D beneficiaries have a gap in their coverage (between the initial coverage limit and the point at which catastrophic coverage begins) where Medicare does not cover their prescription drug costs, known as the coverage gap. However, by 2020 Medicare Part D beneficiaries will pay 25% of drug costs after they reach the initial coverage limit - the same percentage they were responsible for before they reached that limit - thereby closing the coverage gap. The cost of closing the coverage gap is being borne by innovator companies and the government through subsidies. Each manufacturer of drugs approved under NDAs or BLAs is required to enter into a Medicare Part D coverage gap discount agreement and provide a 70% discount on those drugs dispensed to Medicare beneficiaries in the coverage gap, in order for its drugs to be reimbursed by Medicare Part D.

*Federal Contracting/Pricing Requirements*

Manufacturers are also required to make their covered drugs, which are generally drugs approved under NDAs or BLAs, available to authorized users of the Federal Supply Schedule (FSS) of the General Services Administration. The law also requires manufacturers to offer deeply discounted FSS contract pricing for purchases of their covered drugs by the Department of Veterans Affairs, the Department of Defense, the Coast Guard, and the Public Health Service (including the Indian Health Service) in order for federal funding to be available for reimbursement or purchase of the manufacturer's drugs under certain federal programs. FSS pricing to those four federal agencies for covered drugs must be no more than the Federal Ceiling Price (FCP), which is at least 24% below the Non-Federal Average Manufacturer Price (Non-FAMP) for the prior year. The Non-FAMP is the average price for

22

covered drugs sold to wholesalers or other middlemen, net of any price reductions.

The accuracy of a manufacturer's reported Non-FAMPs, FCPs, or FSS contract prices may be audited by the government. Among the remedies available to the government for inaccuracies is recoupment of any overcharges to the four specified federal agencies based on those inaccuracies. If a manufacturer were found to have knowingly reported false prices, in addition to other penalties available to the government, the law provides for significant civil monetary penalties per incorrect item. Finally, manufacturers are required to disclose in FSS contract proposals all commercial pricing that is equal to or less than the proposed FSS pricing, and subsequent to award of an FSS contract, manufacturers are required to monitor certain commercial price reductions and extend commensurate price reductions to the government, under the terms of the FSS contract Price Reductions Clause. Among the remedies available to the government for any failure to properly disclose commercial pricing and/or to extend FSS contract price reductions is recoupment of any FSS overcharges that may result from such omissions.

**Employees**

As of February 13, 2020, we had 3,001 full-time employees, 1,358 of whom were in operations, 653 of whom were in research and development, 508 of whom were in sales and marketing and 482 of whom were in administration.

**Other Information**

We were incorporated in Delaware in October 1996. Our principal executive offices are located at 770 Lindaro Street, San Rafael, California 94901 and our telephone number is (415) 506-6700. Our annual reports on Form 10-K, quarterly reports on Form 10-Q, proxy statements, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the Exchange Act) are available free of charge at www.bmrn.com as soon as reasonably practicable after electronically filing such reports with the Security and Exchange Commission (the SEC). Such reports and other information may be accessed through the SEC's website at www.sec.gov. Information contained in our website is not part of this or any other report that we file with or furnish to the SEC.

**Item 1A. Risk Factors**

*An investment in our securities involves a high degree of risk. We operate in a dynamic and rapidly changing industry that involves numerous risks and uncertainties. The risks and uncertainties described below are not the only ones we face. Other risks and uncertainties, including those that we do not currently consider material, may impair our business. If any of the risks discussed below actually occur, our business, financial condition, operating results or cash flows could be materially adversely affected. This could cause the value of our securities to decline, and you may lose all or part of your investment.*

**Risks Related to Our Business**

**If we fail to obtain and maintain regulatory approval to commercially market and sell our product candidates, or if approval of our product candidates is delayed, we will be unable to generate revenue from the sale of these product candidates, our potential for generating positive cash flow will be diminished, and the capital necessary to fund our operations will increase.**

We must obtain and maintain regulatory approval to market and sell our product candidates. For example, in the United States (U.S.), we must obtain Food and Drug Administration (FDA) approval for each product candidate that we intend to commercialize, and in Europe we must obtain approval from the European Medicines Agency (EMA). The FDA and EMA approval processes are typically lengthy and expensive, and approval is never certain. Accordingly, there are no assurances that we will obtain regulatory approval for any of our product candidates. Furthermore, there can be no assurance that approval of one of our product candidates by one regulatory agency will mean that other agencies will also approve the same product candidate. Similarly, regulatory authorities may approve a product candidate for fewer or more limited indications than requested or may grant approval subject to the performance of post-marketing studies. In addition, regulatory authorities may not approve the labeling claims that are necessary or desirable for the successful commercialization of our product candidates.

