**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470

SALVATORE GRAZIANO
salvatore@blbglaw.com
JEROEN VAN KWAWEGEN
jeroen@blbglaw.com
KATHERINE M. SINDERSON
katiem@blbglaw.com
ABE ALEXANDER
abe.alexander@blbglaw.ccom
CHRISTOPHER R. MILES
christopher.miles@blbglaw.com
THOMAS Z. SPERBER
thomas.sperber@blbglaw.com

*Counsel for Lead Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE BIOMARIN PHARMACEUTICAL INC. SECURITIES LITIGATION | Case No. 3:20-CV-06719-WHO |
| | CLASS ACTION |
| | **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** |
| | Date:        September 8, 2021<br>Time:        2:00 p.m.<br>Courtroom:  2, 17th Floor<br>Judge:       William H. Orrick |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT OF ISSUES TO BE DECIDED ................................................................ vi

I.      INTRODUCTION ................................................................................................. 1

II.     FACTS ................................................................................................................... 4

     A.   Valrox's Approval Was Critical To BioMarin's Business ................................... 4

     B.   Clinical Trial Results Raised Concerns About Valrox's Manufacturing ............... 4

     C.   The FDA's Timeline For BLA Review ................................................................. 4

     D.   BioMarin Reassured Investors That It Was Meeting Its FDA Milestones ............ 5

     E.   In Truth, Defendants Knew Timely FDA Approval Was In Serious Jeopardy ...... 6

     F.   BioMarin Discloses That Valrox Would Not Be Approved On Schedule ............. 7

III.    ARGUMENT .......................................................................................................... 8

     A.   The Complaint Alleges That Defendants' Statements Were Misleading ............... 8

          1.   The Complaint Alleges Defendants' Statements That BioMarin Was "Working Very Closely" With The FDA Were Misleading .............. 8

          2.   The Complaint Alleges Defendants' Statements That BioMarin Was Meeting Review Milestones Were Misleading ................................ 12

          3.   The PSLRA "Safe Harbor" Does Not Apply ........................................ 17

          4.   Defendants' Misstatements Are Not Inactionable Opinions ................... 20

     B.   The Complaint Adequately Alleges Scienter ....................................................... 20

IV.    CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(S)**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ..................................................................................................21

*In re Alphabet, Inc. Sec. Litig.*,
    2021 WL 2448223 (9th Cir. June 16, 2021) ...........................................................................19

*In re Amylin Pharms., Inc. Sec. Litig.*,
    2002 WL 31520051 (S.D. Cal. Oct. 10, 2002) ...........................................................10, 14, 22

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ..........................................................................25

*Azar v. Yelp, Inc.*,
    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ........................................................................24

*Batwin v. Occam Networks, Inc.*,
    2008 WL 2676364 (C.D. Cal. July 1, 2008) ...........................................................................23

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ..............................................................................................8, 22

*Christine Asia Co. v. Ma*,
    718 F. App'x 20 (2d Cir. 2017) .............................................................................................22

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ...............................................................................................17

*In re Dynavax Sec. Litig.*,
    2018 WL 2554472 (N.D. Cal. June 4, 2018) ..........................................................................10

*In re EDAP TMS S.A. Sec. Litig.*,
    2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015)........................................................................18

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)....................................................................................19

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ...................................................................................................8

*Frater v. Hemispherx Biopharma, Inc.*,
    996 F. Supp. 2d 335 (E.D. Pa. 2014) .....................................................................................10

*Freedman v. Saint Jude Med., Inc.*,
    4 F. Supp. 3d 1101 (D. Minn. 2014)......................................................................................2, 9

*Gerneth v. Chiasma*,
   2018 WL 935418 (D. Mass. Feb. 15, 2018) ....................................................................13, 15

*Hatamian v. Advanced Micro Devices, Inc.*,
   87 F. Supp. 3d 1149 (N.D. Cal. 2015) ..............................................................................9, 21

*In re HI/FN, Inc. Sec. Litig.*,
   2000 WL 33775286 (N.D. Cal. Aug. 9, 2000) .......................................................................19

*Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*,
   2020 WL 1244936 (N.D. Cal. Mar. 16, 2020)........................................................................23

*Johnson v. Aljian*,
   394 F. Supp. 2d 1184 (C.D. Cal. 2004) ..................................................................................23

*Johnson v. Costco Wholesale Corp.*,
   2019 WL 6327580 (W.D. Wash. Nov. 26, 2019).....................................................................23

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ....................................................................................................6

*Kovtun v. VIVUS, Inc.*,
   2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ........................................................................18

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .................................................................................................17

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ...................................................................................................25

*Mandalevy v. Bofi Holding, Inc.*,
   2021 WL 794275 (S.D. Cal. Mar. 2, 2021) .............................................................................25

*In re MannKind Sec. Actions*,
   835 F. Supp. 2d 797 (C.D. Cal. 2011) ................................................................................9, 21

*Medina v. Clovis Oncology Inc.*,
   215 F. Supp. 3d 1094 (D. Colo. 2017).....................................................................................24

*Mulligan v. Impax Labs, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .......................................................................................22

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ...................................................................................................24

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
   2018 WL 3126393 (N.D. Cal. June 26, 2018).........................................................................23

*In re Novatel Wireless Sec. Litig.*,
   830 F. Supp. 2d 996 (S.D. Cal. 2011)......................................................................................23

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ......................................................................................17

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ..........................................................................................................20

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) .......................................................................................23

*In re Portal Software, Inc. Sec. Litig.*,
   2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ...................................................................24

*In re Quality Sys. Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ...........................................................................................18

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)......................................................................24

*Rihn v. Acadia Pharms. Inc.*,
   2016 WL 5076147 (S.D. Cal. Sept. 19, 2016)...................................................................13

*Rodriguez v. Gigamon Inc.*,
   325 F. Supp. 3d 1041 (N.D. Cal. 2018) ............................................................................19

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..............................................................................................19

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015)..................................................................................18

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ...................................................................................... *passim*

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ............................................................................10

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..............................................................................8

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) .............................................................................................23

*Skiadas v. Acer Therapeutics, Inc.*,
   2020 WL 4208442 (S.D.N.Y. July 21, 2020) ....................................................................25

*Tellabs, Inc. v. Makor Issues & Rts.*,
   551 U.S. 308 (2007)...........................................................................................................21

*Tomaszewski v. Trevena, Inc.*,
   482 F. Supp. 3d 317 (E.D. Pa. 2020) ................................................................................10

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)................................................................................................10

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. Mar. 27, 2009) ..................................................................24

*In re Viropharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. May 15, 2014)......................................................................23

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    57 F. Supp. 3d 950 (D. Minn. 2014)...................................................................................10

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ...............................................................................................13

*In re WEBMD Health Corp. Sec. Litig.*,
    2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ...........................................................................18

*Wochos v. Tesla Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ...........................................................................................18

*Zaghian v. Farrell*,
    675 Fed. App'x 718 (9th Cir. 2017) ...................................................................................19

*Zak v. Chelsea Therapeutics Int'l., Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ...............................................................................................9

**STATUTES AND OTHER AUTHORITIES**

15 U.S.C. § 78u-5 ......................................................................................................................3, 18

21 U.S.C. § 355(c) .........................................................................................................................17

21 U.S.C. § 379(g) .........................................................................................................................17

42 U.S.C. § 262..............................................................................................................................17

Allan Horwich, *The Origin, Application, Validity, and Potential Misuse of Rule 10b5-1*,
    62 Bus. Law. 913 (2007)....................................................................................................24

## STATEMENT OF ISSUES TO BE DECIDED

Whether the Complaint alleges facts that, considered holistically, state claims under §10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and §20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a).

## I.   **INTRODUCTION**

This case arises from Defendants' false and misleading statements and omissions concerning BioMarin's application to the FDA seeking approval to market the Company's most important drug product during the Class Period, a gene therapy for hemophilia called valrox. Investors were deeply focused on the progress of the FDA's review, and, in particular, the successful completion of a required regulatory inspection of BioMarin's new manufacturing facility ("Preapproval Inspection"). Throughout the Class Period, Defendants assured investors BioMarin was "working very closely" and "quite collaborative[ly]" with the FDA in connection with the valrox application, that the Company was "tracking to" or ahead of approval milestones, and, critically, that the Preapproval Inspection would occur in the second quarter of 2020.

