# EXHIBIT A

2021 WL 3913509
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Danielle CARR, Plaintiff,

v.

ZOSANO PHARMA
CORPORATION, et al., Defendants.

Case No. 20-cv-07625-EMC
|
Signed 09/01/2021

**Attorneys and Law Firms**

Natalie S. Pang, Pavithra Rajesh, Robert Vincent Prongay, Charles Henry Linehan, Glancy Prongay & Murray LLP, for Plaintiff.

Cody Shawn Harris, Keker and Van Nest LLP, Laurie Carr Mims, Taylor L. Reeves, Travis S. Silva, Keker Van Nes & Peters LLP, San Francisco, CA, Jo W. Golub, Berkeley, CA, for Defendants.

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS**

Docket No. 71

EDWARD M. CHEN, United States District Judge

**I. INTRODUCTION**

**\*1**  This case is a securities-fraud class action brought by co-lead Plaintiffs Tuk Doss and Hosam Alqurashi ("Plaintiffs") against Defendants Zosano Pharma Corporation ("Zosano") and three of the company's current or former CEOs: Steven Lo, John Walker, and Konstantinos Alataris. *See* Docket No. 68 ("CAC") at 1, ¶¶ 18-23. Plaintiffs allege that, from February 13, 2017, through October 20, 2020 (the "Class Period"), Defendants made a series of misleading statements about the likelihood of regulatory approval by the U.S. Food and Drug Administration ("FDA") of the company's principal product, Qtrypta, and that these statements violate Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") as well as Securities Exchange Commission ("SEC") Rule 10b-5. *See* CAC ¶¶ 187-201.

Pending before the Court is Defendants' motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint. *See* Docket No. 71 ("Mot."). Defendants argue that the complaint fails to adequately allege (1) that Defendants' statements were false or misleading or (2) that the statements, even if false or misleading, were made with scienter. *See id.* at 12-25. For the reasons given below, the Court **GRANTS** Defendants' motion to dismiss, with leave to amend, on the ground that Plaintiffs have failed to adequately plead scienter.

**II. BACKGROUND**

A. Factual Background

Plaintiffs' Consolidated Amended Class Action Complaint, which runs to 203 pages (including a 100-page appendix collecting Defendants' allegedly misleading statements and omissions), asserts the following. "Zosano is a clinical stage pharmaceutical company" that focuses on "administering drugs to patients using its proprietary intracutaneous delivery system," known as "the Adhesive Dermally-Applied Microarray" ("ADAM"). [1] CAC ¶ 2. Zosano's "ADAM technology consists of an array of titanium microneedles" on an adhesive patch, which is "coated with a drug" that is then absorbed into a patient's skin. *See id.* "Zosano's lead product candidate is Qtrypta," also known during the Class Period as M207. *Id.* ¶ 3 & n.2. Qtrypta is "a proprietary formulation of a previously approved drug, zolmitriptan, coated onto and delivered utilizing the Company's ADAM technology," and it "was developed for the treatment of migraine" headaches. *Id.* ¶ 3. "Qtrypta's objective is to provide faster onset of efficacy and sustained freedom from migraine symptoms by delivering rapid absorption while avoiding the gastrointestinal, or GI, tract." *Id.* ¶ 3.

"Throughout the Class Period, Defendants touted how FDA approval of Qtrypta would be a financial windfall for Zosano" and implied "that Zosano would be able to access substantial revenues after Qtrypta was approved by the FDA." *Id.* ¶ 27; *see also id.* ("[O]n May 14, 2019, Defendant Walker also touted during a conference call that 'we see an overall market potential greater than $400 million in annual sales [of Qtrypta]....'"). "Market commentators and analysts also understood that Qtrypta would be a lucrative product for Zosano." *Id.* ¶ 28. During this same period, however, Zosano "generated no revenues from product sales and [was] in a precarious financial condition," stating on its 2016 SEC 10-K form that there existed "[s]ubstantial doubt" as to whether the

2021 WL 3913509

company could "continue as a going concern." *Id.* ¶ 4. "FDA approval of Qtrypta was thus central to Zosano's survival." *Id.* ¶ 4.

**\*2** Prior to approving a new drug for sale in the United States, the FDA requires pharmaceutical companies to conduct clinical trials, *i.e.*, trials involving human subjects. *See id.* ¶ 5 n.4, ¶ 31. "A clinical investigation is generally divided into three phases, though there is the potential for certain phases to overlap." *Id.* ¶ 32 (citing 21 C.F.R. § 312.21).

Phase 1 includes the initial introduction of the drug into humans, and generally involves 20 to 80 patients. 21 C.F.R. § 312.21(a). The goals of Phase 1 are to determine the most frequent side effects, and how the drug is metabolized and excreted. The latter is determined through pharmacokinetic and pharmacodynamic testing and analysis. Phase 2 includes controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication in patients with the disease or condition under study and generally involves no more than several hundred subjects. 21 C.F.R. § 312.21(b). Phase 3 includes expanded controlled and uncontrolled trials performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and usually includes several hundred to several thousand subjects. 21 C.F.R. § 312.21(c).

After the three clinical trial phases are complete, but prior to filing a New Drug Application ("NDA"), a sponsoring company meets with the FDA in a "pre-NDA meeting" to exchange information about the proposed drug marketing application. 21 C.F.R. § 312.47(2)....

Once a pre-NDA meeting is held, the sponsoring company may then formally request FDA approval of a drug for marketing in the United States through submission of an NDA. 21 C.F.R. § 314.50.... The FDA has 60 days after an NDA is received to decide whether to file the NDA for review. 21 C.F.R. § 314.101(a). Where the FDA finds no basis to refuse the filing of an NDA, the FDA will file the NDA for substantive review. 21 C.F.R. § 314.101(a), (a)(2). Once the review is complete, the FDA will either approve the NDA or [reject it]. 21 C.F.R. § 314.110(a)....

