**Pages 1 - 39**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK, JUDGE

In re BioMarin Pharmaceutical  )  No. 20-cv-6719
Inc. Securities Litigation     )
_____)  San Francisco, California
                                  Friday, December 3, 2021


**TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR**

**APPEARANCES**:   (via Zoom Webinar)

For Lead Plaintiff and the Class:
                         BERNSTEIN LITOWITZ BERGER
                          & GROSSMANN LLP
                         2121 Avenue of the Stars, Suite 2575
                         Los Angeles, California 90067
                    **BY:  SALVATORE GRAZIANO, ESQ.**


For Defendant BioMarin Pharmaceutical Inc., Jean-Jacques
Bienaimé, and Henry J. Fuchs:
                         COOLEY LLP
                         3175 Hanover Street
                         Palo Alto, California 94304-1130
                    **BY:  JOHN C. DWYER, ESQ.**
                         **JESSICA VALENZUELA SANTAMARIA, ESQ.**
                         **JOSHUA WALDEN, ESQ.**


Also Present:            Eric Davis, BioMarin General Counsel



Reported By:    Katherine Powell Sullivan, CSR #5812, CRR, RMR
                Official Reporter - U.S. District Court

**Friday - December 3, 2021**                          **10:24 a.m.**

**P R O C E E D I N G S**

**---000---**

THE CLERK:  We will go ahead and proceed.  This is case number 20-6719 regarding BioMarin Pharmaceutical Inc. Securities.

Counsel, if you would, please, state your appearance for the record.

MR. GRAZIANO:  Good morning, Your Honor.  For the plaintiff ATP, it's Sal Graziano from Bernstein Litowitz.

MR. DWYER:  Good morning, Your Honor.  On behalf of the defendants, John Dwyer of Cooley LLP.  And with me this morning is Eric Davis, the general counsel of BioMarin, as well as my colleagues, Jessica Valenzuela Santamaria and Josh Walden.

THE COURT:  Okay.  Good morning to all of you.

Let me tell you how I analyzed this.  I'm inclined to deny the motion to dismiss.  I think that the heart of this case is that the defendants -- at least as alleged, is that the defendants misled the plaintiffs on the alleged good progress and good relationship between BioMarin and the FDA regarding the FDA approval process, particularly with respect to the inspection and the trial data.

There's no meaningfully cautionary language in the misleading statements about that.  The plaintiffs plausibly

allege defendants' actual knowledge of the statements falsity, so I don't see that the safe harbor would apply.

BioMarin was aware of concrete risks that approval would be denied.  The confidential witness says that the FDA warned BioMarin that the inspection could be delayed, and that witness is identified sufficiently and identifies the source of the information regarding the FDA's statements and concern within the company.

The concerns about the Phase 3 data combined with the delay in the inspection and the unusual period of silence from the FDA, as alleged, would raise serious doubts about prompt FDA approval.  But the opposite of that was communicated.  I think scienter is alleged.

And, in addition to all of that, there's alleged to be a motive with two drugs with about one-third of the revenue ending their exclusivity periods and unusual stock sales in the class period.

So for all of those reasons, I think this case is going to proceed.

But, Mr. Dwyer, if you want to take that on, please go ahead.

MR. DWYER:  Yes, I do, Your Honor.

And, Your Honor, the Court covered a lot of topics there, so I think I'm going to give you the full presentation.

We respectfully, not surprisingly, think that the

complaint falls well short of the pleading requirements.  So let me address, initially, three preliminary points.

And then, Your Honor, I think it's important -- and I apologize for having to do this.  I think it's important to look at the statement on a statement-by-statement basis.  I think that is the requirement under the PSLRA when both falsity and scienter are alleged on a statement-by-statement basis.

And I think when one looks at the statement on a statement-by-statement basis, it becomes clearer why the complaint falls short.  But let me first make three preliminary points, Your Honor.

The first point requires me just to give a brief summary about Roctavian, the drug at issue, hemophilia, and the FDA process.

So I think it's relatively clear from the papers that Hemophilia A is a condition, obviously, that results in excessive bleeding caused by an absence or a deficiency of a protein called Factor 8, and individuals with hemophilia don't have sufficient Factor 8 protein and, therefore, do not adequately -- their blood doe not adequately clot.

Roctavian is a gene therapy developed to address that condition for those suffering from serious hemophilia.  Serious hemophilia is defined as individuals whose Factor 8 is less than 1.

Now, that unit as an international unit, doesn't really

matter exactly what the unit is, but normal would be 50 to 150, and so severe hemophilia is less than 1.  And the critical part of that is, if an individual is able to move from a Factor 8 level above 1, from severe to mild or moderate hemophilia, the treatment is very different for those individuals.

For severe hemophilia, the standard of care is what's called prophylaxis infusions.  Basically, two to three times a week those individuals come in and receive infusions of Factor 8.

The Roctavian gene therapy is pretty revolutionary.  And the way it works is the company -- or the doctors inject this genetic material, which goes by the tradename Roctavian.  And it injects genetic material that's directed towards the liver that allows for the production of Factor 8 naturally.

And if it works -- and this is a key issue having to do with durability -- it should cure the disease, basically, with a single injection.  So one time for the rest of one's life as opposed to infusions two to three times per week.

