COOLEY LLP
JOHN C. DWYER (136533)
(dwyerjc@cooley.com)
PATRICK E. GIBBS (183174)
(pgibbs@cooley.com)
AMANDA A. MAIN (260814)
(amain@cooley.com)
BRETT DE JARNETTE (292919)
(bdejarnette@cooley.com)
AMIE SIMMONS (336356)
(asimmons@cooley.com)
3175 Hanover Street
Palo Alto, California  94304-1130
Telephone:    +1 650 843 5000
Facsimile:    +1 650 849 7400

Attorneys for Defendants
BioMarin Pharmaceutical Inc., Jean-Jacques Bienaimé
and Henry J. Fuchs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re BioMarin Pharmaceutical Inc. Securities Litigation* | Case No. 3:20-cv-06719-WHO<br><br>**<u>CLASS ACTION</u>**<br><br>**DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:  April 12, 2023<br>Time:  2:00 p.m.<br>Crtrm:  2, 17th Floor<br>Judge:  Honorable William H. Orrick<br><br>**FILED UNDER SEAL** |

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................ 3

    A.    Plaintiff's Allegations ........................................................................... 3

    B.    The Former Employee Testifies That He Never Said the Things Attributed to Him in the Complaint and Had No Basis to Know Such Matters ..................... 4

    C.    Plaintiff's Algorithmic Trading Model Directed its Stock Purchases ................... 5

    D.    Plaintiff's Proposed Damages Methodology ........................................... 6

III.  THE COURT SHOULD EXCLUDE MARCH 3 THROUGH JUNE 8 FROM ANY CLASS PERIOD ................................................................................................ 7

IV.  PLAINTIFF FAILS TO SATISFY RULE 23 ................................................. 11

    A.    Plaintiff and Its Counsel Are Inadequate Class Representatives ..................... 11

    B.    Plaintiff Fails to Establish Typicality .................................................. 14

V.   PLAINTIFF FAILS TO SATISFY RULE 23(b ............................................. 17

    A.    Plaintiff Fails to Propose a Methodology Tethered to Its Theory of Liability ........................................................................................... 18

    B.    Hartzmark's "Backcasting" Methodology Is Unsuitable Here ..................... 21

VI.  CONCLUSION ............................................................................................... 25

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFS' OPP. TO CLASS CERT.
3:20-CV-06719-WHO

**TABLES OF AUTHORITIES**

**Cases**

*Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp.*,
    2009 WL 10673338 (C.D. Cal. Dec. 9, 2009) .................................................................. 11, 12

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .......................................................................................................... 14, 17

*In re BP p.l.c. Sec. Litig.*,
    2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ......................................................... 2, 19, 20, 23

*In re BP p.l.c. Sec. Litig.*,
    2014 WL 2112823 (S.D. Tex. May 20, 2014), *aff'd sub nom., Ludlow v. BP,
    P.L.C.*, 800 F.3d 674 (5th Cir. 2015) ....................................................................... 19, 22, 24

*City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*,
    711 F.3d 754 (7th Cir. 2013) ..................................................................................................... 13

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ...................................................................................................... *passim*

*Curtis v. Extra Space Storage, Inc.*,
    2013 WL 6073448 (N.D. Cal. Nov. 18, 2013) ............................................................................ 18

*In re DXC Tech. Co. Sec. Litig.*,
    2020 WL 3456129 (E.D. Va. June 2, 2020), *aff'd sub nom., KBC Asset Mgmt.
    NV v. DXC Tech. Co.*, 19 F.4th 601 (4th Cir. 2021) ................................................................ 13

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.*,
    270 F.R.D. 150 (S.D.N.Y. 2010) ............................................................................................... 11

*GAMCO Invs., Inc. v. Vivendi, S.A.*,
    927 F. Supp. 2d 88 (S.D.N.Y. 2013), *aff'd sub nom.,* 838 F.3d 214 (2d Cir.
    2016) ................................................................................................................................. 15, 17

*Goldman Sachs Grp. v. Arkansas Tchr.*,
    141 S.Ct. 1951 (2021) ................................................................................................................. 22

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ............................................................................................. 14, 17

*Hayes v. MagnaChip Semiconductor Corp.*,
    2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ........................................................................... 7

*Lane v. Wells Fargo Bank, N.A.*,
    2013 WL 3187410 (N.D. Cal. June 21, 2013) ...................................................................... 11

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

*Loritz v. Exide Techs.*,
  2015 WL 6790247 (C.D. Cal. July 21, 2015) ........................................................... 19, 24, 25

*Luna v. Marvell Tech. Grp., Ltd.*,
  2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ........................................................... 7, 10, 11

*In re Millennial Media, Inc. Sec. Litig.*,
  2015 WL 3443918 (S.D.N.Y. May 29, 2015) ....................................................................... 13

*Miller v. RP On-Site, LLC*,
  2020 WL 6940936 (N.D. Cal. Nov. 25, 2020) ..................................................................... 11

*Mulderrig v. Amyris, Inc.*,
  340 F.R.D. 575 (N.D. Cal. 2021) ..............................................................................*passim*

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  2018 WL 3861840 (N.D. Ohio, Aug. 14, 2018) .............................................................. 24, 25

*In re POM Wonderful LLC*,
  2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ...................................................................... 18

*Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ............................................................................ 19, 24, 25

*Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*,
  136 F.R.D. 658 (D. Or. 1991) ............................................................................................ 15

*Seb Inv. Mgmt. AB v. Symantec Corp.*,
  2021 WL 1540996 (N.D. Cal. Apr. 20, 2021) ..................................................................... 13

*Ward v. Apple Inc.*,
  784 F. App'x 539 (9th Cir. 2019) ....................................................................................... 24

*Werdebaugh v. Blue Diamond Growers*,
  2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ..................................................................... 18

**Statutes**

Securities and Exchange Act of 1934 Section 10(b) ............................................................. 3, 7, 21

**Other Authorities**

Federal Rule of Civil Procedure 23 ....................................................................................*passim*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iii

**DEFS' OPP. TO CLASS CERT.**
**3:20-CV-06719-WHO**

## I.    INTRODUCTION

The Court should deny Plaintiff's motion for class certification ("Motion").

