# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE BIOMARIN PHARMACEUTICAL,  )

INC. SECURITIES LITIGATION       ) Case No.

                                 ) 3:20-CV-06719-who

_____)

VIDEORECORDED VIDEOCONFERENCE DEPOSITION OF

MICHAEL L. HARTZMARK, Ph.D.

Monday, November 14, 2022

Volume I

Reported by:

CARLA SOARES

CSR No. 5908

JOB No. 5574063

PAGES 1 - 203

Page 1

Veritext Legal Solutions
866 299-5127

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


IN RE BIOMARIN PHARMACEUTICAL,    )

INC. SECURITIES LITIGATION        ) Case No.

                                  ) 3:20-CV-06719-who

_____)


            VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF MICHAEL L. HARTZMARK, Ph.D., Volume I, taken on

behalf of Defendants, beginning at 11:10 a.m., and

ending at 5:11 p.m., on Monday, November 14, 2022,

before CARLA SOARES, Certified Shorthand Reporter

No. 5908.

Veritext Legal Solutions
866 299-5127

APPEARANCES VIA VIDEOCONFERENCE:


For the Plaintiffs:

    BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP

    BY:  ABE ALEXANDER, Attorney at Law

    BY:  THOMAS Z. SPERBER, Attorney at Law

    BY:  KATHERINE M. SINDERSON, Attorney at Law

    1251 Avenue of the Americas

    New York, New York 10020

    212.554.1400

    abe.alexander@blbglaw.com

    thomas.sperber@blbglaw.com

    katiem@blbglaw.com


For the Defendants:

    COOLEY LLP

    BY:  BRETT DE JARNETTE, Attorney at Law

    BY:  JOSHUA WALDEN, Attorney at Law

    BY:  AMIE SIMMONS, Attorney at Law

    3174 Hanover Street

    Palo Alto, California 94304

    650.843.5000

    bdejarnette@cooley.com

    jwalden@cooley.com

    asimmons@cooley.com


ALSO PRESENT:  Ralph Scholten, Compass Lexicon

                Terrence Weiss, Video Operator

about this off the record, we can talk about it off        13:04:25

the record.  If not --

MR. ALEXANDER:  I don't want to talk off

the record.

MR. DE JARNETTE:  Abe --        13:04:30

MR. ALEXANDER:  I want you to ask

questions about Dr. Hartzmark's report.

MR. DE JARNETTE:  Abe, please stop

interrupting me.  If we're going to do this, can you

wait for me to finish, and then -- like I've been        13:04:38

waiting for you to finish?

MR. ALEXANDER:  Go ahead.  Go ahead,

Brett.

BY MR. DE JARNETTE:

Q    You understand that the complaint alleges        13:05:10

that defendants understated a risk during the class

period that the FDA would issue a complete response

letter before the August deadline, correct?

MR. ALEXANDER:  Objection.  Misstates the

complaint, beyond the scope.        13:05:25

THE WITNESS:  I have not studied the

complaint to come up with legal conclusions.

What I can tell you, that to the extent

that the defendants understated the risk, as you

suggest, okay, and that that concealed risk was        13:05:47

Page 84

disclosed at some point -- for example, August 19th, 13:05:51 2020 -- that that risk or the value or the harm to investors associated with that understatement or that concealed risk would be measured and would become an input into what is called an inflation 13:06:15 ribbon, and would be applied class-wide to, in essence, all the class members.  And my common damages methodology would be utilized to calculate individual damages.

BY MR. DE JARNETTE:                                    13:06:39

Q    Thank you.  I appreciate your answer.

Based on your decades of experience, you would expect the daily levels of artificial inflation, based on an understated risk, to be less than the back-end stock drop associated with the 13:07:00 materialization of that risk, right?

MR. ALEXANDER:  Objection.  Misstates the complaint, calls for a legal conclusion, beyond the scope.

THE WITNESS:  I believe what you're asking 13:07:15 is, to the extent that the finder of fact were to determine that there was risk that had been concealed, and that that risk was changed throughout the class period and, therefore, the harm to investors or the harm and the losses caused to 13:07:33

Page 85

investors changed over the class period, that would be part of a -- the damages to the individual investors.

And so what you're basically asking is a question of what economists call "scaling," and that that risk element would be scaled throughout the class period. It would be then put as an input into the inflation ribbon, would be applied class-wide, and my common damages methodology, which looks at inflation of purchase and inflation of sale, would be utilized.

As to exactly what that concealed risk and the harm caused to investors is is not something that's in my report. I haven't been asked to do that. Should I be asked to do that, I will do it.

