Pages 1-22

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION


IN RE BIOMARIN PHARMACEUTICAL      )  Case No.  20-cv-06719-WHO
INC. SECURITIES LITIGATION         )
                                   )  San Francisco, California
                                   )  Tuesday, February 14, 2023
                                   )
                                   )  ZOOM VIDEOCONFERENCE
                                   )
_____)


TRANSCRIPT OF CASE MANAGEMENT CONFERENCE
BEFORE THE HONORABLE WILLIAM H. ORRICK
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:   (via Zoom)

For Lead Plaintiff          SALVATORE GRAZIANO, ESQ.
Arbejdsmarkedets            KATHERINE M. SINDERSON, ESQ.
Tilloegspension and Lead    Bernstein Litowitz Berger &
Counsel for the Class:      Grossmann LLP
                            1251 Avenue of the Americas
                            New York, New York 10020
                            (212) 554-1400

For Defendants BioMarin     PATRICK E. GIBBS, ESQ.
Pharmaceutical Inc.,        AMANDA A. MAIN, ESQ.
Jean-Jacques Bienaime,      COOLEY LLP
and Henry J. Fuchs:         3175 Hanover Street
                            Palo Alto, California 94304-1130
                            (650) 843-5000

Transcription Service:      Peggy Schuerger
                            Ad Hoc Reporting
                            2220 Otay Lakes Road, Suite 502-85
                            Chula Vista, California 91915
                            (619) 236-9325


Proceedings recorded by electronic sound recording; transcript produced by transcription service.

SAN FRANCISCO, CALIFORNIA   TUESDAY, FEBRUARY 14, 2023   2:51 P.M.

--oOo--

THE CLERK:  Okay.  So we will begin in Case Number 20-6719 in In re BioMarin Pharmaceutical Securities.  Counsel, if you would please state your appearance for the record.

MR. GRAZIANO:   For the Plaintiffs, it's Salvatore Graziano from Bernstein Litowitz.  Good afternoon, Your Honor.

MS. SINDERSON:   Also for the Plaintiffs, Katie Sinderson of Bernstein Litowitz.  Thank you.

MR. GIBBS:   Patrick Gibbs from Cooley for the Defendants.

MS. MAIN:  Amanda Main from Cooley for the Defendants as well.

THE COURT:  Great.  Good afternoon, everybody, and there were a number of things that are in front of me at the moment, which is why I saved you for the end of the CMCs.  So let -- the first thing I'm going to do is go over the discovery dispute and then I'm going to run through my various sense of what to do on eight other issues.  And then -- then we'll be done, I think.

So let's start with the discovery dispute, and either -- I don't know who's going to handle this for the Plaintiffs, but I am wondering whether the Plaintiffs are able to answer the questions that the Defendants say that Mr. Harder couldn't on the top of page 2, that first paragraph.

MS. SINDERSON: So, Your Honor, thank you. I'm looking at the top of page 2. And I think certain of these questions have been answered subsequently by documents produced subsequent to Mr. Harder's deposition. Certain of the questions -- I'm just going to start at the beginning, actually. When the rebalancing was performed that ranked BioMarin within the top 175 stocks, my memory is that Mr. Harder testified that it would be within the month before the actual purchase of the stock or the transaction of the stock, and that could be something that we could identify that's relevant or important.

The ranking versus other stocks has been provided. The industry sector used to rank BioMarin, I suspect that's something we could ascertain. This is questions that we're seeing for the first time in the joint statement. Although they were asked during the deposition, it wasn't apparent to us that this was something critical to Defendants' understanding of the algorithm.

And whether the database contained component scores for the value factor. I believe that has been answered, and also the subsequent questions. I believe that has been answered.

If this is something that Defendants think is necessary to their understanding, we can try to get answers to these questions from the client if they don't believe that they've actually received the answers to these questions after the deposition.

It wasn't our understanding that Defendants believed

4

any of this was truly necessary.

THE COURT: Okay. And the -- with respect to -- the problem with that next paragraph of -- why shouldn't the Defendants' expert be able to do what Mr. Harder did to analyze the 2020 trades?

