**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3472

SALVATORE GRAZIANO (*pro hac vice*)
salvatore@blbglaw.com
JEROEN VAN KWAWEGEN (*pro hac vice*)
jeroen@blbglaw.com
KATHERINE M. SINDERSON (*pro hac vice*)
katiem@blbglaw.com
ABE ALEXANDER (*pro hac vice*)
abe.alexander@blbglaw.com
WILLIAM E. FREELAND (*pro hac vice*)
Billy.freeland@blbglaw.com
THOMAS Z. SPERBER (*pro hac vice*)
thomas.sperber@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400

*Counsel for Lead Plaintiff Arbejdsmarkedets
Tillægspension and Lead Counsel for the
Settlement Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE BIOMARIN PHARMACEUTICAL INC. SECURITIES LITIGATION | Case No. 3:20-cv-06719-WHO<br><br>**DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**<br><br>Judge: Hon. William H. Orrick<br>Date:  November 8, 2023<br>Time:  2:00 p.m. |

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS' FEES & EXPENSES

CASE NO. 3:20-CV-6719-WHO

## TABLE OF CONTENTS

**Page**

EXHIBIT LIST ................................................................................................................. iii

I. HISTORY OF THE ACTION ...................................................................... 3

    A. Background ........................................................................................ 3

    B. The Commencement of the Action and the Appointment of Lead
Plaintiff and Lead Counsel................................................................ 3

    C. The Investigation and Filing of the Complaint ................................. 4

    D. Defendants' Motion to Dismiss ........................................................ 5

    E. The Parties Conduct Extensive Fact Discovery ............................... 7

        1. Document Discovery ............................................................. 8

        2. Depositions ........................................................................... 9

        3. Discovery Disputes ............................................................... 9

    F. Lead Plaintiff's Motion for Class Certification ............................... 12

    G. Work with Experts ............................................................................ 13

    H. The Parties' Mediation Efforts and the Settlement of the Action........................ 14

    I. The Court Grants Preliminary Approval of the Settlement ............... 15

II. RISKS OF CONTINUED LITIGATION ...................................................... 15

III. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S
PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF
NOTICE ....................................................................................................... 25

IV. ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT................... 27

V. THE FEE AND EXPENSE APPLICATION ................................................. 30

    A. The Fee Application........................................................................... 30

        1. Lead Plaintiff Has Authorized and Supports the Fee
Application............................................................................ 31

        2. The Work Performed by Lead Counsel ................................. 31

        3. The Experience and Standing of Lead Counsel ..................... 35

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS' FEES & EXPENSES

i

CASE NO. 3:20-CV-6719-WHO

4.    Standing and Caliber of Defendants' Counsel .......................................... 36

5.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases ....................................................................... 36

6.    The Reaction of the Settlement Class to the Fee Application ................................................................................. 37

C.    The Expense Application ....................................................................................... 37

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS' FEES & EXPENSES

ii

CASE NO. 3:20-CV-6719-WHO

**EXHIBIT LIST**

| Ex. No. | Description |
|---|---|
| 1 | Declaration of Michelle Yoshida in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement ("Yoshida Decl.") |
| 2 | Declaration of Torben Christensen on Behalf of Arbejdsmarkedets Tillægspension in Support of (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Christensen Decl.") |
| 3 | CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2022 REVIEW AND ANALYSIS (2023) |
| 4 | Declaration of Adam D. Walter Regarding (I) Mailing of Notice and Claim Form; (II) Publication of the Summary Notice; and (III) Report on Requests for Exclusion Received to Date ("Walter Decl.") |
| 5 | Summary of Lead Counsel's Hours and Lodestar |
| 6 | Summary Descriptions of Work Performed by Lead Counsel's Attorneys |
| 7 | Lead Counsel's Time by Litigation Category |
| 8 | BLB&G's Firm Resume |
| 9 | Lead Counsel's Expense Report |
| 10 | Compendium of Unpublished Authorities Cited in Fee and Expense Motion |

I, KATHERINE M. SINDERSON, declare as follows:

1.      I am partner in the law firm Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), counsel for Lead Plaintiff Arbejdsmarkedets Tillægspension ("Lead Plaintiff" or "ATP") and Lead Counsel for the proposed Settlement Class in the above-captioned action. I submit this Declaration in support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Motion") and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee and Expense Motion"). The following statements are based on my personal knowledge based on my active participation in all aspects of the prosecution and settlement of the Action, as well as information provided to me by other BLB&G attorneys working under my supervision, and if called on to do so, I could and would testify competently thereto.[1]

2.      The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $39,000,000, plus interest, for the benefit of the Settlement Class. The Settlement Amount has been paid into an escrow account and is earning interest. As detailed herein, the Settlement provides a significant benefit to the Settlement Class by conferring a substantial, certain, and near-term recovery while avoiding the significant risks of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

3.      The proposed Settlement is the result of extensive efforts by Lead Plaintiff and Lead Counsel, which included, among other things: (i) conducting an extensive investigation into the alleged fraud, including interviews with over 100 former employees of BioMarin and a thorough review of public information such as filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, and news articles; (ii) drafting a detailed

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated April 24, 2023 (ECF No. 139-1) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiff, on behalf of itself and the Settlement Class, and (ii) defendants BioMarin Pharmaceutical, Inc. ("BioMarin" or the "Company"), Jean-Jacques Bienaimé, and Dr. Henry Fuchs (collectively, the "Individual Defendants" and, with BioMarin, "Defendants").

| DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES | 1 | CASE NO. 3:20-CV-6719-WHO |
|---|---|---|

consolidated Complaint based on Lead Counsel's extensive investigation; (iii) opposing Defendants' motion to dismiss the Complaint through detailed briefing and oral argument; (iv) conducting substantial fact discovery, including exchanging initial disclosures, document requests, and interrogatories, resolving discovery disputes, and obtaining and reviewing approximately 250,000 pages of documents from Defendants and non-parties; and participating in four depositions; (v) drafting a motion for class certification, which included an expert report on market efficiency and class-wide damages; (vi) consulting extensively with experts on loss causation, damages, market efficiency, and FDA regulation throughout the Action; and (vii) engaging in extended arm's-length settlement negotiations, which included two full-day mediation sessions with Michelle Yoshida of Phillips ADR Enterprises, an experienced mediator.  As a result of these efforts, Lead Plaintiff and Lead Counsel were well-informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement.

4.    The $39 million Settlement was based on a final mediator's recommendation made by Ms. Yoshida at the conclusion of the second mediation session.  Ms. Yoshida has submitted a declaration describing the mediation process (attached as Exbibit 1).  Ms. Yoshida states in her declaration that "the negotiations between the Parties were vigorous and conducted at arm's length and in good faith," and that she believes "that the Settlement represents a recovery and outcome that is reasonable and fair for the Settlement Class and all Parties involved."  Yoshida Decl. ¶¶ 10, 11.

5.    Lead Plaintiff ATP—a sophisticated institutional investor that actively participated in the Action—also strongly endorses the approval of the Settlement.  *See* Declaration of Torben Christensen on behalf of ATP ("Christensen Decl."), attached hereto as Exhibit 2, at ¶¶ 2-7.

6.    As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiff's damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis fairly based on losses attributable to the alleged fraud, calculated in the same manner as they would have been if Lead Plaintiff was successful at trial.

7.      For its efforts in achieving the Settlement, Lead Counsel requests a fee of 19% of the Settlement Fund.  The requested fee is pursuant to an *ex ante* fee agreement negotiated by the Lead Plaintiff which is below the 25% benchmark percentage fee that courts within this Circuit apply in common fund cases and below the range of percentage fees typically awarded similarly sized class action settlements.  Moreover, the requested percentage fee will result in a multiplier of just 1.1 on Lead Counsel's lodestar, which further supports the reasonableness of the requested fee.  As discussed in the Fee and Expense Motion and below, Lead Counsel respectfully submits that the requested 19% fee is fair and reasonable in light of the result achieved in the Action, the efforts of Lead Counsel, and the risks and complexity of the litigation.

## I.      HISTORY OF THE ACTION

### A.      Background

8.      Defendant BioMarin is a specialty pharmaceutical company based in Marin County, California.  At all relevant times, BioMarin common stock traded on the Nasdaq Stock Market under the ticker symbol "BMRN."  In the years leading up to 2020, BioMarin developed a gene therapy known as valrox to treat hemophilia A, an inherited disorder in which the blood does not clot properly.

9.      On December 23, 2019, BioMarin filed a Biologics License Application ("BLA") with the United States Food and Drug Administration ("FDA") seeking approval to market valrox.  Throughout early 2020, BioMarin made statements to investors concerning the FDA's review of the valrox BLA.  On August 19, 2020, BioMarin announced that the FDA issued a Complete Response Letter ("CRL") indicating that it had not approved the BLA.  The price of BioMarin common stock declined significantly on August 19, 2020 in response to this news.

### B.      The Commencement of the Action and the Appointment of Lead Plaintiff and Lead Counsel

10.      On September 25, 2020, a putative class action was filed in the United States District Court for the Northern District of California (the "Court") against Defendants alleging violations of the federal securities laws.  (ECF No. 1.)  In accordance with the PSLRA, a notice was published in

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

3

CASE NO. 3:20-CV-6719-WHO

a national newswire service on September 25, 2020 advising potential class members of the pendency of the action, the claims asserted, and the deadline by which putative class members could move the Court for appointment as lead plaintiff. (ECF No. 30-4.)