We have had fewer interactions with regulatory authorities outside the U.S. and the European Union (EU) as compared to our interactions with the FDA and EMA. The approval procedures vary among countries and can involve additional clinical testing, and the time required to obtain approval may differ from that required to obtain FDA or EMA approval. Moreover, clinical trials conducted in one country may not be accepted by regulatory authorities in other countries. Approval by the FDA or EMA does not ensure approval by regulatory authorities in other countries, and approval by one or more foreign regulatory authorities does not ensure approval by regulatory authorities in other foreign countries or by the FDA or EMA. However, a failure or delay in obtaining regulatory approval in one country may have a negative effect on the regulatory process in others. The foreign regulatory approval process may include all of the risks associated with obtaining FDA or EMA approval. We may not obtain foreign regulatory approvals on a timely basis, if at all. We may not be able to file for regulatory approvals and even if we file we may not receive necessary approvals to commercialize our product candidates in any market.

Because of the risks and uncertainties in pharmaceutical development, our product candidates could take a significantly longer time to gain regulatory approval than we expect or may never gain approval. We also rely on independent third-party contract research organizations (CROs) to file some of our foreign marketing applications and important aspects of the services performed for us by the CROs are out of our direct control. If we fail to adequately manage our CROs, if the CRO elects to prioritize work on our projects below other projects or if there is any dispute or disruption in our relationship with our CROs, the filing of our applications may be delayed.

Although the FDA and the EMA have programs to facilitate expedited development and accelerated approval processes, the timelines agreed under legislative goals or mandated by regulations are subject to the possibility of substantial delays. In addition, the FDA, the EMA and other international regulatory authorities have substantial discretion over the approval process for pharmaceutical products. These regulatory agencies may not agree that we have demonstrated the requisite level of product safety and efficacy to grant approval and may require additional data. Moreover, if original FDA approval for one of our product candidates is granted via the accelerated approval pathway, we may be required to conduct a post-marketing confirmatory trial to verify and describe the clinical benefit in support of full approval. An unsuccessful post-marketing study or failure to complete such a study with due diligence could result in the withdrawal of the FDA's marketing approval for a product candidate. If we fail to obtain and maintain regulatory approval for our product candidates, we will be unable to market and sell those product candidates, which would have a negative effect on our business and financial condition.

24

With respect to valoctocogene roxaparvovec, we may experience challenges specific to gene therapy that cause significant delays or unanticipated costs, or that cannot be solved. Although numerous companies are currently advancing gene therapy product candidates through clinical trials, the FDA has only approved a very small number of vector-based gene therapy products thus far. Moreover, there are very few approved gene therapy products outside the U.S. As a result, it is difficult to determine how long it will take or how much it will cost to obtain regulatory approvals for valoctocogene roxaparvovec in any jurisdiction. Regulatory requirements governing gene and cell therapy products are still evolving and may continue to change in the future. Regulatory review agencies and the new requirements and guidelines they promulgate may lengthen the regulatory review process, require us to perform additional or larger studies, increase our development costs, lead to changes in regulatory positions and interpretations, delay or prevent approval and commercialization of our treatment candidate or lead to significant post-approval studies, limitations or restrictions. Delay or failure to obtain, or unexpected costs in obtaining, the regulatory approval necessary to bring valoctocogene roxaparvovec to market could have a negative effect on our business and financial condition. Even if we do obtain regulatory approval, ethical, social and legal concerns about gene therapy arising in the future could result in additional regulations restricting or prohibiting sale of our product.

In addition, some of our product candidates are intended to be used in combination with a delivery device, such as an injector or other delivery system. Medical products containing a combination of new drugs, biological products or medical devices may be regulated as "combination products" in the U.S. A combination product generally is defined as a product consisting of components from two or more regulatory categories (e.g., drug/device, device/biologic, drug/biologic). Each component of a combination product is subject to the requirements established by the FDA for that type of component, whether a new drug, biologic or device. In order to facilitate pre-market review of combination products, the FDA designates one of its centers to have primary jurisdiction for the pre-market review and regulation of the overall product based upon a determination by the FDA of the primary mode of action of the combination product. The determination whether a product is a combination product or two separately regulated products is made by the FDA on a case-by-case basis. Our product candidates intended for use with such devices, or expanded indications that we may seek for our products used with such devices, may not be approved or may be substantially delayed in receiving approval if the devices do not gain and/or maintain their own regulatory approvals or clearances. Where approval of the drug or biologic product and device is sought under a single application, the increased complexity of the review process may delay approval. The FDA review process and criteria are not well-established areas, which could also lead to delays in the approval process. In addition, because these delivery devices are provided by unaffiliated third-party companies, we are dependent on the sustained cooperation and effort of those third-party companies both to obtain regulatory approval and to maintain their own regulatory compliance. Failure of third-party companies to assist in the approval process or to maintain their own regulatory compliance could delay or prevent approval of our product candidates, or limit our ability to sell a product once it is approved.