Directly contrary to their reassuring statements, however, Defendants have now admitted that the Company had "no dialogue whatsoever" with the FDA from mid-April 2020 to the conclusion of the review in August, outside of a troubling "Late Cycle" meeting ("LCM") in June. As a result, the Company was unable to address key approval milestones, including labelling. Further, the FDA had warned BioMarin at the start of the Class Period that the Preapproval Inspection would likely be substantially delayed, seriously jeopardizing valrox's approval by the August deadline. Then, at the LCM in June 2020, the FDA flagged serious concerns about valrox's efficacy and ***cancelled*** the Preapproval Inspection. Defendants frantically sought reassurances that neither the FDA's concerns about efficacy nor the cancellation of the inspection would impact valrox's approval but received none. Defendants later admitted that they were "going crazy" and "scrambl[ing]" internally as a result. Nevertheless, Defendants continued to publicly assure the market that the valrox BLA and the (already-cancelled) Preapproval Inspection were "on track"; to tout valrox's efficacy; and to crow that valrox's competition was "so far behind" BioMarin.

Defendants had powerful motives to withhold, or postpone, disclosure of those facts. For instance, after the LCM and the cancellation of the Preapproval Inspection—but before investors learned these facts—Defendant Fuchs sold ***64%*** of his BioMarin holdings, though he had not sold a single share during the six months preceding the six-month Class Period ("Control Period").

The truth was ultimately revealed on August 19, 2020, when BioMarin announced that the

FDA would not approve valrox. Analysts were "shocked" and "surprised" by this news and immediately raised questions concerning management's credibility. On this news, BioMarin stock plummeted by $41.82 per share, more than 35%, wiping out billions in shareholder value.

In their Motion, Defendants raise a series of arguments that ignore the Complaint's well-pled allegations and misconstrue the law. ***First***, Defendants cannot seriously dispute that their statements assuring investors that BioMarin was "working closely" with the FDA and meeting key review milestones are actionable. A mountain of authority holds that "where the Defendants chose to speak on the company's interactions with the FDA, they had a duty not to make 'inaccurate, incomplete or misleading disclosures.'" *Freedman v. Saint Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1114 (D. Minn. 2014); *infra* at 9-10. Instead, Defendants argue that the Complaint misconstrues Fuchs' admission that BioMarin "had no dialogue ***whatsoever*** with the agency" after mid-April 2020. Defendants ask this Court to hold, as a matter of law, that Fuchs did not actually mean "whatsoever" and read words into his statement that are not there. DB 17-18.[1] Defendants also ignore their additional admissions that, for example, BioMarin had no discussions with FDA concerning labelling and post-marketing surveillance (both mandatory milestones), and that "the biggest issue that we had was to convince [the FDA] to have a discussion with us ***of any kind***."

While Defendants now improperly (and unsuccessfully) attempt to create a fact issue over the extent of the FDA's silence, their admissions make clear that BioMarin had unusually limited dialogue with the FDA; that the extent to which dialogue was limited was surprising to BioMarin; and that BioMarin missed key review milestones as a result. This is more than adequate to render their statements touting the close dialogue between BioMarin and the agency misleading.

***Second***, Defendants argue that the Complaint fails to allege that either the FDA's concerns raised at the LCM or the cancellation of the Preapproval Inspection "precluded" valrox's approval. DB 15-18, 25. But to plead materiality, the Complaint need not allege that these undisclosed issues ***foreclosed*** approval, but rather, that they made approval materially less likely and, therefore, Defendants' failure to disclose them misled investors "about ***the risk*** of non-approval or delayed

---

[1] All references to "¶_" are in reference to the Amended Class Action Complaint, ECF No. 54. "DB_" refers to Defendants' Brief in Support of Defendants' Motion to Dismiss, ECF No. 59. "Dx._" refers to the exhibits to the Declaration of Addison M. Litton, ECF No. 59-1. Unless otherwise stated, all emphasis is added and all internal quotations and citations are omitted.

approval." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 708 (9th Cir. 2016); *infra* at 14-16. Moreover, Defendants' fact-driven arguments are belied by their own responses to these events, including that they were "going crazy" and "scrambl[ing]" internally as a result of the cancellation of the Preapproval Inspection and that they were worried enough to seek reassurances about approvability from the FDA, but failed to receive them. *Infra* at 16.

*Third*, Defendants argue that virtually all of their statements are protected by the PSLRA's "safe harbor" for "forward-looking" statements. DB 9-11. But these misstatements—*e.g.*, that "*we're* tracking to our [approval] milestones"; "the agency *is* actually ahead of their PDUFA mandated regulatory metrics" and "the agency *has been* quite collaborative"—are misstatements of historical fact. Defendants' misstatements are also ineligible for "safe harbor" protection because they were neither accompanied by "meaningful cautionary language" nor made without actual knowledge of their propensity to mislead. 15 U.S.C. § 78u-5; *infra* at 18-20.

*Finally*, Defendants argue that the Complaint fails to adequately plead scienter. DB 20-25. The Complaint alleges a litany of facts that, when considered collectively, as they must be, easily plead scienter, including Defendants' *own admissions* that (1) BioMarin "had no dialogue whatsoever" with the FDA for most of the Class Period; (2) BioMarin failed to address key BLA review milestones; (3) in connection with the LCM, the FDA raised concerns about valrox's efficacy; (4) Fuchs and his colleagues requested, but the FDA refused to provide, reassurances that the agency's concerns would not derail valrox's approval; and (5) the FDA told BioMarin it was cancelling the Preapproval Inspection, as a result of which Fuchs again admitted that he and his team were "going crazy" and "scrambl[ing]" internally. The Complaint further alleges that (1) Defendants' misstatements concerned the most significant events relating to one of BioMarin's most significant products—one that would *double* BioMarin's *Company-wide* revenue; and (2) Defendants sold millions of dollars' worth of BioMarin stock and held a $600 million bond offering following the FDA's warnings. Defendants' proposed nonfraudulent inference—that Defendants would not "promise FDA approval that [they] *knew* would not materialize" (DB 25)— disregards the Complaint's allegations and theory of the fraud. *See Arena*, 840 F.3d at 708.

## II.    FACTS

### A.    Valrox's Approval Was Critical To BioMarin's Business

In early 2020, BioMarin was facing a dire situation: the exclusivity period for two drugs that made up 36% of the Company's total revenue was due to end in a year. ¶31. Thus, BioMarin's prospects were dependent on the drugs in its development pipeline, especially valrox. ¶32. Valrox was touted as a game-changer for the Company, as it would be the first gene therapy approved to treat hemophilia A. ¶38, 150. BioMarin intended to charge an incredible $2 million for a single valrox infusion, making it the most expensive drug ever marketed. ¶39. As a result, valrox had the potential to *double* BioMarin's revenue. ¶41. But BioMarin needed to get valrox to market before Pfizer and Roche, which were developing their own gene therapies for hemophilia A. ¶40.

### B.    Clinical Trial Results Raised Concerns About Valrox's Manufacturing

In May 2019, BioMarin released results for two important clinical trials of valrox: a Phase I/II trial and a larger Phase III trial. ¶¶45-48. The criteria defining success was the level of "Factor VIII" activity the patients achieved. *Id.* As both trials progressed, Factor VIII activity levels declined significantly. *Id.* Further, the Phase III patients achieved only *half* the levels shown in the Phase I/II trial and an unexpectedly large number did not respond to therapy at all. ¶50.

In the Phase III trials, BioMarin had, for the first time, treated patients with commercial-grade valrox manufactured in its new facility in Novato, California (the "Novato Facility"). Shortly before the Class Period, Dr. Peter Marks, the Director of the FDA's Center for Biologics Evaluations and Research, stressed in high-profile public comments that "many" of the challenges in developing gene therapy "relate to manufacturing issues." ¶57. Analysts questioned whether the switch to the Novato Facility accounted for the decrease in efficacy observed in Phase III. ¶54.