Once the FDA has accepted an NDA, it may refuse to approve it for a variety of substantive reasons. If the FDA determines that it will not approve an NDA in its present form, it will send the applicant a Complete Response Letter ("CRL") that describes the deficiencies in the application and, where possible, provides recommendations for achieving approval. Prior to providing the CRL, the FDA may send the applicant a Discipline Review Letter ("DRL"), which conveys the FDA's preliminary comments on deficiencies identified during the NDA review ....

CAC ¶¶ 32-35.

"In March 2016, prior to the start of the Class Period, Zosano announced that it was restructuring its operations to focus on Qtrypta ... following positive Phase 1 data and FDA feedback on the regulatory pathway for the program," the latter of which indicated that "*a single positive pivotal efficacy study and a long-term safety study could support approval of M207*" via a streamlined approval process for products that incorporate previously approved drugs. *Id.* ¶¶ 36 & 34 n.8 (emphasis added).

"On February 13, 2017, the first day of the Class Period, [Zosano] issued a press release announcing positive top line results from its pivotal efficacy study, the [P]hase 2/3 ZOTRIP trial." [2] *Id.* ¶ 37. Specifically, the press release stated that Qtrypta "achieved both co-primary endpoints of pain freedom and most bothersome symptom freedom at 2 hours" in the ZOTRIP trial, as well as "significance in the secondary endpoints of pain freedom at 45 minutes and 1 hour and showed durability of effect on pain freedom at 24 and 48 hours." *Id.* The press release also stated that Qtrypta "was not associated with any Serious Adverse Events (SAEs)." *Id.* The statement concluded by noting that Zosano was "look[ing] forward to continuing the development of M207 towards filing an NDA." *Id.* "[T]he market reacted favorably to the Company's announcement—Zosano's share price soared to a Class Period high on February 17, 2017[,] of $62.40 per share after rising from a closing price of $24 per share on February 10, 2017...." *Id.* ¶ 38.

**\*3** "Defendants continued to tout the results of the ZOTRIP trial throughout the rest of 2017 and the remainder of the Class Period, as they sought additional funds for, and purported to update the market about[,] the status of [their] development" of Qtrypta. *Id.* ¶ 39. On a May 2017 earnings call with investors, "Defendants stated that '[t]he path forward for Zosano is clear[:] [t]he FDA has indicated that *a single, positive, pivotal efficacy study in addition to a safety study [of] M207 will be sufficient to file for approval*'" on the company's streamlined regulatory "pathway." *Id.* ¶ 77 (emphasis added). "[O]n June 26, 2017, the Company issued

a press release announcing the outcome of its end of [P]hase 2 meetings with the FDA and addressing the path forward for regulatory approval." *Id.* ¶ 41. The press release confirmed Zosano's "previously announced design of [the] Long-term Safety Study" and stated that the ZOPTRIP study had been "acknowledged sufficient for NDA filing."[3] *Id.*

In November 2017, Zosano "announced the launch of the long term safety study for Qtrypta," referred to as the "M207-ADAM Study," "which the Company repeatedly claimed would, [along] with the positive results from the ZOTRIP trial, be sufficient to support an NDA filing for Qtrypta." *Id.* ¶ 46 & n.9. In a press release, Zosano stated that the safety trials "mark[ed] the major component of the final phase of clinical development for M207, prior to filing [an] NDA." *Id.* ¶ 95. In the company's 2017 10-K Form, which was filed on March 12, 2018, Zosano stated that, based on feedback from the FDA, "*one positive pivotal efficacy study, in addition to the required safety study, would be sufficient for approval of M207* for the treatment of migraine." *Id.* ¶ 103 (emphasis added). Later, in November 2018, Zosano reported "positive results and milestones" from the safety trial.[4] *Id.* ¶ 48. In February 2019, Zosano "announced the completion of, and favorable results from, its long term safety study." *Id.* ¶ 49; *see also id.* ¶¶ 126-27 (expanding on these statements).

In May 2019, on a conference call with investors, then-CEO Defendant Walker stated that the company "believe[d] that the potential of Qtrypta ... ha[d] not been fully recognized, as th[e] program is largely derisked." *Id.* ¶ 137. On the same call, Mr. Walker also stated that Zosano "ha[d] a clear path to FDA filing and approval" and that the company saw "an overall market potential greater than $400 million in annual sales." *Id.* In an August 2019 earnings call, Mr. Walker predicted that the company "would probably receive the results of the FDA's consideration[,] which [it] certainly believe[d would] be approval," approximately one year after submitting the NDA. *Id.* ¶ 141. Mr. Walker also asserted, in comments similar to those he had offered in the past: "We think we have a highly derisked asset here at the end of 2020." *Id.* In November 2019, Zosano "announced the completion of pre-NDA meetings with the FDA, setting the stage for the filing of an NDA by the end of 2019."[5] *Id.* ¶ 50.

**\*4** "On December 23, 2019, Zosano announced the submission of an NDA for Qtrypta" to the FDA. *Id.* ¶ 51. In a press release, the company described "the clinical support for the submission," noting positive results from "the ZOPTRIP pivotal Phase 2/3 clinical study" as well as from "the Phase 3 safety study." *Id.* On a March 4, 2020, conference call, the Company announced that the FDA accepted the filing of the NDA for Qtrypta, and [that] the target date for the FDA's approval decision was October 2020," which was sooner than Zosano had previously expected. *Id.* ¶¶ 52-53, 153. During the same call, then-CEO Defendant Lo stated that the "pleasant surprise" of the earlier-than-anticipated decision date had led Zosano to "readjust[ ] all the commercialization efforts that [were] needed" for Qtrypta, such as having "the right amount of inventory in preparation for a commercial launch" of the drug. *Id.* ¶ 153. In August 2020, Zosano announced that it had "partnered with EVERSANA, a leading provider of commercial services to the life science industry, to commercialize and distribute Qtrypta in the United States, in a deal worth $250 million over five years if Qtrypta [were] approved" by the FDA. *Id.* ¶ 27 (internal quotation omitted).