So it's prior to the class period in May 2019, the company disclosed data from two ongoing studies.  The data was excellent, Your Honor.

So the two studies were this Phase 1/2 study that had started back in, I think, 2015, and it was updated data regarding how patients were performing three years after the infusion -- a single infusion of Roctavian.

And I won't get into the details, but the key thing here, Your Honor, is that even after three years the Factor 8 levels in those individuals had an average of 32.  Remember, all these people started at below 1.  And, likewise, the bleed rate -- the annual bleed rate had gone to a median of zero.  They weren't bleeding, the median was not bleeding.

The company also, for the first time, announced the results from Phase 3 results.  So they started Phase 3 trial, and in 23 to 26 weeks, consistent with the agreement that they had reached with the FDA, they disclosed the results of the Phase 3 interim result.

Those also were excellent.  There were 16 patients at that point who had reached the 23 of 26-week threshold, and eight of those patients had mean Factor 8 levels above 40.  All of this was really good.

There was one issue that was identified early in the process, back in May 2019, that discussed repeatedly up to the class period and through the class period, and that was a discrepancy between some of the Phase 1/2 data and the Phase 3 data.

And the issue was that the Phase 3 data, 23 to 26 weeks, had a lower response rate than the Phase 1/2 data had.  And so the question became, and people immediately started asking the question, would the FDA accept both the Phase 1 and 2 data and the Phase 3 data in support of the BLA that had been submitted

in light of this discrepancy.

Because the whole key here, Your Honor, is the durability. Will this last for ten years or is this something that's only going to last for two or three years?  And this discrepancy between the data at least raised some question.  And it was discussed openly.  It was discussed openly on that May 2019 call and subsequent to that.

There were a bunch of different things where the company basically said, very honestly and openly with everybody, all investors were exploring why there's a discrepancy between these two things.

One possibility, and I think the one that the company believed, was that there was one difference between the Phase 1/2 study and the Phase 3 study, in the design, that could have caused the problem.

In the Phase 1/2 study, every patient in the study was provided steroids prior to receiving any injection from -- from physicians of Roctavian.  So it was done on a prophylactic basis.

With regard to the Phase 3 study, individual participants only received steroid if their certain liver enzymes reached certain levels, and so it was only done sort of reactively.  So that was one possibility.

The other possibility was that the Roctavian that was in the Phase 3 study was manufactured at BioMarin's Nevada

facility, and the drug -- the genetic material that had been used in the Phase 1/2 had been manufactured by third parties. So there was ongoing questions about those two things.

Importantly, in August of 2020, when the FDA issues its CRL, which basically says we're not prepared to approve this gene therapy yet, we want to see more data, what they identified -- and there's no suggestion that something else caused the FDA to issue the CRL.  What they identified as the primary concern that they had, and the reason why the FDA issued the CRL, was the disparity that I've been talking about. It was the disparity that had been discussed openly with investors.

So my first point, Your Honor, is, the complaint does not dispute in any way that this issue regarding the slight discrepancy between the results of the two studies was well-known and openly discussed, there was no surprise; and, secondly, and perhaps more importantly, the complaint contains absolutely no well-pled allegation that at any time prior to the issuance of the CRL that FDA indicated to anyone at BioMarin that it would not approve Roctavian due to this issue. That's undisputed.

And that brings me to my second preliminary issue, Your Honor.  The fact, the basis for the FDA's CRL decision was disclosed by the company and known by investors well before the CRL was issued distinguishes this case from every single -- I

believe every single case cited by plaintiffs in which a Court denied a motion to dismiss a securities transaction involving drug development efforts of the FDA regulatory process.

In each of those cases cited by plaintiff, the FDA issued a CRL.  And the reason -- the articulated reason for the CRL was an issue that had never been shared with investors or with anyone else by the company publicly.  Every single one of their cases.

And in each of those cases the Court said, well, you know, when you look at this, the company was aware of these issues.  They'd had interactions with the FDA where the FDA had raised these concerns, and they never disclosed it.

And then the FDA issues its CRL, and the courts have said, you know what, there's a real question as to whether or not that information should have been disclosed.  It was never disclosed.  That is absolutely not what happened in this case.

And, Your Honor, I can walk through all of those cases where that's the situation, but that's true with *Arena (phonetic), MannKind*, all of these cases.  So I won't do that.

Instead, what the plaintiffs do here is concoct what I respectfully think is a somewhat bizarre theory.  That it is not concerns expressed by the FDA that should have been disclosed to investors during the class period but, rather, the FDA's silence in the weeks leading up to the CRL.

I'm unaware of any case in which a court has held that a

securities fraud case should be allowed to go forward because the companies should have disclosed silence by the FDA.  It's not even clear to me what disclosure would be.

But, as reflected in the exhibits from the September time period -- this is after the CRL, when Dr. Fuchs and Mr. Bienaime are talking about what happened -- it's absolutely clear from those that the lack of engagement by the FDA on this clinical issue that we've been discussing was less than they would have expected, but they considered it a good sign.

And when you look at those exhibits, Your Honor -- and they're exhibits attached to the Litton declaration; it's W, X and Y, I think.

When you look at those exhibits, it's clear that when Dr. Fuchs is talking about the regulatory process, he's expressing frustration, not -- he's expressing frustration that we would have expected greater interaction with the FDA, leading up to the FDA -- up to the CRL, or the PDUFA date decision, if they had any concerns.