To begin, the first part of the class period (March 3 through June 8, 2020) is based entirely on a fabricated claim that Plaintiff has no evidence to support.  Specifically, based on statements attributed to a single confidential witness (a former BioMarin employee), Plaintiff claims that the FDA told BioMarin in late February or early March 2020 that the pre-license inspection of BioMarin's manufacturing facility "would likely be delayed beyond the second quarter of 2020," but BioMarin failed to disclose this "fact."  (Amended Complaint ("AC") (ECF No. 54) ¶¶ 79-80, 120, 123, 124, 126, 128, 131, 133.)  This former employee, however, has testified under oath that he never said any such thing to Plaintiff and, in fact, had no basis to make any such statements.  (Declaration of Amanda A. Main ("Main Decl."),[1] Ex. 6 (Former Employee ("FE") Depo.) at 126:18-24 ("never told [Plaintiff] or anyone else that the FDA had warned BioMarin at the start of the class period in March of 2020 that the preapproval inspection would be delayed, and the delay would likely extend beyond the second quarter of 2020").)  Worse, before filing its Complaint, Plaintiff never informed the former BioMarin employee of the allegations it planned to attribute to him, nor did Plaintiff provide him with a copy of the draft allegations so that he could confirm (or dispute) their accuracy.  (*Id.* at 83:14-84:13, 91:18-92:7, 100:10-103:13, 110:11-111:8.)  When the former employee learned of this, he was "shocked." (*Id.* at 102:24-10:15.)  Moreover, the allegation is demonstrably false.  Contemporaneous correspondence between BioMarin and the FDA shows that the pre-license inspection was planned for the end of the second quarter of 2020 (like BioMarin said), and it was not postponed beyond that date until June 8, 2020.  Because Plaintiff's theory of liability for the first part of the class period is unsupported by any facts, the Court should exclude March 3 through June 8, 2020 from any class definition.

In addition, Plaintiff's Motion should be denied in its entirety for failing to satisfy Federal Rule of Civil Procedure 23 ("Rule 23").  Plaintiff and its counsel are not adequate class representatives, having misrepresented the former BioMarin employee's statements to the Court, and at the very least having conducted an inadequate pre-filing investigation.  Plaintiff also cannot

---

[1] All exhibits are attached to the Main Declaration filed concurrently herewith.

establish its claims are typical of the putative class, because it is subject to unique defenses that threaten to become a focus of the litigation (and indeed already have). Specifically, although Plaintiff has persistently resisted discovery into this issue, BioMarin intends to vigorously rebut the fraud-on-the-market presumption of reliance that Plaintiff seeks to benefit from. In deciding to purchase BioMarin's stock, Plaintiff did not rely on the stock price as an accurate measure of BioMarin's intrinsic value. ███████ ██████████████████████████████████████ ███████████████████████████ BioMarin's stock price was not the motivating driving force of the algorithm's decision to purchase BioMarin stock in July and August 2020. As such, Plaintiff is subject to unique defenses that are atypical of the putative class.

Finally, Plaintiff fails to propose a methodology capable of calculating damages on a class-wide basis consistent with its theory of liability, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Without that showing, Plaintiff cannot establish that common issues will predominate under Rule 23(b)(3). Plaintiff proposes the "out-of-pocket method" for calculating damages, as set forth in the report of Michael Hartzmark. But Hartzmark made no effort whatsoever to tether that "methodology" to this case.

Regardless, Hartzmark's "back-casting" methodology for calculating daily levels of artificial inflation is inconsistent with Plaintiff's theory of liability. Plaintiff claims BioMarin failed to disclose certain communications with the FDA that concealed an increased risk that the FDA would deny the Roctavian BLA – a risk that materialized in August 2020, when the FDA denied the BLA at the end of the proposed class period. Hartzmark's "back-casting" method would overcompensate the purported class members because the stock price decline following the FDA's denial – that is, following the materialization of the risk that the FDA could deny the BLA – would be greater than any artificial inflation during any point of the proposed class period based on the alleged failure to fully describe the risk, or an increased risk, of a possible denial. Because of this "mismatch," courts have rejected back-casting in cases involving a similar theory of liability. *See Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 590 (N.D. Cal. 2021); *In re BP p.l.c. Sec. Litig.* ("*BP I*"), 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013). The Court should do the same here.

II.    STATEMENT OF FACTS

A.    Plaintiff's Allegations

This putative class action, brought under Section 10(b) of the Securities and Exchange Act of 1934, centers on BioMarin's gene therapy called Roctavian, which is designed to treat hemophilia A, a life-threatening medical condition that inhibits proper blood clotting. Plaintiff is a Denmark-based pension fund and seeks seek to certify a class of "all persons who purchased or acquired BioMarin common stock from March 3, 2020 until August 18, 2020, inclusive [], and who were damaged thereby." (ECF No. 110 ("Mot.") at 2.)

On August 19, 2020, BioMarin announced that the U.S. Food & Drug Administration ("FDA") issued a Complete Response Letter ("CRL") denying BioMarin's application for FDA approval of Roctavian. BioMarin's stock dropped by nearly $42 per share. Plaintiff filed its Complaint on February 22, 2021, claiming BioMarin made false or misleading statements about the FDA's review, including that it was "on track," while concealing information that would have revealed a heightened risk of adverse FDA action.

Plaintiff claims Defendants misled investors in the first half of the putative class period (March 3 through June 8, 2020) by failing to disclose that the FDA's pre-license inspection of BioMarin's manufacturing facility "would likely be delayed beyond the second quarter of 2020." (AC ¶¶ 79-80, 120, 123, 124, 126, 128, 131, 133.) This allegation is based *entirely* on a statement attributed to a single former BioMarin employee, a "senior business development executive," that "the FDA had warned BioMarin at the start of the class period in March of 2020 that the preapproval inspection would be delayed, and the delay would likely extend beyond the second quarter of 2020," seriously jeopardizing the FDA's ability to approve Roctavian/valrox by the August 21, 2020 PDUFA date. (*Id*. at ¶¶ 79-80.)

This Court's January 6, 2022 order denying Defendants' motion to dismiss relied heavily on the statements attributed to that single former employee. (ECF No. 77 at 16-19.) Indeed, as to the challenged statements made between March 3 and June 8, 2020, the statements attributed to that single former employee were the sole basis for the Court's finding that Plaintiff adequately alleged falsity and scienter. (*Id.* at 16-19, 20-21.)

**B.     The Former Employee Testifies That He Never Said the Things Attributed to Him in the Complaint and Had No Basis to Know Such Matters**

On January 20, 2023, the former employee testified under oath that the allegations attributed to him in the Complaint were "not true" and he had no knowledge of any such matters and thus no basis to make such statements. (Ex. 6 (FE Depo.) at 112:23-126:24.)

In his position as Senior Director of Business Development & Strategy at BioMarin, the former employee had no responsibility for regulatory affairs, never spoke with the FDA about Roctavian, was not involved in any way preparing for the potential pre-approval inspection, and did not have first-hand knowledge or any second-hand information relating to the pre-approval inspection. (*Id.* at 38:23-39:17, 41:16-46:3, 70:20-21.) The former employee was not aware of the status of any pre-approval inspection, any discussions regarding a potential delay in scheduling the inspection, or the impact of the COVID 19 pandemic on the FDA's review of the BLA. (*Id.* at 41:20-43:21, 45:11-46:3, 48:24-49:8, 65:21-67:5, 69:13-70:25.) If fact, he did not know anything about the Roctavian BLA other than what had been publicly disclosed. (*Id.* at 45:16-21.) Moreover, at the time of these events, he was on parental leave for some period of time, as was the person who had allegedly told him that the FDA said the inspection would likely be delayed beyond the second quarter of 2020. (*Id.* at 31:19-37:3.)