But today, what I'm saying in Opinion 2 is that the common damages methodology can be applied class-wide, whatever the input is into the inflation ribbon.

BY MR. DE JARNETTE:

Q    I've actually never heard the term "scaling" before.

Can you explain a little bit more what "scaling" is?

MR. ALEXANDER:  Objection.

Page 86

THE WITNESS:  Scaling would take a --    13:08:57
would take a level of inflation at a specific point
in time and adjust it for different circumstances
over a class period.

BY MR. DE JARNETTE:    13:09:26

Q   So scaling would be used when daily levels
of artificial inflation could change throughout the
class period, right?

MR. ALEXANDER:  Objection.  Beyond the
scope.    13:09:36

THE WITNESS:  Scaling can be associated
with changes in inflation, daily inflation
throughout the class period.

The core issue in terms of my engagement
here in Opinion 2 is that that would be one of the    13:09:50
analyses that would be done at the loss causation
stage, which would enable an economist to create a
daily input.

That input would go into an inflation
ribbon.  That inflation ribbon would be applied    13:10:08
class-wide, and the common damages methodology would
be utilized to calculate individual damages.

BY MR. DE JARNETTE:

Q   Do you know what I mean when I refer to
the "back-end stock drop"?    13:10:34

Page 87

complaint?    13:24:47

A    What paragraph?

Q    Paragraph 95.

A    Okay.  I've read it.

Q    Just so I don't misstate anything, can you    13:25:33
please read the header above paragraph 95?

A    On page 30, subsection 3, "BioMarin
Concealed the FDA's Warnings About The Risk to
Valrox Approval While It Held A Critical Private
Offering."    13:25:54

MR. DE JARNETTE:  I think we've been going
about another hour.  Why don't we go off the record.

THE VIDEO OPERATOR:  We're now going off
the record.  The time is 1:26.

(Recess, 1:26 p.m. - 1:42 p.m.)    13:26:13

THE VIDEO OPERATOR:  We're now back on the
record.  The time is 1:42.

BY MR. DE JARNETTE:

Q    The damages awarded in Section 10(b) cases
are commonly referred to as "out-of-pocket damages,"    13:42:46
right?

MR. ALEXANDER:  Objection.

THE WITNESS:  The standard used to
calculate it is based on what is often referred to
as "out-of-pocket damages" or "OOP damages."    13:42:58

Page 98

BY MR. DE JARNETTE:    13:43:04

Q    Is out-of-pocket damages the artificial inflation at the time of purchase less than that at the time of sale?

A    Yes.    13:43:15

As I discuss on page 45 of my report, paragraph 102, "The calculation of class-wide damages for a violation of Section 10(b) of the Exchange Act is subject to a common and universally accepted methodology, which indeed is routinely    13:43:36 applied and has become standard in federal securities litigation just like the BioMarin matter. The class-wide damages methodology is generally referred to as the 'out-of-pocket' ('OOP') method. Using the OOP method, damages suffered by Class    13:43:58 Members are measured based on the investors' 'inflation losses'."

Q    You did not actually calculate damages in this case, right?

A    Well, as I stated in paragraph 2, I did    13:44:13 not do a loss causation analysis which would be required to be able to calculate the inputs into the inflation ribbon to calculate inflation losses. That's done in a loss causation and damages stage of the -- of litigation.    13:44:34

Q    Just so I understand, you have not    13:44:37
determined whether plaintiff has suffered any
damages in this case, right?

A    I have not calculated the quantum of
damage that any plaintiff has suffered in this case.    13:44:46

Q    Nor have you determined whether any
plaintiff has suffered any damages, correct?

MR. ALEXANDER:  Objection.

You can answer.

THE WITNESS:  You mean I have not -- I    13:45:02
think what you're saying is that I have not
determined whether the misstatements caused harm to
investors.

BY MR. DE JARNETTE:

Q    Correct.    13:45:10

A    And as I've stated numerous times, the
calculation of the harm to investors is done in a
loss causation report.

But whatever that harm to investor is on
any given day is an input into the common -- to the    13:45:27
inflation ribbon and is applied class-wide using
this OOP methodology.

Q    You've submitted loss causation damages
reports in other matters, right?

A    Yes.    13:45:48

Page 100

I understand that you disagree with what    13:51:49
the scope is.  I have a different understanding of
what the scope is.  We both want to get out of here.
Dr. Hartzmark wants to get out of here, and --

MR. ALEXANDER:  Then stop harassing the    13:51:57
witness.