MS. SINDERSON: So -- thank you, Your Honor. So what Mr. Harder did -- I think this is somewhat of a misunderstanding between the parties and, again, this was one of the -- one of the reasons why we wanted to meet and confer -- is Mr. Harder testified that he actually looked back at the rebalancing spreadsheets that were subsequently produced. These are spreadsheets that the -- that the algorithm sort of shoots out as a byproduct of its processes and kind of goes in what my client described as a garbage bin.

After his deposition, we went back in and looked in the garbage bin and got these spreadsheets and provided them. He had looked at two of them at the time to prepare for -- in this case. It wasn't that he went back to the database. He looked at the spreadsheets which were sort of frozen-in-time data. But, again, that frozen-in-time data is something that Defendants now have.

THE COURT: Okay.

MS. SINDERSON: The database itself is not frozen in time. It's modified on an ongoing basis and that's the point we were trying to make. We can't certify tha any query that is done today would yield the same response of whatever's received at the

5

time of the trace.

THE COURT:  All right.  Mr. Gibbs or Ms. Main, what do you think?

MR. GIBBS:  Yes, please, Your Honor.  So on the issues that we pointed out that the witness was unable to answer, we -- we asked the questions because we thought it was important to our understanding, and we do want answers to all those questions.

But on the -- on the document issue and the database issue, Mr. Harder testified about accessing different types of data at different points in time.  I recall specifically him testifying that in order to test the performance of the algorithm, Mr. Harder went back and accessed the database and looked back in time to whatever was in the database then in order to asses whether the algorithm was working the way they wanted it to work. Plaintiffs have been saying repeatedly that the data in the database might change over time, and so if we looked at the database today, it might not be the same as it was back then.  But what they haven't said is they know it's different, they know how it's different, and the fact that it isn't perfect, it is not discoverable.  If whatever historical data is in that database is good enough for Mr. Harder to go back and use it to determine whether his algorithm is working the way he thinks it should work, it's good enough for us to at least get discovery.

If Plaintiffs then look and find something in there that they think has changed since the algorithm was run and the

6

trades were made, that has nothing to do with whether we're entitled to see it in discovery and to test out this theory in discovery.

MS. SINDERSON:  So, Your Honor --

THE COURT:  Go ahead.

MS. SINDERSON:  -- if I -- just may I respond to that? Just two points.  There's literally no way we could identify changes in data because we're talking about hundreds of publicly-traded companies and inputs from each of those publicly-traded companies.  We're trying to explain that the ranking of BioMarin here is a comparative ranking.  So a change from another company -- which, as the witness testified, is almost certain to have happened -- would affect the changed rankings of BioMarin.

Second, I haven't heard an explanation -- I don't fully understand -- and, again, I wish we could have met and conferred before this -- what the purpose of such an inquiry would be, particularly if it's not information that's certified to be accurate.  If -- I'm not sure how -- the process the Defendants are contemplating.  Will they go to Copenhagen and sit at a portal and enter different inputs?  It's unclear to us how that would work, what the purpose of it would be, what the information that they would gather would be, and it's not a question we've ever heard answered.

And I think, you know, they said that they would be able to ascertain whether the inputs actually -- or whether the

price factor actually did drive the transactions but, again, that's unclear as to how that would be accomplished through what they're planning on doing or even what they're planning on doing.

MR. GIBBS:  I'd be happy to explain.

MS. SINDERSON:  Or the relevance of that to class certification here when the market efficiency is the true question.

MR. GIBBS:  I'd be happy to explain, Your Honor, if you'd like to hear me explain why we want and what we want to do with it.  I'd be more than happy to do that.

THE COURT:  Well, can you do it briefly in a way that I will understand?

MR. GIBBS:  I hope so.  So the way we understand this thing works -- and I believe Ms. Sinderson has just confirmed at least part of it -- is a relative ranking of a thousand stocks based on a large number of data inputs.  And one of the key things we want to explore is precisely this point about relativity that Ms. Sinderson has just noted here.

It may be that -- well, they rank stocks 1 through 1000 based on this complex algorithm.  The stocks that are ranked 1 through 175, ATP goes and purchases the same amount of each of those 175 stocks.  And so all you have to do to trigger a trade is to land in the top 175.  It doesn't matter where you land in the top 75 (sic).  You just have to get there.