11. On November 24, 2020, ATP moved for appointment as Lead Plaintiff. (ECF No. 30.) Three other individual investors filed timely motions to be appointed Lead Plaintiff. (ECF Nos. 20, 24, 27.) ATP's motion demonstrated that ATP had the largest financial interest of any of the movants, and all other movants either withdrew their motions or did not oppose ATP's appointment as Lead Plaintiff. (ECF Nos. 35, 36, 38.)

12. On December 22, 2020, the Court entered an order appointing ATP as Lead Plaintiff for the Action and approving ATP's selection of BLB&G as Lead Counsel. (ECF No. 40.)

**C.    The Investigation and Filing of the Complaint**

13. In connection with this matter, Lead Counsel undertook an extensive investigation into the alleged fraud and potential claims that could be asserted in the Action. The investigation included a thorough review of public information such as BioMarin's SEC filings; Defendants' additional public statements, including those made in press releases, at investor conferences, and on earnings calls; analyst reports concerning BioMarin; and other publicly available information regarding the Company.

14. In connection with its investigation, Lead Counsel and its in-house investigators also conducted an extensive search to locate former employees of BioMarin and other industry participants who might have relevant information pertaining to the claims asserted in the Action. This included contacting over 400 former BioMarin employees believed to possess potentially relevant information. Lead Counsel and/or its in-house investigators spoke to 112 of these individuals, and Lead Counsel included detailed information received from one of these former BioMarin employees in the Complaint.

15. On February 22, 2021, Lead Plaintiff filed and served the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 54) (the "Complaint") based on this thorough investigation. The detailed, 186-paragraph Complaint asserts claims against all

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

4

CASE NO. 3:20-CV-6719-WHO

Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against Defendants Fuchs and Bienaimé under Section 20(a) of the Exchange Act.

16.     The Complaint alleges that during the period from March 3, 2020 through August 18, 2020, inclusive (the "Class Period"), Defendants made materially false and misleading statements or omissions concerning BioMarin's application to the FDA for approval of valrox.  The Complaint alleged that such statements were false and misleading because (1) BioMarin subsequently had acknowledged that the FDA had been unusually non-responsive while the BLA was pending and (2) that the pre-approval inspection ("PAI") of the facility built to produce valrox—a prerequisite to approval by the FDA—had been indefinitely postponed.  The Complaint further alleged that the price of BioMarin's common stock was artificially inflated during the Class Period, and declined when the truth was revealed following the FDA's issuance of the CRL, indicating that it had not approved the BLA for valrox.

### D.     Defendants' Motion to Dismiss

17.     On April 22, 2021, Defendants filed and served the motion to dismiss the Complaint. (ECF No. 59.)  The motion included 25 pages of briefing and was supported by over 450 pages of exhibits.  In the motion, Defendants argued that the Complaint should be dismissed because Lead Plaintiff had not alleged any materially false and misleading statements made by Defendants during the Class Period; that certain challenged statements were non-actionable because they were puffery or forward-looking; and that the Complaint failed to allege facts giving rise to a strong inference of scienter.  Specifically, Defendants argued, among other things, that (i) the alleged false and misleading statements concerned "future milestones" and were accordingly protected under the PSLRA safe-harbor for forward-looking statements, (ii) as far as Defendants knew when making the statements, the FDA review process was on track for the date established by FDA regulations, (iii) the former employee to whom Lead Plaintiff attributed allegations concerning BioMarin's internal concerns early in the Class Period about the FDA's silence was not sufficiently described, and (iv) Lead Plaintiff failed to sufficiently allege why differences in efficacy data in clinical trials

DECLARATION OF KATHERINE M.    5    CASE NO. 3:20-CV-6719-WHO
SINDERSON IN SUPPORT OF (I) FINAL
APPROVAL OF SETTLEMENT AND
(II) ATTORNEYS: FEES & EXPENSES

would materially worsen valrox's chances of approval.  Defendants' motion included 40 exhibits including, among other documents, FDA industry guidance, transcripts of conference calls, and clinical research reports.  (ECF Nos. 59-3 – 59-43.)

18.    On June 22, 2021, Lead Plaintiff filed and served a 25-page memorandum of law in opposition to Defendants' motion to dismiss.  (ECF No. 63.)  Lead Plaintiff explained that the Complaint adequately identified the false and misleading statements and omissions, detailed the reasons why each challenged statement was false or omitted material facts, and raised a strong inference of scienter.  Specifically, Lead Plaintiff argued that (i) the PSLRA safe-harbor did not apply as each of the statements concerned misstatements of historical fact, and were ultimately not accompanied by meaningful cautionary language, (ii) Defendants' admissions regarding the lack of communication with the FDA was evidence of Defendants' scienter regarding the status of the valrox BLA, (iii) the Complaint sufficiently alleged the former employee's position and responsibilities at the Company, and (iv) Lead Plaintiff alleged that the FDA cited the efficacy discrepancy as a concern during a Class Period meeting with BioMarin.

19.    On July 22, 2021, Defendants filed and served reply papers in support of the motion to dismiss the Complaint.  (ECF No. 65.)  Defendants and Lead Plaintiff filed Statements of Recent Decisions related to the pending motion to dismiss on November 24, 2021 and November 29, 2021, respectively.  (ECF Nos. 70, 71.)

20.    On December 3, 2021, the Parties participated in oral argument by videoconference concerning Defendants' motion to dismiss.  (ECF Nos. 73, 76.)

21.    On January 6, 2022, the Court entered an Order denying Defendants' motion to dismiss the Complaint in its entirety. (ECF No. 77.)  The Court concluded that the Complaint adequately pleaded that the alleged representations and omissions were false or misleading and plausibly alleged that Defendants acted with scienter in making the alleged misstatements.  (*Id*.)

22.    On January 28, 2022, Defendants filed a motion for reconsideration or, in the alternative, to certify question for interlocutory appeal, arguing that the Court failed to apply the

| DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES | 6 | CASE NO. 3:20-CV-6719-WHO |

correct law concerning whether Defendants' forward-looking statements were accompanied by meaningful cautionary language. (ECF No. 85.)

23. On February 15, 2022, Defendants filed their answer to the Complaint. (ECF No. 86.) Among other things, Defendants' Answer denied Lead Plaintiff's allegations of wrongdoing and asserted various defenses to the claims asserted.

24. On February 28, 2022, the Court denied Defendants' motion for reconsideration. (ECF No. 88.)

**E.    The Parties Conduct Extensive Fact Discovery**

25. Discovery in the Action commenced in January 2022, following the Court's decision on Defendants' motion to dismiss.

26. Lead Plaintiff served its First Set of Requests for the Production of Documents to Defendants on January 25, 2022. Meanwhile, Defendants served to Lead Plaintiff their First Set of Document Requests on March 3, 2022, and their Second Set of Document Requests on May 27, 2022. Defendants served Lead Plaintiff with two subsequent document requests on June 30, 2022 and July 21, 2022.

27. On February 9, 2022, the Parties exchanged their Initial Disclosure Statements pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.

28. On February 23, 2022, following extensive meet-and-confers, the Parties submitted a Case Management Statement to the Court, including a proposed schedule. (ECF No. 87.) The Court did not enter a scheduling order at that time. On September 13, 2022, Lead Plaintiff filed a Motion for a Scheduling Order. (ECF No. 94.) The Parties filed an additional Case Management Statement on September 27, 2022. (ECF No. 100.) The Court held a case management conference on October 4, 2022 and entered a case schedule on October 12, 2022. (ECF Nos. 103-04, 106, 109.) The deadlines set forth in the case schedule required Lead Plaintiff to file its motion for class certification by October 17, 2022 and the Parties to complete fact discovery by April 14, 2023. (*Id*.)

29. The Parties also negotiated the terms of the protective order governing the treatment of documents and other information produced in discovery, which the Parties submitted to the Court

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES
7
CASE NO. 3:20-CV-6719-WHO

on March 23, 2022.  (ECF No. 89.)  The Court entered the stipulated protective order on March 30, 2022.  (ECF No. 90.)

### 1.    Document Discovery

30.    Defendants served their Responses and Objections to Lead Plaintiff's First Set of Requests for Production of Documents on February 28, 2022 and began the production of documents in April 2022.  In the months that followed, Lead Counsel engaged in numerous meet-and-confers with counsel for Defendants and conducted extensive negotiations over the scope and adequacy of Defendants' discovery responses, including relating to the search terms to be used and the date range with which documents would be searched and produced.  The Parties submitted multiple joint statements concerning discovery disputes, including concerning the scope of document production, to the Court.  After hard-fought negotiations, Defendants agreed to produce many of the materials requested by Lead Plaintiff.

31.    Lead Plaintiff also subpoenaed nine non-parties, including the FDA, various banks and consultants, and a former employee.

32.    Lead Plaintiff served sets of interrogatories on Defendants on February 28, 2022, July 22, 2022, and December 13, 2022, to which Defendants served responses and objections.

33.    In response to Lead Plaintiff's requests for production of documents and subpoenas, Defendants and non-parties produced approximately 237,000 pages of documents to Lead Plaintiff. A team of attorneys at Lead Counsel reviewed, analyzed, and coded the documents received.  In reviewing the documents, attorneys were tasked with making several analytical determinations as to the documents' importance and relevance.  Specifically, they determined whether the documents were "hot," "relevant," "adverse hot," or "not relevant."  They also assessed which specific key issues the documents concerned.  Lead Counsel's partners structured the document review to include regular team meetings to discuss the documents of highest interest and other issues that arose during the document review.  Through these meetings, Lead Counsel ensured that all attorneys involved in the review understood the developing nature of the evidence and focused document review on the key issues in the Action.