From time to time during the development and regulatory approval process for our products and product candidates, we engage in discussions with the FDA and comparable international regulatory authorities regarding our development programs, including discussions about the regulatory requirements for approval. As part of these discussions, we sometimes seek advice in the design of our clinical programs from various regulatory agencies globally, but we do not always follow such guidance. This increases the chance of adverse regulatory actions, but we try to always provide appropriate scientific evidence to support approval. For example, although we designed our Phase 3 study of vosoritide in a manner that we believe can demonstrate efficacy and safety of the product candidate for the target patient population, the FDA may ultimately disagree. Moreover, sometimes different regulatory agencies provide different or conflicting advice. While we attempt to harmonize the advice we receive from multiple regulatory authorities, it is not always practical to do so. Also, we may choose not to harmonize conflicting advice when harmonization would significantly delay clinical trial data or is otherwise inappropriate. If we are unable to effectively and efficiently resolve and comply with the inquiries and requests of the FDA and other non-U.S. regulatory authorities, the approval of our product candidates may be delayed and their value may be reduced.

**Any product for which we have obtained regulatory approval, or for which we obtain approval in the future, is subject to, or will be subject to, extensive ongoing regulatory requirements by the FDA, the EMA and other comparable international regulatory authorities, and if we fail to comply with regulatory requirements or if we experience unanticipated problems with our products, we may be subject to penalties, we will be unable to generate revenue from the sale of such products, our potential for generating positive cash flow will be diminished, and the capital necessary to fund our operations will be increased.**

Aldurazyme, Brineura, Kuvan, Naglazyme and Vimizim have received regulatory approval to be commercially marketed and sold in the U.S., the EU and certain other countries, and Palynziq has received regulatory approval to be commercially marketed in the U.S. and the EU. Any product for which we have obtained regulatory approval, or for which we obtain regulatory approval in the future, along with the manufacturing processes and practices, post-approval clinical research, product labeling, advertising and promotional activities for such product, are subject to continual requirements of, and review by, the FDA, the EMA and other comparable international regulatory authorities. These requirements include submissions of safety and other post-marketing information and reports, registration and listing requirements, current good manufacturing practices (cGMP) requirements relating to manufacturing, quality control, quality assurance and corresponding maintenance of records and documents, import and export requirements and record keeping.

An example of the ongoing regulatory requirements our products are subject to is the Palynziq Risk Evaluation and Mitigation Strategy (REMS) program. In the U.S., Palynziq is only available through the REMS program, which is required by the FDA to mitigate the risk of anaphylaxis while using the product. Notable requirements of our REMS program include the following:

- prescribers must be certified by enrolling in the REMS program and completing training;

- prescribers must prescribe auto-injectable epinephrine with Palynziq;

- pharmacies must be certified with the REMS program and must dispense Palynziq only to patients who are authorized to receive it;

- patients must enroll in the REMS program and be educated about the risk of anaphylaxis by a certified prescriber to ensure they understand the risks and benefits of treatment with Palynziq; and

- patients must have auto-injectable epinephrine available at all times while taking Palynziq.

Failure of prescribers, pharmacies or patients to enroll in our REMS program or to successfully complete and comply with its requirements may result in regulatory action from the FDA or decreased sales of Palynziq. The restrictions and requirements under our REMS program, as well as potential changes to these restrictions and requirements in the future, subject us to increased risks and uncertainties, any of which could harm our business. The requirement for a REMS program can materially affect the potential market for and profitability of a drug. We cannot predict whether the FDA will request, seek to require or ultimately require modifications to, or impose additional requirements on, the Palynziq REMS program, or whether the FDA will permit modifications to the Palynziq REMS program that we consider warranted. Any modifications required or rejected by the FDA could make it more difficult or expensive for us to distribute Palynziq in the U.S., impair the safety profile of Palynziq, disrupt continuity of care for Palynziq patients and/or negatively affect sales of Palynziq.

Moreover, promotional communications with respect to prescription drugs, including biologics, are subject to a variety of legal and regulatory restrictions and must be consistent with the information in the product's approved labeling. In particular, a product may not be promoted for uses that are not approved by the FDA as reflected in the product's approved labeling. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant civil, criminal and administrative penalties. Thus, we will not be able to promote any products we develop for indications or uses for which they are not approved.

In addition, the FDA often requires post-marketing testing and surveillance to monitor the effects of products. The FDA, the EMA and other comparable international regulatory agencies may condition approval of our product candidates on the completion of such post-marketing clinical studies. These post-marketing studies may suggest that a product causes undesirable side effects or may present a risk to the patient.

Discovery after approval of previously unknown problems with any of our products, manufacturers or manufacturing processes, or failure to comply with regulatory requirements, may result in actions such as:

- restrictions on our ability to conduct clinical trials, including full or partial clinical holds on ongoing or planned trials;

- restrictions on product manufacturing processes;

- restrictions on the marketing of a product;

- restrictions on product distribution;

- requirements to conduct post-marketing clinical trials;

- untitled or warning letters or other adverse publicity;

- withdrawal of the products from the market;

- refusal to approve pending applications or supplements to approved applications that we submit;

- recall of products;

- refusal to permit the import or export of our products;

- product seizure;

- fines, restitution or disgorgement of profits or revenue;

- injunctions; or

- imposition of civil or criminal penalties.

26

If such regulatory actions are taken, our value and our operating results will be adversely affected. Additionally, if the FDA, the EMA or any other comparable international regulatory agency withdraws its approval of a product, we will be unable to generate revenue from the sale of that product in the relevant jurisdiction, our potential for generating positive cash flow will be diminished and the capital necessary to fund our operations will be increased. Accordingly, we continue to expend significant time, money and effort in all areas of regulatory compliance, including manufacturing, production, product surveillance, post-marketing studies and quality control.