### C.    The FDA's Timeline For BLA Review

On February 20, 2020, the FDA accepted BioMarin's Biologics License Application ("BLA") seeking approval to market valrox. ¶61. Because BioMarin sought "accelerated" FDA approval under the Prescription Drug User Fee Act ("PDUFA"), the FDA was required to issue a decision on valrox by August 21, 2020 (the "PDUFA Date"). *Id.* PDUFA dates are critical milestones, described by one analyst as "binary events that invariably serve as make-or-break

catalysts for stocks." ¶62. Because the FDA does not publicly release PDUFA dates, drug companies often release their PDUFA dates voluntarily, hoping for a surge in their stock price. *Id.*

Multiple milestones must occur in the six months between acceptance of a BLA and the PDUFA date for the FDA to approve an application. ¶67. These milestones include a "mid-cycle" communication and the LCM. *Id*. Following the "mid-cycle" communication, numerous additional milestones must be met, including critical labelling reviews; agreements regarding post-marketing commitments, and the transmission of team commentary; or "discipline review letters." ¶¶69-70.

For drugs granted accelerated review, like valrox, the LCM must occur no later than two months before the PDUFA date, here June 21, 2020, and the FDA must send a background package to the manufacturer no later than two days before the LCM. ¶¶72-73. Likewise, the Preapproval Inspection, which can take multiple weeks to complete, is to be performed, per FDA guidance, at least two months prior to the PDUFA date. ¶76. As the Company disclosed, the Preapproval Inspection of the new Novato Facility was a requirement for valrox's approval. ¶75.

**D.      BioMarin Reassured Investors That It Was Meeting Its FDA Milestones**

Throughout the Class Period, Defendants stated that BioMarin was "***working very closely with***" the FDA "to keep things on track" (¶¶93, 135); that "[t]he confidence from the FDA is that we're tracking our milestones and in some cases, they are accelerating their work" (¶¶89, 122); that the Preapproval Inspection was "scheduled significantly before the PDUFA date" (¶¶90, 125); and that "***everything is going quite well, in review with the FDA***" (¶¶90, 127).

Defendants also assured investors that the Preapproval Inspection was "expected to be complete during the second quarter" of 2020. ¶¶91, 130. Likewise, in response to an analyst's question about whether BioMarin remained "on track for the FDA's inspection," Defendants stated that "***the agency has been quite collaborative***" in ensuring this critical milestone was being met. ¶92. In early June, Fuchs stated "Well, we're ***in the middle of a mesh with the FDA***" and "the agency is actually ahead of their PDUFA mandated regulatory metrics in terms of time line." ¶93.

In May 2020, BioMarin held a $600 million private offering to raise capital needed to pay off $375 million in notes coming due in October of 2020. ¶154.

**E.     In Truth, Defendants Knew Timely FDA Approval Was In Serious Jeopardy**

Unbeknownst to investors, at the beginning of the Class Period, while Defendants were representing that the valrox BLA review was on-track, the FDA had warned BioMarin that the Preapproval Inspection of the Novato Facility would likely be delayed beyond the second quarter of 2020, seriously jeopardizing valrox's approval by the PDUFA Date. ¶78-80, 110.

Further, as Defendants later admitted, even while Defendants were claiming that the FDA was being "quite collaborative," Defendants had in fact had "***no dialogue whatsoever***" with the agency between mid-April and August 2020. ¶¶82-86, 94, 108. The FDA's sudden silence was a sharp break from what Defendants characterized as the agency's "frequent interactions" with BioMarin prior to mid-April 2020. ¶83. Indeed, in response to stunned questions from securities analysts after the Class Period, Defendants admitted that the FDA's reticence was highly unusual, particularly given valrox's Breakthrough Therapy designation. ¶¶83-85, 94. Moreover, Defendants later admitted that, because BioMarin had "no dialogue whatsoever" with the FDA during the second half of the review cycle, BioMarin was unable to address key milestones, including mandatory discussions about "labeling or post-approval studies," and that BioMarin was "just going to be beginning that process" after the Class Period. ¶¶84-86, 103.

The FDA broke its silence for a devastating meeting it conducted with BioMarin no later than June 21, 2020. At the LCM, and in the pre-meeting package delivered to BioMarin, the FDA raised concerns regarding the decline in efficacy between the Phase I/II trials and the Phase III trial, whether manufacturing differences might have caused the disparity, and whether the data indicated any efficacy valrox showed would "wear off." ¶97.

The FDA also told BioMarin that it was ***cancelling*** the Preapproval Inspection. ¶¶103, 108. When BioMarin sought reassurance from the FDA that its concerns would not endanger approval, the FDA refused to provide any. ¶¶97-101. Following the FDA's cancellation of the Preapproval Inspection, BioMarin was internally "going crazy" and "scrambl[ing]." ¶103.

Defendants did not share this information with investors. Instead, on June 24, 2020, an analyst asked Defendants whether BioMarin "still expected to have an inspection [of the Novato Facility] in the first half of this year." Fuchs responded, "Yes . . . . I think our answer to these types

of questions is going to be, *we're on track for our PDUFA [date of] 8[/]21*." ¶¶104, 137. Moreover, on August 13, 2020, even though the Preapproval Inspection had *still* not occurred, Fuchs boasted that BioMarin's hemophilia A gene therapy competitors were "*so far behind*" BioMarin. ¶¶106, 144. Analysts wrote that "[J]ust 7 days away from their PDUFA date, with high odds of success, the top [BioMarin] execs clearly feel that they are way out front." ¶107.

Defendants took advantage of this (undeserved) hype to sell tens of millions of dollars in stock. For instance, Fuchs sold *59% of his BioMarin holdings* (85% of his Class-Period sales) in just two transactions in July 2020, just weeks after the LCM and inspection cancellation, for proceeds of *$19.5 million*. ¶¶110-11. Fuchs' sales were a dramatic departure from his past trading, in which he sold *zero* shares during the pre-Class Period Control Period. ¶111. Likewise, during the Class Period, Bienaimé sold *twice* the number of shares as during the Control Period. ¶111.

F.      **BioMarin Discloses That Valrox Would Not Be Approved On Schedule**

On August 19, 2020, BioMarin revealed that the FDA had issued a Complete Response Letter ("CRL") stating valrox could not be approved by the PDUFA Date. ¶¶113-14. The CRL cited the decline in factor activity between the Phase I/II and Phase III trials—the very same concern that the FDA had flagged during the LCM. ¶116. Analysts were shocked. ¶115 (CRL came "as a massive surprise & chang[ed] our prior thesis"). Piper Sandler stated that they were "shocked by [the] development as *management, as recently as last week . . . was uber bullish regarding [valrox]'s commercial prospects*." *Id.* JPMorgan correctly noted that BioMarin "*would have been aware of this data deficiency well before the week of the [PDUFA Date].*" *Id.*

On August 19, 2020, BioMarin's stock price plummeted by $41.82 per share—more than 35%—to close at $76.72, wiping out billions of dollars in shareholder value in one day. ¶114.[2]

---

[2] Defendants improperly ask the Court to take judicial notice of numerous documents cited nowhere in the Complaint for the truth of their contents. ECF No. 60. The Ninth Circuit has cautioned that courts should resist "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint" in securities fraud cases, which "risks premature dismissals of plausible claims that may turn out to be valid after discovery," and has made clear that such documents may not be accepted for their truth. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1003 (9th Cir. 2018).

## III.   ARGUMENT

### A.   The Complaint Alleges That Defendants' Statements Were Misleading

Section 10(b) protects investors from both misstatements and omissions of material fact that render a statement misleading. A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). If an issuer touts positive information, it must also "disclos[e] adverse information that cuts against the positive information." *Arena*, 840 F.3d at 705-06. "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133-34 (N.D. Cal. 2017).

#### 1.   The Complaint Alleges Defendants' Statements That BioMarin Was "Working Very Closely" With The FDA Were Misleading

Knowing that the progress of the FDA's BLA review was of paramount importance to investors, and in direct response to analyst questions on the subject, Defendants repeatedly reassured the market that BioMarin was closely collaborating with the FDA and touted the extensive dialogue between BioMarin and the agency. Defendants stated that BioMarin was "***in the middle of a mesh*** with the FDA. Any given day, it's like ***back and forth***," that "the agency is actually ***ahead of*** their PDUFA mandated regulatory metrics in terms of timeline" and BioMarin was "***working very closely with them*** to keep things on track." ¶¶93, 135. Likewise, in response to an analyst's question about whether BioMarin remained "on track for the FDA's inspection" of the Novato Facility, Defendants stated that "***the agency has been quite collaborative***" with BioMarin in ensuring this critical milestone was being met. ¶¶92, 132. Defendants further assured investors that "***everything is going quite well, in review with the FDA***." ¶¶90, 127.