But on September 30, 2020, "Zosano disclosed receipt of a [Discipline Review Letter] from the FDA regarding its NDA for Qtrypta," which "stated that approval" of the NDA "was not likely" on Zosano's anticipated timeline. *Id.* ¶ 56. Zosano's press release announcing the setback noted "two concerns" mentioned in the DRL. *Id.* "First, the FDA raised questions regarding unexpected high plasma concentrations of zolmitriptan observed in five study subjects from two pharmacokinetic studies and how the data from these subjects affect the overall clinical pharmacology section of the [NDA]." *Id.* "Second, the FDA raised questions regarding differences in zolmitriptan exposures observed between subjects receiving different lots of Qtrypta in the company's clinical trials." *Id.* Zosano concluded that, based on the DRL, "approval of Qtrypta by the ... goal date of October 20, 2020 [was] not expected." *Id.* "On this news, the Company's share price fell $0.92 per share, or 56.79%, to close at $0.70 per share on October 1, 2020." *Id.* ¶ 57.

Three weeks later, on October 21, 2020, "Zosano disclosed receipt of the FDA's [Complete Response Letter], disclosing the FDA's formal rejection of the Qtrypta NDA, providing additional detail on the deficiencies requiring resubmission of the NDA, and addressing the path forward for Qtrypta's approval in light of the deficiencies identified in the CRL." *Id.* ¶ 58. According to Zosano, the CRL echoed the DRL in citing "inconsistent zolmitriptan exposure levels observed across clinical pharmacology studies," specifically "differences in zolmitriptan exposures observed between subjects receiving different lots of Qtrypta in the company's trials and inadequate pharmacokinetic bridging between the lots that made interpretation of some safety data unclear." *Id.* Similarly, the

2021 WL 3913509

CRL, like the DRL before it, "referenced unexpected high plasma concentrations of zolmitriptan observed in five study subjects enrolled in the company's pharmacokinetic studies." *Id.* The FDA thus "recommended that the company conduct a repeat bioequivalence study between three of the lots used during development." *Id.* The CRL also "noted that additional product quality validation data," which Zosano had planned to submit "following approval" of the NDA, "were required to be submitted with" its new application. *Id.* "On this news, the Company's share price fell $0.171 per share, or 27.8%, to close at $0.444 per share on October 21, 2020." *Id.* ¶ 60.

On February 1, 2021, after meeting with the FDA, Zosano issued a press release announcing that it would be resubmitting its NDA. *Id.* ¶ 63. As a result of the additional pharmacokinetic study that the FDA required Zosano to conduct before resubmitting the application, however, Zosano in its 2020 10-K form (dated March 11, 2021) stated that it did not expect approval of Qtrypta until after July 31, 2021. *Id.* ¶¶ 59, 61. "In addition to delaying Qtrypta's approval, the need to conduct an additional PK study jeopardized Zosano's agreement with Eversana, which was valued at $250 million and [which] Zosano was depending on to market, sell[,] and distribute Qtrypta upon FDA approval." [6] *Id.* ¶ 66. "To date, Zosano has yet to resubmit Qtrypta's NDA to the FDA." [7] Docket No. 75 ("Opp'n") at 8.

**B. Procedural Background**

**\*5** Plaintiffs Danielle Carr and Rob Becerra filed class-action complaints against Defendants in late October and early November 2020, respectively. *See* Docket No. 1; Case No. 20-cv-07850-CRB, Docket No. 1. In late December 2020, seven plaintiffs filed motions to consolidate the two actions, to appoint a lead plaintiff, and to approve lead counsel in the case. *See* Docket Nos. 9, 13, 15, 22, 26, 29, and 33. Pursuant to a stipulation from Plaintiffs Doss and Alqurashi, this Court consolidated the cases, appointed Messrs. Doss and Alqurashi as co-lead plaintiffs, and approved their selected law firms as co-lead counsel in this case. *See* Docket Nos. 57 and 58.

Plaintiffs filed their Consolidated Amended Class Action Complaint on March 30, 2021. *See* CAC. The gravamen of the complaint is that Defendants, throughout the Class Period, "made materially false and/or misleading statements ... regarding the Qtrypta clinical trials and [the drug's] pathway and timing for regulatory approval." CAC ¶ 11. In particular, the complaint alleges that Defendants failed to disclose to investors that:

(i) the Company's clinical results reflected differences in zolmitriptan exposures observed between subjects receiving different lots; (ii) the Company's pharmacokinetic studies to be submitted with its NDA, which included its Phase 1 trial completed in 2016, included patients exhibiting unexpected high plasma concentrations of zolmitriptan ... (iv) as a result of the foregoing issues and the impact they had on the interpretation of safety data of Qtrypta (M207), *the FDA was likely to require further studies to support regulatory approval of Qtrypta* (M207); (v) additional product quality validation data, which Zosano had omitted from its NDA and purportedly planned on submitting following approval, if received, was required to be submitted with the NDA; and (vi) *as a result, regulatory approval of Qtrypta (M207) was at risk and likely to be delayed.*

*Id.* (emphasis added). The complaint further alleges that Defendants were "motivated to issue misstatements regarding the Company's potential for obtaining FDA approval of Qtrypta for financial reasons." *Id.* ¶ 12. It states:

[Zosano] has incurred significant operating losses since its inception, and it was critically low on cash throughout the Class Period. Between 2017 and 2020, the Company posted net losses totaling $135.5 million, with a loss of $29.1 million in 2017, $35.4 million in 2018, $37.6 million in 2019, and $33.4 million in 2020. *In order to stem the flow of losses, boost cash on hand, and provide funding for the development and trials of Qtrypta*—Zosano's only leading viable drug candidate—*the Company*

*had to regularly raise funds through selling the Company's common shares and other securities* in secondary offerings, private placements, and the Company's at-the-market offering ("ATM") program. Because shares in an ATM are sold at prevailing market prices, *Defendants were also motivated to issue false and misleading statements* regarding the Company's potential for obtaining FDA approval of Qtrypta in order to keep Zosano's stock at artificially inflated levels throughout the Class Period and raise cash at these inflated levels *to infuse much needed funds into the Company.*

*Id.* (emphasis added). As noted above, Plaintiffs brought claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. *See id.* ¶¶ 187-201.