And the fact that that engagement was with regard to the clinical issues and the fact that there was no engagement on clinical issues -- remember, Your Honor, if you look at the document and the report, there was a meeting before the BLA was filed in which the FDA said, we don't have issues with this issue.  There was the mid-cycle review meeting right in the middle of the class period, which was in April.

Everybody agrees the FDA said there was nothing -- no clinical issues. And so it was that -- what they're saying after the fact is how frustrated they were, not that there's not really a back and forth but that there wasn't a back and forth in light of the fact that the FDA ultimately issued the CRL.

And, Your Honor, I know of no precedent that would require somebody to disclose a lack of engagement. I tell you, Your Honor, I've helped many companies go through regulatory processes. As a general matter, when your regulator goes quiet, that makes you feel pretty comfortable about the issues you've already discussed with the regulator.

And then the third point I want to raise, Your Honor, preliminary point, relates to the Ninth Circuit's recent decision in 2020 in *Nguyen v. Endologix*. And we submit that that case is controlling here and -- or at least extremely persuasive and should influence the Court's decision here.

As you may recall, in that case the plaintiffs alleged that the defendants knew that the FDA would not approve its device, or at least on the timeline they were claiming, due to issues that the device -- it's a little bit like a stent, but it's used for aneurysms -- that it was migrating in patients that had had it implanted in Europe.

And the allegations were that these positive statements about expected approval, et cetera, were misleading in light of

the migration that was taking place in Europe.

And the Ninth Circuit said -- it was strictly a scienter decision and did not address falsity.  And the Ninth Circuit said, you know what, this whole theory, quote, creates an immediate first-level problem.

The theory does not make a whole lot of sense.  It depends on the supposition the defendants would rather keep the stock price high and then face the inevitable fallout once these unsolvable problems came to light.

Quote, the allegation does not resonate in common experience, and the PSLRA neither allows nor requires us to check our disbelief at the door.

On that basis the Court granted the motion to dismiss on scienter grounds.

That's the same analysis -- Your Honor, you may recall we filed a supplemental authority last week.  That was *Carr v. Zosano Pharma*.  That's the same analysis Judge Chen reached in that case, and the same conclusion.

We submit, Your Honor, that the analysis undertaken by the Ninth Circuit in that case compels the same result here.  It simply doesn't make sense for the same reasons it did not make sense in *Endologix*.

To think BioMarin would commit a fraud, elevate its stock price, when they knew in six months -- there was a time frame, six months from the PDUFA date -- that the fraud would be

revealed.  It's even bizarre, Your Honor -- remember, this company asked for and received expedited review.  The result of that was that the PDUFA date was set at six months as opposed to ten months.  Even that undercuts the plausibility of this.

If one were committing a fraud, why would you go out of your way to make sure that the truth came to light four months earlier than it otherwise would by requesting an accelerated review?

**THE COURT:**  Remind me, in those cases that you're describing, was there a confidential witness who had described the actual knowledge -- the alleged actual knowledge of the company?

**MR. DWYER:**  I can't say for sure about the *Nguyen* case, but in most of these cases there are confidential witnesses.

And I will address this one confidential witness, Your Honor, because, as you know, part of it -- part of the analysis here is looking at whether or not, under *Zucco*, the Ninth Circuit's case in *Zucco*, whether or not the Court should defer to the confidential witness allegations.

I will get to that in one minute, but let me mention one other thing because this, the plaintiffs have already asserted, distinguishes the *Endologix* case from this case.

And it's absolutely clear, as plaintiffs have pointed out in their opposition brief, that the Ninth Circuit in *Endologix*

said, hey, this analysis might be a little bit different if there were stock sales, if there were suspicious stock sales.

And, as Your Honor already pointed out, there are allegations about stock sales. So I'd first like to talk about the stock sales, Your Honor, and then I will talk about the allegations related to FE-1.

So -- and I apologize. It's always interesting when you go back and you prepare for a hearing, you always see how you might brief or say things a little bit differently. I'm not sure that we articulated as clearly as we could have in some of our papers some of the issues with regard to the stock sale. It's all there, but I'm going to take a minute to unpack it for Your Honor.

There's two defendants, there's Mr. Bienaime and Dr. Fuchs. So with regard to Mr. Bienaime, first of all, the fact that the Ninth Circuit says in *Endologix* that it might be different if there were stock sales, I assume that means if there were suspicious stock sales.

The courts always talk about suspicious stock sales, so the issue is, were they suspicious. And neither one of them are suspicious, Your Honor, and, as a result, should be ignored.

So with regard to Mr. Bienaime, as we mentioned in the papers, all of the sales during the class period -- we sold 89,000 shares -- were pursuant to 10b5-1 claims. So let me

talk about those 10b5-1 claims because it gets confused in the briefing.

Of the 89,000 shares sold during the class period by Mr. Bienaime, 80,000 of them were sold pursuant to a 10b5-1 plan that had been entered into in November of 2019, so six months before the class period.

You can see this in the exhibits that we submitted, the Form 4.  You can see there are certain boxes that talk about the sales and whether or not pursuant to stock plans and whether or not stock options, et cetera.  Those are Exhibits JJ through NN.