While the former employee recalled speaking to an investigator associated with Plaintiff's counsel twice in December 2020, initially thinking the investigation was about him, he never gave the investigator permission to attribute any statements to him in a complaint against BioMarin. (*Id.* at 54:7-55:10, 79:20-80:8.) Nor did Plaintiff's counsel send to the former employee a draft of the complaint or the allegations attributed to him. (*Id.* at 80:20-84:13, 91:18-92:7). In fact, the former employee first learned about the litigation *after* Plaintiff filed the Complaint. (*Id.* at 88:9-90:5, 91:2-92:7). The former employee was "shocked" when he recently – and for the first time – saw the allegations attributed to him, because they were false and related to matters that he had no recollection or awareness of. (*Id.* at 102:24-103:15.)

The former employee's testimony is consistent, moreover, with BioMarin's contemporaneous correspondence with the FDA, which shows that in this time period (March 3 to

June 8), the pre-license inspection was scheduled to occur before the end of June (i.e., before the end of the second quarter) 2020. (Exs. 7, 10-14.) In other words, Plaintiff's allegation about the pre-license inspection is demonstrably false.

### C.    Plaintiff's Algorithmic Trading Model Directed its Stock Purchases

Plaintiff's purchases of BioMarin stock in July and August 2020 were made solely pursuant to an proprietary algorithmic trading model. (Ex. 1 at 5-7 ("Purchase and sale decisions are not monitored by any individual . . . and no individual was required to authorize or confirm each purchase or sale decision before execution."); *see also* Ex. 4 (Christensen Depo.) at 26:19-28:9 (Plaintiff did not review and was not aware of any public statements made by BioMarin in deciding to purchase BioMarin's stock).) Plaintiff's model did not consider what Plaintiff knew or did not know about BioMarin, and there was no part of the trading process that would have permitted Plaintiff to second-guess or interrupt its trade in BioMarin's stock once directed by the model. (Ex. 3 (Harder Depo.) at 32:11-33:8, 129:16-131:18.)

(*Id.* at 32:11-33:8, 129:16-131:18, 244:11-246:10; Ex. 1 at 7.) Even to this day, Plaintiff has placed no restriction on its trading of BioMarin's stock so, ironically, if its algorithm were to identify the stock as an attractive investment today, Plaintiff would purchase the stock again— despite its allegations that the Company and its executives engaged in securities fraud. (Ex. 4 (Christensen Depo.) at 59:5-62:23.)



Plaintiff purchased BioMarin stock on July 30, August 6, August 7, August 10, August 11, and August 18, 2020. (ECF No. 30-3; *see also* Ex. 2 at 11.)

### D.    Plaintiff's Proposed Damages Methodology

Plaintiff claims that damages can be calculated on a class-wide basis. As support, it submits the report of Michael Hartzmark, who opines that the "out-of-pocket method" – measuring artificial inflation at the time of purchase minus inflation at the time of sale – can be used to calculate damages on a class-wide basis. (ECF No. 110-2 ("Hartzmark Report") ¶ 105.) Notably, Hartzmark

discusses his damages opinion in just eight (8) paragraphs of his 109-paragraph report.  Those eight paragraphs do not mention any fact relating to this case.  (*See id.* at ¶¶ 101-08.)  Nor do they discuss any details of Plaintiff's theory of liability, let alone describe how those theories are consistent with his proposed damages methodology.  (*Id.*)  Instead, he suggests that damages in any Section 10(b) case can be calculated by "back-casting" – inferring artificial inflation during each day of the class period by the amount of the stock drop at the end of the class period.  (*Id.* at ¶ 105.)

### III.   THE COURT SHOULD EXCLUDE MARCH 3 THROUGH JUNE 8 FROM ANY CLASS PERIOD

Courts have discretion to shorten class periods at the class certification stage if there are "scant" allegations to support liability in that time period.  *Luna v. Marvell Tech. Grp., Ltd.*, 2017 WL 4865559, at *7 (N.D. Cal. Oct. 27, 2017); *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *9 (N.D. Cal. Dec. 22, 2016) (shortening class period by a year at class certification stage because defendants disclosed the risk that was allegedly concealed during that time).  "Though lead plaintiff need not prove its case at this juncture, it must make some showing, grounded in fact, that the[] [statements] were the result of an impropriety, or were otherwise misleading."  *Marvell*, 2017 WL 4865559, at *7.  Here, the Court should not certify any class that includes the period from March 3 through June 8, 2020 (i.e., the day the FDA first notified BioMarin that the inspection scheduled for late June would be delayed), because the evidence indisputably negates Plaintiff's challenge to statements made in that time period.

In that regard, for the period from March 3 to June 8, 2020, Plaintiff claims that Defendants' statements were false or misleading for the same reason: according to Plaintiff, the FDA told BioMarin in late February or early March 2020 that the pre-license inspection "would likely be delayed beyond the second quarter of 2020," seriously jeopardizing the FDA's ability to approve Roctavian by the August 21, 2020 deadline.[2]  (AC at ¶¶ 79-80, 120, 123, 126, 128, 131, 133.)  These allegations are all based on statements attributed to a single former BioMarin employee.  (*Id.* at

---

[2] To the extent Plaintiff also alleges during this time frame that BioMarin had "no dialogue whatsoever" with the FDA since mid-April 2020—an allegation based entirely on taking a statement made many months later out of context—that is also provably false.  BioMarin and the FDA regularly communicated at the time of the May 14, 19, and 31 and June 4 statements. (Ex. 15 (FDA log referencing 14 communications in May 2020 regarding Information Requests).)

¶¶ 79-81.)  The Court denied Defendants' motion to dismiss with respect to the first part of the class period almost entirely because of these purported statements.  (ECF No. 77 at 16-19 ("On the Novato Facility in particular, the Complaint includes allegations that come from a confidential witness inside the company and contradict BioMarin's argument.  According to this confidential witness, the FDA warned BioMarin of that exact danger at the start of the Class Period. Compl. ¶¶ 79–81. *Taking those allegations as true*, BioMarin's statements to the contrary could be found to be misleading.") (emphasis added).)