MR. DE JARNETTE:  I'm not harassing the
witness.

MR. ALEXANDER:  You are harassing the
witness.    13:52:02

MR. DE JARNETTE:  I'm not harassing the
witness.

MR. ALEXANDER:  He's told you what his
opinions in this case are, and you're refusing --
you're refusing to ask him questions about his    13:52:07
opinions.

MR. DE JARNETTE:  Abe, I'm asking
follow-up questions.

Dr. Hartzmark referenced "techniques," and
I asked him what those techniques are.  And this has    13:52:16
led to another five-minute argument about the scope
of this deposition.

If you want to seek to exclude portions
when we submit this to the court, you're free to do
so.  I think there's no basis to do that.  But you    13:52:27

Page 106

can, again, lodge your objection, and that's that.    13:52:30

THE WITNESS:   Let me just try to answer.

You can use -- it's generally the case that you're going to have internal documents, you're going to evaluate press releases, you're going to    13:52:47 investigate analysts' reports, media reports, internal financials, external financials, people's -- analysts' perception of risk, et cetera.

You're going to utilize that information, and you're going to try to come up with a reasonable    13:53:06 model of how it is affecting either the risk or the cash flow or the discount factor over time.   That's commonly done.

I don't want to speculate because I have not been asked to examine loss causation issues    13:53:21 which are what this is about.

But to the extent that after I examine internal documents, press releases, analysts' reports, link the misstatements to the revelation of the truth, link the price movements either at the    13:53:37 times of misstatements or at the times of the revelation of the truth, and examine the -- really, the -- what is produced in this case, until such time as I do that, what I can say is that that will then lead me to develop the inputs.    13:54:00

Page 107

Those inputs will go into an inflation 13:54:06 ribbon. The inflation ribbon will be applied class-wide, so each investor will be -- will have a common inflation ribbon that they face, and their inflation losses or the common damages methodology 13:54:18 will be utilized to calculate their damages.

BY MR. DE JARNETTE:

Q   Just to be clear, you have not evaluated whether any of the techniques that you just referenced would be appropriate to use in this case, 13:54:36 correct?

MR. ALEXANDER:  Objection.

THE WITNESS:  Again, I went through all types of techniques.

What I have told you -- I haven't read and 13:54:49 linked the analysts' reports. I haven't -- I haven't even had access. I don't even think discovery is complete yet of internal documents.

This is not something that you need at the stage of -- or at least for the -- you know, I don't 13:55:03 want to -- I don't want to answer as to what is required.

But as I understand it, my engagement was such:  I was asked about market efficiency. Your question doesn't have any impact on my opinion. 13:55:17

Page 108

I was asked if there's a common damages                13:55:21
methodology.  Your question has no impact on whether
there's a common damages methodology.  I've given
you the techniques.

At a loss causation stage, everything                   13:55:32
you're asking me about is, how is the harm to
investors measured?  And that's done at a loss
causation stage.

BY MR. DE JARNETTE:

Q   I'm just trying to figure out what you             13:55:41
have and have not done for purposes of your report.

I understand that you -- you believe that
what can be done would be class-wide.  That is made
clear throughout this transcript so far.

I'm just asking a simple yes-or-no                      13:55:58
question:  The techniques -- you have not evaluated,
for purposes of your expert report, whether any of
the techniques that you referenced would be
appropriate to use in this case for purposes of
calculating loss causation or damages, correct?        13:56:14

MR. ALEXANDER:  Objection.

You can answer.

THE WITNESS:  I have not done a loss
causation analysis.  Correct.

BY MR. DE JARNETTE:                                    13:56:22

Q    Your former experience here that I -- just
so I understand, in your expert report, did you
propose a methodology for calculating daily levels
of artificial inflation?                               13:56:44

A    I think you're confused.

I proposed a common damages methodology
which has -- which is based on inflation losses.
Your confusion comes under the -- I'll call it
"techniques."                                          13:57:01

The techniques, as I've told you, now at
least two other times, are based on internal
documents, financial reports, external and internal,
letters that you would probably review, comments
internal, maybe even e-mails, how analysts respond.    13:57:14

The techniques that you use, okay, are
generated in a loss causation analysis.  And should
counsel ask me to do a loss causation analysis, I
would do it.  It would premature.  I think they
would be very upset if I did a loss causation          13:57:36
analysis when I was asked to opine on whether
BioMarin stock trades in an efficient market, which,
according to my opinion, it does, or whether there's
a common damages methodology.