And changes in the rankings of some other stock might

cause a company to move from outside the 175 into the 175. And so it could be, for example, that a trade is triggered not by anything that happens to BioMarin, but because something happens to another stock that's up in the -- in the top 175 and it falls out and BioMarin ends up moving up into the top 175. That's one theory we're trying to explore, and the only way we can do it is to see the data that's actually feeding into the algorithm in real time at specific points where they do the rebalancing.

A related theory that we are trying to explore is because it doesn't matter where the stock falls, between 1 and 175, it may be that the Plaintiff would have purchased the same amount of BioMarin stock had it not traded at a whole range of different prices.

We think either one of those things would break the connection between market price and this, which is what basic says Defendants can do to rebut the presumption of reliance from the fallen market theory.

It is not, as Counsel just suggested, only about market efficiency. The Supreme Court -- no court has ever said market efficiency, you've got to classify there's reliance. That's not how it works. It's a rebuttable presumption, and we are looking for evidence that we think might break that connection. I think the relevance is clear. There is no burden. And all they're doing is obfuscating and saying it might not be perfect. It doesn't have to be perfect. Her evidence isn't going to be

9

perfect. So that's what we're trying to do.

THE COURT: All right. Go ahead, Ms. Sinderson. I'll give you the last word on this and then I'll decide what I want to respond on. Go ahead.

MS. SINDERSON: Thank you, Your Honor. I would just like to dispute two points, which is Defendants' contention that this wouldn't be burdensome. Again, it's unclear as to exactly what they're asking for, but I do think this is a burdensome intrusion on ATP's commercial interests, asking to invade their -- again, it's unclear whether they want to go into their business place and go into their database. But we do think that's a burdensome invasion. We do think it's disproportionate to the needs of the case because there's literally no case that Defendants have been able to point to in which a court has found this sort of -- this investigation of class certification to be appropriate to break the link that Defendants are talking about.

We haven't identified a case, Defendants haven't identified a case. They cite to one case, which is a post-trial decision and it deals with an entirely different situation that they don't have any indication that this is like that. So that would be my last word -- the disproportional measure that it's inappropriate.

THE COURT: Well, so I don't understand this -- I understand this to be a merits argument, not a class certification argument. The Defendants -- they filed or they're about to file,

10

right, their opposition, so I think this is a merits question.

Okay.  I will -- I'm going to think on this, not for very long.  The thing that I know that I'm going to do is require the Plaintiffs to answer perhaps again the questions that are identified at the top of page 2, and I think it should be obvious that the Defendants should be able to test what the Plaintiffs' experts are -- what their opinion is with respect to things that are relevant.  And -- and so if -- if Mr. Harder's been able to run something, that the Defendants ought to be able to test that as well.  If they are as what you say, Ms. Sinderson, then maybe there are different ways of getting to the same place.  I don't know.  And you should be talking to each other about these things, but -- but I'm going to -- I will get something further out on this with me just in part requiring you to do a little more talking and bring me something that's actually honed down once you've tried to accommodate each other's needs on this.

Okay.  So that's the discovery dispute.  Now, let me go -- I'm going to run through the different discovery issues that were in the joint statement, most of which seemed to be relatively close to being resolved as far as I was concerned.  So -- and I -- so the -- with the texts, they ought to be substantial completion by February 28th, complete by March 15th is fine.

The three additional custodians by February 28th is fine.

The BLA should be produced with "eyes only" to outside

11

counsel as agreed.

What's the basis for the accusation that FE 1 is being pressured to change testimony?

MS. SINDERSON:   So, Your Honor, the basis is an extensive record of communications between FE 1 and -- well, first, BioMarin's general counsel reached out to him directly after the -- when the complaint was filed.   Then there was an extensive record of communications with in-house counsel and then Cooley reaching out to him and arranging conversations.   It was clear to us, based on our interactions with former employees and these types of situations that it is an extensive pressure campaign to retract their testimony or to not provide testimony that the attorneys that they are in contact with would disagree with.