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

8

CASE NO. 3:20-CV-6719-WHO

34.     Lead Counsel also assisted Lead Plaintiff in searching for and producing documents in its own files responsive to Defendants' requests for production of documents. Lead Plaintiff served several initial and supplemental responses and objections to Defendants' requests for production and began producing documents to Defendants in May 2022. In total, Lead Plaintiff produced over 5,000 pages of documents to Defendants in response to their requests. Lead Plaintiff also responded to interrogatories propounded by Defendants.

### 2.     Depositions

35.     As discussed further below, Defendants took the depositions of two representatives of Lead Plaintiff and of Lead Plaintiff's expert on market efficiency and class-wide damages in November 2022 in connection with Lead Plaintiff's motion for class certification. In addition, Defendants and Lead Plaintiff cross-noticed the deposition of a former employee at BioMarin, whose statements to Lead Plaintiff's investigators had been included in the Complaint, and conducted that deposition on January 20, 2023. Lead Plaintiff had also noticed the depositions of three other fact witnesses in the Action before the Settlement was reached. These fact witnesses included the Vice President of Regulatory Affairs CMC, a Group Vice President, and the General Counsel of BioMarin. These depositions were ultimately not held because the Parties reached an agreement in principle to settle the Action before the dates the depositions were scheduled to occur.

### 3.     Discovery Disputes

36.     Discovery in the Action was highly contested. Lead Counsel and Defendants' Counsel exchanged numerous letters and participated in numerous meet-and-confer sessions regarding, among other things, the scope of the documents collected and produced, the adequacy of the search terms and date range of productions, and the adequacy of responses to interrogatories.

37.     Despite many extensive and good-faith negotiations, the Parties could not resolve each of these disputes without Court intervention. Accordingly, the Parties filed several joint letter briefs concerning discovery disputes, including the following:

(a)     Defendants' position that Lead Plaintiff should provide additional information in response to certain interrogatories and requests for production concerning whether

---

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES
9
CASE NO. 3:20-CV-6719-WHO

the trading model used by ATP was, in fact, driven by stock price when ATP transacted in BioMarin common stock. Lead Plaintiff argued that the discovery sought was not relevant to the *Basic* reliance inquiry. (ECF No. 97, Sept. 23, 2022.) The Court addressed this dispute during an October 4, 2022 case management conference, holding that Defendants' opportunity to depose an ATP employee familiar with the trading model would be sufficient to determine what, if any, discovery was outstanding. (ECF No. 107.)

(b)    Lead Plaintiff's request that Defendants produce responsive text messages from nine custodians, and office and cellphone numbers and carriers of key employees. Defendants argued that only text messages sent or received by the Individual Defendants are relevant to the scienter inquiry, and that because the FDA had already produced a log of its communications with BioMarin, there was no indication that further call-log discovery would be relevant or non-duplicative. (ECF No. 112, Nov. 9, 2022.)    On November 18, 2022, the Court ordered that Defendants produce responsive text messages from each of the requested custodians, but denied Lead Plaintiffs' request regarding employee phone numbers and cell phone carriers. (ECF No. 113).

(c)    Lead Plaintiff's contention that Defendants should produce unredacted versions of 29 documents withheld for privilege, produce a privilege log within two weeks, and execute the Parties' negotiated ESI Protocol.    Defendants argued that the withheld documents included requests for legal advice, and that they had already agreed to produce a privilege log one month from the date of the joint letter brief. (ECF No. 114, Nov. 29, 2022.) On December 7, 2022, the Court issued an order on the dispute holding that Defendants were overinclusive in withholding "email threads where no attorney communicated" and requiring that defendants produce them but denying Lead Plaintiff's request as to draft press releases and email responses from attorneys.

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

10                              CASE NO. 3:20-CV-6719-WHO

(ECF No. 118.) Further, the Court denied Lead Plaintiff's request as to the timing of Defendants' privilege log. (*Id.*)

(d) Defendants' position that Lead Plaintiff should "provide reasonable access" to the software underlying ATP's trading model such that they could test Lead Plaintiff's assertion that the trading model was driven by stock price. Lead Plaintiff argued that Defendants deposed an ATP employee familiar with the trading model and underlying software, and that he (i) provided sufficient detail regarding the trading model software, and (ii) confirmed that the data currently available is not likely identical to the data relied on by the software at the time of the trades. (ECF No. 126, Feb. 10, 2023.) The Court addressed this dispute during a case management conference on February 14, 2023, noting that Defendants' argument was "a merits argument" rather than one relevant to class certification, but otherwise reserving its ruling. (ECF No. 133.) On February 15, 2023, the Court issued an order requiring Lead Plaintiff to answer specifically enumerated questions Defendants set forth in the joint statement concerning the ranking and rebalancing of ATP's stock portfolio and to provide access to ATP's trading model to the extent ATP deponent Stig Harder was able to access it in preparation for his deposition. (ECF No. 132.)

38. In addition, the Parties submitted a joint case management statement on February 8, 2023 that set forth several existing discovery disputes. Specifically, Lead Plaintiff (i) raised that Defendants had yet to produce any text messages in connection with the Court's November 18, 2022 order, (ii) noted that Defendants had yet to produce a material number of documents from three individuals that were agreed-to as custodians by the Parties on October 27, 2022, (iii) noted that Defendants had not yet produced the entire BLA, nor other documents contained on purported centrally-stored repositories; (iv) alerted the Court to the fact that all custodial data of the former employee referenced in the Complaint had been destroyed subsequent to his departure from BioMarin; and (v) requested that Defendants produce a legally sufficient privilege log by February 24, 2023. Defendants responded that (i) the Court should require substantial completion of the

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

11

CASE NO. 3:20-CV-6719-WHO

production of text messages by February 28, 2023, with completion by March 15, 2023, (ii) a deadline to produce additional custodial documents was unnecessary, but that the Court could enter a deadline of February 28, 2023 for completion, (iii) Defendants never agreed to produce the entire BLA, and that they had produced other documents from centrally-stored repositories, (iv) Defendants conducted a reasonable search for the former employee's custodial documents and produced everything that was responsive, but that BioMarin no longer possessed or controlled his mailbox, laptop, or mobile device, and (v) Defendants had already produced a legally sufficient privilege log that complied with the Parties' agreed-upon protocol. The Parties also previewed their arguments concerning the Defendants' requests for more discovery concerning ATP's trading model, as presented in detail in the February 10, 2023 joint statement regarding discovery dispute. (ECF No. 124.)

39. The Court addressed these disputes during a February 14, 2023 case management conference. First, the Court ordered that the production of text messages should be substantially completed by February 28, 2023, and completed by March 15, 2023, and that the BLA be produced on an "attorneys' eyes only" basis by February 28, 2023. Second, the Court ordered that Defendants provide clarification on the destruction of the former employee's custodial data, in response to questions raised by Lead Plaintiff. Third, the Court proposed that the Parties file the log with the Court and then identify 10 entries for in-camera review, allowing Defendants to justify the basis for the privilege. (ECF No. 133.)

**F.     Lead Plaintiff's Motion for Class Certification**

40. On October 17, 2022, Lead Plaintiff filed its motion for class certification. (ECF No. 110.) The motion was supported by an expert report by Dr. Michael L. Hartzmark, Lead Plaintiff's market efficiency expert. In his report, Dr. Hartzmark opined that BioMarin's common stock traded in an efficient market during the Class Period and that per-share damages could be measured for all class members using a common methodology. (ECF No. 110-2.)

| DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES | 12 | CASE NO. 3:20-CV-6719-WHO |

41.    In connection with the motion for class certification, Defendants took two Rule 30(b)(6) depositions of representatives of ATP—Legal Director Torben Christensen and Senior Portfolio Manager Stig Harder—and the deposition of Dr. Hartzmark in November 2022.

42.    On January 27, 2023, Defendants filed their opposition to Lead Plaintiff's motion for class certification.  (ECF No. 119.)  In their opposition, Defendants argued that Lead Plaintiff's claims for the first part of the class period (March 3 through June 8, 2020) were based entirely on a statement in the Complaint attributed to a BioMarin former employee that the FDA had told BioMarin in late February or early March 2020 that the pre-approval inspection of BioMarin's manufacturing facility "would likely be delayed beyond the second quarter of 2020," (which BioMarin failed to disclose).  Defendants argued that the former employee in question testified under oath at his deposition that he did not have any basis to make any such statement.  Thus, Defendants argued that the Class Period should be shortened to run only from June 8, 2020 to August 18, 2020.  Defendants also argued that Lead Plaintiff and its counsel were not adequate class representatives and that Lead Plaintiff failed to propose a methodology capable of calculating damages on a class-wide basis consistent with its theory of liability.

43.    While Lead Plaintiff had strong responses to each of these arguments, and believed it would be successful in its motion for class certification, the Parties reached an agreement to settle before Lead Plaintiff filed its response.

**G.    Work with Experts**

44.    Throughout the Action, Lead Plaintiff retained several highly qualified experts and consultants in disciplines including damages, loss causation, market efficiency, and FDA regulation to assist in the prosecution of this Action.  Lead Counsel consulted extensively with these experts and consultants throughout the litigation, including both before and after filing the Complaint in this Action.  Lead Plaintiff's principal experts were: (a) Michael Hartzmark, a financial economist who served as Lead Plaintiff's expert on market efficiency and class-wide damages and provided Lead Plaintiff with expert advice on damages and loss causation issues; and (b) Suzanne M. Sensabaugh,

who provided expert advice on FDA regulation issues.  Lead Counsel also consulted with additional consulting experts on both financial economics and FDA regulation.

45.    Lead Counsel consulted with these experts in preparing the Complaint, in reviewing documents produced in discovery, and in preparation for settlement negotiations.  In addition, after the Settlement was reached, Lead Counsel worked with Dr. Hartzmark's team to develop the Plan of Allocation.