**If we fail to obtain or maintain orphan drug exclusivity for some of our products, our competitors may obtain approval to sell the same drugs to treat the same conditions and our revenues will be reduced.**

As part of our business strategy, we have developed and may in the future develop some drugs that may be eligible for FDA and EU orphan drug designation. Under the Orphan Drug Act, the FDA may designate a product as an orphan drug if it is intended to treat a rare disease or condition, defined as a patient population of fewer than 200,000 in the U.S. In the EU, orphan drug designation is available if a sponsor can establish: that the medicine is intended for the diagnosis, prevention or treatment of (1) a life-threatening or chronically debilitating condition affecting no more than five in 10,000 people in the EU, which is equivalent to around 250,000 people or fewer or (2) a life-threatening, seriously debilitating or serious and chronic condition in the EU and that without incentives it is unlikely that the marketing of the medicinal product in the EU would generate sufficient return to justify the necessary investment. For either of these conditions, the applicant must demonstrate that there exists no satisfactory method of diagnosis, prevention or treatment of the condition in question that has been authorized in the EU or, if such method exists, the medicinal product will be of significant benefit to those affected by that condition. The company that first obtains FDA approval for a designated orphan drug for a given rare disease receives marketing exclusivity for use of that drug for the stated condition for a period of seven years. Orphan drug exclusive marketing rights may be lost if the FDA later determines that the request for designation was materially defective or if the manufacturer is unable to assure sufficient quantity of the drug. In addition, the FDA may approve another drug during a period of orphan drug exclusivity if the second drug is found to be clinically superior to the first drug. In the EU, a ten-year period of market exclusivity (extendable to twelve years for medicines that have complied with an agreed pediatric investigation plan pursuant to Regulation 1901/2006) is available. Orphan drug marketing exclusivity may be lost in the EU if a manufacturer is unable to supply sufficient quantities and marketing authorization may also be granted to a similar medicinal product with the same orphan indication if this medicinal product is safer, more effective or otherwise clinically superior to the original orphan medicinal product. The period of market exclusivity may, in addition, be reduced to six years if, at the end of the fifth year, it can be demonstrated on the basis of available evidence that the criteria for its designation as an orphan medicine are no longer satisfied, for example if the original orphan medicinal product has become sufficiently profitable not to justify maintenance of market exclusivity. Because the extent and scope of patent protection for some of our products is limited, orphan drug designation is especially important for our products that are eligible for orphan drug designation. For eligible products, we plan to rely on the exclusivity period under the Orphan Drug Act to maintain a competitive position. If we do not obtain orphan drug exclusivity for our products that do not have broad patent protection, our competitors may then sell the same drug to treat the same condition and our revenues will be reduced.

Even though we have obtained orphan drug designation for certain of our product candidates and even if we obtain orphan drug designation for our future product candidates, due to the uncertainties associated with developing biopharmaceutical products, we may not be the first to obtain marketing approval for any particular orphan indication, which means that we may not obtain orphan drug exclusivity and could also potentially be blocked from approval of certain product candidates until the competitor product's orphan drug exclusivity period expires. Moreover, with respect to certain biologics and gene therapies, it is uncertain how similarity between product candidates designed to treat the same rare disease or condition may affect such product candidates' orphan drug exclusivities. Further, even if we obtain orphan drug exclusivity for a product, that exclusivity may not effectively protect the product from competition because different drugs can be approved for the same condition and the same drug can be approved for different conditions and potentially used off-label in the orphan indication. Even after an orphan drug is approved and granted orphan drug exclusivity, the FDA can subsequently approve the same drug for the same condition if the FDA concludes that the later drug is safer or more effective or makes a major contribution to patient care. Orphan drug designation neither shortens the development time or regulatory review time of a drug, nor gives the drug any advantage in the regulatory review or approval process.

**We may face competition from biosimilars approved through an abbreviated regulatory pathway.**

Our Aldurazyme, Brineura, Naglazyme, Palynziq and Vimizim products are regulated by the FDA as biologics under the Federal Food, Drug, and Cosmetic Act (the FDC Act) and the Public Health Service Act (the PHS Act). Biologics require the submission of a Biologics License Application (BLA) and approval by the FDA prior to being marketed in the U.S. The Biologics Price Competition and Innovation Act of 2009 (BPCIA) created a regulatory pathway under the PHS Act for the abbreviated approval of biological products that are demonstrated to be "biosimilar" or "interchangeable" with an FDA-approved biological product. A similar abridged marketing authorization process is available to biosimilar products in the EU. In order to meet the standard of interchangeability, a sponsor must demonstrate that the biosimilar product can be expected to produce the same clinical result as the reference product, and for a product that is administered more than once, that the risk of switching between the reference product and biosimilar product is not greater than the risk of maintaining the patient on the reference product. The BPCIA establishes a period of 12 years of exclusivity for reference products. In Europe, a medicinal product containing a new active substance benefits from eight years of data exclusivity, during which biosimilar applications referring to the data of that product may not be accepted by the regulatory authorities, and a further two years of market exclusivity, during which such biosimilar products may not be placed on the market. The two-year period may be extended to three years if during the first eight years a new therapeutic indication with significant clinical benefit over existing therapies is approved. Our products approved under

27

BLAs in the U.S. or Marketing Authorisation Applications (MAAs) in Europe, as well as products in development that may be approved under those regimes in the future, could be reference products for biosimilar marketing applications.