As discussed above, these statements were false. Defendants have admitted that from mid-April until it received the CRL in August, BioMarin "had no dialogue whatsoever with the agency" outside of the dismal LCM. ¶¶82-86. Defendants have further admitted that the FDA's reticence was highly unusual given valrox's Breakthrough Therapy designation, that it was a sharp break

with the FDA's past course of dealing and their expectations, and that, as a result, BioMarin was unable to meet (or even begin) multiple key approval milestones, such as labelling. ¶¶84-86, 103. Accordingly, Defendants' statements assuring investors BioMarin was "working closely" with FDA and meeting key review milestones were materially misleading. *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1160 (N.D. Cal. 2015) ("Defendants' later admissions also make plausible plaintiffs' allegations that [the] statements . . . were false when made.").

Courts in this Circuit and across the country routinely hold that "where the Defendants chose to speak on the company's interactions with the FDA, they had a duty not to make inaccurate, incomplete or misleading disclosures." *Freedman*, 4 F. Supp. 3d at 1114 (statements regarding company's efforts to comply with FDA regulations misleading where company failed to disclose FDA's warnings of non-compliance). In *Arena,* the Ninth Circuit held that a drug maker's statements expressing confidence in FDA approval based on its trial data were misleading where it failed to disclose that the FDA had privately voiced concerns about the safety results of one study and had requested additional data—a request plaintiffs alleged was "highly unusual" and "out-of-process"—though the agency permitted trials to continue and ultimately approved the drug. 840 F.3d at 707-08. The Ninth Circuit concluded that:

> Arena's failure to inform the market about the risk of non-approval or delayed approval based on the FDA's concerns . . . was an extreme departure from the standards of ordinary care . . . [that] present[ed] a danger of misleading buyers or sellers that [was] either known to [Arena] or [was] so obvious that [it] must have been aware of it.

*Id*. Likewise, a drug maker's "misstatement[s] of the basic facts regarding the company's ongoing involvement with the FDA" are actionable because they mislead the market about "the likelihood of [drug] approval." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809-10 (C.D. Cal. 2011) (statements that study design "was vetted with the FDA" and company had FDA's "blessing" were misleading where it never obtained such agreement); *see also Zak v. Chelsea Therapeutics Int'l., Ltd.*, 780 F.3d 597, 602-03 (4th Cir. 2015) (statements that meeting with the FDA had "a successful outcome" and that FDA had "agreed" company could submit its application using data from just one study were misleading because, "even assuming [defendants] truthfully represented an FDA communication that [the] new drug application *could* be submitted," they omitted FDA's warning

at that meeting "that a single successful study typically was not sufficient to support approval").[3]

Defendants here did not just express confidence in the likelihood of FDA approval based on trial data (as in *Arena*) or characterize their interactions with the FDA as "successful" (as in *Zak*); they stated that BioMarin had been in regular dialogue with the FDA when, in fact, the opposite was true—which Defendants admitted was highly unusual—and, as a result, BioMarin was unable to address key issues essential to approval, including labelling.[4]

In response, Defendants argue that Plaintiff misinterprets Fuchs' September 2020 statement that "we had no dialogue ***whatsoever*** with the agency." DB 18. Defendants ask this Court to conclude, ***as a matter of law***, that Fuchs did not actually mean "whatsoever"; instead, he meant BioMarin had no dialogue "about valrox's efficacy." DB 18. ***First***, Defendants cannot secure dismissal by asking the Court to read words into an admission that are not there. *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1131-32 (N.D. Cal. 2020) ("Court must adopt Plaintiff's interpretation . . . because the Court may not resolve any disputes about the actual meaning of the statement in this procedural posture.").[5]

***Second***, the Complaint's allegation is entirely consistent with Defendants' other post-Class Period admissions, which Defendants ignore. For instance, Fuchs admitted that BioMarin had no

---

[3] *See also Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 323, 330 (E.D. Pa. 2020) (statement that "[w]e expect the data from our Phase III pivotal efficacy studies in the first quarter of 2017 with an NDA submission in the second half of 2017" misleading because it omitted that FDA expressed skepticism about important elements of study design); *W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 971-72 (D. Minn. 2014) (statement that issuer was "continuing to work with the FDA to figure out kind of where they are on" approval misleading because it omitted that issuer had "received a letter of non-approval"); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 346 (E.D. Pa. 2014) (statement that FDA agreed to accept "new analyses" materially misleading because it omitted FDA's "statement that it would be 'unusual' for such reanalysis to provide sufficient evidence for approval"); *In re Amylin Pharms., Inc. Sec. Litig.*, 2002 WL 31520051, at *8 (S.D. Cal. Oct. 10, 2002) (statement that trial results "met the requirements for FDA approval" were misleading where prior FDA meeting "shed serious doubt on the sufficiency of the trials").

[4] Defendants' cases (DB 12) are inapposite. *Tongue v. Sanofi*, 816 F.3d 199, 211-12 (2d Cir. 2016) is an out-of-circuit case that held that defendants did not need to disclose the FDA's concerns about single-blind studies because the FDA offered reassurance that those concerns would not be an issue if the "results showed an 'extremely large effect,'" which they undisputedly did *Id.* at 211. In *In re Dynavax Sec. Litig.*, 2018 WL 2554472, at *7 (N.D. Cal. June 4, 2018), the court noted the "absence of any factual allegations to suggest that the dialogue with the FDA was 'highly unusual'" and "outside the normal process," which is exactly what Plaintiff alleges here.

[5] Defendants claim the Complaint's allegation is not "plausible" because a months' long silence from the FDA would be highly unusual. DB 18. But that is precisely the point. And it is why analysts expressed shock when they finally learned the truth. ¶¶83-84.

discussions with FDA concerning labelling and post-marketing surveillance, both key milestones: "So there has been no dialogue [with the FDA] . . . . And it's often in that dialogue that you can lay issues to rest and—through [discussions about] labeling or post-approval studies, et cetera. So we're *just going to be beginning that process, unfortunately, now after the CRL is received*." ¶84.[6] Likewise, on September 10, 2020, Fuchs emphatically agreed with a stunned analyst's observation that "you would assume that there would be more meetings [between BioMarin and FDA] with the Breakthrough Therapy designation typically." ¶83. Fuchs further admitted, "Well, it's going to sound funny, but the biggest issue that we had was to convince [the FDA] to have a discussion with us *of any kind*." Dx. W at 7. On yet another occasion, Fuchs stated that "we had so little communication with the agency about the review." Dx. V at 8.

*Third*, even if credited, Defendants' rendering of Fuchs' statement—that BioMarin had no dialogue with the FDA concerning valrox's *efficacy*, an issue that would be at the center of virtually every discussion during *any* BLA review—does not help them. Defendants do not explain how BioMarin could have had the required discussions with the FDA about labelling, post-marketing studies, or manufacturing, without any discussion "whatsoever" of valrox's efficacy.

*Fourth*, even putting aside whether BioMarin literally had "no dialogue *whatsoever* with the agency," at a minimum, Defendants statements make clear that BioMarin had unusually limited contact with the FDA following the mid-cycle meeting; that the extent to which dialogue was limited was surprising to BioMarin; and that BioMarin's inability to effectively communicate with the FDA precluded it from meeting key review milestones. These undisclosed adverse facts render Defendants' statements touting BioMarin's close dialogue with the FDA misleading.

*Finally*, Defendants assert that the FDA's silence was supposedly unsurprising because it was "consistent with the agency's indications at the pre-BLA and mid-cycle meetings that it had no clinical concerns." DB 22. Defendants' claim is belied by their admission that they "*would assume that there would be more meetings* [between BioMarin and FDA] with the Breakthrough Therapy designation typically." ¶83. Indeed, the Complaint identifies numerous mandatory

---

[6] Defendants assert that the Complaint fails to identify review milestones that BioMarin missed. DB 14-15. Defendants ignore their own admissions, cited in the Complaint, that BioMarin failed to meet key labelling and post-marketing commitment milestones, not to mention the Preapproval Inspection, because of its inability to effectively communicate with the FDA. ¶¶84-86, 103.

meetings and communications that ought to have taken place after the mid-cycle meeting, but did not.[7] Further, Defendants' argument does not alter the fact that their statements that BioMarin *was* in close dialogue with the FDA were untrue.