Defendants moved to dismiss the complaint on May 14, 2021. *See* Mot. Plaintiffs responded by opposing the motion on June 14, 2021. *See* Opp'n. Defendants filed a reply on July 6, 2021. *See* Docket No. 79 ("Reply"). This Court held a hearing on the motion to dismiss on July 22, 2021. *See* Docket No. 85.

### III. LEGAL STANDARDS

A. Rule 9(b) and the PSLRA

**\*6** Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a plaintiff's complaint based on its failure to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Securities fraud complaints are subject to heightened pleading requirements" in comparison with the baseline standard of Federal Rule of Civil Procedure 8(a). *See* Nguyen v. Endologix, Inc., 962 F.3d 405, 414 (9th Cir. 2020). As the Ninth Circuit has recently explained:

> One source of these higher standards is Federal Rule of Civil Procedure 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud."
>
> *See also* [Schueneman v. Arena Pharm., Inc., 840 F.3d 698, 705 (9th Cir. 2016)]; [Zucco Partners, LLC v.

Digimarc Corp., 552 F.3d, 981 990 (9th Cir. 2009)]. Another source is the [Private Securities Litigation Reform Act ("PSLRA")], which was enacted in 1995 as part of Congress's desire to "curb perceived abuses of the § 10(b) private action— 'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.' " [Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320 (2007) (quoting Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81 (2006))].

Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Importantly for purposes here, *the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id.* § 78u-4(b)(2)(A).

*The PSLRA's "strong inference" requirement has teeth.* It is an "exacting" pleading obligation, Zucco Partners, 552 F.3d at 990, that "present[s] no small hurdle for the securities fraud plaintiff." Schueneman, 840 F.3d at 705 (quotations omitted). As the Supreme Court has explained, "[t]he strong inference standard unequivocally raised the bar for pleading scienter." Tellabs, 551 U.S. at 321 (quotations omitted) (alteration adopted). Given the substantial costs that securities fraud litigation can impose, the "strong inference" standard reflects Congress's attempt to halt early on securities litigation that lacks merit or is even abusive, while allowing plaintiffs with potentially winning claims to proceed to discovery. *See* id. at 323–24.

Acknowledging these interests, the Supreme Court has held that under the PSLRA's "strong inference" standard, *a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.* at 324.

Endologix, 962 F.3d at 414 (emphasis added). Pursuant to the PSLRA's scienter requirement, therefore, courts "must

compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Id.* at 419 (quoting *Zucco Partners*, 552 F.3d at 991).

## B. Section 10(b), Rule 10b-5, and Section 20(a)

**\*7** Regarding the substantive provisions at issue in this case, the Ninth Circuit has stated:

Section 10(b) ... makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Pursuant to this section, the [SEC] promulgated Rule 10b-5, which makes it unlawful ... "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). [8]

...

"To recover damages for violations of [S]ection 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, [573 U.S. 258, 267 (2014)] (internal quotation marks omitted)....

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140-41 (9th Cir. 2017).

In order to adequately plead "the critical element of scienter," the Ninth Circuit requires a complaint to "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Endologix*, 962 F.3d at 414 (quoting *Zucco Partners*, 552 F.3d at 991). Deliberate recklessness entails "an *extreme* departure from the standards of ordinary care," one that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor

must have been aware of it." *Id.* (quoting *Schueneman*, 840 F.3d at 705) (emphasis in original). While courts are to "examine individual allegations" of scienter "in order to benchmark whether they are actionable," they also "consider the allegations collectively and examine the complaint as a whole." *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("*PRS*"). "In the Ninth Circuit," therefore, "courts must first determine 'whether any of the plaintiff's allegations, standing alone, is sufficient to create a strong inference of scienter,' " and, if "none is sufficient alone," courts "must 'then consider the allegations holistically to determine whether they create a strong inference of scienter taken together.' " *Colyer v. Acelrx Pharm., Inc.*, 2015 WL 7566809, at \*11 (N.D. Cal. Nov. 25, 2015) (quoting *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014)).

"Section 20(a) of the [Exchange] Act makes certain 'controlling' individuals also liable for violations of [S]ection 10(b) and its underlying regulations." *Zucco Partners*, 552 F.3d at 990; *see also* 15 U.S.C. § 78t(a) (stating that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with ... such controlled person to any person to whom such controlled person is liable"). Section 20(a) thus "provides for derivative liability" of "controlling" individuals based on predicate violations of Section 10(b) and Rule 10b-5. *See In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1000 (N.D. Cal. 2016) (internal quotation omitted).

## C. Leave to Amend

**\*8** Where a court dismisses a complaint, it "should grant leave to amend ... unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party[,] and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## IV. DISCUSSION

Defendants' motion to dismiss the Consolidated Amended Class Action Complaint argues that Plaintiffs fail to state a claim under Section 10(b) and Rule 10b-5, as well as Section 20(a), for two main reasons. First, they contend that "none of the allegedly false or misleading statements identified" in the complaint are actionable, as they were truthful "predictions about Qtrypta's regulatory pathway" and so not false or misleading for purposes of the PSLRA. *See* Mot. at 1. Second, Defendants assert that "the Complaint fails to ... raise a strong inference of[ ] scienter on the part of any of the Defendants." *Id.* Specifically, they argue that "the type of scienter theory underlying" the complaint is implausible as a matter of law based on the Ninth Circuit's decision in *Endologix*. *See id.* Even if that case is not dispositive, Defendants continue, the complaint fails to allege "*who* at Zosano knew about" the purported problems in the clinical studies, "*when* they learned about them," "*how* they learned about them, and *why*—even if they had such knowledge— the omissions were material enough to render any of the challenged statements false or misleading." *Id.* at 2. Additionally, Zosano points out that "the Complaint contains none of the hallmarks of a potentially viable securities fraud claim," such as "allegations attributed to confidential witnesses," "insider stock sales," or "motivation [for] personal financial gain." *Id.* Plaintiffs respond to each of these arguments in turn.[9] *See* Opp'n at 8-25.