The other 9,000 shares were sold in May of 2020.  And they were also pursuant to a 10b5-1 plan, but this was a 10b5-1 plan that had been executed and entered in on March 5, 2020.

And plaintiff said, and there's some case law to support it, that if you have a 10b5-1 plan that you entered into during a class period, while 10b5-1 claims generally negate scienter from stock sales, you have to take that into account.

But, Your Honor, there is a pattern here that is absolutely undeniable.  All of the sales that took place during the class period -- you had sales in March, April, and May. All of the sales took place -- and this is also in all these exhibits.  All of the sales were sales of options, so the -- Mr. Bienaime exercised options and then sold them, all of which were expiring on May 11th, 2020.

So, Your Honor, again, if you look at these documents, you can see that all of these options that were exercised in March, April, and May would have expired in May of 2020.  The result is they would have become worthless.

I can't think of anything less suspicious than an executive saying, hey, if my options are going to expire, let's exercise those options to the extent they're in the money.  It's the least suspicious -- in fact, it would be -- if somebody didn't do that, we'd say, oh, my god, what's going on; right?

So, Your Honor, totally lacks any suspicion.  Every single sale of Mr. Bienaime during the class period was of options that were going to expire in May of 2020, during the class period.  There's no suspicion there.

The -- and, in fact, those are also consistent with his prior practice.  So in the prior year, he sold stock in March, April, and May of 2019.  Again, this is all in the documents.  These are Exhibits GG, HH, and II.

**THE COURT:**  You're really expecting quite a lot from me, Mr. Dwyer, not to make that argument in your papers.

**MR. DWYER:**  Your Honor, it's all there.  It's just not as expansive as I would like the Court to consider.

**THE COURT:**  I hear you.  Go ahead.

**MR. DWYER:**  So all the sales in 2019 were options that expired in May 2019.  They were all expired on May 11, 2019.

All the options in 2020 were expired May 11, 2020.  That's the annual date that he receives his grant.

Let me talk about Mr. Fuchs -- Dr. Fuchs.  Dr. Fuchs sold more shares.  We obviously disagree from the paper how you calculate what percentage of his shares he sold.  We believe you have to take into account his options.  That's what *Silicon Storage* said.  But let's put that aside for a second.

All of Dr. Fuchs' class period stock sales were pursuant to a 10b5-1 plan executed on March 11, 2020.  So this is eight days into the class period.  And, again, plaintiffs -- I would have made the same argument -- they say, well, we understand that a 10b5-1 plan undercuts scienter, but this was during the class period, so it brings it back to life in some way.

But, Your Honor, again, there's nothing suspicious about what happened here.  So, first of all, the stock plan dated March 11, 2020, that Dr. Fuchs entered into, was 14 days after BioMarin's Form 10-K was filed.  Okay?  That's often typical.  You let all the nonpublic information come out under 10b5-1.

In order to get the protection of 10b5-1, the executive must not be in possession of any material nonpublic information when they execute it, so you typically do it after a periodic filing with SEC.

Eighteen months before that 10b5-1 claim was executed in March of 2020, Dr. Fuchs executed another 10b5-1 claim.  That was on October 30th, 2019, and that was four days after they

had filed their 10-Q.

Eighteen months before that, in May of 2017, he filed an earlier 10b5-1 plan.  And, again, that was five days after the company filed its 10-Q.

So the point here is, they say it's suspicious that he executed a 10b5-1 plan during the class period.  First of all, those first few days of the class period, I think -- I will get to FE1.  I think the allegations are quite weak of anything.  Certainly, silence didn't matter from the FDA because that was at the very beginning of the review process.

But, regardless, what you have is you have Dr. Fuchs, who, in May of 2017, five days after the company filed a 10-Q, entered into a 10b5-1 plan.  Eighteen months later, four days after the company filed its 10-Q, entered into a 10b5-1 plan.  And 18 months after that, in May of 2020, he does the same thing.  It is a pattern that undercuts any suggestion of suspicion.

Your Honor, I just want to -- my final point with regard to stock sales is that at least one Court in the Northern District has concluded that if -- we don't think they have alleged any suspicious stock sales, but at least one Court, one -- in the case of *City of Royal Oak versus Juniper Networks* concluded that a plan is able to adequately allege suspicious stock sales by one official, that's not enough to create scienter with regard to all defendants.

So those are the stock sales.  And when I -- when I look at those stock sales, to me it negates the idea that they were suspicious and, therefore, puts us firmly into *Nguyen v. Endologix* and the rationale by the Circuit in that case.

Let me talk about FE1, Your Honor, as you raised that issue.  And it is true, the entirety of their allegations -- I don't think this is unfair.

The entirety of their allegations -- they have two allegations, by the way, none of which involve any discussions, communications, or information being provided to Dr. Fuchs or Mr. Bienaime; right?  So there's no allegations of any contacts with any defendant.

But the first allegation as to FE1 said that sometime in February or March of 2020 there was a communication that he heard about that suggested that the FDA might delay the inspection.  And their case is premised on, we should have disclosed that.

Really, the only other factual allegations that they pled, neither one of which are well pled, in my view, is this idea that as we got closer to the CRL date or the PDUFA date in August, the silence was something that should have tempered some of our statements.

I actually think, when you look at our statements, as we get closer and closer to August, they are tempered.  But that's their second allegation.