Discovery, however, has revealed that these allegations are *not true*.  As an initial matter, this is proven by written FDA correspondence.  In February 2020, leading up to BioMarin's first challenged statement on March 3, the FDA and BioMarin were discussing inspection dates for March and April.  (Ex. 7.)  As of the first challenged statement on March 3, there is no evidence of the FDA telling BioMarin that inspection would be delayed beyond the second quarter.  Over a week *after* the March 3 statement, the FDA temporarily postponed the inspection due to travel restrictions resulting from the COVID-19 pandemic.  (Ex. 8.)  However, by the time of the next challenged statement on April 29, and at the time of all other challenged statements during this first part of the class period, the FDA repeatedly confirmed its plan to conduct the inspection in June (i.e., within the second quarter of 2020).  The FDA confirmed this, at the very least, on April 3, April 14, April 20, May 5, and June 1.  (Exs. 9-13).  It was not until June 8, that the FDA notified BioMarin it had to postpone the on-site inspection scheduled for June due to ongoing travel restrictions from COVID-19.  (Ex. 14.)  Put simply, during this part of the proposed class period, the FDA repeatedly told BioMarin that the inspection was planned for June, and that plan did not change until June 8, *after* the statements at issue were made.

In addition to FDA correspondence establishing beyond any doubt that Plaintiff's allegation is false, the former employee to whom it was attributed testified under oath that he never said those things, and he would have had no basis to know about them.  Perhaps more appalling, Plaintiff never even informed the former employee of the allegations it planned to attribute to him nor did Plaintiff provide him with a copy of the draft complaint or allegations before filing its Complaint.  The chart below summarizes the former employee's testimony about the allegations Plaintiff

attributed to him.

| Plaintiff's Allegation | Former Employee's Deposition Testimony |
|---|---|
| "According to a former BioMarin executive, the FDA warned BioMarin at the start of the Class Period that the Preapproval Inspection of the valrox facility would be delayed and that the delay would likely extend beyond the second quarter of 2020." (AC at ¶ 79.) | "That statement is not true." (Ex. 6 (FE Depo.) at 126:5-17.)<br><br>He "never told [the investigator] or anyone else that the FDA had warned BioMarin at the start of the class period in March of 2020 that the preapproval inspection would be delayed, and the delay would likely extend beyond the second quarter of 2020." (Id. at 126:18-24.) |
| "FE 1 stated that, in late February or early March of 2020, before COVID-19-related shutdowns became widespread, the FDA held a meeting with BioMarin personnel at which the agency provided 'concrete feedback' concerning the Company's valrox BLA." (AC at ¶ 80.) | He "never said that" and "ha[s] no basis to make the statement." (Id. at 112:15-114:14.)<br><br>He "was not" "aware of any meetings between BioMarin and the FDA that took place in late February or early March of 2020." (Id.) |
| "Brinda Balakrishnan, Group Vice President of Corporate and Business Development and one of Bienaimé's direct reports, informed FE 1 that, during the pre-pandemic meeting, the FDA told BioMarin that the Preapproval Inspection of the Company's Novato facility would likely be delayed beyond the second quarter of 2020, seriously jeopardizing the agency's ability to approve valrox by the August 21, 2020 PDUFA date." (AC at ¶ 80.) | "Completely incorrect . . . other than who Ms. Balakrishnan is and what the PDUFA date is." (Id. at 114:17-115:21, 116:19-22.)<br><br>He did not "tell [Plaintiff's investigator] or anyone else associated with the plaintiffs that." (Id. at 115:2-5.)<br><br>"No basis" to "believe that the preapproval inspection of the company's Novato facility was either on schedule or not on schedule" in January-March 2020. (Id. at 116:5-11.) |
| "FE 1 confirmed the Company's understanding that the inspection was a necessary condition for FDA approval of the valrox BLA." (AC at ¶ 80.) | "No, I did not" tell "[Plaintiff's investigator] or anybody else from the plaintiff's firm that... the company understood that the inspection was a necessary condition for FDA approval of the Valrox BLA." (Id. at 117:7-13.) |
| "FE 1 reported that as the PDUFA date drew closer, the FDA's failure to perform the Preapproval Inspection continued to generate anxiety inside BioMarin." (AC at ¶ 81.) | "No, I did not" tell "[Plaintiff's investigator] or anybody else associated with plaintiff's law firm that statement..." (Id. at 119:18-21.)<br><br>"It's not true because I would not know [if] FDA is actually doing a preapproval inspection." (Id. at 120:12-17.)<br><br>"I did not" "know whether or not the |

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFS' OPP. TO CLASS CERT.
3:20-CV-06719-WHO

| Plaintiff's Allegation | Former Employee's Deposition Testimony |
|---|---|
| | preapproval inspection had taken place on schedule or not" when he left BioMarin in July 2020. (*Id.* at 121:2-5.) |
| "FE 1's colleagues in both R&D and in manufacturing expressed concern, particularly after April 2020, that the FDA had failed to move the valrox CMC review forward." (AC at ¶ 81.) | Did not "express that to [Plaintiff's investigator] or anybody else at the plaintiff's law firm" (*Id.* at 121:6-14.)<br><br>"Other than what was [publicly] disclosed. I had no other way of knowing anything else" about the "status of the Valrox BLA." (*Id.* at 121:23-122:4.) |
| "Indeed, FE 1 stated he was 'very surprised' when Fuchs and Bienaimé told investors in August 2020 that the valrox BLA was on track when, in truth, the Preapproval Inspection had not occurred and the Company had received no subsequent communication from the FDA on this and other critical issues, including labeling." (AC at ¶ 81.) | Did not "say to [Plaintiff's investigator] or anyone else at plaintiff's law firm what is alleged [he] said in that sentence." (*Id.* at 123:7-20.)<br><br>"[He] can't recall" "reading some statement attributed to either Mr. Fuchs or Mr. Bienaimé in August 2020 that the Valrox BLA was on track" (*Id.* at 124:5-9.)<br><br>"[He] did not know" in "August 2020 that the preapproval inspection in relation to the Roctavian BLA had not occurred." (*Id.* at 124:10-14.)<br><br>"[He] ha[d] no basis to receive such information" regarding if "the company [in August 2020] had received no subsequent communication from the FDA on the inspection issue and other critical issues, including labeling." (*Id.* at 124:15-22.)<br><br>He "had no knowledge with regard to communications between the FDA and BioMarin between April and August of 2020 about any topic whatsoever" (*Id.* at 125:20-126:1.) |

Where, as here, a plaintiff has no evidentiary support for a claim covering a portion of the class period, Judge Alsup's decision in *Marvell* is instructive. There, plaintiff alleged that Marvell misled investors in the first three months of the putative class period by failing to disclose its practice of channel stuffing that allowed it to meet projections. *Marvell Tech. Grp., Ltd.*, 2017 WL

4865559, at *7.  The court shortened the class period to exclude the first three months because plaintiff failed to make any showing that the channel stuffing was improper or fraudulent. *Id*.  The court held that plaintiff "must make some showing, grounded in fact" that defendants misled investors, and it failed to do so.  *Id*.  As in *Marvell*, here, Plaintiff cannot make any showing grounded in fact that Defendants misled investors between March 3 and June 8, 2020.  Accordingly, the Court should exclude that period from any putative class period.

## IV.    PLAINTIFF FAILS TO SATISFY RULE 23(a)

Plaintiff's Motion should be denied because it cannot prove adequacy or typicality, each of which is a required element for class certification under Rule 23(a).