The techniques that you asked for are part    13:57:51

Page 110

the efficacy and durability of Valrox.                14:18:16

To the extent that those inflated the prices, and investors purchased at inflated prices and sold at lower inflation, I think it's very reasonable and appropriate that inflation losses be    14:18:31 utilized as measuring the harm to investors.

BY MR. DE JARNETTE:

Q   Is it your opinion that when there is artificial inflation of a stock price, that the out-of-pocket method is always an appropriate method    14:18:45 for calculating damages?

MR. ALEXANDER:  Objection.

THE WITNESS:  I don't want to speculate as to "always."

But to the extent that there are -- an    14:18:54 investor purchases at a level of inflation and sells, if he makes a gain, he doesn't have any harm. If he has a loss, then I think it's a very reasonable measure of the harm or damages to the investor.                                                14:19:13

BY MR. DE JARNETTE:

Q   You explain your damages -- well, you explain your Opinion 2 in paragraphs 101 to 108 of your report, correct?

A   Yes.  Section VII is the discussion that I    14:19:40

Page 126

have, the ability to calculate damages on a                14:19:43

class-wide basis.

Q    Section VII does not reference Roctavian

at all, does it?

A    No.  No.                                              14:20:03

Q    Nor does Section VII reference the

individual defendants?

A    What do you mean by -- do you mean the

lead plaintiffs?  I'm not -- oh, the individual --

I'm sorry.  The individual defendants?  No, it does       14:20:18

not.

        I'm not sure what you mean, but the daily

inflation and the harm to investors is common to all

the investors.  I'm not sure why the defendants --

why one would mention the defendants in this              14:20:36

particular section.

Q   Your Section VII does not cite to a single

paragraph of the complaint, correct?

A   That's not true.  In paragraph 101, I cite

to the complaint, paragraph 20 and 174 to 182.  So        14:20:55

that's wrong.

Q    Aside from Footnote 131, Section VII does

not cite to a paragraph in the complaint, correct?

A    It does not.

Q   Other than mentioning BioMarin,                        14:21:20

Page 127

Section VII does not specifically include any      14:21:22

particular facts from this case, right?

            MR. ALEXANDER:  Objection.

            THE WITNESS:  Well, I mean, the facts are

that there are misstatements that caused inflation.   14:21:31

The inflation harmed investors.  That's my

understanding.

            I wasn't asked to opine on whether the

allegations are true or not true.  I wasn't asked to

measure the harm to investors.  That's done in a      14:21:43

loss causation analysis.

BY MR. DE JARNETTE:

    Q    When you've submitted loss causation and

damages reports, have you used any methodology aside

from that out-of-pocket method to calculate damages    14:22:09

in a Section 10(b) case?

            MR. ALEXANDER:  Objection.  Outside the

scope.

            THE WITNESS:  And I answered that.  I said

in my experience, I haven't -- you asked it -- when    14:22:18

I said, "almost universally," I didn't want to say

other than, you know, again, Section 11, Section 12.

            In the 10(b) cases that I've been involved

in, given that they've all associated -- they've all

been associated with misstatements that have        14:22:35

Page 128

let's go to your report.                                    14:33:07

So I believe you read this sentence to me. It's in paragraph 105.  The third-from-last sentence, "From this, daily levels of inflation can be calculated by 'back-casting' and adjusting the    14:33:26 inflation measure for each day throughout the class period."

Correct?

A    Correct.

Q    And you include the process of making    14:33:39 adjustments in these steps because sometimes back-casting is not appropriate in and of itself to calculate daily levels of artificial inflation, right?

MR. ALEXANDER:  Objection.  Misstates the    14:34:02 report.

THE WITNESS:  I just don't understand.

Back-casting, in essence, accounts for and adjusts for the changes in inflation on a daily basis.                                                    14:34:14

And again, I don't know where you're going, but what I can tell you is whatever that adjustment might be, it becomes an input into the inflation ribbon, which is applied class-wide, and then individual damages are calculated using the    14:34:30

Page 136

common damages methodology.                    14:34:32

BY MR. DE JARNETTE:

Q   Let me try a different way, because all --
all I'm trying to get at is that you can't use the
back-end drop to infer front-end inflation when        14:34:43
there's a difference between the two pieces of
information.

MR. ALEXANDER:  Objection to the
testimony.

THE WITNESS:  That misstates my testimony        14:34:54
definitely.

BY MR. DE JARNETTE:

Q   I know.  I'm trying to get at -- get at
that.  So let me ask the question.

When the back-end drop is different than        14:35:03
the front-end inflation, it's inappropriate to
impute the back-end drop to be the same value as the
front-end inflation, correct?