This is a -- this is unfortunately a standard sort of playbook in securities class actions in which former employees provide testimony -- and courts have recognized this -- that they're subject to immense pressure once they're identified. Their former colleagues are reaching out to them and they're put on the spot in testifying about what they previously had told the Plaintiffs, and that's -- that is our impression of what occurred here.   I've actually never seen such an extensive record of outreach and communications about a case.   And seeing it for the first time here after this had been put in motion was surprising to us.

12

And then once we sat for his deposition and he again provided testimony that he didn't recall anything about the multiple conversations he had with our firm, except he did remember specifically exactly what, you know, Defense counsel was asking him to remember in his deposition.

Again, all of this is the type of information that we'll provide to Your Honor in the reply on class cert. We're going to provide a vigorous response to Defendants' accusations, which we think are completely baseless. You'll receive sworn affidavits from one of the lead partners on this case who spoke with his former employee directly at length, our investigators, email correspondence between us and this former employee. The record is going to be much more complete, Your Honor. It's going to be very different from what you're seeing.

THE COURT: And so there's nothing -- it sounds like I should wait for that -- there's enough time to do whatever additional discovery you think is appropriate after class cert. and while fact discovery is still open. Would that be true?

MS. SINDERSON: That would be true. I think the one piece of guidance or relief we've asked from Your Honor is to -- is that if Defendants could explain to us the circumstance of the data destruction that they noted for the first time in the joint statement in the next, you know, few days, we think that would be very helpful. We learned about this for the first time in the joint statement to the Court. This was something we thought we

13

had an understanding that they still had this employees' custodial files. They told us they were searching the documents. And then we found out after his deposition, actually, they'd already destroyed his documents and those documents were not searched before his deposition.

So that's the only relief we're asking for, Your Honor, is to get some guidance to Defendants that -- to provide, you know, those answers in the near term would be very helpful.

THE COURT: That sounds like something that's worth doing. And you can do that offline, but you ought to have that discussion.

MS. SINDERSON: Thank you, Your Honor.

THE COURT: Okay. Then the privilege log issues. The -- what I'm inclined to do -- but I'll listen to you -- is I'm inclined to have the Plaintiffs file the log with the court and identify ten documents that they would like to have tested as -- as to whether privilege occurs -- whether privilege exists. And -- and then I would ask a week later for the Defendants to explain the basis of the privilege to -- provide the documents to me and explain the basis, and I'd do that in camera, and you don't have to -- obviously, you don't have to provide the documents. You should include the explanation, though, so that Plaintiffs can see it. That's my idea of how to deal with it.

Mr. Gibbs?

MR. GIBBS: Yes, please, if I may. Counsel has not

14

raised with us any individual privilege entry calling into whether the privilege properly applies to that document. What's been -- what's been under dispute here is we provided a privilege log. We believe it complies with the Rules of Federal Procedure and it complies with the parties' stipulation about what elements -- what pieces of information would be included in a privilege log.

Very recently, Plaintiffs' counsel came and said, We want a bunch of other individual pieces of information about every one of the entries, like subject line or other specific data points, for all of them. And we haven't actually engaged in any meaningful meet-and-confer on this. They just said, You've got to give it to us, and we said, We gave you what we agreed to give you, and that's kind of where it stood.

So we've -- they've never asked us about an individual entry and said, That entry doesn't look to us like a privileged document. So we're happy to submit anything the Court wants us to, but the disagreement right now is whether we should be required to include all of these additional elements for every single document in the log.

And we're not going to confer on that. It's a big burden. But -- but we don't really have a dispute about individual entries right now as far as I'm aware of.

THE COURT: Well, you -- I assume that you stand behind the privilege log that you --

MR. GIBBS: Oh, sure.

THE COURT: -- prepared. And so if -- if you can't -- it's -- it's fine with me. My guess is that the Plaintiffs -- the Plaintiffs identified two thirds of the -- of the log didn't show that there was a lawyer involved. So -- so you have some justification for why you're doing what you're doing.

Either look at that log and talk to the Plaintiffs now and get serious about what you have, or then do it this other way. Because you have to pierce this. So you don't have an unlimited amount of time before the fact discovery is done, and if you've been overly liberal in your declarations of privilege, now is the time to -- to scaling it down.