**H.    The Parties' Mediation Efforts and the Settlement of the Action**

46.    The Parties began exploring the possibility of a mediation in the summer of 2022.  The Parties conferred and selected Michelle Yoshida of Phillips ADR Enterprises to serve as the mediator for the Action.  Ms. Yoshida is an experienced mediator of securities class actions and other complex litigation.  *See* Yoshida Decl. (Ex. 1) ¶¶ 3-5.  On November 22, 2022, the Parties exchanged detailed mediation statements addressing issues of liability and damages.  A mediation session with Ms. Yoshida was held on December 5, 2022.  Despite several hours of good-faith negotiation, the Parties were unable to reach a resolution at the December 5 mediation session.

47.    In January 2023, the Parties renewed their settlement discussions and agreed to engage in a second full-day session before Ms. Yoshida on March 8, 2023.  At the conclusion of the mediation on March 8, 2023, Ms. Yoshida issued a final mediator's recommendation to the Parties that the Action be resolved in exchange for payment of $39,000,000 in cash, which the Parties accepted.

48.    Thereafter, the Parties' agreement-in-principle to settle the Action was memorialized in a term sheet executed on March 14, 2023.  Over the next few weeks, the Parties negotiated the full terms of the Settlement and drafted the Stipulation and related papers, including the notices to be provided to the Settlement Class.

49.    On April 24, 2023, the Parties executed the Stipulation (ECF No. 139-1), which sets forth the terms of the Parties' agreement to settle all claims asserted in the Action for $39,000,000, subject to the Court's approval.  That same day, Lead Plaintiff and BioMarin also entered into a Supplemental Agreement, which provides that BioMarin has the right to terminate the Settlement if

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES                14                CASE NO. 3:20-CV-6719-WHO

the persons who request exclusion from the Settlement Class reach a certain threshold. *See* Stipulation ¶ 35.

**I.   The Court Grants Preliminary Approval of the Settlement**

50.   On April 28, 2023, Lead Plaintiff filed a motion for preliminary approval of the Settlement.  (ECF No. 139.)

51.   Following a hearing on June 7, 2023, the Court entered the Order Granting Preliminary Approval on June 8, 2023 (ECF No. 146) (the "Preliminary Approval Order") which, among other things: (a) preliminarily approved the Settlement; (b) approved the form of Notice, Summary Notice, and Claim Form; (c) authorized notice to be provided to Settlement Class Members through mailing of the Notice and Claim Form, posting of the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *The Wall Street Journal* and over the *PR Newswire*; (d) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the fee and expense application; and (e) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Motion.  The Court also scheduled the Settlement Hearing for November 8, 2023 at 2:00 p.m. to determine, among other things, whether the Settlement should be finally approved.

**II.   RISKS OF CONTINUED LITIGATION**

52.   The Settlement provides a certain and substantial benefit to the Settlement Class in the form of a $39,000,000 cash payment.  Lead Plaintiff and Lead Counsel believe that the proposed Settlement—which represents a significant portion of the realistically recoverable damages in the Action—is a very favorable result for the Settlement Class considering the risks of continuing to litigate.  As explained below, Lead Plaintiff would face meaningful risks related to proving liability, establishing loss causation, and securing damages at the several remaining stages of litigation, including at class certification, summary judgment, and trial.  Even if Lead Plaintiff defeated Defendants' motion for summary judgment and prevailed at trial, Lead Plaintiff would have faced

| DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES | 15 | CASE NO. 3:20-CV-6719-WHO |
| --- | --- | --- |

post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that might have prevented Lead Plaintiff from obtaining a recovery for the Settlement Class—or, at the very least, delayed recovery for years.

### A. General Risks in Prosecuting Securities Class Actions

53. In recent years, securities class actions have faced greater risks than in prior years, and it is not uncommon for district courts to dismiss securities class actions at the summary judgment stage. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023). (defendants prevailed at summary judgment in a securities class action against Mylan arising out of misstatements concerning the company's EpiPen product and other generic drugs); *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *1 (D. Or. May 24, 2021) (granting defendants' renewed motion for summary judgment based on recent Ninth Circuit decision on forward-looking statements), *aff'd, AMF Pensionsforsakring AB v. Precision Castparts Corp.*, 2022 WL 2800825 (9th Cir. July 18, 2022); *see also Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878, at *28 (D. Nev. Jan. 3, 2017), *aff'd Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th. Cir. 2018); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd Dalberth v. Xerox*, 766 F.3d 172 (2d Cir. 2014).

54. Even cases that have survived summary judgment can be dismissed prior to trial in connection with *Daubert* motions, such as those likely to be filed by Defendants here. *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 197-98 (D. Mass. 2012), *aff'd* 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of the defendants after finding that the event study offered by plaintiffs' expert was unreliable and that there was accordingly no evidence that the market reacted negatively to disclosures).

55. Even when securities class action plaintiffs successfully overcome multiple substantive and procedural hurdles before trial, there remain significant risks that a jury will not find the defendants liable or award expected damages. *See, e.g., In re Tesla Inc., Sec. Litig.*, 2023 WL

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

16

CASE NO. 3:20-CV-6719-WHO

4032010 (N.D. Cal. June 14, 2023) (defense verdict in securities class action even though the court had already found the statements were false and defendant had acted recklessly in issuing them, and the same conduct had resulted in SEC charges and a settlement).

56. Further, post-trial motions, based on a complete record, also present substantial risks. For example, in *In re BankAtlantic Bancorp, Inc.*, following a jury verdict in the plaintiffs' favor, the district court granted the defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. 2011 WL 1585605, at \*14-22 (S.D. Fla. Apr. 25, 2011), *aff'd* 688 F.3d 713 (11th Cir. 2012) (finding that there was insufficient trial evidence to support a finding of loss causation). Intervening changes in the law may also impact a successful trial verdict. For example, a district court in Oregon reconsidered its order denying defendants' motion for summary judgment and granted the motion more than a year later based on a new decision by the Ninth Circuit. *See Precision Castparts*, 2021 WL 2080016, at \*6.

57. Accordingly, securities class actions face serious risks of dismissal and non-recovery at all stages of litigation.

### B. Specific Risks Concerning this Action

58. Lead Plaintiff and Lead Counsel believe the claims asserted against Defendants in this action are meritorious. They recognize, however, that this Action presented meaningful risks to establishing liability. As discussed further below, Defendants vigorously argue that their challenged statements about the valrox BLA and BioMarin's communications with the FDA were not false or misleading when made, and, in any event, even if any of their statements were false or misleading, Defendants did not have any intent to mislead investors.

59. Therefore, the risks of continuing on with the litigation were significant, and the class's ultimate potential for recovery was always in question.

### 1. Risks Concerning Liability

60. As discussed further below, Defendants vigorously argued that their challenged statements about valrox were not false or misleading when made, and, in any event, Defendants did not have any intent to mislead investors.

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES
17
CASE NO. 3:20-CV-6719-WHO

### a)     Falsity

61.     Lead Plaintiff and Lead Counsel recognized that, while they prevailed at the motion to dismiss stage, they may have been unable to withstand some or all of Defendants' arguments at summary judgment or convince a jury of Defendants' liability.  Among other things, Lead Plaintiff recognizes the challenges in proving that Defendants' statements were materially false and misleading when made.  Defendants would contend that certain of the statements regarding the FDA's review process were made either prior to the FDA's delay of the pre-approval inspection or concurrent with the FDA's indications that the PAI could be rescheduled in time to meet the required deadlines.  Thus, Defendants could present strong arguments that, at minimum, the earliest statements of the Class Period were made before Defendants had a reasonable basis to believe that approval would be denied or delayed.

62.     As discussed above, this Action involves a Class Period of less than six months (March 3, 2020-August 18, 2020).  Ultimately, liability would be determined on a statement-by-statement basis, and Plaintiffs would have to had to establish falsity and scienter as to each statement—in particular the earliest statements during the Class Period—in order to fully capture all potential damages for the full Class Period.

63.     The risks relating to falsity were particularly acute with respect to statements made by Defendants before June 8, 2020.  Plaintiffs alleged that these early statements were false and misleading based upon witness reports that the FDA had informed BioMarin that the inspection for the valrox facility would be delayed beyond the second quarter of 2020, thus jeopardizing approval of the valrox BLA by the August 2020 PDUFA date.

64.     Defendants argued vigorously that, as of the first challenged statement on March 3, the FDA had not definitively told BioMarin that the inspection would be delayed beyond the second quarter.  Defendants would have also argued that, even if the FDA may have indicated some uncertainty as to the preapproval inspection after the March 3 statement, by the time of the next challenged statement on April 29, and at the time of all other challenged statements during this first part of the Class Period, the FDA had reaffirmed its plan to conduct the inspection in June (i.e.,

within the second quarter of 2020).  Defendants would have arguments that it was not until June 8 that the FDA notified BioMarin that it had to postpone the on-site inspection scheduled for June due to ongoing travel restrictions from COVID-19.  Thus, there was a particularly substantial risk that Lead Plaintiff would not be able to establish falsity as to Defendants' earlier alleged misstatements, which would have shortened the Class Period by 50%—and thus cutting Class Period damages commensurately.