**To obtain regulatory approval to market our products, preclinical studies and costly and lengthy clinical trials are required and the results of the studies and trials are highly uncertain. Likewise, preliminary, initial or interim data from clinical trials should be considered carefully and with caution since the final data may be materially different from the preliminary, initial or interim data, particularly as more patient data become available.**

As part of the drug development process we must conduct, at our own expense, preclinical studies in the laboratory, including studies in animals, and clinical trials on humans for each product candidate. The number of preclinical studies and clinical trials that regulatory authorities require varies depending on the product candidate, the disease or condition the drug is being developed to address and regulations applicable to the particular drug. Generally, new drugs for diseases or conditions that affect larger patient populations, are less severe, or are treatable by alternative strategies must be validated through additional preclinical and clinical trials and/or clinical trials with higher enrollments. With respect to our early stage product candidates, we may need to perform multiple preclinical studies using various doses and formulations before we can begin clinical trials, which could result in delays to our development timeline. Furthermore, even if we obtain favorable results in preclinical studies, the results in humans may be significantly different. After we have conducted preclinical studies, we must demonstrate that our product candidates are safe and efficacious for use in the targeted human patients in order to receive regulatory approval for commercial sale. Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later-stage clinical trials, and favorable data from interim analyses do not ensure the final results of a trial will be favorable. From time to time, we have and may in the future publish or report preliminary, initial or interim data from our clinical trials, such as the data we have announced from the GENEr-8-1 study for valoctocogene roxaparvovec. Preliminary, initial or interim data from our clinical trials may not be indicative of the final results of the trial and are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and/or more patient data become available. In this regard, such data may show initial evidence of clinical benefit, but as patients continue to be followed and more patient data become available, there is a risk that any therapeutic effects will not be durable in patients and/or will decrease over time or cease entirely. Preliminary, initial or interim data also remain subject to audit and verification procedures that may result in the final data being materially different from such preliminary, initial or interim data. As a result, preliminary, initial or interim data should be considered carefully and with caution until the final data are available.

Product candidates may fail to show the desired safety and efficacy traits despite having progressed through preclinical studies and initial clinical trials, or despite having favorable data in connection with an interim analysis. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials. Also, as noted above, we do not always follow the advice of regulatory authorities or comply with all of their requests regarding the design of our clinical programs. In those cases, we may choose a development program that is inconsistent with the advice of regulatory authorities, which may limit the jurisdictions where we conduct clinical trials and/or adversely affect our ability to obtain approval in those jurisdictions where we do not follow the regulatory advice.

Adverse or inconclusive clinical results could stop us from obtaining regulatory approval of our product candidates. Additional factors that can cause delay or termination of our clinical trials include:

- slow or insufficient patient enrollment;

- slow recruitment of, and completion of necessary institutional approvals at, clinical sites;

- budgetary constraints or prohibitively high clinical trial costs;

- longer treatment time required to demonstrate efficacy;

- lack of sufficient supplies of the product candidate;

- adverse medical events or side effects in treated patients, including immune reactions;

- lack of effectiveness of the product candidate being tested;

- availability of competitive therapies to treat the same indication as our product candidates;

- regulatory requests for additional clinical trials or preclinical studies;

- deviations in standards for Good Clinical Practice (GCP); and

- disputes with or disruptions in our relationships with clinical trial partners, including CROs, clinical laboratories, clinical sites, and principal investigators.

28

Table of Contents

Moreover, principal investigators for our clinical trials may serve as scientific advisors or consultants to us from time to time and receive compensation in connection with such services reportable to the FDA or other regulatory authority. If the FDA or other regulatory authority concludes that a financial relationship between us and a principal investigator has created a conflict of interest, the FDA or other regulatory authority may question the integrity of the data generated at the applicable clinical trial site and the utility of the clinical trial itself may be jeopardized.

**Our valoctocogene roxaparvovec program is based on a gene therapy approach, which, as a novel technology, presents additional development and treatment risks in relation to our other, more traditional drug development programs.**

In addition to the risks set forth in this Risk Factors section associated with developing more traditional pharmaceutical drugs, there are additional, unique development and treatment risks associated with gene therapy products like our product candidate valoctocogene roxaparvovec. The goal of gene therapy is to be able to correct an inborn genetic defect through one-time administration of therapeutic genetic material containing non-defective gene copies. The gene copies are designed to reside permanently in a patient, allowing the patient to produce an essential protein or ribonucleic acid (RNA) molecule that a healthy person would normally produce. There is a risk, however, that the new gene copies will produce too little or too much of the desired protein or RNA. Although a one-time administration of a gene therapy product like our product candidate valoctocogene roxaparvovec is intended to correct an inborn genetic defect for the entire lifetime of a patient, there is a risk that the therapeutic effect will not be durable and production of the desired protein or RNA will decrease over time or cease entirely. Because the treatment is irreversible, there may be challenges in managing side effects, particularly those caused by potential overproduction of the desired protein. Adverse effects would not be able to be reversed or relieved by stopping dosing, and we may have to develop additional clinical safety procedures. Furthermore, because the new gene copies are designed to reside permanently in a patient, there is a risk that they will disrupt other normal biological molecules and processes, including other healthy genes, and we may not learn the nature and magnitude of these side effects until long after clinical trials have been completed.