**2. The Complaint Alleges Defendants' Statements That BioMarin Was Meeting Review Milestones Were Misleading**

Defendants repeatedly assured investors that BioMarin was meeting or ahead of review milestones and that the critical Preapproval Inspection would occur in the second quarter of 2020. Defendants stated, for instance, that BioMarin was "tracking to our [BLA] milestones and in some cases, [the FDA] are accelerating their work" (¶122); that "the [Preapproval Inspection] by the FDA is scheduled significantly before the PDUFA date. So we're on track in this respect," and that "everything is going quite well, in review with the FDA" (¶125); and that "the agency is actually ahead of their PDUFA mandated regulatory metrics in terms of timeline" (¶135). These statements were materially misleading because they omitted facts that seriously jeopardized valrox's approval by the PDUFA Date: (1) the FDA had warned BioMarin that the Preapproval Inspection would likely be delayed beyond the second quarter of 2020; and (2) from April 2020 on, the FDA "had no dialogue whatsoever" with BioMarin, including regarding key approval milestones. *See Arena*, 840 F.3d at 707-09 ("Defendants intentionally withheld information material to the market's assessment of whether and when the FDA would likely approve" drug).

Moreover, at the June 2020 LCM, the FDA raised concerns about valrox's efficacy, refused to provide BioMarin with the assurances it sought, and at the same time, cancelled the required Preapproval Inspection. ¶¶97-99, 140. Nevertheless, Defendants continued to assure investors that BioMarin was meeting all review milestones. ¶¶104-08, 137 (BioMarin "on track for our PDUFA [date of] 8[/]21"); ¶138 ("[C]ontinue[d] to anticipate approval of [valrox] in the second half of the year"); ¶144 (BioMarin's competitors were "so far behind").[8]

---

[7] Defendants also mischaracterize the record. The FDA did *not* tell BioMarin that it had "no clinical concerns" at the pre-BLA meeting (before the review began) or at the mid-cycle meeting—as Defendants elsewhere describe it, the FDA simply did not raise specific concerns (DB 15).

[8] Defendants' argument that their statements were "literally true" because the FDA issued a decision by the PDUFA Date (that the drug could not be approved by the deadline) is nonsensical. DB 12. Defendants meant, and investors understood, that BioMarin was on track to achieve approval by the PDUFA Date, including that it was meeting all necessary milestones. It is trivially true that the FDA would have to take *some* action by the PDUFA Date.

Again, courts nationwide have held actionable drug makers' statements, like those here, touting the positive progress of the FDA's review of an application for approval or the efficacy of the drug under review, where the drug maker fails to disclose material adverse developments in the review process. *See Arena*, 840 F.3d at 709 (statements that Arena was "confident" about drug's approval misleading where issuer failed "to disclose 'issues' and 'concerns'" raised by FDA about safety, even though agency allowed ongoing trial to continue and ultimately approved drug); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 958-59 (9th Cir. 1996) (statements that "FDA-approval process was progressing positively," including that "everything [was] going fine" and that FDA approval was "imminent" were actionable); *Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *7 (S.D. Cal. Sept. 19, 2016) (statements that NDA submission to FDA was "on track" false and misleading where facility would not be inspected on time); authority cited *supra* at 9-10.

In *Gerneth v. Chiasma*, the court held that it was materially misleading for a drug manufacturer seeking approval of an important drug to fail to disclose that, while the FDA allowed the company's clinical trial forming the basis of the application to go forward, the agency "had *raised specific questions* about . . . *the durability of [drug's] effect on its Phase 3 trial patients*" and had stated it "*would prefer*" that the company conduct the study in the United States. 2018 WL 935418, at *2-3, 5 (D. Mass. Feb. 15, 2018). Nonetheless, the company expressed confidence that it would be able to secure approval for the drug on an accelerated timeline. The court rejected the same argument Defendants make here: that the FDA's "questions" did not foreclose approval. *See* DB 15-16. The court refused to resolve factual questions concerning "the severity of the FDA's reservations at the pre-NDA meetings [because] the Court cannot consider that disputed issue of fact on a motion to dismiss." *Chiasma*, 2018 WL 935418, at *5. Moreover, the court held,

> While ultimate FDA disapproval . . . could not have been known at the time of the . . . omissions, certainly the FDA had expressed concerns that made Chiasma's claim that it would be able to secure approval for [the drug] with shorter development timelines materially misleading when it was made because the omitted fact made approval on any timeline less likely.

*Id.*; *see also id.* (falsity alleged based on "a later statement by an executive of the defendant that he was aware that the FDA expressed concerns during a pre-NDA meeting").

The Complaint's allegations here are even stronger than those in *Chiasma*. Here, the FDA

not only privately raised the same concerns about valrox's efficacy, durability, and manufacturing that formed the basis of the agency's ultimate denial, it cancelled the required Preapproval Inspection. At a minimum, these omitted facts made valrox's "approval on [the PDUFA Date] less likely." *Id*. Defendants' own reactions demonstrate that they understood these adverse developments were material. Defendants felt the need to seek reassurances that neither the concerns raised by the FDA at the LCM nor the cancellation of the Preapproval Inspection would affect valrox's approval by the PDUFA Date, but failed to receive those assurances. ¶¶97-99, 103-05, 140. Indeed, Defendants admitted that they were "going crazy" and "scrambl[ing]" internally as a result of the FDA's cancellation of the Preapproval Inspection (¶¶103-04), but nevertheless continued to assure investors that the valrox BLA was "on track." *See Arena*, 840 F.3d at 708 ("[I]t seems quite clear that Arena understood that the FDA did not entirely agree with Arena's views . . . . Defendants' own response to the issue contributes to an inference of scienter here.").[9] Accordingly, Defendants' "failure to inform the market about the risk of non-approval or delayed approval based on the FDA's concerns" was materially misleading. *See id*. at 707-08.[10]

In response, Defendants raise a series of arguments, each of which fails.

***First***, Defendants' argument that the Complaint fails to allege that the FDA's concerns expressed at the LCM "would preclude approval" ignores the Complaint's allegations. DB 15. To start, the Complaint need not allege that the FDA's concerns (or the cancellation of the Preapproval Inspection) "preclude[d]" approval to plead materiality; Defendants misled investors "about ***the risk*** of non-approval or delayed approval." *Arena*, 840 F.3d at 708.

Defendants assert that they had no reason to take the FDA's concerns seriously because both before the BLA submission and at the mid-cycle meeting the FDA supposedly raised "no clinical issues" about efficacy, and at a 2018 pre-BLA meeting it purportedly "indicated" that

---

[9] The Complaint also alleges that investors viewed both the Preapproval Inspection and the FDA's assessment of valrox's durability as highly material, and, indeed, asked Defendants about both subjects repeatedly during the Class Period. ¶¶89-90, 92-93, 99, 104, 119, 122, 125, 132, 137.

[10] Defendants assert that they were not required to detail BioMarin's back-and-forth with the FDA (DB 15-16), but ignore that by affirmatively touting the BLA's progress, they were obligated to "disclos[e] adverse information that cuts against the positive information." *Arena*, 840 F.3d at 705-06; *see also Amylin*, 2002 WL 31520051, at *5 ("While the court agrees that the FDA approval process is highly uncertain . . . [defendant] was also under no obligation to make statements regarding the . . . likelihood for FDA approval.")

BioMarin could establish the relationship between factor activity and reduced bleeding after approval. DB 15 (citing Dxs. W at 7 and Y at 6). Even assuming these claims are true, the agency *did* raise concerns at the LCM, a key purpose of which is to discuss "[m]ajor deficiencies identified to date." ¶71. Moreover, the 2018 pre-BLA meeting occurred before BioMarin shared the concerning Phase III data (*see* Dx. Y at 6) and well before the FDA published guidance targeting BioMarin's exact studies, stating that sponsors should "provide evidence, specific to their [gene therapy] product, that correlates the [Factor VIII] levels with relevant clinical outcomes." ¶100. This guidance cast doubt on whatever nebulous "indicat[ion]" BioMarin supposedly received about establishing the factor activity threshold for clinical efficacy. Defendants' fact-driven argument should be rejected. *See Chiasma*, 2018 WL 935418, at *5 ("While the parties hotly dispute the severity of the FDA's reservations at the pre-NDA meetings and thus their materiality, the Court cannot consider that disputed issue of fact on a motion to dismiss.").