The Court is doubtful that Plaintiffs have adequately alleged that Defendants' statements were materially misleading with sufficient particularity. As Defendants point out, the statements identified as fraudulent and/or misleading in the complaint "fall into two general categories": (1) "statements about the efficacy and long-term safety studies," where "Zosano disclosed that [the studies] reported positive results," and (2) "Zosano's public statements regarding Qtrypta's pathway to FDA approval." Mot. at 8 (citing, *e.g.*, CAC ¶¶ 67, 69, 71, 127 and ¶¶ 81-82, 139, 142, 150-51, respectively). Defendants plausibly argue that neither category contains an actionable misrepresentation, as Plaintiffs do not challenge Defendants' characterizations of the ZOTRIP and safety studies as promising, nor do they dispute that those studies were sufficient to filing an NDA. *See* Mot. at 12-15. Instead, Plaintiffs suggest that Defendants *omitted* important clinical data—namely those concerning the very problems that the FDA later identified in rejecting the Qtrypta NDA—when touting the results of Zosano's various clinical studies. *See,*

*e.g.*, CAC ¶ 11. But "Plaintiffs nowhere allege who at Zosano learned about issues (1) and (2) above, how they learned it, when they learned it, or even if the allegedly non-disclosed issues arose before any particular Challenged Statement was made." Mot. at 13. Given the heightened pleading standards of [Rule 9(b)](#) and the PSLRA, the complaint's lack of specificity appears problematic for Plaintiffs. However, the Court need not decide that issue here since it concludes that Plaintiffs have failed to plead scienter and that their claims under Section 10(b) and Rule 10b-5, as well as under Section 20(a), necessarily fail as a result.

**\*9** As indicated above, Plaintiffs' scienter allegations are based on the theory that Defendants "failed to disclose material adverse facts about ... the Qtrypta clinical trials and [the drug's] pathway and timing for regulatory approval." *See* CAC ¶ 11, *supra* note 10. In particular, Plaintiffs allege that Defendants omitted from their public statements data that the FDA later identified as grounds for rejecting the Qtrypta NDA, *i.e.*, "differences in [zolmitriptan](#) exposures observed between [clinical] subjects receiving different lots" of Qtrypta and "unexpected high plasma concentrations of [zolmitriptan](#)" in certain patients during [pharmacokinetic studies](#). *See id.*; *see also id.* ¶¶ 56-60 (describing the contents of the FDA's review letters). Plaintiffs suggest that Defendants intentionally failed to disclose this information knowing that "the FDA was likely to require further studies to support regulatory approval of Qtrypta" and that, "as a result, regulatory approval of [Qtrypta] was at risk and likely to be delayed." *Id.* Plaintiffs' scienter theory thus requires Defendants (1) to have been aware of the undisclosed and problematic data during the Class Period and (2) to have known, or been "deliberately reckless," about the data's likely effect on the timing and/or ultimate outcome of the regulatory review process. *See* [Endologix, 962 F.3d at 414](#). Plaintiffs also posit that Defendants were "motivated to issue misstatements regarding [Zosano's] potential for obtaining FDA approval of Qtrypta for financial reasons," namely "to keep Zosano's stock at artificially inflated levels throughout the Class Period and raise cash at these inflated levels to infuse much needed funds into the Company." CAC ¶ 12. These allegations, however, fail on numerous grounds.

First, as Defendants argue, this case is closely analogous to *Endologix*, where the Ninth Circuit rejected allegations of scienter—*i.e.*, "that defendants made false or misleading statements either intentionally or with deliberate recklessness"—because they had "no basis in logic or

common experience." *Endologix*, 692 F.3d at 407-08. In that case, the plaintiff's "central theory [was] that company executives knew" that a medical device for which they were seeking FDA approval "had encountered problems in Europe that would manifest again in U.S. clinical trials, which would in turn lead the FDA to deny premarket approval." *Id.* at 407. More specifically, the complaint alleged "that while the FDA approval process was ongoing," the company, its CEO, and its CFO became aware that the device (which was designed to treat disorders of the aorta and had been introduced in Europe after undergoing a less rigorous approval process than it would in the United States) was migrating within the abdomens of European patients. *Id.* at 408-09. The complaint alleged that, despite the device's safety issues in Europe, "Endologix executives repeatedly assured investors that the FDA would likely approve" the device. *Id.* at 410. Later, however, "Endologix issued a press release disclosing that the FDA would not approve [the device] within the timeline the company had previously presented" and that the FDA "had requested that Endologix provide it with two years of follow-up data for patients in the [device's] clinical trial." *Id.* at 412. The company's share price immediately dropped more than 20% and Endologix later chose not to seek FDA approval of the device. *Id.*