So what about FE1?  He's identified as a senior business development executive, who, in late February, early March, got a report from the VP of corporate and business development that someone at BioMarin had met with the FDA and that the FDA indicated that the inspection of the company's Nevada facility would likely be delayed beyond the second quarter of 2020.

*Zucco* -- the Ninth Circuit's decision in *Zucco*, when looking at confidential witness statements, in determining whether or not to give them any credibility, there's a six-part test.  Basically, the executive must be -- or the former employee must be described with sufficient particularity to support the probability that that person would be in a position to have that information.

You look at the level of detail, you look at corroborating allegations, you look at plausibility of the allegations and the number of sources.  This allegation falls short on all of them.  If you look at how the Ninth Circuit in *Zucco* applied each of those tests, it's clear that this allegation falls short.

So, first, let me talk about who this individual is.  He's a senior business development executive.  I don't know what that is.  I'm sure plaintiff knows exactly what this person's responsibilities are.  They aren't described.  But from that title, from my understanding of BioMarin, that's not somebody involved with R&D, clinical development, regulatory affairs.

This is somebody who is involved with the business side, potentially buying assets.  That's what a business development person does.  So there's no reason to believe that person personally would be in the mix with regard to FDA.

And the allegations are clear he did not attend any meeting with the FDA.  He said that he was told by his boss, who was also in business development, so has no -- again, no reason to believe that this person would be involved in FDA conversations.

And the allegations are really interesting, Your Honor.  They don't even say that his boss had this conversation with FDA.  The allegations are in the passive voice.

And the plaintiffs are smart folks.  They know how to use passive and active voice.

And what it says is that his boss told him that some -- that there was a meeting and somebody at FDA said there might be delay.  There's at least three levels of hearsay, maybe four.

I think, when you look at the case law, it's clear to me that the more levels of hearsay, the less reliance the Court puts on these things.  The fact that it's hearsay in and of itself doesn't disqualify it, but the courts are absolutely clear you have to take it into account.

So what we have is -- this is what we know if you believe FE1:  Some unnamed person at the FDA had some meeting,

undetermined when it occurred, met with some unnamed people from BioMarin, and after that meeting one of those people told somebody, which might have been his boss, might have been somebody else, who then told his boss, that this is what was said at the meeting.

It's too attenuated, Your Honor.  With respect, I've not seen any Ninth Circuit decision relying on confidential witness allegations that are that attenuated.

But there are other problems.  The Court says look at -- is there any corroborating evidence?  There's not.  There's no other witness who says, yes, this happened.  There's no corroborating witness.

There's the other issue, is it plausible?  It's not, Your Honor.  With respect, the allegations just aren't plausible.

Remember, it was on February 20, 2020, that the FDA accepted the BLA filing by BioMarin and designated it for expedited review.  That was on February 20.

And their allegation is that, basically, at that same time -- it's not clear -- sometime in late February, early March, somebody at FDA was also saying that the PDUFA is not going to be met.  It's just -- it doesn't ring true in common experience.

That's what the Ninth Circuit says we need to do, and that's what I urge the Court to do.

And then, finally, there's just a lack of specificity,

Your Honor; again, specificity providing additional credibility.

But there's a lot that's missing. Who wasn't there at the FDA meeting? When did it take place? No detail as to why the person said there might be a delay. Did the person say there might be a delay because, wow, it's February 20th and the whole world, at that point, is talking about COVID? We hadn't shut down yet, but everybody is talking about it. And then maybe because of COVID there might be an issue?

Was it because they were concerned about this discrepancy between Phase 1? It doesn't say any of that. There's no specificity at all. There's just none, Your Honor.

And that's the only allegation -- that is the only allegation that is in any way related to the statements by the company to -- I think it's -- there's 13 challenged statements. I think eight or nine of them were made -- seven or eight of them were made prior to the late cycle meeting taking place.

And so this allegation attributed to FE1 is the only allegation related to those first eight challenged statements, and it simply lacks the specificity, the credibility, internal coherence and corroborative effect I believe the Ninth Circuit requires in order to lend credibility to the FE1's allegations.

**THE COURT:** All right. Well, let me stop you there, Mr. Dwyer, and bring Mr. Graziano in to respond to your -- what you referred to as preliminary but I will take as primary.

**MR. DWYER:**  I apologize, Your Honor.  I get worked up. I apologize.  It was a little long.

**THE COURT:**  Okay.  Mr. Graziano.

**MR. GRAZIANO:**  Thank you, Your Honor, for the opportunity to respond.

I don't think anything we've heard should change Your Honor's inclination.  I'd like to be specific just about a couple of points counsel made.

First, the data were not excellent in 2019.  They were problematic.  The Phase 3 performance was worse than Phase 1 and 2.  This was the first time the company attempted to manufacture the gene therapy itself.  There was a decline over time, a troubling decline.

So that's the scenario leading up to the beginning of the class period.  And that's in paragraphs 48 through 52.  So I do take issue with the data being excellent.  It's completely undermined by the complaint's allegations.

I think -- importantly, I think Your Honor's summary captured this.  This is not a case where -- to show the defendants were making false statements with scienter.  They actually had to predict the CRL.