### A.    Plaintiff and Its Counsel Are Inadequate Class Representatives

Under Rule 23(a), Plaintiff must prove it "will fairly and adequately protect the interests of the class." Fed. R. Civ. Proc. 23(a)(4).  But Plaintiff cannot make that showing if it (or its counsel) misrepresented facts to the court that raise serious questions regarding their integrity and credibility. *Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp.*, 2009 WL 10673338, at *8 (C.D. Cal. Dec. 9, 2009).  Indeed, a proposed class representative is inadequate where "'the representative's credibility is questioned on issues directly relevant to the litigation or there are confirmed examples of dishonesty.'" *Miller v. RP On-Site, LLC*, 2020 WL 6940936, at *9 (N.D. Cal. Nov. 25, 2020); *see Lane v. Wells Fargo Bank, N.A.*, 2013 WL 3187410, at *14, 15 (N.D. Cal. June 21, 2013) (dismissing lead counsel where it misrepresented "nature and status of similar ongoing class actions" to court that raised "serious questions" concerning adequacy); *Mulderrig*, 340 F.R.D. at 581 (finding plaintiff inadequate where it "affirmatively misled this Court about his stock holdings by omitting numerous transactions from his sworn certification"); *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 160-61 (S.D.N.Y. 2010) (noting that the court "may consider the honesty and integrity of the putative class counsels" and denying class certification because Plaintiff and her attorneys made false statements in interrogatory responses and deposition testimony, rendering them inadequate to represent the class.)

Here, in an effort to support its adequacy claim, Plaintiff states that it "investigated and filed an Amended Complaint" and "successfully opposed a motion to dismiss."  (Mot. at 10:9-10; 6:1-

2.) However, for more than half of the alleged class period, Plaintiff's Complaint turns on indisputably false allegations that it attributes to a single former employee who has completely denied having said any of those things. At the very least, Plaintiff's "investigat[ion]" should have revealed that the former employee was not privy to sensitive information regarding the status of the Roctavian BLA and thus would have had no basis to speak on these matters. Plaintiff also should have learned through its investigation that both the former employee and the person who allegedly told him this information were on parental leave at the time.

In any event, the former employee's unequivocal testimony and other facts have raised serious issues relating to Plaintiff's integrity and credibility. This concern is highlighted by the fact that not a single other confidential witness was identified to corroborate this fiction. Even more, before filing a Complaint attributing allegations to the former employee, Plaintiff could have and should have provided a draft of those allegations for the former employee's review and confirmation. But Plaintiff never sent him the Complaint or allegations—either before or even after it was filed. Plaintiff then leveraged those false allegations to save its Complaint, or at least a majority of it, from dismissal. And although BioMarin and the FDA long-ago produced correspondence disproving this false allegation, Plaintiff continues to argue it in its Motion. (*See, e.g.*, Mot. at 1:17-18, 1:23-25.)

This is enough for the Court to find that Plaintiff and its counsel have not met their burden to establish adequacy. For example, in *Argent*, the court denied class certification on adequacy grounds after discovery revealed that plaintiff's allegation regarding where the loan certificates were purchased was false. 2009 WL 10673338, at *8. The court found that "counsel undertook [an] inadequate pre-complaint investigation" and stated that it "must be able to rely upon counsel's factual representations." *Id.* As in *Argent*, here, discovery has revealed that Plaintiff's "investigation" was inadequate, because it attributed statements that were in fact false to a former employee who testified under oath that he said no such things, and Plaintiff failed to take the basic step of providing the former employee with the draft allegations for him to confirm their accuracy.

Plaintiff's conduct deviated from the expectations of counsel. *See In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at *11-14 (S.D.N.Y. May 29, 2015) (observing that the practice

of making "no attempt to confirm the quotes of a witness on whom counsel proposes to rely in a public filing, sits at best uneasily alongside Federal Rule of Civil Procedure 11"); *City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 759-61 (7th Cir. 2013) (remanding for consideration of Rule 11 sanctions after plaintiff abandoned the "sole confidential source" in its complaint and defendant's investigation revealed that the confidential witness's statements were false, noting that the failure to conduct a reasonable inquiry regarding representations made in a public filing violates Rule 11).

Given all this, it is relevant that Plaintiff's counsel, Bernstein, Litowitz, Berger & Grossmann—including the lead counsel and two other attorneys representing Plaintiff in this matter—were recently suspected of an improper *quid pro quo* in another matter in the Northern District of California. (ECF No. 110-5 (*Seb Inv. Mgmt. AB v. Symantec Corp.,* 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021)).) While no "clear-cut evidence of a *quid pro quo* emerged," Judge Alsup observed that discovery did show that Plaintiff's lead counsel made "misleading" statements to the Court that were "concerning," and required Plaintiff's counsel to disclose this order in future cases where they seek appointment as class counsel for a period of three years. *Id.* at \*2.

Plaintiff also claims its adequate based on its "experience successfully leading securities class action litigation . . . ." (Mot. at 3:3-5.) However, Plaintiff identified only two matters in which it has served as lead plaintiff: (1) this case and (2) a case that was dismissed at the pleading stage, as affirmed by the court of appeals (*In re DXC Tech.*). (Ex. 2 at 15; Ex. 4 (Christensen Depo.) at 22:17-24:20); *In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129 (E.D. Va. June 2, 2020), *aff'd sub nom., KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601 (4th Cir. 2021). This hardly weighs in Plaintiff's favor.[3]

For these reasons, the Court should deny Plaintiff's Motion on the ground that Plaintiff and its counsel are not adequate class representatives under Rule 23(a).

---

[3] Further, despite that the Court ordered Plaintiff to produce a 30(b)(6) witness to testify about Plaintiff's trading model and BioMarin trades (ECF No. 106), Plaintiff's witness was not prepared and Plaintiff has since produced documents (that its counsel previously claimed did not exist), which have contradicted the self-serving testimony of its witness. (Ex. 3 (Harder Depo.) at 295:10-303:22 (when asked what he did to prepare for his deposition, he responded "Not a lot" and said "to be quite honest, I've been busy with a lot of other things so – so I have not been overly active in preparation [for] this so-called deposition")

**B.      Plaintiff Fails to Establish Typicality**

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). As the Ninth Circuit has held, "a named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Id.* The Court may consider evidence that is relevant to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case. *Id.* at 509.

Here, Plaintiff cannot establish typicality, because it is "subject to unique defenses which threaten to become the focus of the litigation." *See id.* at 508. Plaintiff contends that it and the putative class members are entitled to benefit from the fraud-on-the-market presumption to establish the reliance element of the Section 10b-5 claim. (Mot. at 3:10-11; 11:13-17:10 ("[Plaintiff] and the Class may rely on the 'fraud-on-the-market' presumption to establish reliance").) However, that presumption is *rebuttable*, and "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988).