MR. ALEXANDER:  Objection.  Misstates the
report, incomplete hypothetical, assumes that        14:35:22
there's front-end inflation.

THE WITNESS:  Let me give you a
hypothetical.

A front end is 10 and the back-end drop is
20, okay?  And inflation is -- you agree it stays        14:35:34

Page 137

constant at 10 throughout the whole period, okay? 14:35:39

And you've done a complete loss causation analysis,

so you understand where that other 10 came from.

Then the drop is different than the front end.

But even if that's the case, okay, in this 14:35:53

hypothetical that is totally unrelated to BioMarin

specifically, but it's totally related to my common

damages methodology, you have an input of inflation

of 10 throughout the class period.  That input goes

into an inflation ribbon, and it's applied 14:36:11

class-wide, and damages are calculated.

BY MR. DE JARNETTE:

Q    That's actually very helpful.

So using your hypothetical, the $20

back-end drop is not the same as the front-end 14:36:26

inflation, right?

MR. ALEXANDER:  Objection.

THE WITNESS:  Well, things have changed

over time.

After a loss causation analysis, you 14:36:39

evaluate that, and you can determine that you have

20 at the time of the back end, which translates

into 10.

Again, in the very speculative

hypothetical unrelated to BioMarin example that I 14:36:52

Page 138

just gave, it's a constant level of $10 through the whole period.  But that's after a loss causation analysis.

What I can tell you is that if it were determined by the trier of fact that it were 20, and then it declined, say, linearly to 10, okay, that creates an inflation ribbon that starts at 10, goes to 20, and that inflation ribbon is applied class-wide, and damages are calculated to all class members based on a common damages methodology.

If it's the case that the price drops by 20, and it's found that 15 of it is associated with the misstatements and the revelation of the truth, adjusting for any types of issues that you've brought up, and it goes from 15 linearly back to 10, again, same thing.  That inflation ribbon in a loss causation analysis would be applied class-wide, and individual damages would be used using the common damages methodology that I had proposed.

BY MR. DE JARNETTE:

    Q   You mentioned in one of your answers earlier adjustments made by a trier of fact.

        Are adjustments made in the back-casting process ever made by the trier of fact?

        MR. ALEXANDER:  Objection.  Misstates

Page 139

BY MR. DE JARNETTE:                                        14:39:49

Q   Are you aware of a methodology that can reliably calculate, for each day of the class period, the probability that the FDA would have issued a complete response letter based on the          14:39:58 information BioMarin knew at the time?

MR. ALEXANDER:  Objection.  Outside the scope, incomplete hypothetical.

THE WITNESS:  So basically you're asking me, can I -- do I have a methodology today that          14:40:10 would examine the differences between concealed and publicly disclosed risks associated with BioMarin and how those might change over time, and how those losses then would change over time.

And what I can tell you is that those          14:40:33 would be inputs into an inflation ribbon that would be applied class-wide.

As to the technique that you would use based on those probabilities, I mean, those probabilities would be associated likely with          14:40:42 different states of the world and cash flows.

So you would use, again, all of the components that I mentioned before to do an in-depth loss causation report, and come up with an inflation ribbon, apply it class-wide, and utilize the common          14:40:59

Page 141

damages methodology to calculate individual damages.    14:41:03

BY MR. DE JARNETTE:

Q   Are you sure that a methodology exists that can reliably calculate, for each day of the class period, the probability that the FDA would    14:41:18 have issued a complete response letter based on the information BioMarin knew at the time?

MR. ALEXANDER:  Objection.  Outside the scope, mischaracterizes his opinion, mischaracterizes his testimony.    14:41:30

We've been through this, Brett.  He hasn't done a loss causation analysis.

THE WITNESS:  Right.  So what you're saying is, am I certain that when I complete a loss causation analysis, that I will reliably be able to    14:41:40 calculate the losses caused by the misstatements every day in the class period?  That's what you're basically asking.

And I can say --

BY MR. DE JARNETTE:    14:41:54

Q   Do you know?

A   First of all -- first of all, I can tell you that whatever that is, okay, that input will be put into the inflation ribbon, and damages will be calculated.    14:42:04

Page 142

And to the extent, okay, that it -- that     14:42:05
the court were to determine that the technique that
I utilized to calculate that, that the probabilities
are not reliable, okay, that the cash flow analysis
that I do is not reliable, that the parsing and the     14:42:21
scaling are not reliable, they would -- for, is
let's say, a particular day, they would put zero in
there, okay?  Zero for the inflation.  Let's assume
that's what the finder of fact determines.
"Hartzmark has not been able to come up with a     14:42:37
reliable measure on this particular day.  We put
zero in there," okay?