MR. GIBBS: We'll certainly have a conversation about specific entries. But that's different from the dispute that I understood Plaintiffs to have been raising with us before, but we're happy to have that and -- but mistakes get made and we're normally able to work them out on a document-by-document basis. When they see an entry or a group of entries or a category of entries and they think it is wrong, we'll take a look at it. We're always willing to take a look a second look.

THE COURT: So Ms. Sinderson, why don't you identify either by category or individually the things that you will ultimately want me to rule on if there's disagreement. Make sure that the Defendants know what that is, and then bring it to me in a manner that I described.

MS. SINDERSON: Yes, Your Honor. Thank you.

16

THE COURT:  All right.  Then the next issue is the expansion of the number of depositions.  The -- I don't -- I don't just write a blank check to people, so my suggestion is that you take five depositions and then meet and confer with the Defendants about your need for additional folks.  And if you can't agree, send me a letter describing specifically who you need, why you need them, what the dispute's about, and do that prior to the next CMC which I'm going to have on April 12th because there are just so many different things that are brewing, so I'd like you to do that.

I will extend fact discovery for two months as requested.

The calendar is basically fine.  The -- I would move the trial about a month, to May 20th of 2024.  Could you look on your calendars and let me know whether that would work.

MR. GIBBS:  It's fine as far as I know, Your Honor.  I haven't obviously been able to check that date with clients, but we're far enough out that I'd be surprised if anybody had something that they couldn't move to adjust.

MS. SINDERSON:  That's fine here it appears to me, Your Honor, as well.

THE COURT:  Okay.  Okay.  So that will be the new date -- May 20th, 2024.  We'll have the pretrial conference on April 15th.  And the dispositive motion hearing date will be February 14th.  Why did I do that?  Yeah.  It will be February 14th.  And

17

if you want to shift the briefing back a little -- if you want to shift the other dates that don't impact me, by stipulation, that will be fine.

MS. SINDERSON:  Thank you, Your Honor.

THE COURT:  Okay.  So those were all the things that I was interested in talking about.  Ms. Sinderson, are there other issues that are brewing that we ought to address?

MS. SINDERSON:  No, Your Honor, I don't think so.  But if I could just get clarity on one thing.  You went through a few different categories of documents.

THE COURT:  Yeah.

MS. SINDERSON:  And I think you accepted February 28th were the ones that you referenced, except for text messages, which I think is March 15th.  I can go back and look into that.

THE COURT:  Yes.

MS. SINDERSON:  The -- there's at least one category of documents you didn't reference, which was the centrally-stored documents, which I think we also -- we just asked for sort of a blanket February 28th date for production of all remaining documents, and with the exception of the text messages where Defendants specifically identified March 15th, if we could get that date just to have it as a target so that we understand what we do and don't have from Defendants, that would be very helpful.

THE COURT:  Okay.  And what's -- and that -- I wasn't paying close enough attention because I missed that one.  So Mr.

18

Gibbs or Ms. Main -- I don't know who's --

MR. GIBBS:  No.  I'll start, Your Honor.  I may need Ms. Main to weigh in, but I'm not aware of any specific centrally-stored documents that are at issue other than the BLA which Your Honor separately referenced.  You know, obviously we're always open to discussions about whether they think there are additional responsive documents that we haven't found, but I'm not aware of a specific category of centrally-stored documents that have been identified, that are agreed to be responsive, and have not been produced, other than the BLA which we just recently agreed to produce large portions of fairly recently.

THE COURT:  Okay.

MS. SINDERSON:  I can just tell you that there are a number of these Sharepoint files, as an example, a number of other centrally-stored documents that have been the subject of a lot of back-and-forth.  I think Defendants have agreed to produce those documents.  It's just when they will.  I think Defendants in the joint statement say they will be produced in a timely manner.  I think it would just do us -- it will make our job a lot easier if we have a deadline for the production -- to file production of all of these documents, including the BLA, which the BLA is the easiest of documents.  It's like you just push a button and it goes out.