65.     Even for post-June statements, Defendants would have also challenged the falsity of statements that BioMarin was working "closely" and "collaboratively" with the FDA, which the Complaint argued was contradicted by Defendants' September 2020 statement that there was "no dialogue whatsoever" between BioMarin and the FDA.  Defendants would have argued that discovery revealed that there were at least some communications between BioMarin and the FDA throughout a large portion of the Class Period—some of which could have reasonably led Defendants to believe that the FDA's review of the valrox BLA was going well and on-schedule—challenging Lead Plaintiff's allegation that there were no communications between BioMarin and the FDA. Defendants would have argued that Defendants' public statements that there was "no dialogue whatsoever" was in reference to communications with FDA senior management, rather than FDA officials who attended meetings regarding the CRL.  While Lead Plaintiff would have argued that those communications were immaterial and not focused on the issues necessary to address pre-approval, these statements remained at risk at the summary judgment and trial stages of the litigation.

66.     Defendants would have also argued that their statements were provably true.  For example, Defendants would have claimed that the view within BioMarin was that the FDA was on track to make a decision regarding valrox, and that discovery reinforced this defense.  Defendants would have also argued that any FDA concerns regarding clinical data did not render BioMarin's statements false because Defendants had no reason to believe that discrepancies in the clinical studies posed an obstacle to approval.

67.     As another example, Defendants would have argued that they never believed that postponement of the pre-approval inspection signaled a risk that the FDA would issue the CRL.

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES
19
CASE NO. 3:20-CV-6719-WHO

While Lead Plaintiff believes it would have had strong arguments that the cancellation damaged the prospect of valrox's approval, there was a risk that Lead Plaintiff would not be able to establish falsity as to statements regarding valrox's anticipated approval.

68. Finally, Defendants would argue that their statements at the end of the Class Period—in August 2020—were not false. In particular, Defendants would have argued that discovery showed that the statement that "our commercial team is preparing to launch" was true, and that a separate statement, claiming that valrox competitors were "so far behind," was supported by internal documentation and research. In other words, Defendants would argue that they did not have a duty to disclose additional information, especially given their belief that they could address issues raised by the FDA and still obtain approval, putting the falsity of the August 2020 statements at risk.

#### b) Scienter

69. Even if Lead Plaintiff proved that Defendants' statements were false or misleading, Lead Plaintiff would still need to demonstrate to a jury that Defendants made the misstatements with scienter—*i.e.*, an intent to defraud or with deliberate recklessness. Defendants vigorously argued that they believed their statements to be true and that they had no intent to commit fraud.

70. Lead Counsel anticipates that Defendants would argue, among other things, that the stock sales made by Defendants Bienaimé and Fuchs were non-discretionary and pre-planned, and that in any event, the allegedly suspicious insider sales had no bearing on decision-making or knowledge within BioMarin. Defendants would also have argued that the timing of the trades and their amounts, as compared to Bienaimé and Fuchs' previous trading patterns, were not suspicious.

71. Defendants would have also relied on the unprecedented disruption of the COVID-19 pandemic as a reason why Defendants would not have believed that the FDA's unusual silence concerning the pendency of the valrox BLA or the FDA's inability to timely schedule a physical PAI necessarily meant that the valrox BLA was less likely to be approved. Indeed, Defendants would have argued that discovery concerning the postponement of the PAI suggested that travel complications caused by the pandemic played a substantial role in the FDA's decision not to conduct a physical inspection.

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES | 20 | CASE NO. 3:20-CV-6719-WHO

72.    Moreover, in June 2023, the FDA ultimately approved BioMarin's gene therapy to treat hemophilia A, now known as Roctavian.  While this occurred substantially after the end of the Class Period, the ultimate approval of the therapy would allow Defendants to argue that there were no fundamental problems with valrox underlying the FDA's denial of the BLA, but only delays related to COVID travel restrictions and other issues, and thus BioMarin and its executives had no motive to mislead investors about the valrox approval process.

### 2.    Risks Related to Loss Causation and Damages

73.    Even assuming that Lead Plaintiff and Lead Counsel overcame Defendants' arguments and established liability at trial, Lead Plaintiff would have still confronted additional challenges in establishing loss causation and damages.

74.    Lead Plaintiff and Lead Counsel anticipate that Defendants would argue at summary judgment, trial, and subsequent stages of the proceedings, that the declines in the price of BioMarin common stock were not caused entirely—or at all—by the alleged corrective disclosures.  Rather, Defendants were expected to argue that investors' losses were attributable to other factors, such as the FDA's unanticipated two-year delay to valrox's approval, which Defendants would have also argued was not reasonably foreseeable.  Defendants would have argued that even with full disclosure of the allegedly withheld facts, no market participant would have anticipated that the FDA would require two years of additional data.

75.    Defendants would have also argued that, even if some portion of the price decline were caused by the revelation of the truth about the alleged misstatements, it was small compared to the decline resulting from other factors, including the unanticipated two-year delay, and any purported damages to Lead Plaintiff and the Settlement Class were minimal.  Lead Plaintiff would have faced challenges in proving what portion of the BioMarin's price decline on August 19, 2020 resulted from the revelation of the alleged misstatements, rather than confounding non-fraud or "mismatching" information.  Defendants also would have argued that, because BioMarin did not know about the FDA denial until after the last challenged statement, the stock drop at the end of the Class Period cannot be used to infer how much BioMarin's stock would have dropped on any given

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

21

CASE NO. 3:20-CV-6719-WHO

day during the Class Period, because the "truth"—the FDA denial—did not exist prior to the last challenged statement. Defendants would have argued that Lead Plaintiff's expert would have had to demonstrate how much BioMarin's stock price would have dropped had the risk of adverse FDA action been fully disclosed during the Class Period, and would have challenged the methodology used to calculate how much of BioMarin's stock price was artificially inflated during the Class Period due to the alleged fraud. Thus, if the Court agreed with Defendants, any damages would be a fraction of the $41.82 stock drop.

76. Accordingly, the falsity, scienter, and loss causation challenges would have provided Defendants with strong arguments for reducing the ultimate maximum damages Lead Plaintiff could seek. Defendants' most credible arguments would have been to exclude a significant portion of the putative Class Period from the case, on the basis that discovery demonstrated that statements made before June 8, 2020 were not false. Had Defendants succeeded in narrowing the Class Period—just one of their challenges to liability—damages would have been reduced to at least $395 million (assuming Lead Plaintiff fully prevailed on all other arguments). Defendants' loss causation or "mismatch" arguments described above—that a significant portion of the decline in BioMarin stock was not "foreseeable"—also created the significant and credible risk that maximum damages would be reduced still further.

**B.    Risks Related to Class Certification**

77. Lead Plaintiff and Lead Counsel believe that the Court would have certified the class in this action. However, at the time that the Parties reached their agreement in principle to settle, Defendants' opposition to Lead Plaintiff's motion for class certification had been filed, and Lead Plaintiff was preparing to submit a reply brief. Thus, upon the completion of briefing class certification, there was some risk that the Court might adopt Defendants' view and decline to certify the class, which would have precluded any recovery for the class, or could have certified a class for only for a shorter period.

78. In particular, Defendants argued at the class certification stage that they could rebut the fraud-on-the-market presumption of reliance. They argued that BioMarin's stock price was not

the motivating driving force behind Lead Plaintiff's decision to purchase BioMarin stock, and that Lead Plaintiff's trading model did not consider what was known about BioMarin. Thus, Defendants argued, Lead Plaintiff would be subject to unique defenses that were atypical of the putative class. Defendants would have relied on *GAMCO Invs. Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88 (S.D.N.Y. 2013) as the legal support for this argument. While Lead Plaintiff believes that discovery contradicted Defendants' arguments, and that *Vivendi* was inapposite because the trading model in that case relied on idiosyncratic measures of inherent value that were entirely untethered to the stock price, Defendants' arguments nevertheless posed a risk to establishing typicality and adequacy, and therefore to certifying the class.

79. Even if the Court had certified the class, Lead Plaintiff also faced the risk of a shortened class period. Defendants' opposition to class certification argued that Lead Plaintiff's claims for the first part of the class period (March 3 through June 8, 2020) were based entirely on a statement in the Complaint attributed to a BioMarin former employee. Defendants argued that the former employee in question denied having made such statements to Lead Plaintiff's investigators during his deposition and, in fact, had no basis to make any such statements. Had Defendants persuaded the Court not to rely on the allegations attributed to the former employee, the Class Period could have been shortened to begin on June 8, 2020, rather than March 3, 2020.

80. Additional risks to class certification included Defendants' argument that Lead Plaintiff and its counsel were not adequate class representatives and that Lead Plaintiff failed to propose a methodology capable of calculating damages on a class-wide basis consistent with its theory of liability. Defendants' challenge to Lead Plaintiff's methodology argued that there was a "mismatch" between the alleged misrepresentations and the corrective disclosures. This challenge relied on the recent Supreme Court decision in *Goldman Sachs Grp. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021). Following remand, in August 2023, the Second Circuit instructed the District Court to decertify the class on the basis of the "mismatch" between the alleged misrepresentations and corrective disclosures. Here, as noted, Defendants argued that there was a "mismatch" between omissions about the status of FDA communications and the corrective disclosure announcing that

the FDA denied approval of valrox—that because the alleged false and misleading statements and omissions were not specifically related to the likelihood of approval, the disclosure that valrox was, in fact, not approved did not correct the alleged false and misleading statements.  Lead Plaintiff would have argued that *Goldman* is distinguishable, and that there is no "mismatch" concern here, as the statements and omissions concealing the state of valrox's approval were corrected at the end of the Class Period by a corrective disclosure that revealed the true state of the approval process. Nevertheless, the *Goldman* argument posed a tangible risk to class certification.

### C.  The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial

81.     The Settlement Amount—$39 million in cash, plus interest—represents a significant recovery for the Settlement Class.  The Settlement is more than five times the size of the median securities class-action settlement in the Ninth Circuit from 2013 to 2022 ($7.6 million).  *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2022 REVIEW AND ANALYSIS (2023), attached hereto as Exhibit 3, at 19.