**As compared to our other, more traditional products, our gene therapy product candidate valoctocogene roxaparvovec, if approved, may present additional problems with respect to the pricing, coverage, and reimbursement and acceptance of the product candidate.**

In addition to the risks set forth in this Risk Factors section associated with commercializing more traditional pharmaceutical drugs, there are additional, unique commercial risks associated with gene therapy products like our product candidate valoctocogene roxaparvovec. Due to the relative novelty of gene therapy and the potential to provide extended duration therapeutic treatment with a one-time administration, we face uncertainty with respect to the pricing, coverage and reimbursement of valoctocogene roxaparvovec, if approved. In order to recover our research and development costs and commercialize this one-time treatment on a profitable basis, we expect the cost of a single administration of valoctocogene roxaparvovec to be substantial. Therefore, we expect that coverage and reimbursement by governments and other third-party payers will be essential for the vast majority of patients to be able to afford valoctocogene roxaparvovec. Accordingly, sales of valoctocogene roxaparvovec, if approved, will depend substantially, both domestically and internationally, on the extent to which its cost will be paid by third-party payers. Even if coverage is provided, the reimbursement amounts approved by third-party payers may not be high enough to allow us to realize sufficient revenues from our investment in the development of valoctocogene roxaparvovec.

We also face uncertainty as to whether gene therapy will gain the acceptance of the public or the medical community. Even if we obtain regulatory approval for valoctocogene roxaparvovec, the commercial success of valoctocogene roxaparvovec will depend, in part, on the acceptance of physicians, patients and third-party payers of gene therapy products in general, and our product candidate in particular, as medically necessary, cost-effective and safe. In particular, our success will depend upon physicians prescribing our product candidate in lieu of existing treatments they are already familiar with and for which greater clinical data may be available. Moreover, physicians and patients may delay acceptance of valoctocogene roxaparvovec until the product candidate has been on the market for a certain amount of time. Negative public opinion or more restrictive government regulations could have a negative effect on our business and financial condition and may delay or impair the successful commercialization of, and demand for, valoctocogene roxaparvovec.

**We have implemented a data access plan for valoctocogene roxaparvovec, which restricts our management's review of emerging data from these trials. Without access to ongoing data, management does not have the ability to adjust the trials based on such emerging data, which could adversely impact the ultimate outcome of these trials.**

In order to preserve the scientific integrity of the valoctocogene roxaparvovec trials and to allow us to only report on data at intervals that we believe will be meaningful to investors, we have implemented a data access plan related to the ongoing open label trials, which is designed to significantly mirror blinded trials. Pursuant to this plan, the ongoing emerging data are generally not collected by us, with the exception that certain specific data points are collected and reviewed by a small group of medical personnel monitoring and managing the trial, and then, only to the extent necessary to allow them to perform their monitoring responsibilities. As we disclose and publicly discuss prior data from these trials, such discussions do not incorporate any of the currently emerging data that are being collected and reviewed by personnel monitoring the trial and, accordingly, this prior data may differ significantly from more recent data that are only available to such personnel. Further, since our management does not have access to any of the ongoing data and does not have the ability to adjust the trials based on such emerging data, the data access plan could adversely impact the ultimate outcome of the trials.

**Item 2. Properties**

The following table contains information about our significant owned and leased properties as of December 31, 2019:

| Location | Approximate Square Feet | Use | Lease Expiration Date |
|---|---|---|---|
| San Rafael facility, San Rafael, California | 407,300 | Corporate headquarters, laboratory and office | Owned property |
| Several facilities in Novato, California | 293,300 | Clinical and commercial manufacturing, laboratory and office | Owned property |
| Several leased facilities in Novato, California | 203,700 | Office and warehouse | 2023-2026 |
| Shanbally facility, Cork, Ireland | 203,500 | Manufacturing, laboratory and office | Owned property |

We expect that these properties, together with our other smaller leased office facilities in various countries, will be adequate for our operations for the foreseeable future.

**Item 3. Legal Proceedings**

None.

**Item 4. Mine Safety Disclosures**

Not applicable.

50

**Part II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

Our common stock is listed under the symbol "BMRN" on the Nasdaq Global Select Market.

We have never paid any cash dividends on our common stock and we do not anticipate paying cash dividends in the foreseeable future.

***Recent Sales of Unregistered Securities***

We did not sell any unregistered securities during the year ended December 31, 2019.