*Second*, Defendants wrongly assert that "Plaintiff does not allege that the FDA communicated to BioMarin that an inspection would be required for approval." DB 17. But Fuchs told investors that BioMarin "had fairly clear dialogue with [the FDA] about requirements for registration," and that "what they want to see, the agency, is . . . that you are ready for them to come to an inspection." ¶75. This is consistent with FDA regulations that a BLA can be approved only if the product is shown to comply with "good manufacturing practice requirements," and that preapproval inspections are particularly critical where, as in valrox's case, the manufacturing facility is new and the drug is a breakthrough therapy. ¶¶74-77. Indeed, the Preapproval Inspection was especially significant here because the FDA had raised concerns about gene therapy manufacturing generally and trial data raised concerns about valrox's manufacturing in particular. ¶¶51-60. That is why securities analysts repeatedly asked about the Preapproval Inspection during the Class Period and Defendants were "going crazy" and "scrambl[ing]" when it was cancelled.

Defendants inaccurately suggest based on August 19, 2020 guidance—which was issued *after* the Class Period—that the FDA suspended the requirement for inspections during the Class Period. DB 17 (citing Dx. U). Critically, Defendants fail to show this "nonbinding," post-Class-Period guidance is at all relevant to the valrox review. Moreover, the guidance does not say what

Defendants claim. That guidance states, "With respect to pre-approval inspections, FDA intends to continue using other tools and approaches *where possible*." Dx. U at 3, 5. Defendants concede that the FDA never told BioMarin that any alternatives were "possible" and so Defendants had no reason to believe valrox would be approved without the required inspection.

Moreover, Defendants' argument is inconsistent with their conduct during the Class Period. In response to repeated analyst questions, Defendants routinely affirmed well into the pandemic that the FDA *did* plan to conduct the Preapproval Inspection by the second quarter of 2020. ¶¶77, 104, 125. Defendants' argument that they believed the Preapproval Inspection was no longer required but never said so, even when pressed to confirm that it would occur, strains credulity.[11] Moreover, Defendants admitted that because the FDA cancelled the Preapproval Inspection, they were "going crazy" and "scrambl[ing]" internally—conduct that is inconsistent with their claim that they believed the inspection was unnecessary and immaterial.

*Third*, Defendants dispute the Complaint's allegations concerning the timing of the FDA's cancellation of the Preapproval Inspection—namely that it occurred no later than June 21, 2020—rests on a "contorted reading of a statement made by Fuchs" on September 16, 2020. DB 17. While discussing the concerns the FDA raised at the LCM, Fuchs stated, "at the same time, it's probably worth appreciating that they had communicated that they were going to inspect us, and then they changed their plans . . . . [O]ur focus *in this time* [that the LCM was occurring] was, well, they must have problems with inspection." ¶103. Even if the Court accepts Defendants' proposed inference that Fuchs was using the phrase "at the same time" idiomatically, Defendants ignore the remainder of Fuchs' statement, in which he asserts that BioMarin's "focus *in this time*" around the LCM was on the cancellation of the inspection, rather than the concerns the FDA raised at the LCM. On Defendants' reading, Fuchs' discussion of the cancellation is a non sequitur in a discussion about the LCM. Read in context, Fuchs stated that these events were contemporaneous to excuse BioMarin's failure to disclose FDA's concerns. Further, pursuant to agency guidance, FDA conducts inspections at least two months prior to the PDUFA date; here, June 21. ¶76.

---

[11] Likewise, Defendants do not cite a single analyst who stated or reported that they believed BioMarin would no longer be required to conduct the Preapproval Inspection; indeed, analysts' repeated questions demonstrate they believed it was highly material to valrox's approval.

*Finally*, Defendants argue that their pre-LCM statements are not actionable because "they were made before the [Complaint] alleges that the inspection was purportedly cancelled." DB 13. But the FDA warned BioMarin at the start of the Class Period that the inspection would likely be delayed beyond the second quarter of 2020, seriously jeopardizing approval of valrox by the PDUFA Date. ¶80. Defendants' statements omitting these warnings misled investors "about the risk of non-approval or *delayed approval*" of valrox. *Arena*, 840 F.3d at 708.

Defendants argue that FE1's report that the FDA warned BioMarin about this delay is unreliable because the Complaint does not adequately describe his "position and responsibilities," but the Complaint describes FE1 "with sufficient particularity to support the probability [he] possess[ed] the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). The Complaint alleges that FE1 was a "senior business development executive" at BioMarin during the Class Period and that Brinda Balakrishnan, the head of that group and one of Bienaimé's direct reports, directly informed him of the FDA's warning at a contemporaneous meeting (¶80)—a warning that was corroborated by FE1's R&D and manufacturing colleagues who confirmed that, as late as April 2020, the FDA had still "failed to move the valrox CMC review forward" (¶81). *See, e.g.*, *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019) (crediting former employee report of discussions with non-Defendant executive about the substance of a separate meeting); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (same). Defendants also urge the Court to disregard FE1's report on the grounds that it supposedly constitutes hearsay. DB 14. The Ninth Circuit has made clear that "hearsay" is not an appropriate basis for rejecting a confidential witness report. *Lifelock*, 780 F. App'x at 485 n.5 (refusing to reject CW report based on hearsay); *Lloyd*, 811 F.3d at 1208 (same).[12]

### 3. The PSLRA "Safe Harbor" Does Not Apply

Defendants also assert that virtually all of their statements, even if misleading, are protected

---

[12] Defendants argue it is implausible the FDA would "set the August [2020] PDUFA date" at the time the BLA was accepted for review, but thereafter "signal[] the likelihood of delay" early in the review process. DB 14. As Defendants know, however, "PDUFA deadlines" are set automatically, as they are dictated by PDUFA itself. 42 U.S.C. § 262; 21 U.S.C. §§ 355(c), 379(g). The FDA's acceptance of the valrox BLA on February 20, 2020 automatically triggered an August 21, 2020 PDUFA date. It is entirely plausible that, after beginning the review process, the FDA indicated that the default statutory deadline was in jeopardy (because of the delay in the inspection).

by the PSLRA's "safe harbor," (DB 9-10), which protects wholly forward-looking statements that are either accompanied by meaningful cautionary language or made without actual knowledge of their propensity to mislead. 15 U.S.C. § 78u-5. This argument fails.

*First*, the statements Defendants challenge—*e.g.*, that "*we're* tracking to our [approval] milestones and in some cases, [the FDA] *are* accelerating their work"; "the agency *is* actually ahead of their PDUFA mandated regulatory metrics in terms of timeline" and "*we're working* very closely with them *to keep* things on track"; "the agency *has been* quite collaborative"; and "everything *is* going quite well, in review with the FDA"—are misstatements of historical fact. Courts have repeatedly held virtually identical misstatements actionable. *Supra* at 9-10, 13. While Defendants attempt to immunize these historical statements by combining them with forward-looking remarks (DB 10-11), the Ninth Circuit has categorically rejected such efforts. *See, e.g.*, *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) ("[A] defendant may not transform non-forward-looking statements into forward-looking statements . . . by combining non-forward-looking statements about past or current facts with forward-looking statements[.]").[13]

*Second*, even if the Court concludes that certain misstatements are forward-looking, they are not eligible for safe harbor protection. None of the statements are accompanied by "meaningful cautionary language." The boilerplate "risk warnings" Defendants cite concern possible risks that had already materialized or are not specifically tailored to the risks that Defendants concealed from investors. *See Zaghian v. Farrell*, 675 Fed. App'x 718, 720 (9th Cir. 2017) ("boilerplate warning" that pertained to "potential product defects" not sufficiently tailored to misstatements concerning product's likely lack of success); *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1053-54 (N.D.

[13] Defendants rely on *Wochos v. Tesla Inc.*, 985 F.3d 1180 (9th Cir. 2021), but that case is inapposite. Unlike *Tesla*, Defendants' statements here included "concrete factual assertion about a specific present or past circumstance," including assertions that BioMarin was "hit[ting] certain intermediate benchmarks" in the BLA review. *Id.* at 1192-93. Moreover, unlike *Tesla*, Defendants' statements here were not accompanied by meaningful cautionary language and there is no dispute they were aware of the facts concealed from investors, as discussed below. Defendants' other cases are similarly inapposite because they concerned purely forward-looking assertions, specific cautionary language, and no concealed facts that would demonstrate knowledge of falsity. *See Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *12 (N.D. Cal. Sept. 27, 2012) (statements regarding approval prospects forward-looking because cautionary language was specific and "FDA review process had not even commenced at the time"); *In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) (allegations of falsity were merely conclusory); *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) (does *not* hold "on track" is forward-looking); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015) (no knowledge allegations).