On appeal, the Ninth Circuit affirmed the district court's dismissal of the plaintiff's Section 10(b), Rule 10b-5, and Section 20(a) claims for failure to "adequately allege[ ] a 'strong inference' of scienter." *Id.* at 413 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). The Ninth Circuit noted that "the PSLRA's heightened pleading requirements are meaningful ones," and that the law's specific demand that complaints "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter is "an exacting pleading obligation." *Id.* at 413-14 (internal quotations omitted). It then stated that the plaintiff's theory—*i.e.*, "that defendants knew the FDA would not approve [the device], or at least that it would not do so on the timeline defendants were telling the market"—did "not make a whole lot of sense." *Id.* at 415. "It depends on the supposition," the court went on, "that defendants would rather keep the stock price high for a time and then face the inevitable fallout once [the device's] 'intractable' migration problem was revealed." *Id.* The court acknowledged that "the theory might have more legs" if "defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium," but observed that the complaint lacked any such allegations. *Id.* Instead, the court was being "asked to accept the theory that defendants were promising

FDA approval for a medical device application they knew was 'unapprovable' "—a theory that "does not resonate in common experience." *Id.* In weighing "the malicious and innocent inferences cognizable from ... the complaint," the Ninth Circuit concluded that "the more plausible inference from the facts alleged is that defendants based their statements about FDA approval on the status and progress of the U.S. clinical trial, not that defendants were intentionally or with deliberate recklessness seeking to mislead the market about an FDA approval that they knew would never come through." *Id.* at 419. The plaintiff's allegations of scienter were therefore implausible and her securities-fraud claims had to be dismissed. *See id.* at 419-20.

**\*10** The Court agrees with Defendants that the instant case is, for all intents and purposes, "on all fours with *Endologix*." Mot. at 20. As in the earlier case, "[t]here is no logical reason why Defendants would tell investors that they believed FDA approval was likely if they secretly knew the FDA was going to delay or reject the application," especially since Plaintiffs here do not allege that Defendants engaged in "insider stock sales" or other suspicious financial activity prior to the disclosures of the FDA's Disciplinary Review Letter and Complete Response Letter in late 2020. *See id.* at 20-21; *see also* In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869, 884-85 (9th Cir. 2012) (holding that plaintiffs failed to plead scienter where, *inter alia*, "none of the defendants sold stock during the period between the allegedly fraudulent statements and the subsequent public disclosure of the detailed data, which is the period during which they would have benefitted from any allegedly fraudulent statements").

Indeed, "the scienter allegations in *Endologix* were stronger" than those here insofar as plaintiffs in the earlier case "relie[d] heavily on allegations from" a confidential witness, a former director of research and development at Endologix who alleged that the defendants knew about the device-migration problem in European patients prior to FDA review. *See* Reply at 13; Endologix, 962 F.3d at 409-10. The witness identified a series of contemporaneous reports and informal complaints that were relayed to the defendants and alerted them to the migration issue. *Id.* But the Ninth Circuit ruled that the witness's account did "not get [the] plaintiff where she needs to be under the PSLRA" since the various reports reflected only "a general concern" about the migration problem and were "short on the facts about [the problem] that would establish a strong inference that defendants' later statements about FDA approval were

intentionally false or made with deliberate recklessness." [10] *Id.* at 416. *Endologix* thus held that even where a complaint includes concrete allegations of scienter from a well-placed confidential witness, such allegations do not suffice to plead scienter if they lack significant detail.

Here, in contrast, Plaintiffs fail to include any allegations against Defendants from confidential witnesses or former Zosano employees. As a result, their complaint lacks notable features that tend to be "hallmarks of a potentially viable securities claim." Mot. at 2, 21-22; *see also* In re Hansen Nat'l Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1163 (C.D. Cal. 2007) (dismissing securities claims where, *inter alia*, the plaintiff's allegations were "all based on publicly-filed documents—and not, as is the case in many securities fraud cases, on the statements of confidential witnesses and/or employees and former employees").

Plaintiffs do not meaningfully engage with *Endologix* in their opposition, stating only, in a one-sentence footnote, that Defendants' reliance on the case "is misplaced" because Plaintiffs here are asserting a *weaker* theory of scienter than that which was at issue in *Endologix*, *i.e.*, that Defendants "rationally—but recklessly—gambled that the FDA would ultimately approve Qtrypta," not that they *knew* that approval would be withheld. *See* Opp'n at 19-20 & n.9. But this argument effectively concedes that, at worst, Defendants had *some* "rational[ ]" basis for believing that the FDA would approve the Qtrypta NDA, which in turn suggests that their statements were neither knowingly fraudulent nor so reckless as to constitute "an *extreme* departure from the standards of ordinary care." *See* Endologix, 962 F.3d at 414 (quoting Schueneman, 840 F.3d at 705) (emphasis in original). In any event, Plaintiffs' feeble attempt to distinguish this case from *Endologix* fails to address the latter's key conclusion: that allegations that company executives "would rather keep [a] stock price high for a time and then face the inevitable fallout" when their product fails to win regulatory approval on a certain timeline, without themselves seeking "to profit from this scheme in the interim," have scant "basis in logic or common experience." *See* id. at 415, 407-08. Consequently, allegations like these are implausible as a matter of law and cannot survive a motion to dismiss. *See* id. at 419.

**\*11** Plaintiffs argue that scienter should be inferred because Defendants "had a motive to downplay the risks that the Qtrypta NDA might not be approved." Opp'n at 23. Again, Plaintiffs contend that "Zosano was in desperate need of cash and engaged in regular securities offerings to raise sufficient funds to sustain the Company's operations, including its clinical trials." *Id.* (citing CAC ¶¶ 4, 12, 167-68). Defendants were thus "incentivized to issue misstatements about Qtrypta's FDA approval process to cause Zosano's stock price to trade at as ... high a price as possible and offset or mitigate any unease about its ability to continue as a 'going concern.' " *Id.* at 24 (quoting CAC ¶ 4). However, the Ninth Circuit has rejected the proposition that "allegations of routine corporate objectives such as the desire to obtain good financing and expand" are "sufficient to allege scienter," since holding otherwise "would support a finding of scienter for any company that seeks to enhance its business prospects." In re Rigel, 697 F.3d at 884. Courts in this district have reached a similar conclusion in circumstances closely analogous to those here. *See* Colyer v. Acelrx Pharm., Inc., 2015 WL 7566809, at \*14 (N.D. Cal. Nov. 25, 2015) (finding allegations that "Defendants were motivated to mislead the public in order to obtain financing from an investment firm" and to cement partnership opportunities inadequate to show scienter, as the allegations merely described "common business practices that virtually all companies undertake"). Thus, even if Defendants had a short-term incentive to commit fraud in order to obtain interim financing, that incentive would not gainsay the basic illogic pointed out in *Endologix*, as merely prolonging the inevitable—if such was known to Defendants—makes little sense. *See* 692 F.3d at 413-15.