They were making repeated statements about present facts, things that were supposedly happening, such as collaboration and mesh and talking all the time with the FDA.  And those statements were completely undermined when Dr. Fuchs had to

explain to the market in September, over and over again, what happened here, because he had given the market such optimism; but, more importantly, such falsity, telling the market, we are meeting with the FDA, we're on schedule, we have an inspection scheduled. And then he reverses course and says literally the opposite; no, they never talked to us, we had no dialogue whatsoever since April of 2020.

So this is not like the Ninth Circuit's decision in *Nguyen*. Here, there is insider selling, and I want to get to that because that's counsel's other main point.

But, more importantly, besides the concrete motive we have in this case, the misstatements are just, on their face, inconsistent with what the company, as well as CW1, tell us. And those two allegations are completely consistent.

And if there's any change here, as counsel said, in June, that's further troubling because suddenly, on June 24th, after we know in the late cycle meeting the FDA, after delaying the inspection, totally cancelled it, Dr. Fuchs refuses to answer that question.

So there's the turnaround. He doesn't admit to anything. He says what great promise this drug and the continued performance of it, in fact, has, something the FDA told him exactly the opposite around June 21.

But then he says, oh, no, we shouldn't be talking about this because we have a PDUFA date coming up. That, also, is

different than the Ninth Circuit decision in *Nguyen*, because the Ninth Circuit says why would a corporation commit active misstatements in a period of time where it knows those misstatements are bound to be revealed?

Well, here we see something quite different. We see a company that is racing against two other manufacturers to be the first manufacturer in this gene space, which is critical for profitability. It wanted to charge over $2 million per dosage of this product if it were successful.

And it was constantly saying things about how the FDA was accelerating its work, the FDA inspection was scheduled, everything was going well with the FDA. Yes, we have a schedule. The FDA has been quite collaborative. We're in the middle of a mesh. Any given day it's like back and forth. We are working very closely with them. We look forward to continuing the collaboration.

None of those things were actually true, as we know not only from CW1 but from Dr. Fuchs himself, who, four times in September, has to now explain what he was talking about.

So, you know, I don't really want to go on too much longer because, obviously, I agree with Your Honor's assessment of the case, and I don't want to undermine that, but I do want to talk about the insider selling just a little bit.

Let's start with Dr. Fuchs. His biggest sales here, 59 percent of his overall holdings, are put in place with a

10b5-1 plan he starts on March 11th of 2000 -- 2020.  I'm sorry, 2020.

The price of BioMarin stock on that day is $85 per share. With all of his repeated excitement and misstatements about what was actually happening between BioMarin and the FDA, the price of BioMarin stock climbs from that $85 to over $130 in July.  And that's when he sells.

What is the price today, Your Honor, now that this drug is going to be delayed for years?  And if it's successful, we don't know.  It's back to 85.  So that is what happened with the insider selling.

He had an absolute motive to build this false excitement, maybe to demoralize the competition, maybe because he knew those sales would only happen if the price reached what it did.

The CEO, we heard today for the first time that he had expiring options.  But expiring options doesn't mean you have to sell your stock.

There is no case that I'm aware of in this area of the law that says that, because if your options are expiring, he was able to acquire the stock in the low 20s.

So [audio glitch] during the class period he doesn't have to sell it to acquire it.  Some CEOs just sell the minimum amount and pay the option exercise price.  This person was selling the stock, not just exercising the option.

So I don't think that's a viable argument.  I've yet to

see a case that says the CEO was forced to sell because his options were expiring.  That's not really how it works.

I think those were the -- the main points that my adversary made in his presentation.  Obviously, I'm here to answer any of the Court's questions, but I prefer to rest as to where we are because I do agree with Your Honor's assessment.

**THE COURT:**  Okay.

Mr. Dwyer, go ahead.

**MR. DWYER:**  Your Honor, I want to make four points, but the first three will be very brief.  And then I want to talk for just one second about the other point Your Honor made at the beginning about the adequacy of the cautionary language for the forward-looking statements.

Just three quick points first.

They allege that the June -- that about June 21st -- or June -- about June 21st, when the late-cycle meeting occurred, that at that point in time the FDA indicated that they weren't going to undertake an inspection.

Remember, Your Honor, this all taking place with COVID. We provided some of the guidance that -- I think it's Exhibit U -- that the FDA issued.  They did issue that in August, but it talks about all the back and forth.  They're trying to figure out ways to inspect facilities without actually physically getting there.

There is no -- I do not think they've well pled that the

inspection was actually cancelled at the late-cycle meeting. They rely on what's ECF 59-27, at page 9, where there's a reference to "at the same time." I would encourage the Court to look at that.

At the end of the day, I don't think it matters, because I think -- I think the motion should be granted either way. But I think if you looked at those two paragraphs on that page, it's clear that what actually happened at the meeting and what Dr. Fuchs was saying was that they were still talking about the inspection. After that meeting, the inspection was cancelled. That's the first point.

The second point is the fact that there were competitors out there and that we were concerned about competitors. First of all, those competitors are way behind us. They haven't even started Phase 3 trial.

There's no allegations anywhere in the complaint that when we said they were behind us, that they weren't behind us. And, Your Honor, the Ninth Circuit's decision *In Re Rigel Pharmaceuticals* makes absolutely clear that these typical corporate objectives -- beating your competitors, raising money, et cetera -- do not raise an inference of scienter.