Importantly, for purposes of class certification,

> **The defense of non-reliance may or may not prove successful, but that is not what matters. It is the threat of unique defenses to preoccupy class representatives, rather than the viability of those defenses, that determines whether a proposed class representative should be deemed typical for purposes of class certification.**

*Mulderrig*, 340 F.R.D. at 582 (internal quotations omitted) (emphasis added) (concluding representative was neither typical nor adequate where his reliance was at issue and defendants intended to aggressively pursue that issue). Thus, courts deny class certification where a plaintiff's reliance is meaningfully at issue. *See e.g.*, *Hanon*, 976 F.2d at 508-09 (affirming denial of class certification where representative's reliance on the integrity of the market was subject to serious dispute); *Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991)

(denying class certification because of questions concerning the representative's reliance on the integrity of the market in part because of "his personal belief that the stock presented good value in the long term").

A defendant rebuts the presumption of reliance by showing that plaintiff traded stock based on its own assessment of the stock's value and the stock price was not the "motivating driving force" of Plaintiff's investment decision. *GAMCO Invs., Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 100, 103 (S.D.N.Y. 2013) ("the presumption is rebutted if the plaintiff did not rely on the market price of the security as an accurate measure of its intrinsic value"), *aff'd sub nom.*, 838 F.3d 214 (2d Cir. 2016). For example, in *Vivendi*, plaintiff used proprietary techniques to assess a company's "Private Market Value" (PMV) or "intrinsic value" and purchased securities based on the "spread between that PMV and the market price of Vivendi securities," so that the market price was merely one factor in Plaintiff's investment decision. *Id.* at 95-97. The Court found that defendants rebutted the fraud-on-the-market presumption because plaintiff's decision to trade the stock was based on its own internal measure of the stock's value, and the stock price was not the "motivating driving force" of plaintiff's decision. *Id.* at 103. Importantly, the court rejected plaintiff's argument that rebutting the presumption required showing that the current stock price played no part in the decision-making process. *Id.*

Here, like in          discovery has revealed that

Further, even if Plaintiff had known the alleged "truth" at the time, it still would have

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

16

purchased BioMarin's stock, because ███████████████████████████████████

████████████████████████████████████████████████████████████ *See Vivendi,*

927 F. Supp. 2d at 99 (citing *Basic*, stating presumption is rebutted "when the investor would have

transacted in the security regardless of what was known or not known about the issuer or its stock").

Without the presumption, there is no question that Plaintiff will not be able to show that it

relied on the allegedly false and misleading statements it challenges. Plaintiff already admitted that

none of its employees reviewed or were aware of BioMarin's public statements. (Christensen

Depo. at 25:16-22, 26:19-28:9.)

For these reasons, Defendants intend to show that BioMarin's stock price was not the

motivating driving factor of Plaintiff's decisions to purchase BioMarin stock, such that Plaintiff's

ability to benefit from the presumption of reliance is "subject to serious dispute." *See Hanon*, 976

F.2d at 508-09. Because Plaintiff is subject to unique defenses that threaten to become a focus of

this litigation, the Court should deny Plaintiff's motion on the ground that Plaintiff cannot meet

Rule 23(a)'s typicality requirement. This is particularly so where, as here, "Defendants have

already demonstrated an intention to pursue this line of inquiry aggressively." *Mulderrig*, 340

F.R.D. at 582. In fact, discovery disputes relating to Plaintiff's algorithmic trading model have

been the primary focus of ongoing disputes between the parties for more than six months and the

topic of two discovery disputes, one of which is forthcoming.

## V.    PLAINTIFF FAILS TO SATISFY RULE 23(b)

Even if Plaintiff could satisfy Rule 23(a) (it does not), it fails to prove that a class can be

certified under Rule 23(b). Plaintiff moves for class certification under Rule 23(b)(3), which

requires a showing that "questions of law or fact common to class members predominate over any

questions affecting only individual members" and that a "class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The

predominance analysis under Rule 23(b) is "even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34. Plaintiff must demonstrate "that damages are capable of measurement on a classwide basis" by proposing a damages methodology consistent with its theory of liability. *Id.* If it fails to do so, then "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.*

Importantly, "a model purporting to serve as evidence of damages in [a] class action must measure ***only*** those damages attributable to [the operative] theory of [liability]. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35 (emphasis added). *Curtis v. Extra Space Storage, Inc.*, 2013 WL 6073448, at *4 (N.D. Cal. Nov. 18, 2013) (explaining plaintiff must "offer a method that tethers their theory of liability to a methodology for determining the damages suffered by the class"). This requires a "***rigorous analysis***." *Comcast*, 569 U.S. at 35 (emphasis added). Here, Plaintiff fails to establish predominance under Rule 23(b)(3), because its proposed damages methodology is not consistent with its theory of liability.

### A. Plaintiff Fails to Propose a Methodology Tethered to Its Theory of Liability

Plaintiff proposes Hartzmark's "out of pocket method" for calculating damages, which measures "the artificial inflation at the time of purchase less than that at the time of sale." (Ex. 5 (Hartzmark Depo.) at 99:1-5.) But that methodology fails to measure damages ***only*** attributable to Plaintiff's theory of liability in the case. *See Comcast*, 569 U.S. at 34. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id*. at 35; *see Curtis*, 2013 WL 6073448, at *4 (denying class certification in consumer class action because plaintiffs failed to "offer a method that tethers their theory of liability to a methodology for determining the damages suffered by the class"); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *8-14 (N.D. Cal. Dec. 15, 2014) (decertifying class because proposed regression methodology failed to compute damages due to complications in product data); *In re POM Wonderful LLC*, 2014 WL 1225184, at *2 (C.D. Cal. Mar. 25, 2014) (decertifying consumer class action based on "full refund" damages methodology being inconsistent with the plaintiff's theories of liability).

*Comcast* is instructive.  There, plaintiffs asserted claims against Comcast for violations of federal antitrust laws.  *Id*. at 29.  Plaintiffs sought to certify a class under Rule 23(b)(3) and set forth four theories of liability, each of which they argued ultimately increased cable subscription prices in the relevant market.  *Id.* at 30-31.  However, the plaintiffs' proposed damages methodology did not isolate damages arising from any one of the four theories of antitrust impact.  *Id*.  Because the plaintiffs' model did not attempt to distinguish between the alleged damages under ***each*** of the four proposed theories – three of which had been rejected by the district court – it was insufficiently tied to the plaintiffs' one remaining theory of liability.  *Id.*

Courts have applied *Comcast* to deny class certification in securities class actions where the plaintiffs' proposed damages methodology did not "track [p]laintiffs' theories of liability."  *BP I*, 2013 WL 6388408, at *17 (denying class certification because event study methodology proposed by expert did not "track" theory that understated risk materialized in harm); *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (no class certification because references to various damages methodologies did not tie to the facts of the case); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.* ("*Fort Worth*"), 301 F.R.D. 116, 142 (S.D.N.Y. 2014) (no certification because references to various methodologies was insufficient); *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014), *aff'd sub nom., Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) ("*BP II*") (rejecting proposed methodology for materialization of risk theory).