Well, that zero is applied class-wide.
Every individual who is a class member faces that
zero based on what the trier of fact determines.     14:42:52

As to certainty, the world is not certain.
That's why people invest in securities.

   Q   So that's no, you're not certain?

   MR. ALEXANDER:  Objection.  Misstates his
testimony, beyond the scope, asked and answered.     14:43:06

Brett, do you need his answer read back to
you?

   MR. DE JARNETTE:  I'm asking him to
clarify.

   Q   That's a "no," correct?     14:43:17

Page 143

MR. ALEXANDER:  Objection.  Asked and    14:43:18
answered, misstates his testimony, beyond the scope.

If you want the court reporter to read the question back, she can do that -- read the answer back, she can do that.    14:43:34

MR. DE JARNETTE:  So I'll read the relevant portion of the answer back.

"As to certainty, the world is not certain.  That's why people invest in securities."

MR. ALEXANDER:  That's not the relevant    14:43:43
portion of the answer, Brett.  Do you want to read his entire answer back?

MR. DE JARNETTE:  No, because he didn't answer my question.

Q   I'm going to read --    14:43:53

MR. ALEXANDER:  He did answer your question, but you keep asking it, and you're harassing the witness and wasting his time.

BY MR. DE JARNETTE:

Q   Dr. Hartzmark, I understand -- I'm    14:44:00
starting to understand the scope of your opinions. And again, I'm not asking you to undertake a loss causation analysis.

I'm just asking you, sitting here today, testifying under oath before God and country, are --    14:44:17

Page 144

A    Yes.

15:44:39

Q    Do you remember how much time you specifically spent on this portion of your report?

A    I can't -- I can't speculate on that.

But, you know, if you just take the

15:44:58

beginning of paragraph 102, "The calculation of class-wide damages for a violation of 10(b) of the Exchange Act is subject to a common and universally accepted methodology, which indeed is routinely applied and has become standard in federal

15:45:14

securities litigation just like the BioMarin matter," you start right there and understand that the nature of the Section VII is consistent because this is the common and universally accepted methodology.

15:45:33

Q    Do you think you spent less than an hour working on this specific portion of the report?

MR. ALEXANDER:  Objection.  Asked and answered.

THE WITNESS:  It would definitely be more

15:45:42

than an hour.

BY MR. DE JARNETTE:

Q    How much more?

MR. ALEXANDER:  Objection.

THE WITNESS:  I can't answer that

15:45:47

Page 159

question.  I don't -- I don't know.                    15:45:48

BY MR. DE JARNETTE:

Q    Do you think it would be more than five?

MR. ALEXANDER:  Objection.  Asked and answered.                                                     15:45:55

THE WITNESS:  I really don't know.

BY MR. DE JARNETTE:

Q    Sitting here today, do you recall drafting any portion of Section VII yourself?

A    I'm not sure what you mean by that.         15:46:10

I mean, I drafted -- this report, I sat down at the table and drafted it.  It's gone through various iterations since I first -- but I don't -- the first word is not -- you know, I utilized language that's consistent with my prior reports,       15:46:27 which is sort of the nature -- I mean, my -- you know, the folks who I work for, you know, I don't think would be excited if I totally re-invent the world.

But I -- the ability to calculate damages       15:46:45 on a class-wide basis is a section that I've included in -- I don't know -- at least 25, probably 50 reports.

I, me, I drafted it.  I tweaked it over time, but I drafted it.                                  15:47:01

Page 160

Q    Just so I understand, this Section VII is    15:47:05
near identical to other common damages methodology
sections you've included in other reports, correct?

MR. ALEXANDER:  Objection.

THE WITNESS:  I think that should be a    15:47:20
positive.  I mean, it's consistent with prior
reports because prior reports offer the same
methodology.

In 10b-5 securities litigation, you know,
I guess for your information, it's generally    15:47:37
associated with misstatements that cause inflation.
And there's inflation at purchase and inflation at
loss.

It's not -- you know, we -- I think we
went through this in pretty substantial detail.  And    15:47:49
therefore, the fact that this section is consistent
with prior sections, or prior damages on a
class-wide basis only makes sense.

BY MR. DE JARNETTE:

Q    So that's a yes, this Section VII is near    15:48:09
identical to other common damages methodology
sections you've used in other reports?

MR. ALEXANDER:  Objection.  Misstates his
testimony.