MR. GIBBS:  That's just --

MS. SINDERSON:  I mean, it -- forgive me if I'm

overstating.  I'm just seeing the file structure and it's all right there.  The other documents have been (indiscernible).

THE COURT:  So what is -- maybe, Ms. Main, I'll make you unmute yourself if you are the person who knows a little more about the documents that Ms. Sinderson is talking about and what's -- from your perspective, what can you do in order to get the -- whatever's left out, if there's anything out.

MS. MAIN:  Yes, Your Honor. There's -- there aren't specific documents that they've identified that they're demanding that we produce from centrally-located repositories.  So I don't see any basis for the Court to set a deadline for document production in advance of the fact discovery cutoff, which has now been extended by two months.

We are continuing to search for potentially responsive materials.  And as we locate those, we'll produce them.  I do think that our production is substantially complete.  Outside of the BLA, there has not been a specifically-identified document at issue.

THE COURT:  Okay.  So you are -- are you -- so what is -- what are you doing now to locate documents that haven't been produced?

MS. MAIN:  Continuing to have discussions about potentially-responsive materials.

THE COURT:  Okay.  So I'm not going to set -- if there's no specific document, I'm not going to set any deadline.

I am -- I don't expect that there will be any delay in producing documents that undoubtedly have been requested long ago -- categories of documents, I should say.

And so I would urge you to continue working on that. And, Ms. Sinderson, if you find that there are obvious gaps and you're unable to -- after discussing them with Ms. Main or whoever -- if you're unable to reach agreement on them, then send me a dispute letter and say, This is what's happening, I need help -- and I'm happy to do that.

We will be seeing each other in April and we can address things there as well.

MR. GIBBS:  Your Honor, if I could just -- because I don't want the parties to have any misunderstanding on this point, I want to be very clear about something.

The BLA is not a single document.  It's not a thing we can push a button and produce.  It's actually a very large number of separate individual files that gets submitted to the FDA through a special type of portal system that is -- that is not commonly used.  There are many, many different types of file formats that are -- that are included within the BLA, some of which we have never worked with before, some of which Ms. Main and I have not yet even ourselves been able to lay eyes on.

And so I just want to be very clear we're working as hard as we can on getting the entire BLA produced.  It is not a simple matter of pushing a button and we're not just dragging our

21

feet.  It's actually an extremely complicated undertaking, but we are working as hard as we can.

But I don't want anyone to be under the impression that it's a push-the-button exercise and why hasn't the BLA been produced.  We're working on it.

THE COURT:  All right.  Thank you for that.  Is there anything else, Mr. Gibbs, from your perspective that we ought to talk about today?

MR. GIBBS:  Well, I would just ask -- this isn't necessarily a request for a specific ruling, but especially with the additional breathing room from the extension of the fact discovery cutoff, I would appreciate it if the parties could try to work together to schedule depositions well in advance, rather than just having us receiving, you know, sort of random sets of deposition notices with dates that Plaintiffs' counsel have unilaterally selected.  They should know at least the first ten people they're gonna want to depose.  Let's sit down and let's work out a calendar that makes sense for everybody rather than just having notices popping out at random intervals.

THE COURT:  I agree.  So why don't you do that.  You should -- litigation is so much easier when people are cooperating.  It's actually easier when you're meeting in person.  But it is just -- I think it's your obligation as lawyers to do this and to get along because it makes, you know, things cheaper for your clients and move better and -- so -- so please do that

and -- and work together to schedule these things.

And you'll want those first five so that you can start figuring out how many you're actually going to get.  So go to it.

MR. GIBBS:  Thank you, Your Honor.

THE COURT:  All right.  Thank you, all.  I will see you in the next couple of months.

MR. GRAZIANO:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. GIBBS:  Thank you, Your Honor.

MS. SINDERSON:  Thank you.

(Proceedings adjourned at 3:24 p.m.)


I, Peggy Schuerger, certify that the foregoing is a correct transcript from the official electronic sound recording provided to me of the proceedings in the above-entitled matter.


*Peggy Schuerger*
Signature of Approved Transcriber          February 15, 2023
                                           Date

Peggy Schuerger
***Ad Hoc Reporting***
Approved Transcription Provider
for the U.S. District Court,
Northern District of California