82.     The $39 million Settlement is also a favorable result when it is considered in relation to the maximum amount of damages that realistically could be established at trial—even assuming that Lead Plaintiff and the Settlement Class prevailed on all liability issues, including falsity and scienter.  Lead Plaintiff's damages expert has calculated that the theoretical maximum damages for the Settlement Class would be approximately $650 million.  This amount assume that investors would prevail over all liability and loss causation challenges noted above for the entire Class Period (including challenges in determining what portion of BioMarin's stock price decline was attributable to the revelations of the lack of cooperation from the FDA, as opposed to other "mismatching" factors).  This amount further assumes that a uniform high level of artificial inflation applied throughout the Class Period, and assumes that the entire stock price decline on August 19, 2020 was attributable to the alleged fraud and was foreseeable.

83.     However, as discussed above, Lead Plaintiff faced real challenges to establishing the material falsity of Defendants' statements concerning the status of BioMarin's application for FDA

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

CASE NO. 3:20-CV-6719-WHO

approval of valrox in the first half of the Class Period or, at the very least, would have been likely to show that level of artificial inflation was substantially lower during that initial period, and increased during the latter half of the Class Period. If Lead Plaintiff was unable to establish liability for that initial period and the Class Period began in June 2020 rather than March 2020, the maximum damages would be approximately $395 million.[2] Moreover, all of these maximum damages estimates would have been still further reduced if Lead Plaintiff could not prove that all of BioMarin's price decline on August 19, 2020 was attributable to the alleged misstatements concerning BioMarin's communications with the FDA, as opposed to other factors.

84. In short, the maximum total damages that Lead Plaintiff could establish at trial would range from approximately $395 million to a theoretical high of $650 million. The $39,000,000 recovery under the Settlement therefore represents 6% to 10% of the maximum potential damages, which is a highly favorable result for the Settlement Class in this Action.

85. Given the meaningful litigation risks, and the immediacy and amount of the $39,000,000 recovery for the Settlement Class, Lead Plaintiff and Lead Counsel believe that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.

## III. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

86. The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to potential members of the Settlement Class. The Preliminary Approval Order also set October 18, 2023 as the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application or to request exclusion from the Settlement Class.

---

[2] Defendants, of course, dispute that Lead Plaintiff or investors were damaged at all, contest Lead Plaintiff's class-wide damage estimates, and believe Lead Plaintiff and investors are not entitled to any recovery through this Action.

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

25

CASE NO. 3:20-CV-6719-WHO

87. In accordance with the Preliminary Approval Order, Lead Counsel instructed A.B. Data, Ltd. ("A.B. Data"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice. The Notice contained, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class. The Notice also informed Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 19% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $650,000.

88. In order to disseminate the Notice and Claim Form (together, the "Notice Packet"), A.B. Data obtained information from BioMarin and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members. The accompanying Declaration of Adam D. Walter, attached hereto as Exhibit 4, provides additional information about the Claims Administrator's distribution of the Notice Packet. *See* Walter Decl. ¶¶ 2-9.

89. A.B. Data began mailing copies of the Notice Packet to potential Settlement Class Members and nominee owners on June 30, 2023. *Id*. ¶¶ 2-5. As of October 2, 2023, A.B. Data had mailed a total of 103,153 Notice Packets to potential Settlement Class Members and nominees. *Id*. ¶ 9.

90. On July 12, 2023, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire*. *Id*. ¶ 11.

91. Lead Counsel also caused A.B. Data to establish a dedicated settlement website, www.BioMarinSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and other relevant documents. *See* Walter Decl. ¶ 14. That website became operational on June 30, 2023. *Id*. Lead Counsel also made copies of the Notice and Claim Form and other documents available on its own website, www.blbglaw.com.

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES | 26 | CASE NO. 3:20-CV-6719-WHO

Lead Counsel and A.B. Data will continue to monitor and to update the settlement website as needed as the settlement process continues. For example, Lead Plaintiff's papers in support of its motion for final approval of the Settlement and Lead Counsel's papers in support of its motion for attorneys' fees and litigation expenses will be made available on the website after they are filed, and any orders entered by the Court in connection with the motions will also be posted.

92. As noted above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, or Fee and Expense Application, or to request exclusion from the Settlement Class is October 18, 2023. To date, one request for exclusion has been received, *see* Walter Decl. ¶ 15, and no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received. Lead Counsel will file reply papers on or before November 1, 2023, that will address all requests for exclusion and any objections that may be received.

**IV.     ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT**

93. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to be eligible to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than October 30, 2023. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to a plan of allocation approved by the Court.

94. Lead Counsel consulted with Lead Plaintiff's damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation" or "Plan"). Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered economic losses as result of the conduct alleged in the Action.

95. The Plan of Allocation is set forth at pages 11 to 14 of the Notice. *See* Walter Decl., Ex. A at pp. 11-14. As described in the Notice, the calculations under the Plan of Allocation are

| DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES | 27 | CASE NO. 3:20-CV-6719-WHO |

intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable *pro rata* allocation of the Net Settlement Fund.  Notice ¶ 74.

96.      In this case, Lead Plaintiff alleges that Defendants made false statements and omitted material facts during the Class Period (from March 3, 2020 through August 18, 2020), which had the effect of artificially inflating the price of BioMarin common stock, and that corrective information allegedly revealing the truth concerning Defendants' alleged misrepresentations and omissions was released to the market on August 19, 2020, which had the effect of removing the artificial inflation from the price of BioMarin common stock that day. Notice ¶ 75.  The estimated artificial inflation in BioMarin common stock at the end of the Class Period has been calculated by considering the price change to BioMarin common stock on August 19, 2020 and adjusting for price changes attributable to market or industry factors that day.  Based on these calculations, there was a total of $41.68 in estimated artificial inflation per share in the BioMarin common stock price that was removed on August 19, 2020.  *Id.*  In addition, Lead Plaintiff alleges that the gap between the Defendants' statements about the FDA approval process for valrox and the underlying truth widened substantially during the course of the Class Period.  Accordingly, for the purposes of the Plan of Allocation, the amount of artificial inflation in BioMarin common stock increases threefold after June 8, 2020.  Therefore, the estimated artificial inflation under the Plan from March 3, 2020 through June 8, 2020 is $13.89 per share and from June 9, 2020 through August 18, 2020 is $41.68 per share.  *Id.*

97.      Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase or acquisition of BioMarin common stock during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided.  In general, Recognized Loss Amounts are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares.  *See* Notice ¶ 76.  Claimants who purchased and sold all their BioMarin shares during the Class Period (that is, they did not hold any shares purchased during the Class Period until August 19, 2020, when artificial inflation was

allegedly removed from the stock price), will have no Recognized Loss Amount under the Plan of Allocation because any loss suffered on those sales would not be the result of the alleged misstatements in the Action. *See id*. ¶¶ 76, 78.A.

98. As stated in the Notice, and in accordance with the PSLRA, Recognized Loss Amounts for shares of BioMarin common stock sold during the 90-day period after the end of the Class Period are further limited to the difference between the purchase price and the average closing price of the stock from the end of the Class Period to the date of sale. Notice ¶ 78.B(ii). Recognized Loss Amounts for shares of BioMarin common stock still held as of the close of trading on November 16, 2020, the end of the 90-day period, will be the lesser of (a) the amount of artificial inflation on the date of purchase or (b) the difference between the purchase price and $76.42, the average closing price for the stock during that 90-day period. *Id*. ¶ 78.C.

99. The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of BioMarin common stock during the Class Period is the Claimant's "Recognized Claim." Notice ¶ 79. The Plan of Allocation also limits Claimants' Recognized Claim based on whether they had an overall market loss in their transactions in BioMarin common stock during the Class Period. A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in BioMarin common stock transactions during the Class Period, and Claimants who have an overall market gain are not eligible for a recovery. *Id*. ¶¶ 86-87.

100. The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Notice ¶¶ 88-89. If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant. *Id*. ¶ 90. Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum.

101. One hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. Notice ¶ 91. Only when the residual amount left for re-distribution to Settlement

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

29                CASE NO. 3:20-CV-6719-WHO

Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), will those funds be donated to the Investor Protection Trust, a 501(c)(3) nonprofit organization devoted to investor education. *Id*.

102.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of BioMarin common stock that were attributable to the misconduct alleged in the Action in the same way that Lead Plaintiff would propose if it were successful at trial.  To date, no objections to the proposed Plan of Allocation have been received.

## V.    THE FEE AND EXPENSE APPLICATION

103.    Lead Counsel is applying to the Court for an award of attorneys' fees of 19% of the Settlement Fund.  Lead Counsel also requests payment for litigation expenses that it incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $397,052.78 (the "Expense Application").  In accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4), Lead Counsel further requests reimbursement to Lead Plaintiff ATP the amount of $127,400 for the value of the time that Lead Plaintiff's employees dedicated to the Action.  The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee and Expense Motion. The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

104.    For its efforts on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  The percentage method is the standard and appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interests of Lead Plaintiff and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances.  Use of the percentage method has been recognized as appropriate by the Supreme Court and Ninth Circuit for cases of this nature where an all-cash common fund has been recovered for the class.

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

30

CASE NO. 3:20-CV-6719-WHO

105.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved. As discussed in the Fee and Expense Motion, a 19% fee award is substantially below the 25% benchmark for percentage fee awards in the Ninth Circuit, is below the range of percentage fees typically awarded in securities class actions in this Circuit in comparable cases, and is fair and reasonable in light of all the circumstances in this case.