***Issuer Purchases of Equity Securities***

We did not make any purchases of our common stock during the year ended December 31, 2019.

***Holders***

As of February 12, 2020, there were 44 holders of record of 179,925,602 outstanding shares of our common stock.

51

*Performance Graph*

The following is not deemed "filed" with the Securities and Exchange Commission and is not to be incorporated by reference into any filing we make under the Securities Act of 1933, as amended, whether made before or after the date hereof and irrespective of any general incorporation by reference language in such filing.

The following graph shows the value of an investment in BioMarin common stock, the Nasdaq Composite Index and the Nasdaq Biotechnology Index, assuming the investment of $100.00 at the beginning of the period and the reinvestment of dividends, if any. Our common stock is traded on the Nasdaq Global Select Market and is a component of both the Nasdaq Composite Index and the Nasdaq Biotechnology Index. The comparisons shown in the graph are based upon historical data and we caution that the stock price performance shown in the graph is not indicative of, nor intended to forecast, the potential future performance of our stock.



**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN\***
Among BioMarin Pharmaceutical Inc., the NASDAQ Composite Index
and the NASDAQ Biotechnology Index

\* $100 invested on December 31, 2014 in stock or index, including reinvestment of dividends.

| | Fiscal Year Ending December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| BioMarin Pharmaceutical Inc. | $ 100.00 | $ 115.88 | $ 91.64 | $ 98.64 | $ 94.19 | $ 93.53 |
| Nasdaq Composite | $ 100.00 | $ 106.96 | $ 116.45 | $ 150.96 | $ 146.67 | $ 200.49 |
| Nasdaq Biotechnology | $ 100.00 | $ 111.77 | $ 87.91 | $ 106.92 | $ 97.45 | $ 121.92 |

**Item 6. Selected Consolidated Financial Data**

We derived the selected consolidated statements of operations data for the years ended December 31, 2019, 2018 and 2017 and the selected consolidated balance sheet data as of December 31, 2019 and 2018 from the audited Consolidated Financial Statements appearing elsewhere in this Annual Report on Form 10-K. We derived the selected consolidated statements of operations data for the years ended December 31, 2016 and 2015 and the selected consolidated balance sheet data as of December 31, 2017, 2016 and 2015 from audited Consolidated Financial Statements not included in this Annual Report on Form 10-K. The information set forth below is not necessarily indicative of results of future operations, and should be read in conjunction with Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the Consolidated Financial Statements and related notes thereto included in Item 15 of this Annual Report on Form 10-K to fully understand factors that may affect the comparability of the information presented below:

| | Years Ended December 31, (In millions, except for per share data) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 (1) | | 2018 (1) | | 2017 (1) | | 2016 | | 2015 | |
| **Consolidated Statements of Operations data:** | | | | | | | | | | |
| Total revenues [2] | $ | 1,704.0 | $ | 1,491.2 | $ | 1,313.6 | $ | 1,116.9 | $ | 889.9 |
| Total costs and expenses | $ | 1,804.5 | $ | 1,614.7 | $ | 1,328.3 | $ | 1,920.3 | $ | 1,000.6 |
| Loss from operations | $ | (100.5) | $ | (123.5) | $ | (14.7) | $ | (803.4) | $ | (110.7) |
| Provision for (benefit from) income taxes | $ | (71.0) | $ | (65.5) | $ | 81.2 | $ | (200.8) | $ | 17.1 |
| Net loss | $ | (23.8) | $ | (77.2) | $ | (117.0) | $ | (630.2) | $ | (171.8) |
| Net loss per share, basic | $ | (0.13) | $ | (0.44) | $ | (0.67) | $ | (3.80) | $ | (1.07) |
| Net loss per share, diluted | $ | (0.13) | $ | (0.44) | $ | (0.67) | $ | (3.81) | $ | (1.07) |
| Weighted average common shares outstanding, basic | | 179.0 | | 177.1 | | 174.4 | | 166.0 | | 160.0 |
| Weighted average common shares outstanding, diluted | | 179.0 | | 177.3 | | 174.4 | | 166.2 | | 160.0 |

| | December 31, (In millions) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 (1) | | 2018 (1) | | 2017 | | 2016 | | 2015 | |
| **Consolidated Balance Sheets data:** | | | | | | | | | | |
| Cash, cash equivalents and investments | $ | 1,165.8 | $ | 1,320.2 | $ | 1,781.7 | $ | 1,362.4 | $ | 1,018.3 |
| Total assets [2] | $ | 4,690.0 | $ | 4,427.1 | $ | 4,633.1 | $ | 4,023.7 | $ | 3,729.4 |
| Convertible senior notes, net | $ | 848.1 | $ | 830.4 | $ | 1,174.5 | $ | 683.2 | $ | 662.3 |
| Other long-term obligations [2] | $ | 148.9 | $ | 105.5 | $ | 194.4 | $ | 157.3 | $ | 220.8 |
| Total stockholders' equity | $ | 3,122.4 | $ | 2,967.9 | $ | 2,808.7 | $ | 2,766.3 | $ | 2,400.8 |

(1)    Refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations — Results of Operations" in Part II, Item 7 of this Annual Report on Form 10-K for additional discussion of our operating results and changes in our financial position.