Cal. 2018) ("extensive lists of important risk factors" not meaningful where they did not address issue at heart of plaintiffs' claims; "premature to decide whether Safe Harbor immunize[d]" defendants); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.,* 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013) ("To be 'meaningful,' a cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'"). For example, Defendants point to vague warnings in BioMarin's February 2020 Form 10-K that unspecified "risks and certainties in pharmaceutical development" could cause "product candidates" to "take a significantly longer time to gain regulatory approval than we expect." DB 5. But this warning is not tailored to the FDA's troubling silence here, its efficacy concerns, or its cancellation of the inspection.

Further, Defendants rely on the statement that "COVID-19 *could* postpone necessary interactions with regulators regarding our products in development and *could* delay review or approval of our regulatory submissions," (DB 10-11), but this does not appear in the February 2020 Form 10-K they cite (Dx. G). Defendants only began including this "risk warning," which relates strictly to COVID-19, in its filings in May 2020, *after* the FDA warned BioMarin that the critical Preapproval Inspection would be seriously delayed, and *after* BioMarin had already missed key regulatory milestones. ¶¶78-86, 97-108. *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *11 (9th Cir. June 16, 2021) ("Risk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors.").[14]

Moreover, the Complaint adequately alleges that Defendants knew these statements were misleading, and thus the safe harbor does not apply. *See infra* at 20-25. Defendants argue that they did not know with certainty that valrox "could never be approved" (DB 11), but the Complaint alleges that Defendants knew facts that materially increased "the risk of non-approval or delayed

---

[14] *See also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (warning about risks that have already transpired is akin to "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"). Defendants also ignore that the "risk warnings" they cite did not accompany their oral misstatements at investor conferences and, so, cannot possibly immunize them. *In re HI/FN, Inc. Sec. Litig.*, 2000 WL 33775286, at *5 (N.D. Cal. Aug. 9, 2000) ("[M]isleading oral statements are not protected by cautionary language spread out among various documents."). Defendants further rely on "risk warnings" in an unrelated pre-Class Period press release, which expressly applies only to "forward-looking statements" in "[t]his press release." Dx. F at 3.

approval based on the FDA's concerns" and actions. *Arena*, 840 F.3d at 707-08.

### 4. Defendants' Misstatements Are Not Inactionable Opinions

Defendants also incorrectly argue that many of their statements—*e.g.*, "everything is going quite well, in review with the FDA," Fuchs' June 24, 2020 statements touting valrox's durability, and his August 13, 2020 statement that competing therapies are "so far behind" valrox—are inactionable opinions. DB 18-19. Ninth Circuit courts have repeatedly held such statements actionable. *See, e.g.*, *Arena*, 840 F.3d at 702 (statements touting efficacy, including that studies had "demonstrated" the "the long-term safety and efficacy" of drug were misleading where they failed to disclose FDA's concerns); authority cited *supra* at 9-10, 13.

Defendants ignore the Supreme Court's holding in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, which explained that an opinion is a statement that expresses uncertainty using qualifying language such as "I believe" or "I think." 575 U.S. 175, 182-85 (2015). None of the challenged statements use such qualifying language. Moreover, opinion statements are actionable if the defendant "lacked the basis for making those statements that a reasonable investor would expect." *Id.* at 196. Here, a reasonable investor would not expect Defendants to state "everything is going quite well, in review with the FDA" when in fact there was "no dialogue whatsoever" with the agency, or to state that competitors were "so far behind" BioMarin when, with the PDUFA Date just one week away, the FDA had still not performed the required Preapproval Inspection and had refused to accept any substitutes.

### B. The Complaint Adequately Alleges Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Arena*, 840 F.3d at 709.[15] The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of "scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 324. Instead, a

---

[15] Defendants argue that the Complaint fails to allege that "Bienaimé or Fuchs believed they risked misleading investors." DB 21. Defendants are wrong and, in any event, they misstate the scienter standard, which does not require Plaintiff to plead intent to defraud.

scienter inference is "strong" when it is *as likely* as any other inference. *Id.*; *see also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("*Tellabs* now ***awards the draw to the plaintiff.***"). Numerous facts give rise to an inference of scienter here.

*First*, Defendants' post-Class Period admissions support a strong inference of scienter. *See Hatamian* 87 F. Supp. 3d at 1160 ("Defendants' later admissions also make plausible plaintiffs' allegations that [the] statements . . . were false when made."); ¶¶146-54. These admissions directly contradict Defendants' statements that, for example, the agency "has been quite collaborative," that BioMarin was "working very closely with them to keep things on track," and that BioMarin was "tracking to our [valrox BLA] milestones and in some cases, [the FDA] are accelerating their work." ¶¶89-93; *see MannKind*, 835 F. Supp. 2d at 809 ("Defendants' later characterization of the FDA's communications with MannKind as mere 'advice,' a description inconsistent with their prior statements describing an 'agreement' or 'approval'" supports strong inference of scienter).

Defendants reprise their arguments that "a lack of dialogue with the FDA was consistent with" the view that the FDA "had no clinical concerns," (DB 22), but as discussed above, (1) Defendants' own admissions make clear that the FDA's silence was highly unusual and, indeed, as a result, BioMarin was unable to address predicates for approval; (2) even if the Court credited Defendants' assertion that they believed the FDA's silence was benign (which it should not do on a motion to dismiss), that does not immunize their affirmative misstatements that BioMarin was in close dialogue with the agency and meeting all milestones; and (3) the FDA did ***not*** tell BioMarin there were no clinical issues with valrox at the mid-cycle meeting.

Defendants have further admitted that (1) at the LCM and in the pre-meeting package, the FDA raised concerns about valrox's efficacy, including its durability and manufacturing—issues that were highly important to investors; (2) at the LCM Fuchs and his colleagues requested, but the FDA refused to provide, reassurances that these concerns would not derail valrox's approval; and (3) at the same time, the FDA also said it was canceling the Preapproval Inspection, as a result of which Fuchs and his team were "going crazy" and "scrambl[ing]" internally. Defendants' admissions thus establish that at the same time they were telling investors that "we're on track for our PDUFA [date of] 8[/]21," touting valrox's efficacy, and crowing that competitors were "so far

behind," they were aware of facts that made approval of the valrox BLA by the PDUFA Date highly unlikely. *See Arena*, 840 F.3d at 707-08 (defendants' "failure to inform the market about the risk of non-approval or delayed approval based on the FDA's 'concerns'" was "an extreme departure from the standards of ordinary care," giving rise to strong scienter inference).

Defendants repeat their argument that "a possible delay in the inspection would not indicate that approval was unlikely, as the FDA's inspection protocols dispensed with the requirement of an on-site inspection" (DB 21). As discussed *supra* at 15-16, this argument fails. Indeed, as late as June 2020, Fuchs continued to state that the "***onsite***" Preapproval Inspection was on track.

***Second***, that Defendants' misstatements concerned the most significant events relating to one of BioMarin's most significant products supports a strong inference of scienter. *See, e.g.*, *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) ("[I]t is absurd to think that the CEO and CFO of a pharmaceutical company would be unaware" of the FDA's concerns at "the heart of a company whose main business is manufacturing pharmaceuticals"); *Amylin*, 2002 WL 31520051 at *8 (scienter where misstatements concerned company's "primary drug candidate"). Defendants repeatedly told investors they were laser-focused on valrox's approval, which they stated would be "***transformative for BioMarin***" and would ***double*** BioMarin's ***Company-wide*** revenue, even if it achieved only modest market penetration. ¶¶38-43; s*ee Berson*, 527 F.3d at 983 (strong scienter inference where statements concerned significant revenue).