Even if *Endologix* did not control the outcome here, Plaintiffs more fundamentally fail to establish that Defendants in fact had knowledge either "of the allegedly omitted clinical data" themselves or the fact that these data created any "increased regulatory risk." *See* Reply at 9, 11. The complaint does not specifically allege that the individual Defendants "knew about any of the allegedly concealed information" concerning clinical data or their potential effect on the regulatory timeline "when they or Zosano made the Challenged Statements." *See* Mot. at 22. Rather, Plaintiffs' contention is that scienter may be inferred because they allege that Defendants "had access to, and were well aware of, the underlying data which gave rise to the FDA's rejection of the[ ] NDA." [11] CAC ¶ 164(a). But merely proclaiming in conclusory terms that Defendants "had access to, and were well aware of," potentially problematic clinical data does not satisfy the PSLRA's scienter requirement, as the Ninth Circuit has rejected scienter allegations that were based on defendants'

mere access to, or general awareness of, problematic clinical trial data.

In *Rigel,* the plaintiff alleged "that Defendants knew that their statements regarding" a clinical drug's "efficacy were false because they had access to the clinical trial results and therefore knew that" they contained potentially worrying data. [697 F.3d at 883](). The Ninth Circuit rejected the plaintiff's argument: "Even assuming," it stated, "that Plaintiff adequately pled that all of the defendants had knowledge of the detailed clinical results at the time the allegedly false statements were made, such an allegation does not support a strong inference of scienter" because it does not establish that defendants knowingly misled investors about the drug's overall efficacy. *Id.* at 883-84; *see also Prodanova v. H.C. Wainwright & Co., LLC,* 993 F.3d 1097, 1109 (9th Cir. 2021) (holding that a plaintiff failed to plead scienter by alleging that a company's CEO had only a "general awareness of the day-to-day workings of the company's business" rather than "detailed and contemporaneous knowledge" of, and "control over," a key report containing misleading statements). Consequently, Defendants' putative access to, or general awareness of, the contested clinical data does not give rise to "a strong inference" of scienter, as the PSLRA requires. *See* 15 U.S.C. § 78u-4(b)(2)(A).

In a similar vein, Plaintiffs suggest that scienter should be inferred pursuant to the "core operations" doctrine, which provides that scienter may be based, at least in part, on "the theory that facts critical to a business's core operations ... are known to a company's key officers." *See Azar v. Yelp, Inc.,* 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018). The Ninth Circuit has thus stated that allegations of scienter founded on "management's role in a company" may "satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information" or where "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 786 (9th Cir. 2008) (internal quotation omitted). Allegations based on the core operations doctrine may also be combined "with other allegations that, when read together, raise an inference of scienter that is cogent and compelling." *Id.* at 785 (internal quotation omitted). The Ninth Circuit has held, though, that supplying "[p]roof under this theory is not easy," as plaintiffs "must produce either [1] specific admissions by one or more

corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring," "or [2] witness accounts demonstrating that executives had actual involvement in creating false reports." *PRS,* 759 F.3d at 1062.

**\*12** Plaintiffs here have not carried the heavy burden imposed by the core operations doctrine. *See id.* Plaintiffs' theory is that because "Qtrypta was the only product in Zosano's pipeline that presented any opportunity for profitability in the near term," the company was otherwise "in a dire financial position throughout the Class Period," and the company was small, it is reasonable to infer "that Defendants were keenly focused on the clinical data in the Qtrypta trials and the interpretation and analysis of that data." Opp'n at 22 (citing, *e.g.,* CAC ¶¶ 27, 165) (internal quotation omitted). But claiming that "Zosano was a relatively small company focused on a single product," Reply at 11, amounts to far less than adducing "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations" or "witness accounts demonstrating that executives had actual involvement" in the fraudulent scheme, as the Ninth Circuit requires. *See PRS,* 759 F.3d at 1062. Indeed, in *PRS* the plaintiff produced statements of witnesses who claimed that the defendant-executives "were involved with [a company's] day-to-day operations and were familiar with the contents" of internal sales reports that contradicted the company's optimistic public statements about its financial health. *Id.* The Ninth Circuit ruled that these allegations failed to establish scienter, as they did not adequately "link[ ] *specific* reports and their contents to the executives" or clarify "the link between the witnesses and the executives." *Id.* at 1062-63 (emphasis added). "Mere access to reports containing undisclosed [company] data," the *PRS* court stressed, "is insufficient to establish a strong inference of scienter." *Id.* In the instant case, Plaintiffs have plausibly shown only that "FDA approval of Qtrypta was ... central to Zosano's survival," CAC ¶ 4, not that the individual Defendants were personally aware of the relevant clinical data or that they believed the data would be material to the FDA's approval of Qtrypta.