The third quick point is, the offer is expiring, that they're wanting to exercise the options, not sell them. I never said that it was legally required that these executives sell them. I'm just saying it wasn't suspicious.

And the truth of the matter is, if you exercise the options and don't sell them, you have to pay tax on the delta. And almost everybody I know sells them to cover the tax.

Let me just mention four additional statements briefly.

Your Honor, we -- we attached an exhibit with each of the 13 statements to our motion to dismiss.  And just looking at that Appendix A -- and I do think you need to go statement by statement, but I'll just go through the first statement to illustrate it.

So Statement Number 1 was a statement made by Mr. Bienaime on March 3rd, and it was, "We anticipate launching in the second half of this year."

A couple of things.  First of all, Your Honor, I do not believe in their opposition that they even address this statement, so I think they actually kind of waive any argument.

But putting that aside for a second, it's clear to me that the statement that "we anticipate launching in the second half of this year" is a forward-looking statement.  I don't think plaintiffs would argue against that.  I think that's self-evident.

So the question is, is it entitled to the protection of the safe harbor provisions of the PSLRA?  And there are two safe harbor provisions.  It's entitled to both, but I want to talk about the first one.

The first one is, has it been identified as a

forward-looking statement, and is it accompanied by meaningful cautionary language?

And, again, Your Honor, if you look at the exhibit, Exhibit H, which is ECF 59 -- if you look at the -- if you look at that exhibit, at the very beginning of the conference call, on page 3 of 59-10, the very first thing Mr. Bienaime says is, quote:  "I just want to highlight as usual that this presentation would contain forward-looking statements.  For details about this, look at our 10-K, 10-Q, and 8-K reports."

Okay.  So it's identified forward-looking statements.  The case law is clear that that's adequate to identify forward-looking statements.

And then it refers to the company's 10-Ks and 10-Qs. We've included that as well, Your Honor.  That's Exhibit G, which is ECF 59-9.  And if you look at the disclosures there -- again, I'm using ECF page numbers.

If you look at the disclosures there -- and the reference for it is page 25 to 26 and 29 to 30 -- Your Honor, those are about as robust risk factors as you could possibly have.

On page 59 of Exhibit G, there's an extensive risk factor that talks about, amongst other things, the risk that there may not be approval or there may be delays.

Quote:  "Although the FDA and EMA, the European authority, have programs to facilitate an expedited development, the timeline to brief under legislative goals or mandated by

regulations are subject to the possibility of substantial delays."

It goes on.  A few pages later, the warnings are specific about the fact that gene therapy is unique and novel and there's only been a few approvals of gene therapy and that adds additional risk.

Your Honor, I -- I believe that that is more than adequate meaningful cautionary language.  If that's correct, you don't even have to talk about the second prong and that should be the end of the analysis.

What *Cutera* says -- the Ninth Circuit decision in *Cutera* is, if the statement is forward-looking, it's identified as such and has meaningful cautionary language, that's the end of the analysis.

And, Your Honor, I think that's -- I think that sort of needs to -- there are other issues with this; right?  It's an opinion.  It's somebody's opinion.  They haven't alleged that Mr. Bienaime did not hold that opinion, that it was irrational to have that opinion.

Remember, this is early on.  Whatever FE1 may or may not have heard three rows down, who knows what subsequent conversations were with the FDA; right.  Maybe there was a conversation afterwards that said we're okay to go.  There's no way FE1 would know that because FE1 has no responsibility for the regulatory process.  And so at this point in time it's

protected by the safe harbor, in my view.

If you don't give the analysis under the safe harbor, it's an opinion. And you have to do the analysis under *Dearborn*, *OmniCare*. And the allegations by the plaintiff don't come close to meeting the pleading requirements by *OmniCare* and *Dearborn*.

Anyway, Your Honor, I'm not going to go through it because I know I'm trying your patience, but that's the analysis one needs for each and every one of those statements.

The statement, is it forward-looking; does it have adequate cautionary language? And if not, what were the facts known at that time?

I believe plaintiffs have done a fantastic job of mixing everything together and kind of throwing it against the wall and force us to parse it apart. That's what we did -- we tried to do by having Appendix A.

And when you look at it from a statement-by-statement basis and you look at what statements were being made, given what the dialogue was with the FDA at any particular point, none of the statements are false. Most of the statements are opinion.

There's not a single allegation that Dr. Fuchs or Mr. Bienaime did not believe that the drug was going to be approved or that the PDUFA date was going to slide. There's not a single allegation anywhere.

In our view, that should be the end of the inquiries, Your Honor.  I really appreciate your time.

**THE COURT:**  Okay.  Mr. Graziano, do you want to take on that one statement?

**MR. GRAZIANO:**  Sure.  I was going to say, maybe a little more broadly, that the defendants actually label almost all the statements in this case as forward-looking.  And, in fact, you know, I was going to go through some highlights, but I'll just focus on the one statement.

In fact, they're talking about present things that are just not true, but let's go only to the March statement.  I think that that one is more of a forward-looking statement because it's talking about anticipating launching in the second half of the year.

But the problem is -- as counsel was speaking, I went back to make sure I wasn't missing something, and there was no warning there, whatsoever, that the company had already been alerted by the FDA that this inspection was not going to happen on time to meet the PDUFA date.