***Plaintiff advances a materialization of risk theory of liability***.  Plaintiff claims that Defendants (1) knew about a heightened risk that Roctavian would not be approved, (2) did not disclose the increased risks, and (3) the risks materialized in a denial by the FDA, causing a stock drop and investor losses.  (AC ¶¶ 2, 9-20.)  This theory is analogous to that alleged in *BP*, and determined by the Court to involve a "materialization of risk."  *BP*, 800 F.3d at 680.  In that case, BP allegedly (1) knew of an increased risk of an oil spill, (2) did not disclose that risk, and (3) the risk materialized in an oil spill, causing a stock drop.  *Id*.  Here, Plaintiff alleges that Defendants concealed the following information that somehow put Roctavian's approval in "jeopardy": (1) BioMarin's infrequent dialogue with the FDA, (2) the FDA's warning at the late-cycle meeting that it was concerned about clinical data submitted with the BLA, and (3) the FDA's indefinite

postponement of the pre-approval inspection. (*Id.*) Plaintiff claims that these increased risks materialized in BioMarin's August 19, 2020 announcement that the FDA issued the complete response letter, which caused the stock drop. Importantly, Plaintiff does not allege that BioMarin knew about the complete response letter before any challenged statement was made. Nor does it claim that the probability that the FDA would issue a complete response letter was 100% throughout the class period.

As the Court noted in ruling on Defendants' motion to dismiss, "[t]he plaintiffs' core theory is that the FDA had raised concerns about [Roctavian's] approval, that BioMarin had reason to know there was a heightened risk of denying approval, and that the FDA and BioMarin stopped communicating during the Class Period." (ECF No. 77 at 18.) The Court emphasized that Plaintiff "do[es] not assert that BioMarin was sure approval would be denied," but instead that "serious doubts [had been raised] about prompt FDA approval." (*Id.*) Therefore, "The plaintiffs' position is not that the statements about the PDUFA date were misleading because the date would absolutely not be met, it is that they are misleading because BioMarin was allegedly aware of concrete risks that approval would be denied even as it projected that it would be granted." *Id.*

***Hartzmark makes no effort whatsoever to tailor a damages methodology to Plaintiff's theory of liability***. Hartzmark's report is 109-paragraphs, but only 8 of those are in his "Damages" section. Those eight paragraphs do not mention Roctavian, Mr. Bienaime, Dr. Fuchs, the FDA, or a single fact relating to this case. (Hartzmark Report, ¶¶ 101-108; Ex. 5 (Hartzmark Depo.) at 127:3-24 ("**Q.** Section VII does not reference Roctavian at all, does it? **A.** No. No. **Q.** Nor does Section VII reference the individual defendants? **A.** . . The individual defendants? No, it does not . . . **Q.** Aside from Footnote 131, Section VII does not cite to a paragraph in the complaint, correct? **A.** It does not.").) Indeed, Hartzmark did not contest that the damages section of his report is nearly identical to "at least 25, probably 50" other reports he has prepared, involving vastly different facts, and even boasted that it was a "positive": "**Q**. Just so I understand, this Section VII is near identical to other common damages methodology sections you've included in other reports, correct? . . . **A**: I think that should be a ***positive***. I mean, it's consistent with prior reports because prior reports offer the ***same*** methodology." (*Id*. at 161:1-8; 160:14-23.)

But Hartzmark made no effort to compare the allegations in those 50 other cases to this case to determine whether the same methodology should apply here. (*Id*. at 166:11-23 (**Q**: So the allegations alleged in those cases are necessarily different than the allegations made here, correct? . . . **A**: I have not compared the allegations.).) Nor does Hartzmark recall ever "working on a litigation matter involving the announcement of *any* type of adverse FDA action," like this case. (*Id*. at 194:14-19.) His failure to engage with the facts of this case is particularly troubling given his attempt to distinguish a case involving BP because it centered on a "blown-up oil rig," tacitly conceding that the specific facts of each case are highly relevant in determining which methodology could apply. (*Id.* at 192:8-15 (**A**. "before you were upset that I wasn't relying on other pharmaceutical cases. Now you want me to rely on a blown-up oil rig. No, I did not rely on a blown-up oil rig).)

Hartzmark's generic approach fails to tie his damages methodology to the specific theories of liability at issue in ***this case***. For example, his eight paragraphs of boilerplate damages language do not explain how he would calculate out-of-pocket damages based on the "materialization of risk" theory of liability Plaintiff advances here, as discussed further below.

Hartzmark effectively suggests that courts across the country (including this one) should rubber stamp his damages opinions for any securities case, regardless of the facts or theories at issue. (Hartzmark Report ¶ 102 ("The calculation of class-wide damages for a violation of Section 10(b) of the Exchange Act is subject to a common and universally accepted methodology").) The Supreme Court's mandate that plaintiffs propose a damages methodology consistent with their theories of liability ***must*** require more than recycling boilerplate damages language that fails to articulate a methodology to calculate damages ***in this case*** given the theory of liability Plaintiff asserts. Granting Plaintiff's motion "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 569 U.S. at 36. Hartzmark's failure compels denial of the Motion.

**B.    Hartzmark's "Backcasting" Methodology Is Unsuitable Here**

Hartzmark opines that his "out-of-pocket" methodology starts with an event study to calculate the amount the stock dropped at the end of the class period due to company specific news. (Hartzmark Report ¶ 105.) He then "back-cast[s] and adjust[s] the inflation measure for each day

throughout the Class Period." (*Id*.)  In other words, he "point[s] to a negative disclosure about a company and an associated drop in its stock price; allege[s] that the disclosure corrected an earlier misrepresentation; and then claim[s] that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Goldman Sachs Grp. v. Arkansas Tchr.*, 141 S.Ct. 1951, 1961 (2021).  But as stated by the Supreme Court, "[T]hat final inference – that the back-end price drop equals front-end inflation – starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure . . . which means that there is less reason to infer front-end price inflation [] from the back-end price drop." *Id*.

Such a mismatch can occur when plaintiffs allege that defendants concealed a risk that later materialized as reflected in a corrective disclosure.  Specifically:

> [W]hen the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (i.e., on the date that the risk materialized) *will not equate* to inflation on the date of purchase unless the probability of the risk materializing was 100 percent.  If the probability is less than 100 percent, the stock price correction after the risk materializes will be larger than the pre-materialization inflation.

*BP II*, 2014 WL 2112823 at *10.  Thus, Hartzmark's "back-casting" approach – inferring front-end price inflation from the back-end price drop – does not work when the theory of liability is based on a materialization of an understated risk, as is the case here.  In fact, Hartzmark did not disagree that "[w]hen the back-end drop is different than the front-end inflation, it's inappropriate to impute the back end drop to be the same value as the front-end inflation."  (Ex. 5 (Hartzmark Depo.) at 137:15-138:11.)  He even provided a hypothetical during his deposition that involved such a mismatch: "Let me give you a hypothetical.  A front end is 10 and the back-end drop is 20, okay?  And inflation is – you agree it stays constant at 10 throughout the whole period, okay?  And you've done a complete loss causation analysis, so you understand where that other 10 came from.  Then the drop is different than the front end."  (*Id*. at 137:22-138:4.)  And Hartzmark did not contest that "you would expect the daily levels of artificial inflation, based on an understated risk, to be less than the back-end stock drop associated with the materialization of the risk."  (*Id*. at 85:12-86:19 ("**A.** I believe what you're asking is, to the extent that the finder of fact were to determine

that there was a risk that had been concealed, and that risk was changed throughout the class period and, therefore, the harm to investors or the harm and the losses caused to investors changed over the class period, that would be part of a – the damages to the individual investors.").)

*Hartzmark's methodology is inconsistent with Plaintiff's materialization risk theory of liability*. A generic out-of-pocket damages methodology is not consistent with Plaintiff's theory of liability in this case. *BP I* is instructive. 2013 WL 6388408, at \*16. There, the plaintiffs claimed that BP understated the risk of an oil spill, which ultimately materialized in the Deepwater Horizon explosion and oil spill. *Id*. Plaintiffs' expert submitted a report in support of class certification, proposing an event study methodology to calculate damages on a class-wide basis. *Id*. The court denied class certification, finding that the out-of-pocket methodology was not tethered to the plaintiff's materialization of risk theory. *Id*. In doing so, the court explained that the event study would "compensate[] investors for the full value of the stock price drop from the materialization of that risk. This [would] overcompensate[] investors for their harm." *Id*. Similarly, in *Mulderrig v. Amyris, Inc.*, Judge Gonzalez Rogers denied class certification to the extent plaintiffs advanced a materialization of risk theory of liability. 340 F.R.D. at 590. She explained that "plaintiffs fail to tie any materialization of the risk theory to a calculation of damages as required under *Comcast* . . . In sum, because the proposed damages model does not attribute damages to a materialization of the risk theory, defendants are correct that the proposed damages model does not support the same. Accordingly, the Court declines to authorize class-action treatment as to this theory." *Id*.

As in *BP* and *Amyris*, there is a glaring mismatch between the alleged omission of the status of communications with the FDA on the one hand, and the subsequent announcement that the FDA had denied approval of Roctavian on the other. Plaintiff does not allege that there was a 100% probability (or any probability for that matter) during the class period that the FDA would deny approval, as required to infer front-end inflation from the back-end stock drop. Nor would it be credible to do so. For example, the public reaction to a cruise ship approaching an iceberg would be dramatically different than the reaction to the ship hitting an iceberg and sinking. Here, the public reaction to more detailed information about communications with the FDA would be

extremely different than the public reaction to the FDA's denial of Roctavian. As a result, Hartzmark's "back-casting" methodology is inappropriate as applied to the facts of this case.

***Hartzmark's unspecified "adjustments" to back-casting are insufficient.*** Hartzmark claims that "adjust[ments]" would have to be made to his back-casting methodology to calculate damages. (Hartzmark Report ¶ 105.) Yet, he offered no opinion on what those adjustments would be. (Ex. 5 (Hartzmark Depo.) at 109:16-24 (**Q.** "you have not evaluated for purposes of your report whether any of the techniques that you referenced would be appropriate to use in this case for purposes of calculating loss causation or damages, correct?" . . . **A.** I have not done a loss causation analysis. Correct.").) Hartzmark's position amounts to nothing more than saying, "Trust me, I can do it." But Plaintiffs' "burden is not met by asking the Court simply to trust them." *See BP II*, 2014 WL 2112823, at *12; *Ward v. Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019) (affirming denial of class certification where the plaintiffs' expert "merely asserted that he would be able to develop a model at some point in the future"); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.* ("*Freddie Mac*"), 2018 WL 3861840, at *19 (N.D. Ohio, Aug. 14, 2018) (denying class certification because expert's recitation of "tools" he could use to determine market efficiency amounted to "no damages model at all.").

In *Loritz*, 2015 WL 6790247, at *22, the plaintiff's expert in a securities class action failed to propose a sufficient damages methodology because he only "discusse[d] general techniques for computing damages in securities fraud cases." *Id*. The court explained that the expert failed to tie those techniques "to the facts of th[e] case or to each other – in other words, he fails to propose one model explaining how he would use these techniques in concert to calculate damages in this case." *Id*. Similarly, in *Fort Worth*, the court denied class certification in a securities class action where the expert would not commit to a particular methodology. 301 F.R.D. at 142. The court explained that, "without assurance beyond [the expert's] ***say-so***, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis." *Id*.

As in *Loritz* and *Forth Worth*, Hartzmark's failure to identify the specific "adjustments" necessary to calculate damages in this case "amounts to 'no damages model at all.'" *Loritz*, 2015 WL 6790247, at *22; *Fort Worth*, 301 F.R.D. at 142; *Freddie Mac*, 2018 WL 3861840, at *19. He

did not even identify any statistical valuation tool that may be used to adjust daily levels of artificial inflation.  Instead, when asked what techniques or adjustments he could potentially make, Hartzmark evaded the question by simply listing types of information an expert could "evaluate," without explaining how any adjustment would be made: "**A**.  it's generally the case that you're going to have internal documents, you're going to evaluate press releases, you're going to investigate analysts' reports, media reports, internal financials, external financials, people's – analysts' perception of risk, et cetera.  You're going to utilize that information and you're going to try to come up with a reasonable model of how it is affecting either the risk or the case flow or the discount factor over time.  That's commonly done." (Ex. 5 (Hartzmark Depo.) at 107:2-13.)  And after refusing to answer the question numerous times during deposition, Hartzmark finally acknowledged that a methodology may not exist to reliably calculate damages in this case: "**Q**. Are you sure that a methodology exists that can reliably, for each day of the class period, the probability that the FDA would have issued a complete response letter based on the information BioMarin knew at the time?  **A**. . . . "As to certainty, *the world is not certain*.  That's why people invest in securities." (*Id.* at 142:3-7; 143:16-17.)

Because Plaintiff has failed to propose a damages methodology consistent with its theory of liability under *Comcast*, Plaintiff's Motion should be denied

## VI.    CONCLUSION

Defendants respectfully request that the Court deny Plaintiff's Motion.

Dated: January 27, 2023

COOLEY LLP

By: */s/ Patrick E. Gibbs*
        Patrick E. Gibbs

Attorneys for Defendants
BioMarin Pharmaceutical Inc., Jean-Jacques Bienaimé and Henry J. Fuchs

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

25

DEFS' OPP. TO CLASS CERT.
3:20-CV-06719-WHO