THE WITNESS:  I mean, you know, you can do    15:48:20

Page 161

a compare.  Maybe you have.  I would think you'd   15:48:22

find that it's consistent because my opinion has

remained consistent on this particular viewpoint, on

this particular opinion.

And, indeed, if the language had changed   15:48:40

substantially, I think you'd be asking me about

every word as to why I changed it in one report

versus another report.

BY MR. DE JARNETTE:

Q   For the sake of not having to put redlines   15:48:49

in front of you, this language in Section VII is

near identical to other reports you -- or language

from other reports you have submitted, correct?

MR. ALEXANDER:  Objection.  Misstates his

testimony.   15:49:01

Again, Brett, he said, "consistent."  He

didn't say, "near identical."  I don't know why you

keep putting that word in his mouth.

THE WITNESS:  It's consistent with.  I --

you know, I have not examined to determine whether   15:49:11

it is identical, but the concept is consistent.

BY MR. DE JARNETTE:

Q   Does Section VII here differ from

damages -- common damages methodology sections you

have included in other expert reports in securities   15:49:33

Page 162

methodology that is common to the class and is     15:52:26

properly tethered to the corrective disclosure

theory of liability."

Needless to say, the idea of going back

and utilizing language from reports that had been     15:52:36

utilized in support of class certification when the

judge has found and credited your opinion is a

common approach and a reasonable approach.

BY MR. DE JARNETTE:

Q   So it's possible for purposes of     15:52:56

Section VII of this report that you copied and

pasted your damages methodology section from another

report?

MR. ALEXANDER:  Objection.  Misstates his

testimony, asked and answered.     15:53:05

THE WITNESS:  Again, I would have drawn

from past reports for this.

BY MR. DE JARNETTE:

Q   Do you remember making any -- strike that.

Aside from including the name "BioMarin"     15:53:18

in this section, do you remember making any changes

to your starting point for Section VII?

MR. ALEXANDER:  Objection.

THE WITNESS:  I can't recall.

///     15:53:34

Page 165

BY MR. DE JARNETTE:                                    15:53:35

Q   Would it surprise you that the only change you made to Section VII from prior reports is changing the name of "BioMarin"?

A   From prior -- you state a positive number    15:53:45 of reports.  I would think there are some paragraphs that are probably -- the only change is "BioMarin."

Again, if there's a report that's consistent with this report, then that's the case. Then I probably drew from that report.              15:54:06

Q   And each of the cases you reference in that footnote you directed me to, those cases had different facts than this case, correct?

MR. ALEXANDER:  Objection.

THE WITNESS:  They're different cases.    15:54:38

BY MR. DE JARNETTE:

Q   So the allegations alleged in those cases are necessarily different than the allegations made here, correct?

MR. ALEXANDER:  Objection.  Misstates the    15:54:49 report, misstates -- assumes facts.

THE WITNESS:  I have not compared the allegations.

What I can tell you is that there were misstatements in those other cases that would have    15:55:00

Page 166

caused inflation in the price, and -- or alleged to          15:55:04

have caused inflation in the price, and that the

common damages methodology is consistent with the

common damages methodology that I propose in this,

and basically suggests that whatever the input is          15:55:25

into the inflation ribbon, it will be used and

applied class-wide, and the common damages

methodology will be the same.

Whether it be in, if I go back, Rougier

versus Applied Opto, U.S. Steel, Signet, DFC,          15:55:44

Cobalt, or IntraLinks, the damages methodology would

include the inflation losses.  I'm not -- that's

consistent with this view here.

BY MR. DE JARNETTE:

Q   Did any of the cases you just referenced          15:56:10

involve the announcement of a complete response

letter from the FDA?

MR. ALEXANDER:  Objection.

THE WITNESS:  All the cases that I had

included corrective disclosures and disclosures of          15:56:23

some type which were followed by substantial --

well, statistically significant price declines.

BY MR. DE JARNETTE:

Q   But none of those cases involved the

announcement of a complete response letter from the          15:56:39

Page 167

scope.                                                          16:30:48

THE WITNESS:  I don't remember -- I don't recall.  I could guess because I think I know what it is, but I don't know.  If you could tell me why it's relevant and how it relates.  There are a           16:31:05 couple of Goldman Sachs cases that I'm familiar with.

BY MR. DE JARNETTE:

Q   You did not refer to a Goldman Sachs case when drafting your Opinion 2 for purposes of your        16:31:14 expert report, correct?

A   I'm checking here.  I don't recall citing to the Goldman case as it relates to this particular matter.  Any Goldman case for that matter.  I don't rely on the Goldman case, but...                       16:31:37

Q   Are you familiar with the Fifth Circuit's decision in Ludlow v. BP?

MR. ALEXANDER:  Objection.  Outside the scope.

THE WITNESS:  Many years ago, I read the         16:31:51 BP decision.

BY MR. DE JARNETTE:

Q   What do you recall about the BP decision?

MR. ALEXANDER:  Objection.  Calls for a narrative, outside the scope.                              16:32:05

Page 191

THE WITNESS:  I just -- I can't even -- an    16:32:10
oil well blew up.  I remember that, I believe.
Wasn't that -- or did it get -- I just had to live
through a hurricane myself, so I don't know if it
was a hurricane or a blowup or something.  But    16:32:20
something associated with an oil rig.

BY MR. DE JARNETTE:

Q    Safe to say you did not rely on that BP
decision in drafting Opinion 2 of your expert
report?    16:32:31

A    A blowup of a -- before, you were upset
that I wasn't relying on other pharmaceutical cases.
Now you want me to rely on a blown-up oil rig.
No, I did not rely on a blown-up oil rig
for purposes of this particular case.    16:32:47

Q    So it's your opinion that the BP decision
has zero applicability to this case?

MR. ALEXANDER:  Objection.  Misstates his
testimony, beyond the scope.

THE WITNESS:  I believe that there's --    16:33:03
there are many cases, academic articles, textbooks,
working papers, that underlie my 47 years of
experience.

As it relates specifically to the BP case,
if you could point me in the direction as to where    16:33:27

Page 192

it is relevant and should have been included, that 16:33:29 would be fine.  But I -- I have not relied on that case.

And again, I'll state, I was asked whether the stock of BioMarin traded in an efficient market 16:33:49 and whether there's a common damages methodology. And I have not been asked to provide a legal opinion as to any of those issues.

I reinforced my economic opinion through intense and extensive empirical work, and my second 16:34:11 opinion through experience of 47 years as an economist, and...

BY MR. DE JARNETTE:

Q   Are you familiar with the Northern District of California's decision last year in 16:34:35 Muldering v. Amyris?

A   No.

MR. ALEXANDER:  Objection.  Outside the scope.

BY MR. DE JARNETTE: 16:34:47

Q   Safe to say that that Amyris decision was not relied upon by you in drafting Opinion 2 of your report?

A   It's not in my materials relied upon, but I'm not offering a legal opinion. 16:34:59

Page 193

You and plaintiffs' counsel can battle    16:35:01

over whether that's relevant or not.  I have no idea

what it is.

MR. DE JARNETTE:  Let's go off the record.

THE VIDEO OPERATOR:  We're now going off    16:35:21

the record.  The time is 4:35.

(Recess, 4:35 p.m. - 4:54 p.m.)

THE VIDEO OPERATOR:  We're now back on the

record.  The time is 4:54.

BY MR. DE JARNETTE:    16:54:25

Q   Earlier, we were talking about the FDA and

complete response letters.  I want to ask one more

question about your past experience.

Do you recall ever working on a litigation

matter involving the announcement of any type of    16:54:42

adverse FDA action?

MR. ALEXANDER:  Objection.

THE WITNESS:  Adverse FDA action?  I just

can't recall.

Some of these might have had an FDA    16:55:13

component to it, some of them might have had a

regulatory component to it, a developmental and

approval component to it, but I can't recall.

BY MR. DE JARNETTE:

Q   Do you still have Appendix B in front of    16:55:38

Page 194

you?                                                                16:55:40

A    Yes.

Q    Do you see the first header that says, "BioMarin Pharmaceutical Inc. News And Disclosures"?

A    Yes.                                                           16:55:58

Q    Did you rely on any of the information listed here for purposes of Opinion 2 of your expert report?

A    The fact that there is so much information in terms of analysts' reports, press releases,          16:56:34 transcripts and such, would suggest that there is a great deal of publicly available information.

     I have not looked at any internal documents, but nothing specifically as it's listed here did I rely upon for my Opinion 2 under this          16:57:00 heading "BioMarin Pharmaceutical Inc. News And Disclosures."

Q    Would you say that you relied on the amended complaint in this action for purposes of rendering your Opinion 2?                                  16:57:20

     MR. ALEXANDER:  Objection.

     THE WITNESS:  Yes.

BY MR. DE JARNETTE:

Q    How so?

A    That that complaint indicates that there          16:57:34

Page 195

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [x] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: November 16, 2022

*Carla Soares*

CARLA SOARES, CSR No. 5908

Page 201