### 1.    Lead Plaintiff Has Authorized and Supports the Fee Application

106.    Lead Plaintiff ATP is a sophisticated institutional investor that closely supervised and monitored the prosecution and settlement of this Action. *See* Christensen Declaration ¶¶ 2-6. Lead Plaintiff has evaluated the Fee Application and fully supports the fee requested. *See id*. ¶¶ 8-9.

107.    The 19% fee requested is consistent with the *ex ante* retainer agreement entered into between Lead Counsel BLB&G and Lead Plaintiff ATP at the outset of the litigation, which provided for different levels of percentage fees based on the state of litigation at which settlement was reached. *See* Christensen Decl. ¶ 8. Following the agreement to settle the Action, Lead Plaintiff has again evaluated the proposed fee and believes it is fair and reasonable in light of the result obtained for the Settlement Class, the quality of the work performed by Lead Counsel, and the risks undertaken by counsel in this Action. *Id*. ¶ 9.

### 2.    The Work Performed by Lead Counsel

108.    Lead Counsel devoted substantial time to the prosecution of the Action. The work that Lead Counsel performed in this Action included, among other things: (i) conducting an extensive investigation into the claims asserted, which included a detailed review of public documents, interviews with over 100 former BioMarin employees, and consultation with experts; (ii) drafting the detailed consolidated Complaint; (iii) researching, briefing, and arguing Lead Plaintiff's opposition to Defendants' motion to dismiss the Complaint; (iv) researching and briefing Lead Plaintiff's motion for class certification; (v) undertaking substantial fact discovery, including obtaining and reviewing approximately 250,000 pages of documents, briefing 11 distinct discovery

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

31

CASE NO. 3:20-CV-6719-WHO

disputes, litigating discovery disputes, and taking or defending four depositions; (vi) consulting extensively with experts and consultants; and (vii) engaging in extensive arm's-length settlement negotiations to achieve the Settlement, including two formal mediation sessions.

109.    Attached hereto as Exhibit 5 is a schedule summarizing the amount of time spent by the attorneys and professional support staff employees of Lead Counsel BLB&G on the Action from its inception through September 15, 2023, and a lodestar calculation for those individuals.  As set forth in Exhibit 5, the number of hours expended by BLB&G on the Action from its inception through September 15, 2025 is 12,564.75, with a total lodestar, based on these individuals' current hourly rates, of $6,702,525.  The requested fee of 19% of the Settlement Fund (or $7,410,000, plus interest) therefore represents a modest multiplier of approximately 1.1 of Lead Counsel's lodestar. Such a request is well below the fee multipliers typically awarded in comparable securities class actions and in other class actions such as this involving significant contingency fee risks.

110.    The information in this declaration and its exhibits regarding the time spent on the Action by Lead Counsel's attorneys and other professional staff is based on contemporaneous daily time records regularly prepared and maintained by BLB&G, which are available at the request of the Court.  BLB&G attorneys reviewed these time records in connection with the preparation of this Declaration to confirm the accuracy of the time entries and the necessity for, and reasonableness of, the time committed to the litigation.  All time expended in preparing this application for fees and expenses was excluded.  In addition, all time incurred by any timekeeper who spent fewer than ten hours working on the Action has been excluded.  Certain other time entries were also removed in the exercise of Lead Counsel's billing judgment.

111.    I believe that the time reflected in the firm's lodestar calculation is reasonable in amount and was necessary for the effective and efficient prosecution and resolution of the litigation.

112.    The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 5 and the other exhibits to this declaration are the usual and customary rates set by the firm for each individual.  These hourly rates are the same as, or comparable to, the rates accepted by courts, including courts in this Circuit, in other contingent-fee securities-class-action litigation or

shareholder litigation. The firm's rates are set based on an annual analysis of rates that are charged by firms performing comparable work and that have been approved by courts. Different timekeepers within the same employment category (*e.g.*, partners, associates, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, years at the firm, year in the current position (*e.g.*, years as a partner), relevant experience, relative expertise, and the rates of similarly experienced peers at our firm or other firms. For personnel who are no longer employed by my firm, the current rate used for the lodestar calculation is based upon the rate for that person in his or her final year of employment with the firm.

113.    Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that ensured the efficient prosecution of this litigation. To that end, in addition to partners and associates, Lead Counsel also relied upon its staff attorneys in prosecuting this Action, whose work included (among other things) a review and analysis of the documents produced by Defendants, preparation of substantive memoranda on issues in the case, and assisting in preparation for depositions. The work these attorneys conducted was substantive and crucial to Lead Plaintiff's successful prosecution of the case. The attorneys who participated in discovery in this Action had significant credentials and experience, as set forth in their biographies included in BLB&G's firm resume. *See* Exhibit 8 at 33-35. The staff attorneys are full-time W-2 employees of the firm, not independent contractors or employees of a staffing firm; they were each supervised by the firm's partners and associates and had access to secretarial and paralegal support; and had firm email addresses, access to the firm's 401(k) program, and eligibility to receive year-end bonuses.

114.    Attached hereto as Exhibit 6 are summary descriptions of the principal tasks in which each attorney from my firm were involved in this Action.

115.    Attached hereto as Exhibit 7 is a chart that reflects the hours spent by each timekeeper on each of the following task categories during the course of the Action:

(1)    **Investigation and Pre-Filing Case Analysis:** includes time spent on Lead Counsel's thorough investigation into the claims asserted in the Action, including reviewing the voluminous public record and identifying, contacting, and interviewing potential witnesses; initial case development; and analysis of clients' and class losses;

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES
33
CASE NO. 3:20-CV-6719-WHO

(2) **Lead Plaintiff Motion:** includes time spent researching and drafting motion papers for appointment of ATP as Lead Plaintiff and BLB&G as Lead Counsel;

(3) **Complaint:** includes time incurred by Lead Counsel in researching and preparing the Complaint, including associated legal and factual research;

(4) **Motion to Dismiss:** includes time incurred by Lead Counsel in researching and drafting Lead Plaintiff's opposition to Defendants' motion to dismiss the Complaint and the related motion for reconsideration; and preparing for and participating in oral argument on the motion to dismiss;

(5) **Class Certification:** includes the time Lead Counsel spent on the motion for class certification, including related legal research and briefing;

(6) **Discovery Communications & Disputes:** includes time spent by Lead Counsel on discovery correspondence, numerous meet and confers with Defendants' Counsel, preparing Lead Plaintiff's Initial Disclosure Statement under Rule 26(a), drafting and negotiating the proposed protective order and protocol for electronically stored information ("ESI"), discovery disputes, and strategy and planning related to discovery efforts;

(7) **Written/Document Discovery:** includes the time incurred by Lead Counsel in drafting requests for production of documents, interrogatories, requests for admission, and subpoenas; preparing responses and objections to requests for production of documents, interrogatories, and requests for admission served on Lead Plaintiff; reviewing client documents for production; and reviewing and analyzing documents produced by Defendants and third parties;

(8) **Depositions:** includes the time incurred by Lead Counsel in preparing a deposition plan; and preparing to take fact depositions, including document review specifically for purposes of deposition preparation; and taking and defending the deposition of Lead Plaintiff's representatives and the former BioMarin employee that was deposed;

(9) **Expert Work:** includes the time Lead Counsel spent communicating with experts and consultants; working on preparing expert reports; and engaging in expert discovery, including preparing to defend and defending the deposition of Lead Plaintiff's expert on market efficiency and damages;

(10) **Mediation & Settlement:** includes time incurred by Lead Counsel in extended settlement negotiations with Defendants; preparing for and attending the mediation session; drafting the mediation statement; drafting and negotiating the Term Sheet and Stipulation of Settlement and related documents; selecting a Claims Administrator; and drafting the motions for preliminary and final approval of the Settlement (but does not include work related to Lead Counsel's motion for fees and expenses);

(11) **Case Management:** includes time incurred by Lead Counsel in preparing status reports to the Court, participating in case management conferences and status

hearings, and negotiating and preparing stipulations and proposed scheduling orders and other related tasks;

(12)    **Case Strategy & Analysis:** includes time incurred by Lead Counsel devoted to overall case strategy and analysis, including litigation strategy and damages issues;

(13)    **Docket/News Monitoring**: includes time incurred in reviewing docket updates on case or related cases and monitoring of news on company or industry; and

(14)    **Client Communications:** includes time incurred in communications with Lead Plaintiff ATP, including preparing status reports and memoranda at various stages of the case.

### 3.    The Experience and Standing of Lead Counsel

116.    A copy of Lead Counsel BLB&G's firm resume, which includes information about the standing of the firm and brief biographical summaries for each attorney listed in Exhibit 5, including information about their position, education, and relevant experience, is attached as Exhibit 8 hereto.  As demonstrated by the firm resume, BLB&G is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases.  BLB&G is consistently ranked among the top plaintiffs' firms in the country.  As reflected in ISS/Securities Class Action Services' latest report on the "Top 100 U.S. Class Action Settlements of All Time," BLB&G has been lead or co-lead counsel in more top recoveries than any other firm in U.S. history.  BLB&G has taken complex cases such as this Action to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions. As reflected in its firm resume, BLB&G has obtained numerous significant settlements.  BLB&G served as Lead Counsel in *In re WorldCom, Inc. Securities Litigation*, No. 02-cv-3288 (S.D.N.Y.), in which recoveries obtained for the class totaled in excess of $6 billion.  BLB&G also secured a resolution of $2.43 billion for the class in *In re Bank of America Corp. Securities, Derivative & "ERISA" Litigation*, No. 09-md-2058 (S.D.N.Y.); a $1.06 billion recovery for the class in *In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*, No. 05-cv-1151 (D.N.J.); a $1 billion dollar recovery for the class this year in *In re Wells Fargo & Co. Securities Litigation*, No. 1:20-cv-04494-JLR-SN (S.D.N.Y.), and a $730 million settlement on behalf of the class in *In re Citigroup Inc. Bond Action Litigation*, No. 08-cv-9522 (S.D.N.Y.).

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES          35          CASE NO. 3:20-CV-6719-WHO

**4.    Standing and Caliber of Defendants' Counsel**

117.    Defendants were represented in the Action by a team of extremely able counsel from Cooley LLP, who vigorously litigated the Action.  In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants and their counsel to settle the case on terms that will benefit the Settlement Class.

**5.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases**

118.    The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above.  The risks assumed by Lead Counsel here, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

119.    From the outset, Lead Counsel understood that it was embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that the prosecution of the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands.  Because complex shareholder litigation often proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel has received no compensation during the course of this Action and no reimbursement of out-of-pocket expenses, yet they have incurred over $390,000 in expenses in prosecuting this Action for the benefit of BioMarin investors.

120.    Lead Counsel also bore the risk that no recovery would be achieved in the Action. As discussed above, this case presented a number of significant trial risks and uncertainties from the

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

36

CASE NO. 3:20-CV-6719-WHO

outset, including challenges in proving the materiality and falsity of Defendants' statements, establishing scienter, and establishing loss causation and damages. These risks were elevated in this case, given that BioMarin never restated any of its financial statements or admitted to any wrongdoing whatsoever and there was no parallel SEC enforcement action or any criminal prosecution concerning the claims asserted. In addition, as discussed above, valrox was ultimately approved by the FDA.

121. The Settlement was reached only after Lead Plaintiff had got past the motion to dismiss and engaged in substantial discovery. Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class.

### 6. The Reaction of the Settlement Class to the Fee Application

122. As noted above, as of October 2, 2023, over 103,000 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 19% of the Settlement Fund. *See* Walter Decl. ¶ 9 and Ex. A (Notice ¶¶ 5, 55). In addition, the Court-approved Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire* on July 12, 2023. *See* Walter Decl. ¶ 11. To date, no objections to the request for attorneys' fees have been received.

### C. The Expense Application

123. Lead Counsel also respectfully seeks $397,052.78 in litigation expenses from the Settlement Fund that it reasonably incurred in connection with the prosecution of the Action.

124. From the outset of the Action, Lead Counsel has been cognizant of the fact that it might not recover any of the expenses it incurred, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Lead Counsel also understood that, even assuming that the case were ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. Consequently, Lead Counsel was motivated to, and did,

take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

125.   As set forth in Exhibit 9 hereto, Lead Counsel has paid or incurred a total of $397,052.78 in unreimbursed litigation expenses in connection with the prosecution of the Action. The expenses are summarized in Exhibit 9, which identifies each category of expense (*e.g.*, experts and consultants, online legal and factual research, court fees, telephone charges, and printing and copying) and the amount incurred for each category.  These expenses are reflected in the books and records maintained by Lead Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  These expenses are submitted separately by Lead Counsel and are not duplicated by the firm's hourly rates.

126.   The following is additional information regarding certain of these expenses:

127.   **Experts.**  Approximately 72% of the total expenses, or $284,177.50, was expended for the retention of Lead Plaintiff's experts or consultants.  These included (a) Dr. Michael Hartzmark, a financial economist who served as Lead Plaintiff's expert on market efficiency and class-wide damages methodologies, and who also provided expert advice on loss causation and damages issues; (b) Chad Coffman, of Global Economics Group, Lead Plaintiff's consulting expert on damages and loss causation; (c) Suzanne M. Sensabaugh of HartmannWillner, LLC, who provided expert advice on FDA regulatory issues; and (d) Joshua Sharlin, who also provided advice on FDA regulation issues.  As discussed above, Lead Counsel consulted extensively with these experts throughout the Action.

128.   **Online Legal and Factual Research.**  The combined costs of on-line legal and factual research were $58,054.22, or approximately 14.6% of the total expenses.  The charges reflected are for out-of-pocket payments to vendors such as Westlaw, Lexis/Nexis, Thomson Reuters, Court Alert, and PACER for online legal and factual research done in connection with this litigation.  These resources were used to obtain access to court filings, to conduct legal research and cite-checking of briefs, and to obtain factual information regarding the claims asserted through access to various financial databases and other factual databases.  These expenses represent the

actual expenses incurred by BLB&G for use of these services in connection with this litigation. There are no administrative charges included in these figures. Online research is billed to each case based on actual usage at a charge set by the vendor. When BLB&G utilizes online services provided by a vendor with a flat-rate contract, access to the service is by a billing code entered for the specific case being litigated. At the end of each billing period, BLB&G's costs for such services are allocated to specific cases based on the percentage of use in connection with that specific case in the billing period.

129.    **Document Hosting & Management.**    BLB&G seeks $9,550.08 for document management and litigation supports costs, which represent approximately 2.4% of the overall expenses. This represents the costs associated with establishing and maintaining the internal document database that BLB&G employed to process and review the documents produced to Lead Plaintiff by Defendants and third parties in the Action. BLB&G charges a rate of $4 per gigabyte of data per month and $17 per user to recover the costs associated with maintaining its document database management system, which includes the costs to BLB&G of necessary software licenses and hardware. BLB&G has conducted a review of market rates charged for the similar services performed by third-party document management vendors and found that its rate was at least 80% below the market rates charged by these vendors, resulting in a savings to the class.

130.    **Mediation Costs.**    Lead Plaintiff's share of the mediation fees paid to Phillips ADR Enterprises for the services of Ms. Yoshida amounted to $13,700 or 3.5% of the total expenses.

131.    The other expenses for which Lead Counsel seeks payment are also the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court costs, service of process costs, printing and copying costs, long distance telephone charges, postage and delivery expenses, and travel costs. Airfare for Lead Counsel's travel is at coach rates, hotel charges per night are capped at $350; and travel and other out-of-office meals are capped at $20 per person for breakfast, $25 per person for lunch, and $50 per person for dinner. In-office working meals are capped at $25 per person for lunch and $40 per person for dinner.

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

39

CASE NO. 3:20-CV-6719-WHO

132.  In addition, Lead Plaintiff seeks reimbursement for the reasonable costs and expenses that it incurred directly in connection with its representation of the Settlement Class.  Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee and Expense Motion at 20-21.  In accordance with the PSLRA, Lead Plaintiff ATP seeks reimbursement of $127,400 for the time expended in connection with the Action by its employees, including its Legal Director, Head of Legal, Senior Portfolio Manager and other employees, who devoted a substantial amount of time communicating with Lead Counsel, reviewing pleadings and motion papers, and gathering and reviewing documents in response to discovery requests, and sitting for depositions.  *See* Christensen Decl. ¶¶ 5, 12-15.

133.  The total amount requested by Lead Plaintiff and Lead Counsel for expenses, $524,452.78, is below the $650,000 that Settlement Class Members were advised could be sought in the Notice.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

134.  Attached hereto as Exhibit 10 is a compendium of true and correct copies of the following documents cited in the Fee and Expense Motion:

Ex. 10A  *In re Sandisk LLC Sec. Litig.*, Case No. 3:15-cv-01455-VC, slip op. (N.D. Cal. Oct. 23, 2019), ECF No. 284

Ex. 10B  *In re Intuitive Surgical Sec. Litig.*, Case No. 5:13-cv-01920 EJD (HRL), slip op. (N.D. Cal. Dec. 20, 2018), ECF No. 317

Ex. 10C  *In re Snap Inc. Sec. Litig.*, Case No. 2:17-cv-03679-SVW-AGR, slip op. (C.D. Cal. Mar. 9, 2021), ECF No. 400

Ex. 10D  *In re Allergan, Inc. Proxy Violation Sec. Litig.*, No. 8:14-cv-02004-DOC-KES, slip op. (C.D. Cal. Aug. 14, 2018), ECF No. 637

Ex. 10E  *In re Brocade Sec. Litig.*, No. 3:05-CV-02042-CRB, slip op. (N.D. Cal. Jan. 26, 2009), ECF No. 496-1

Ex. 10F  NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review* (2023)

Ex. 10G  Sixth Interim Application of Cooley LLP, *In re Mallinckrodt PLC*, Case No. 20-125222 (JTD) (Bankr. D. Decl. May 17, 2022), ECF No. 7392

DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF (I) FINAL APPROVAL OF SETTLEMENT AND (II) ATTORNEYS: FEES & EXPENSES

40

CASE NO. 3:20-CV-6719-WHO

Ex. 10H    *In re HP Sec. Litig.*, No. 3:12-cv-05980-CRB, slip op. (N.D. Cal. Nov. 16, 2015), ECF No. 279

Ex. 10I    *In re Kraft Heinz Sec. Litig.*, Case No. 1:19-cv-01339, slip op. (N.D. Ill. Sept. 19, 2023), ECF No. 493

Ex. 10J    *In re Equifax Inc. Sec. Litig.*, No. 1:17-cv-03463-TWT, slip op. (N.D. Ga. June 26, 2020), ECF No. 17

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of October, 2023.

*/s/ Katherine M. Sinderson*
KATHERINE M. SINDERSON

DECLARATION OF KATHERINE M.
SINDERSON IN SUPPORT OF (I) FINAL
APPROVAL OF SETTLEMENT AND
(II) ATTORNEYS: FEES & EXPENSES

41

CASE NO. 3:20-CV-6719-WHO