(2)    Refer to the Consolidated Financial Statements and related notes thereto included in Item 15 of this Annual Report on Form 10-K for additional discussion of the impact of adoption of new accounting pronouncements.

**Quarterly Financial Data (unaudited)**

You should read the following tables presenting our unaudited quarterly results of operations in conjunction with the Consolidated Financial Statements and related notes contained elsewhere in this Annual Report on Form 10-K. We have prepared this unaudited information on the same basis as our audited Consolidated Financial Statements. Our quarterly operating results have fluctuated in the past and may continue to do so in the future as a result of a number of factors, including, but not limited to, the timing and nature of research and development activities.

| | Three Months Ended (In millions, except per share data, unaudited) | | | |
| | March 31, | June 30, | September 30, | December 31, |
|---|---|---|---|---|
| **2019:** | | | | |
| Total revenues | $ 400.7 | $ 387.8 | $ 461.1 | $ 454.4 |
| Net income (loss) | $ (56.5) | $ (37.4) | $ 55.0 | $ 15.0 |
| Net income (loss) per share, basic | $ (0.32) | $ (0.21) | $ 0.31 | $ 0.08 |
| Net income (loss) per share, diluted | $ (0.32) | $ (0.21) | $ 0.30 | $ 0.08 |
| **2018:** | | | | |
| Total revenues | $ 373.4 | $ 372.8 | $ 391.7 | $ 353.2 |
| Net loss | $ (44.1) | $ (16.8) | $ (12.6) | $ (3.7) |
| Net loss per share, basic | $ (0.25) | $ (0.09) | $ (0.07) | $ (0.02) |
| Net loss per share, diluted | $ (0.26) | $ (0.09) | $ (0.07) | $ (0.03) |

Refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations - Results of Operations" in Part II, Item 7 of this Annual Report on Form 10-K for discussion of our operating results.

54

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

BIOMARIN PHARMACEUTICAL INC.

Dated: February 27, 2020                                  By:  _____
                                                                          /S/ BRIAN R. MUELLER

                                                                        **Brian R. Mueller**
                                                         **Senior Vice President, Finance and**
                                                           **Acting Chief Financial Officer**

82

**Exhibit 24.1**

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Jean-Jacques Bienaimé and Brian R. Mueller, his or her attorney-in-fact, with the power of substitution, for him or her in any and all capacities, to sign any amendments to the Report on Form 10-K and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /S/ JEAN-JACQUES BIENAIMÉ<br>**Jean-Jacques Bienaimé** | Chairman and Chief Executive Officer (Principal Executive Officer) | February 27, 2020 |
| /S/ BRIAN R. MUELLER<br>**Brian R. Mueller** | Senior Vice President, Finance and Acting Chief Financial Officer (Principal Financial and Accounting Officer) | February 27, 2020 |
| /S/ ELIZABETH MCKEE ANDERSON<br>**Elizabeth McKee Anderson** | Director | February 27, 2020 |
| /S/ WILLARD H. DERE, M.D.<br>**Willard H. Dere, M.D.** | Director | February 27, 2020 |
| /S/ MICHAEL G. GREY<br>**Michael G. Grey** | Director | February 27, 2020 |
| /S/ ELAINE J. HERON<br>**Elaine J. Heron** | Director | February 27, 2020 |
| /S/ ROBERT J. HOMBACH<br>**Robert J. Hombach** | Director | February 27, 2020 |
| **V. Bryan Lawlis** | Director | February 27, 2020 |
| /S/ ALAN J. LEWIS<br>**Alan J. Lewis** | Director | February 27, 2020 |
| /S/ RICHARD A. MEIER<br>**Richard A. Meier** | Lead Independent Director | February 27, 2020 |
| /S/ DAVID PYOTT<br>**David Pyott** | Director | February 27, 2020 |
| /S/ DENNIS J. SLAMON<br>**Dennis J. Slamon** | Director | February 27, 2020 |

83

**Exhibit 31.1**

**CERTIFICATION**

I, Jean-Jacques Bienaimé, certify that:

1.  I have reviewed this Annual Report on Form 10-K of BioMarin Pharmaceutical Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  b)any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2020


/S/ JEAN-JACQUES BIENAIMÉ

Jean-Jacques Bienaimé
Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION**

I, Brian R. Mueller certify that:

1. I have reviewed this Annual Report on Form 10-K of BioMarin Pharmaceutical Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2020

/S/ BRIAN R. MUELLER
_____

Brian R. Mueller
Senior Vice President, Finance and
Acting Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of BioMarin Pharmaceutical Inc. (the Company) for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the Report), we, Jean-Jacques Bienaimé, and Brian R. Mueller, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1)        the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)        the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/S/ JEAN-JACQUES BIENAIMÉ

Jean-Jacques Bienaimé
Chief Executive Officer

February 27, 2020


/S/ BRIAN R. MUELLER

Brian R. Mueller
Senior Vice President, Finance and
Acting Chief Financial Officer

February 27, 2020


This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of BioMarin Pharmaceutical Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.