Given the importance of valrox's approval to BioMarin, there is a strong inference that Defendants were fully aware, or at least recklessly disregarded, the FDA's highly significant communications concerning the delay and cancellation of the Preapproval Inspection that was required for approval (and which was the subject of ***numerous*** investor inquiries), as well as the FDA's concerns about valrox, flagged at both the critical LCM and the pre-meeting memorandum (issues that were also the subject of investor discussion). *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) ("Considering the high-level nature of the meeting . . . and the huge potential impact of the SAIC's threat made at the meeting . . . it is virtually inconceivable that this threat was not communicated to the senior level [management], i.e. the individual Defendants.").[16]

---

[16] Defendants' reliance on *Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, 2020 WL 1244936,

***Third***, while "motive is not required to plead securities fraud," *Johnson v. Costco Wholesale Corp.*, 2019 WL 6327580, at \*21, n.18 (W.D. Wash. Nov. 26, 2019), Plaintiff has alleged motive here. Defendants sold millions of dollars' worth of BioMarin stock during the Class Period, including following the highly negative LCM and the agency's cancellation of the critical Preapproval Inspection. *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1024 (S.D. Cal. 2011) ("unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter."). As the PDUFA Date approached, Fuchs sold 64% of his BioMarin holdings, reaping proceeds of nearly ***$22.9 million***; by contrast, Fuchs did not sell ***a single share*** of BioMarin stock during the Control Period. ¶111. Likewise, Bienaimé sold 89,000 shares of BioMarin stock, 23% of his BioMarin holdings during the Class Period, for proceeds of more than $8.2 million—***twice*** his sales during the Control Period. *Id.*; *see In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (sales of "43.6%" of holdings support an inference of scienter); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at \*14 (C.D. Cal. July 1, 2008) (sales of 7% of holdings support an inference of scienter); *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1199-1200 (C.D. Cal. 2004) (sale of 18% of holdings supports scienter inference).

Significantly, Fuchs sold ***59% of his BioMarin holdings*** —for proceeds of ***$19.5 million***—in just two July 2020 transactions, shortly after the FDA raised concerns about valrox at the LCM and cancelled the Preapproval Inspection. ¶110. Allegations of insider sales that are suspicious as to either timing or amount support an inference of scienter. *See Novatel*, 830 F. Supp. 2d at 1024; *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014) (scienter where defendants sold $8 million in stock weeks before FDA issued denial, compared with only $400,000 sold during control period); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("Trades made a short time before a negative public announcement are suspiciously timed").[17]

at \*11 (N.D. Cal. Mar. 16, 2020) is misplaced. That case held conclusory core operations allegations did not, standing alone, give rise to a scienter inference. *Id*. Here, the Complaint includes detailed allegations of valrox's significance, and cites Defendants' data-laden statements recounting exact exchanges at meetings, the status of the BLA, and valrox's trial results, evincing "detailed involvement in the minutia of a company's operations." *Id*. For the same reason, *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393, at \*9 (N.D. Cal. June 26, 2018) is inapposite.

[17] Defendants dispute the Complaint's allegations concerning the percentage of holdings sold by Fuchs and Bienaimé, but those allegations are taken directly from Defendants' Form 4s filed with

Defendants argue that the fact that their sales were preplanned negates any scienter inference (DB 23), but ignore the allegations that they delayed the release of negative news about valrox in order to circumvent their trading plans and offload their stock at a favorable price. ¶¶108-10; *see, e.g.*, *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *18 (N.D. Cal. Nov. 27, 2018) (Rule 10b5-1 plan did not insulate defendant who withheld unfavorable news to keep share prices steady); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) ("10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales"); *In re UTStarcom Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) (defense based on Rule 10b5-1 plan was premature).[18] Moreover, two of Defendants' three trading plans were only entered into *after* the start of the Class Period. DB 24.

Again, although not necessary to plead scienter, the Complaint also alleges motive arising from BioMarin's $600 million May 2020 private offering, which it held to pay off an imminently due $375 million debt. The need for cash to pay off this debt provided a powerful incentive for Defendants to conceal that timely approval of the valrox BLA was in jeopardy. *Medina v. Clovis Oncology Inc.*, 215 F. Supp. 3d 1094, 1128 (D. Colo. 2017) (need for financing provides motive); *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) ("obtain[ing] much-needed operating capital does allege facts of a palpable motive for fraud").

*Finally*, the Complaint's allegations raise an inference of scienter that is at least as cogent as any opposing inference Defendants proffer. Citing *Nguyen v. Endologix*, 962 F.3d 405 (9th Cir. 2020), Defendants assert that it makes no sense for Defendants to mislead investors about the status of a drug application they knew with certainty would be rejected. DB 25. But unlike *Nguyen*, the Complaint here does not allege that Defendants "knew that there was absolutely no hope" of approval. 962 F.3d at 415. Rather, as in *Arena*, the Complaint alleges that Defendants misled

---

the SEC. Even if the Court credits Defendants' claims that Fuchs sold 45% of his holdings—nearly half of all his stock—that is more than adequate to support an inference of scienter. Moreover, Defendants ignore that insider sales are probative of scienter if they are unusual in scope *or* timing.

[18] *See also* Allan Horwich, *The Origin, Application, Validity, and Potential Misuse of Rule 10b5-1*, 62 Bus. Law. 913, 949-50 (2007) ("If an executive knows that his or her Plan will result in a sale of company stock on a particular date, he or she may be able to cause a delay in the disclosure of unfavorable news so that the expected stock price decline is deferred until after the sale, thereby producing larger proceeds.").

investors about the progress of the FDA's review, including failing to disclose the delay and subsequent cancellation of the Preapproval Inspection and serious concerns raised by the FDA that were material to the likelihood of approval.[19] *Arena*, 840 F.3d at 707-08; *Skiadas v. Acer Therapeutics, Inc.*, 2020 WL 4208442, at *7-8 (S.D.N.Y. July 21, 2020) (distinguishing *Nguyen*, because plaintiff "has not alleged that the 'day of reckoning' was 'inevitable,'" but that defendants held out hope "the FDA might have approved" the drug despite negative commentary).

*Nguyen* was also premised on the absence of motive allegations, including insider trading, which are present here. *See also Mandalevy v. Bofi Holding, Inc.*, 2021 WL 794275, at *5 (S.D. Cal. Mar. 2, 2021) (distinguishing *Nguyen* as "the defendants had not attempted to profit off the temporarily high stock prices by selling stock"). Finally, courts have viewed *Nguyen* as largely confined to its facts. *In re Apple Inc.*, 2020 WL 6482014, at *12-13 (N.D. Cal. Nov. 4, 2020) ("*Nguyen* presents an unusual case because both the Supreme Court and the Ninth Circuit have found scienter on fairly similar allegations"; the "deeper concern" was "lack of . . . falsity").

Finally, reaching far outside the four corners of the Complaint, Defendants assert that BioMarin spent $25 million on valrox's launch and met with third-party payers to discuss pricing, and ask the Court to hold that this defeats scienter as a matter of law. DB 25. But Defendants offer no (1) facts about when this money was spent or these meetings occurred (before or after the Class Period); and (2) no support for the assertion that $25 million represents a significant financial commitment for the launch of a supposedly blockbuster drug.[20] None of these claims change the fact that Defendants were aware of the facts the Complaint alleges were withheld from investors.[21]

## IV.   CONCLUSION

Defendants' motion to dismiss should be denied. In the alternative, Lead Plaintiff respectfully requests leave to amend.

---

[19] *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("[T]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.").

[20] Indeed, BioMarin spent *more than $470 million* on its operations in just the second quarter of 2020—more than *18 times* the amount Defendants claim they spent on valrox's launch. Dx. Q at 13. If anything, the paltry resources devoted valrox's launch heightens the inference of scienter.

[21] Defendants argue that Plaintiff's "control person" claims under Section 20(a) fail due to a failure to plead a Section 10(b) violation. DB 25, n.13. As above, however, Defendants are wrong.

Dated: June 22, 2021        Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**


*/s/ Katherine M. Sinderson*
SALVATORE GRAZIANO (admitted *pro hac vice*)
(salvatore@blbglaw.com)
JEROEN VAN KWAWEGEN (admitted *pro hac vice*)
(jeroen@blbglaw.com)
KATHERINE M. SINDERSON(admitted *pro hac vice*)
(katiem@blbglaw.com)
ABE ALEXANDER (admitted *pro hac vice*)
(abe.alexander@blbglaw.com)
CHRISTOPHER R. MILES (admitted *pro hac vice*)
(christopher.miles@blbglaw.com)
THOMAS Z. SPERBER (*pro hac vice* motion pending)
(thomas.sperber@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470

*Lead Counsel for Lead Plaintiff and the Class*