In sum, Plaintiffs have not "state[d] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(2)(A). With respect to scienter, the complaint alleges little more than "that the FDA ultimately found the [data] material, coupled with Plaintiffs' conclusory allegation that Defendants

must have seen it coming." *See* Reply at 11. Thus, comparing "the malicious and innocent inferences cognizable from the facts pled in the complaint," the Court cannot conclude that "the malicious inference is at least as compelling as any opposing innocent inference." *Endologix*, 962 F.3d at 419; *see also Colyer*, 2015 WL 7566809, at *14 (stating that a plausible alternative to plaintiffs' theory of fraud was "that Defendants honestly believed that [their product] would receive FDA approval but—like all drugs submitted to the FDA—understood that such approval was not guaranteed"). Whether viewed individually or collectively, *see Zucco Partners*, 562 F.3d at 991, Plaintiffs' allegations amount to "an assertion of fraud by hindsight," which is insufficient under the PSLRA, *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999). As Plaintiffs' claim under Section 10(b) and Rule 10b-5 is unavailing for failure to plead scienter, their claim under Section 20(a) necessarily also fails.

*See* *Endologix*, 962 F.3d at 419. Defendants' motion to dismiss is therefore **GRANTED**.

### V. CONCLUSION

For the reasons given above, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint on the ground that the complaint fails to plead scienter. Moreover, the specificity required to establish Defendants' fraudulent misrepresentation or omission under the PSLRA appears to be lacking, as well. Although Plaintiffs' case seems questionable, the Court cannot yet conclude that amendment would necessarily be futile. Plaintiffs are thus given leave to amend. *See* *Foman*, 371 U.S. at 182. The Court observes, however, that Plaintiffs' current allegations fall far short of the mark for adequately alleging scienter under the PSLRA and that any amended complaint must set forth considerably stronger evidence of Defendants' illicit state of mind if it is to survive another motion to dismiss. Plaintiffs have thirty (30) days from the date of this order to file an amended complaint.

This order disposes of Docket No. 71.

**IT IS SO ORDERED**.

**All Citations**

Slip Copy, 2021 WL 3913509

### Footnotes

1     Zosano is a Delaware corporation with its principal place of business in Fremont, California. CAC ¶ 19.

2     The complaint explains, as also noted above, that Phase 2 and Phase 3 trials can sometimes overlap. CAC ¶ 5 n.4. This was apparently what occurred with the ZOTRIP trial, although the complaint does not make this point with complete clarity.

3     "Analysts reacted favorably to the Company's June 26, 2017[,] announcement," with one entity concluding that the statement would "incrementally reduce[ ] regulatory, execution, and financing risk for M207." CAC ¶ 42. In July 2017, "Zosano issued a press release announcing the publication" in an industry journal of positive data from "the Company's phase 1 pharmacokinetic trial of Qtrypta." *Id.* ¶ 43. In September and October 2017, Zosano also "announced that it presented data from the ZOTRIP study" at a medical conference and that it was publishing "positive ZOTRIP data" in another "peer-reviewed ... prestigious journal." *Id.* ¶¶ 44-45.

4     A group of analysts responded by stating that "Zosano continues to advance M207" and that, "[w]ith a solid commercial manufacturing strategy for M207 now funded and in place, positive safety should serve as an additional de-risking event" for Zosano stock. CAC ¶ 48.

5     Another group of analysts noted that, based on "recent FDA feedback," Zosano "expect[ed] acceptance" of the NDA "in March 2020." CAC ¶ 50. This prediction evidently refers to the FDA's acceptance of Zosano's NDA for *filing*, rather than its ultimate *approval* of the NDA. As Defendants clarify in their opposition, "it is important to distinguish between 'submitting' an NDA, 'filing' an NDA, and having an NDA 'approved.' After a product's sponsor (like Zosano) 'submits' an NDA, the FDA has 60 days to determine if 'the NDA may be filed. The filing of an NDA means that FDA has made a threshold determination that the NDA is sufficiently

complete to permit a substantive review.' 21 C.F.R. § 314.101(a)(1). Thereafter, the FDA has 180 days to complete its substantive review of the NDA and issue an approval decision. *See id.* § 314.101(a)(2). In other words, there is an initial period in which the FDA decides if the application is sufficiently complete to allow for the agency's review; then it has a second, six-month-long period to undertake that substantive review." Opp'n at 6; *see also* CAC ¶¶ 34-35 (describing the same process).

6      Zosano confirmed in its 2020 10-K Form that if its relationship with Eversana is terminated, Zosano's "ability to generate revenue will be limited and [it] will need to identify and retain an alternative organization, or develop [its] own sales and marketing capability." CAC ¶ 66.

7      Zosano avers that it continues to pursue FDA approval of Qtrypta at the present time. *See* Docket No. 79 ("Reply") at 1.

8      This paragraph is quoted from *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).

9      As a threshold matter, the Court notes that the parties have filed a total of three requests for the Court to take judicial notice of various documents mentioned in the complaint and/or the parties' moving papers. *See* Docket Nos. 73, 77, and 80. The parties do not dispute that the complaint "refers extensively to the document[s]" that they request the Court to take notice of, or that, in the alternative, the documents "form[ ] the basis of" Plaintiffs' claims; as a result, the documents are likely incorporated by reference into the complaint and the Court would be permitted to assume their contents' truth for purposes of a motion to dismiss. *See*

*United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014); *Khoja v. Orexigen Therapeutics, Inc.*, 889 F.3d 988, 998-1003 (9th Cir. 2018). However, because the Court need not rely on these documents in deciding Defendants' motion to dismiss, it **DENIES** the parties' requests for judicial notice.

10     "Nowhere does [the witness] identify, for example, the number of European patients that experienced device migration, how much [the device] was migrating in these patients, whether the alleged device migration led to any further medical issues, whether the patients had particular conditions that exacerbated the migration, and whether the patients were within or outside" the device's indications for use. *Endologix*, 962 F.3d at 416.

11     They also assert that the individual Defendants, "made specific statements about [Zosano's] Qtrypta (M207) trials, and the regulatory approval of Qtrypta (M207), which implies they had done their due diligence to evaluate the accuracy of their statements," and were therefore "aware of, or recklessly disregarded, the underlying facts that gave rise to the FDA's rejection of the Qtrypta NDA." *Id.* ¶ 164(c).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.