And there's an inconsistency when they try to reinterpret Dr. Fuchs's words, because he says at the same time, during the late-cycle meeting, the FDA now cancelled the inspection.  They say no, it happened after the late-cycle meeting.

But that's actually just not plausible because the inspection under FDA guidance is supposed to happen more than

two months before the PDUFA date.  There's no more time left after the late-cycle meeting around June 21 because the PDUFA date is August 21.

So the notion that, no, no, this inspection was canceled sometime later is not plausible.  It's also not consistent with the behavior we see, which I alluded to before; and that is, for the first time, on June 24th, Dr. Fuchs starts evading the question directly.  Do you have an inspection scheduled?

And he said, after once again praising the product, when the FDA said the opposite on June 21, he said, oh, no, we're not going to get into that, we're going to do a lockdown because things can be misinterpreted at this late stage.

So I think the allegations really do line up, and I think we know what happened here, primarily because Dr. Fuchs kept telling us in September.

So I'll just rest there unless Your Honor has more questions.

THE COURT:  Okay.  Mr. Dwyer, you want to just make any last comment with respect to that?

MR. DWYER:  Yeah.  Just two quick reactions.

This idea about the FDA guidance saying the inspection should take place two months ahead of time, what the guidance says is that's the goal.  And it's also very clear that we were in extraordinary circumstances.

And you can't decide this case without taking into account

the extraordinary circumstances that, at the beginning of this class period, the country and the Government was locked down and the FDA and the company were trying to continue the regulatory and their business role in that extraordinary circumstance.

And as they were doing that, and as is abundantly clear from the documents, they came up with other ways of trying to get manufacturing facilities certified that did not require physical inspection.

And part of that was BioMarin provided all the documentation in the first quarter of 2020.  The European Medicines Agency came over and certified the plan for Europe, and the company shared all of that with the FDA.

The guidance materials that we've provided to you shows that the FDA totally understood all of this stuff, they knew this timeline would no longer work as a general matter.

They said we will no longer issue CRLs just based upon an inspection issue.  And if we are going to, we will give you a heads-up.  That's what the guidance says.  None of that takes place.

And then, Your Honor, it's hard -- again, because there's 13 statements, but the one statement that my plaintiff's counsel referred to is what we identify as Statement Number 9, from June 24th, where there was a comment about, Do you still expect an inspection later this year?

And they said, yeah, that's a good question.  We're over two months away from PDUFA, we're not going to -- there's so much back and forth we're not going to talk about that.

So earlier in the call the company had said that.  So if you look at the transcript, the company started by saying, hey, listen, we're getting close to PDUFA date.

I tell all my clients to do that because you -- because there's so much that takes on, you don't want to feel like every time you talk you have to give an update.  There's nothing nefarious or problematic about that.

In the statement -- I don't know what statement they are challenging, but it is either the statement that "we're on track for a PDUFA date," which is a forward-looking statement, there's no question saying we're on track.

That's what *Tesla* -- *Tesla* holds.  The Ninth Circuit in *Tesla* said a projection that you're going to be able to generate or manufacture 5,000 cars per week by the end of the year, that's a forward-looking statement.

And the statement that "we are on track to make that," that is also a forward-looking statement, because it doesn't really say anything beyond the fact that your goal is reasonable.

So when they say "we're on track for our PDUFA date," there's no question that that's a forward-looking statement.  They have not alleged actual knowledge.  Actual knowledge

requires in this case -- this is also from the *Tesla* case -- that to allege actual knowledge that a goal -- a projected goal could not be reached requires a determination or well-pled factual allegations that the speaker believed there was no way that goal could be obtained.  There's not a single allegation to that.

In the *Tesla* case, it's fascinating, Your Honor.  In the *Tesla* case, Mr. Musk said, I'm projecting 5,000 cars by the end of the year, a week.  And well-pled factual allegations, very detailed allegations, that the head of manufacturing at the Fremont facility said that was impossible, and he said it to Mr. Musk.  And then another senior business person on the manufacturing site said the same thing.  And then Mr. Musk fired both of those people.

And the Ninth Circuit said even despite all of that, it's not adequate because that doesn't establish actual knowledge.  The fact that they were executives at *Tesla*, who believed the goal was unattainable, does not mean, absent well-put factual allegations, that Mr. Musk shared that.

As a result, when Mr. Musk continued to repeat the goal of 5,000 cars a week by the end of the year, there was no allegation that he did not believe that or that he believed that that was impossible.  And that's what you need to plead for actual knowledge in those circumstances.

            **THE COURT:**  All right.  So thank you, both, for your

argument on this.  I will go back and look again with the context that you've provided here, some of which is new.  And I'll get an order out pretty soon.

I do think that the issue -- I think in some ways you're both shooting past each other a little bit, and the plaintiff gets to -- it's the plaintiff's shot that I really have to focus on, which is the relationship with the FDA and what statements were made and whether they were made with -- with falsity, whether they misled the investors.

And so I'll be going back to look at this again.  And I appreciate your arguments, and I'll get the order out as soon as I can.

**MR. GRAZIANO:**  Thank you, Your Honor.

**THE COURT:**  Thank you.

(At 11:16 a.m. the proceedings were adjourned.)

- - - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, December 10, 2021

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter